THE HONORABLE BENJAMIN H. SETTLE

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

TODD BRINKMEYER

　　　　　　Petitioner,

　　v.

WASHINGTON STATE LIQUOR AND
CANNABIS BOARD,

　　　　　　Respondent.

Case No. 3:20-cv-05661-BHS

**PETITIONER'S MOTION FOR
SUMMARY JUDGMENT**

**NOTE ON MOTION CALENDAR:
MARCH 11, 2022**

**ORAL ARGUMENT REQUESTED**

PETITIONER'S MOTION FOR SUMMARY JUDGMENT
USDC No. 3:20-cv-05661-BHS

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Ste 300
Seattle, WA 98121-1128
206.624.8300 | Fax: 206.340.9599

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

I.   INTRODUCTION AND RELIEF REQUESTED ................................................. 1

II.  EVIDENCE RELIED UPON ............................................................................... 2

III. FACTS ................................................................................................................. 2

IV.  AUTHORITY AND ARGUMENT ...................................................................... 6

    A.   The Admittedly Economic Protectionist Residency Requirements Violate the Dormant Commerce Clause. ................................................................................... 7

        1.   As a matter of law, none of the State's purported interests provide a legitimate basis to uphold the Residency Requirements. .......................................... 9

        2.   Federal courts agree that Residency Requirements violate the dormant Commerce Clause despite the federal illegality of cannabis. ....................................... 13

    B.   The Residency Requirements Violate the Privileges and Immunities Clause in Article IV Because they Prevent Nonresidents from Doing Business in Washington. . 16

        1.   The Residency Requirements violate Brinkmeyer's right to pursue a livelihood and his right to travel. ..................................................................... 17

        2.   The State cannot show a substantial reason supporting the Residency Requirements because nonresidents are no more dangerous than residents. ................................... 19

        3.   The Residency Requirements bear no substantial relationship to legitimate state objectives because less restrictive means are available and used. ............................ 20

    C.   The Residency Requirements Violate the Equal Protection and Privileges or Immunities Clauses of the Fourteenth Amendment. ......................................................... 21

    D.   The Residency Requirements Violate Brinkmeyer's Fourteenth Amendment Due Process Rights. ............................................................................. 22

V.   CONCLUSION ................................................................................................. 24

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Ste 300
Seattle, WA 98121-1128
206.624.8300 | Fax: 206.340.9599

# TABLE OF AUTHORITIES

**Cases**

*Amunrud v. Bd. of Appeals*,
    143 P.3d 571 (Wash. 2006)................................................................23

*Attonrey General of New York v. Soto–Lopez*,
    476 U.S. 898 (1986)................................................................21

*Baldwin v. Fish & Game Comm'n of Montana*,
    436 U.S. 371 (1978)................................................................18, 19

*Barnard v. Thorstenn*,
    489 U.S. 546 (1989)................................................17, 19, 20, 21

*California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*,
    445 U.S. 97 (1980)................................................................8

*Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*,
    520 U.S. 564 (1997)................................................................9

*Conservation Force, Inc. v. Manning*,
    301 F.3d 985 (9th Cir. 2002) ................................................................8, 9

*Dunn v. Blumstein*,
    405 U.S. 330 (1972)................................................................21, 22

*Gonzales v. Raich*,
    545 U.S. 1 (2005)................................................................15

*Granholm v. Heald*,
    544 U.S. 460 (2005)................................................................9, 10

*Gulch Gaming, Inc. v. State of S.D.*,
    781 F. Supp. 621 (D. S.D. 1991) ................................................................7, 23, 24

*Harman v. Forssenius*,
    380 U.S. 528 (1965)................................................................21

*Healy v. Beer Inst., Inc.*,
    491 U.S. 324 (1989)................................................................12

*Hicklin v. Orbeck*,
    437 U.S. 518 (1978)................................................................17

*Hughes v. Oklahoma*,
    441 U.S. 322 (1979)................................................................8, 9

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Ste 300
Seattle, WA 98121-1128
206.624.8300 | Fax: 206.340.9599

*Lowe v. City of Detroit,*
   21-CV-10709, 2021 WL 2471476 (E.D. Mich. June 17, 2021) ...............................8

*Martinez v. Bynum,*
   461 U.S. 321 (1983)......................................................................................22

*Ne. Patients Grp. v. Maine Dep't of Admin. & Fin. Servs.,*
   1:20-CV-00468-NT, 2021 WL 3560840 (D. Me. Aug. 11, 2021)................8, 14, 15

*NPG, LLC v. City of Portland,*
   2:20-cv-00208-NT, 2020 WL 4741913 (D. Me. Aug. 14, 2020) ................8, 14, 15

*Oregon Waste Sys., Inc. v. Dept. of Environmental Quality of State of Oregon,*
   511 U.S. 93 (1994)......................................................................................8, 9

*Original Investments, LLC v. State,*
   CIV-20-820-F, 2021 WL 2295514 (W.D. Okla. June 4, 2021).......................15, 16

*Reitz v. Kipper,*
   674 F.Supp.2d 1194 (D. Nev. 2009) ...............................................................19

*Saenz v. Roe,*
   526 U.S. 489 (1999)..................................................................................18, 21

*Silver v. Garcia,*
   760 F.2d 33 (1st Cir. 1985)........................................................................19, 20

*Smith v. D.C.,*
   387 F.Supp.3d 8 (D. D.C. 2019)....................................................................21

*Standing Akimbo, LLC v. U.S.,*
   141 S. Ct. 2236 (2021)..................................................................................15

*Supreme Court of New Hampshire v. Piper,*
   470 U.S. 274 (1985)........................................................................16, 17, 19, 20

*Supreme Court of Virginia v. Friedman,*
   487 U.S. 59 (1988)..............................................................................16, 17, 20

*Tennessee Wine & Spirits Ass'n v. Thomas,*
   139 S. Ct. 2449 (2019) ............................................................................*passim*

*Toigo v. Dept. of Health and Senior Svcs.,*
   2021 WL 5533412 (W.D. Mo. June 21, 2021) ......................................8, 10, 12, 13

*Toomer v. Witsell,*
   334 U.S. 385 (1948)..........................................................................16, 17, 18

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Ste 300
Seattle, WA 98121-1128
206.624.8300 | Fax: 206.340.9599

*United Bldg. & Constr. Trades Council v. Mayor of Camden*,
    465 U.S. 208 (1984) ........................................................................................17

*Walsh v. City and Cty. of Honolulu*,
    423 F.Supp.2d 1094 (D. Haw. 2006) .............................................................22

**Statutes**

RCW 69.50.101 ...................................................................................................12

RCW 69.50.328 ...................................................................................................12

RCW 69.50.331(1)(b) ........................................................................................3, 6

RCW 69.50.331(10) ............................................................................................11

RCW 69.50.562(2)(b)(v) .....................................................................................10

RCW ch. 69.50 .......................................................................................................3

Washington Initiative Measure 502 .......................................................................2

**Other Authorities**

WAC 314-55-020(10) .............................................................................................3

WAC 314-55-020(11) ....................................................................................3, 4, 6

WAC 314-55-035 ...................................................................................................4

WAC 314-55-035(1) ..........................................................................................4, 6

WAC 314-55-050 .................................................................................................10

WAC 314-55-075(6) ............................................................................................12

WAC 314-55-083 .................................................................................................10

WAC 314-55-087 .................................................................................................10

WAC 314-55-185 .................................................................................................10

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Ste 300
Seattle, WA 98121-1128
206.624.8300 | Fax: 206.340.9599

1

## I.   INTRODUCTION AND RELIEF REQUESTED

2    A defining purpose of the Constitution was to set the terms of fair play amongst the states

3    and their citizens. The founders abhorred individual states' protectionist policies, which hindered

4    the union and limited opportunities for residents of other states. The founders addressed their

5    concerns by enumerating several rights in the Constitution that prevent economic discrimination.

6    In contravention of those provisions and fundamental principles of national unity, Washington

7    reserves its multi-billion dollar legalized cannabis market to its own long-term residents,

8    preventing any recent Washington resident and all nonresidents from owning a licensed cannabis

9    business. This type of blatant economic protectionism has always been unconstitutional.

10    Todd Brinkmeyer comes to this Court seeking equal treatment by the State of

11    Washington when it processes his application to obtain an interest in a licensed cannabis

12    business. Brinkmeyer wishes to directly invest in and become an owner of the business his

13    longtime friend Scott Atkison founded. With Brinkmeyer's financial and business help, Atkison

14    has built a successful cannabis business. Atkison is also a Stage IV cancer survivor and wants to

15    make arrangements that ensure continuity of his business in the event his illness progresses,

16    which includes selling his equity to Brinkmeyer. Brinkmeyer is familiar with Atkison's business

17    because the Washington Liquor and Cannabis Board (the "LCB" or "State") has thrice approved

18    Brinkmeyer to act as a financier for Atkison's stores—an approval that involved subjecting

19    Brinkmeyer to rigorous criminal and financial background checks, which he passed. Although

20    the LCB allowed Brinkmeyer to loan Atkison's business money, the LCB confirmed it will not

21    allow Brinkmeyer to hold equity in that business. In making their decision, the LCB did not cite

22    anything nefarious or even of concern with Brinkmeyer; the sole determinative factor was

23    Brinkmeyer's status as an Idaho resident.

24    The State's discriminatory policy of favoring its long-term residents facially violates

25    numerous constitutional provisions—the Commerce Clause, the Privileges and Immunities

26    Clause, and each of the Equal Protection, Privileges or Immunities, and Due Process Clauses of

PETITIONER'S MOTION FOR SUMMARY JUDGMENT - 1
USDC No. 3:20-cv-05661-BHS

1  the Fourteenth Amendment. Throughout this dispute, the State has not cited a single case

2  upholding a durational residency requirement in commerce, but Brinkmeyer has cited dozens

3  that uniformly struck residency requirements as unconstitutional, including those in the cannabis

4  field. Brinkmeyer asks this Court to continue that hundred year old unbroken chain of case law

5  and decide as a matter of law that the residency requirements violate the Constitution.

## II.      EVIDENCE RELIED UPON

7       This motion relies upon the Declaration of Andy Murphy in Support of Petitioner's

8  Motion for Summary Judgment ("Murphy Decl."), the Declaration of Chris Masse in Support of

9  Petitioner's Motion for Summary Judgment ("Masse Decl."), the Declaration of Todd

10  Brinkmeyer in Support of Petitioner's Motion for Summary Judgment ("Brinkmeyer Decl."), the

11  Declaration of Scott Atkison in Support of Petitioner's Motion for Summary Judgment ("Atkison

12  Decl."), and the Court's file.

## III.     FACTS

14  **A.  Washington Voters Approved Adult-Use Marijuana in 2012.**

15       In 2012, the people of Washington approved Initiative Measure 502 ("I-502"), which

16  legalized the possession and sale of marijuana for adults. When codifying I-502, the legislature

17  affirmed the intent of the initiative "to stop treating adult marijuana use as a crime and try a new

18  approach that: (1) Allows law enforcement resources to be focused on violent and property

19  crimes; (2) Generates new state and local tax revenue for education, health care, research, and

20  substance abuse prevention; and (3) Takes marijuana out of the hands of illegal drug

21  organizations and brings it under a tightly regulated, state-licensed system similar to that for

22  controlling hard alcohol." I-502 §1.

23       The marijuana industry has been an economic powerhouse for the State of Washington.

24  The State has received more than $1.7 billion in excise tax and fees generated from the sale of

25  marijuana since 2014. Murphy Decl. Ex. A ("Answer") ¶ 7. Public data indicates Washington's

26  marijuana industry has yielded more than $13.8 billion in sales since 2014. Murphy Decl. Ex. B.

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Ste 300
Seattle, WA 98121-1128
206.624.8300 | Fax: 206.340.9599

**B.  The State Imposes a Durational Residency Requirement on All Licensees and True Parties of Interest to Marijuana Licenses.**

The LCB tightly regulates the marijuana industry, and there are hundreds of rules that marijuana businesses must follow. *See generally,* ch. 69.50 RCW; ch. 314-55 WAC (collectively, the "LCB Rules"). The LCB Rules require owners of marijuana businesses to obtain licenses from the LCB. Answer ¶ 9. Those interested in becoming a licensee must apply, after which the LCB investigates the applicant to verify compliance with the LCB Rules. *Id*. ¶ 9

In addition to verifying the applicant would not pose a threat to public health and safety if given a license, the LCB verifies that the applicant has resided in Washington for at least six months. *Id*. ¶ 10. That is because, by statute and regulation, Washington law imposes a durational residency requirement on those who apply for marijuana licenses. The statutory Residency Requirement, RCW 69.50.331(1)(b), provides the following:

> No license of any kind may be issued to:
>
> (i) A person under the age of twenty-one years;
> (ii) A person doing business as a sole proprietor <u>who has not lawfully resided in the state for at least six months prior to applying to receive a license;</u>
> (iii) A partnership, employee cooperative, association, nonprofit corporation, or corporation unless formed under the laws of this state, and <u>unless all of the members thereof are qualified to obtain a license as provided in this section;</u> or
> (iv) A person whose place of business is conducted by a manger or agent, <u>unless the manager or agent possesses the same qualifications required of the licensee.</u>

(Emphasis added.) This statutory "Residency Requirement" applies only to sole proprietorships and "members" of certain corporate entities, but the LCB expanded the Residency Requirements by administrative rule. WAC 314-55-020(11)[1] requires <u>all</u> marijuana license applicants to reside in Washington for "at least six months" before submitting their application to the LCB:

> Under RCW 69.50.331(1)(c) [sic], <u>all applicants applying for a marijuana license must have resided in the state of Washington for at least six months prior to application for a marijuana license</u>. All business entities including, but not limited to, partnerships, employee cooperatives, associations, nonprofit corporations, corporations and limited liability companies, applying for a marijuana license must be formed in Washington. <u>All members, governors, or agents of business</u>

---

[1] Brinkmeyer's petition references WAC 314-55-020(10), but the LCB has since amended this regulation, so the challenged regulatory Residency Requirement is now in subsection 11.

PETITIONER'S MOTION FOR SUMMARY JUDGMENT - 3
USDC No. 3:20-cv-05661-BHS

entities must also meet the six month residency requirement. Managers or agents who manage a licensee's place of business must also meet the six month residency requirement.

(Emphasis added.) The LCB further expanded the Residency Requirements in WAC 314-55-035 by requiring all true parties of interest ("TPIs") to be applicants for a license. TPIs—which include stockholders, members, managers, partners, officers, and those who exercise control over a marijuana business—all must meet the residency requirement in WAC 314-55-020(11). WAC 314-55-035(1). Only approved licensees and TPIs (and thus only long-term Washington residents) may receive a share of the profits from a marijuana business operating in Washington. WAC 314-55-035.

Moreover, through policy and practice, the LCB requires all applicants it approves as a licensee or TPI to <u>remain</u> a Washington resident. *See* Answer ¶ 15. Licensees must forfeit their license, their business, and any associated right to profit if they move out of Washington.

### C. The LCB Approved Brinkmeyer as a Financier for Marijuana Businesses, but will not Allow him to Obtain an Equity Interest Solely Because he is an Idaho Resident.

Brinkmeyer and Atkison have been close friends for more than 25 years. Brinkmeyer Decl. ¶ 2; Atkison Decl. ¶ 2. Although they live just 30 minutes from each other, they reside in different states. *Id*. Brinkmeyer lives in Idaho, and Atkison lives in Washington. *Id*.

Atkison is fortunate to have survived for over seven years with Stage IV cancer, however, his illness has progressed to where it is prudent for him to plan the disposition of his estate. Atkison Decl. ¶ 5. That includes planning to ensure continuity of operations at the marijuana retail stores he partially owns in Washington (the "Stores"). *Id*. Atkison cares about the team who have contributed to the Stores' success and does not wish to see his ownership sold under duress, which could put undue stress on the Stores' other owners and business operations. *Id*. He wants to make sure that he can transfer his ownership to someone who he trusts will do right by the other owners, the Stores, and the team members. *Id*. The person Atkison believes to be best suited for carrying on the same ownership values and principles he has brought to the Stores is

PETITIONER'S MOTION FOR SUMMARY JUDGMENT - 4
USDC No. 3:20-cv-05661-BHS

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Ste 300
Seattle, WA 98121-1128
206.624.8300 | Fax: 206.340.9599

1   Brinkmeyer. *Id*.

2       With the LCB's knowledge and approval, Brinkmeyer and Atkison already work together

3   on the Stores. Brinkmeyer has provided business advice to Atkison and loans to the Stores.

4   Brinkmeyer Decl. ¶ 4; Atkison Decl. ¶ 4. Indeed, the LCB approved Brinkmeyer three times as a

5   debt financier to the Stores. Answer ¶ 20. The LCB subjects financiers of licensed marijuana

6   businesses to the same vetting and approval process that it performs on licensees and TPIs,

7   including rigorous criminal and financial background checks, except debt financiers like

8   Brinkmeyer are not subject to the Residency Requirements. *See* Answer ¶¶ 19-22. Through its

9   three approvals of Brinkmeyer as a financier, the LCB has repeatedly concluded there is nothing

10  concerning in Brinkmeyer's background. *See id*.

11      As part of his estate planning, Atkison would like to transfer part of his ownership

12  interest in the Stores to Brinkmeyer, and will do so if the LCB will allow it. Atkison Decl. ¶ 5.

13  Brinkmeyer is willing and able to assume Atkison's interest. Brinkmeyer Decl. ¶ 6. To obtain

14  approval for the transfer of equity, counsel for Brinkmeyer inquired with the LCB about whether

15  it would approve him as an owner of the Stores. Masse Decl. Ex. A. On May 20, 2020, the LCB

16  confirmed it would deny Brinkmeyer's application to be added to the Stores' license because

17  Brinkmeyer does not comply with the Residency Requirements. *Id*.

18      Thus, while Brinkmeyer is able to support the Stores by providing debt financing, the

19  Residency Requirements prevent him from sharing in the profits of the Stores by providing

20  equity financing or becoming an owner solely because he is not a Washington resident. *See*

21  Answer ¶ 22. The LCB has evidently concluded it is safe for the Stores to take Brinkmeyer's

22  money, but against public policy for Brinkmeyer to become an owner of the businesses he

23  provides advice for and finances.

24  **D.  Procedural History**

25      On June 8, 2020, Brinkmeyer filed this suit in Thurston County Superior Court for the

26  State of Washington. Dkt. ##1, 2. Brinkmeyer sought to invalidate the durational residency

PETITIONER'S MOTION FOR SUMMARY JUDGMENT - 5
USDC No. 3:20-cv-05661-BHS

1    requirements for Washington's licensed cannabis industry in RCW 69.50.331(1)(b)(ii)–(iv),

2    WAC 314-55-020(11), and WAC 314-55-035(1) (collectively, the "Residency Requirements")

3    by alleging causes of action based on both Washington State and federal law. Dkt. #1. On July 7,

4    2020, the LCB removed the case to this Court based on federal question jurisdiction. Dkt. #1.

5         Brinkmeyer filed a motion for preliminary injunction in this Court on August 6, 2020.

6    Dkt. #6. After the parties fully briefed the preliminary injunction motion, but before the Court

7    ruled on the motion, the Court issued an order to show cause on September 8, 2020 seeking

8    briefing on whether this Court lacked jurisdiction. Dkt. #17. The parties responded and agreed

9    this Court had jurisdiction over Brinkmeyer's claims and should rule on their merits. Dkt. ##18,

10   19. On October 5, 2020, the Court ruled it had jurisdiction over Brinkmeyer's claims, but *sua*

11   *sponte* invoked *Pullman* abstention, then severed and remanded Brinkmeyer's state law claims to

12   the Thurston County Superior Court. Dkt. #20 at 4, 6. The Court stayed Brinkmeyer's federal

13   claims and this matter "pending final resolution of the state law claims." *Id.* at 6–7.

14        On October 26, 2020, the Thurston County Superior Court re-instituted the state action

15   for a limited consideration of the state law issues. Dkt. #22. Brinkmeyer sought a preliminary

16   injunction in state court on December 30, 2020, which was denied on January 29, 2021. Murphy

17   Decl. Exs. C, D. The parties agreed to a summary judgment briefing schedule to accommodate

18   parental leave for the LCB's counsel. *Id.* ¶ 5. Consistent with that briefing schedule, the parties

19   both sought summary judgment. *Id.* Exs. E, F. On July 23, 2021, the Thurston County Superior

20   Court dismissed with prejudice all of Brinkmeyer's state law claims because the Washington

21   Constitution did not apply to him as a nonresident. *Id.* Ex. G at 2–3. On November 19, 2021, the

22   parties filed a stipulated motion to lift the stay, which the Court granted. Dkt. ##23, 25. The

23   parties, who agree this case should be resolved on cross motions for summary judgment, then

24   agreed on a briefing schedule for their summary judgment motions. Dkt. #30.

25              **IV.    AUTHORITY AND ARGUMENT**

26        This is a facial challenge to state laws that is ripe for resolution on summary judgment.

PETITIONER'S MOTION FOR SUMMARY JUDGMENT - 6
USDC No. 3:20-cv-05661-BHS

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Ste 300
Seattle, WA 98121-1128
206.624.8300 | Fax: 206.340.9599

There are no disputes of material fact because the State admitted all relevant material facts in its answer. Brinkmeyer is therefore entitled to summary judgment because the Residency Requirements facially violate five independent provisions of the Constitution. Fed. R. Civ. P. 56(a); *see, e.g.*, *Tennessee Wine & Spirits Ass'n v. Thomas*, 139 S. Ct. 2449, 2474–76 (2019) (affirming grant of summary judgment finding residency requirements unconstitutional).

**A.   The Admittedly Economic Protectionist Residency Requirements Violate the Dormant Commerce Clause.**

The Residency Requirements violate the dormant Commerce Clause by preventing nonresidents from obtaining equity investments in Washington's cannabis industry. *Tennessee Wine*, 139 S. Ct. at 2464. Residency requirements that limit commercial opportunities have always been unconstitutional regardless of the industry involved. For example, in striking a South Dakota statute that prohibited corporations with nonresident shareholders from owning gaming licenses, a federal district court recognized that preventing out-of-state investment unconstitutionally burdens interstate commerce:

> The gambling itself, however, is not the interstate commerce at issue in this case. South Dakota is not regulating the individual gamblers who come to Deadwood to try their luck at the slot machines. <u>The interstate commerce allegedly affected by this statute</u>, which prohibits certain types of business entities from obtaining a license to operate gaming establishments in South Dakota, <u>is the out-of-state investment in businesses holding South Dakota gaming licenses</u>."

*Gulch Gaming, Inc. v. State of S.D.*, 781 F. Supp. 621, 625-26 (D. S.D. 1991) (emphasis added).

The constitutionality of residency requirements for ownership of licensed in-state businesses was foreclosed in *Tennessee Wine* where the Court affirmed a summary judgment ruling that invalidated a durational residency requirement to hold equity in Tennessee's licensed alcohol industry. 139 S. Ct. at 2475. *Tennessee Wine* involved liquor licenses and this case involves cannabis licenses, but that is a distinction without a difference particularly where states have *more* authority to regulate liquor than cannabis due to the Twenty First Amendment. *See California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc*., 445 U.S. 97, 110 (1980). In

applying *Tennessee Wine*, numerous district courts have struck down residency requirements in licensed cannabis markets for violating the dormant Commerce Clause.[2] *See, e.g.*, *Ne. Patients Grp. v. Maine Dep't of Admin. & Fin. Servs.*, 1:20-CV-00468-NT, 2021 WL 3560840 (D. Me. Aug. 11, 2021); *Toigo v. Dept. of Health and Senior Svcs.*, 2021 WL 5533412 (W.D. Mo. June 21, 2021); *Lowe v. City of Detroit*, 21-CV-10709, 2021 WL 2471476 (E.D. Mich. June 17, 2021); *NPG, LLC v. City of Portland*, 2:20-cv-00208-NT, 2020 WL 4741913 (D. Me. Aug. 14, 2020).

Under the dormant Commerce Clause, if a state law discriminates against nonresident economic actors, "the law can be sustained only on a showing that it is narrowly tailored to advance a legitimate local purpose." *Tennessee Wine*, 139 S. Ct. at 2461 (internal quotation and brackets omitted). States discriminate against interstate commerce by treating differently in-state and out-of-state economic interests. *Conservation Force, Inc. v. Manning*, 301 F.3d 985, 995 (9th Cir. 2002). While the initial burden to show discrimination rests on Brinkmeyer, *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979), he meets that burden because the Residency Requirements expressly favor Washington residents over nonresidents. *See Tennessee Wine*, 139 S. Ct. at 2461; *Oregon Waste Sys., Inc. v. Dept. of Environmental Quality of State of Oregon*, 511 U.S. 93, 98-99 (1994) ("'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."). The Residency Requirements are thus subject to strict scrutiny review. *Conservation Force*, 301 F.3d at 995.

Under strict scrutiny review, the LCB must show a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives. *Id.* at 997. Put another way, the State must show that Residency Requirements are the "least discriminatory alternative" to advance its legitimate purpose. *Id.*; *see also Hughes*, 441 U.S. at 336. This is no easy task. "State laws discriminating against interstate commerce on their face are virtually *per se* invalid."

---

[2] The dormant Commerce Clause violation is so facially apparent that when a lawsuit filed in federal court asserted Maine's residency requirement for marijuana businesses violated the dormant Commerce Clause, the State of Maine declined to defend the residency requirement before a single motion was heard in the case. Murphy Decl. Ex. K.

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Ste 300
Seattle, WA 98121-1128
206.624.8300 | Fax: 206.340.9599

1   *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 575 (1997) (internal

2   quotation omitted); *see also Granholm v. Heald*, 544 U.S. 460, 487 (2005) ("When a state statute

3   directly regulates or discriminates against interstate commerce, or when its effect is to favor in-

4   state economic interests over out-of-state interests, we have generally struck down the statute

5   without further inquiry."). The State must show that its "justifications for discriminatory

6   restrictions on commerce pass the 'strictest scrutiny.' The State's burden of justification is so

7   heavy that 'facial discrimination by itself may be a fatal defect.'" *Oregon Waste*, 511 U.S. at 101

8   (citations omitted).

9          **1.**     **As a matter of law, none of the State's purported interests provide a**

10                  **legitimate basis to uphold the Residency Requirements.**

11       After admitting the primary justification of the Residency Requirements is economic

12  protectionism, Answer ¶ 18, the State offered new justifications for its discriminatory statute and

13  regulations: the Residency Requirements allegedly (1) meet the aims of the Cole Memo to have a

14  "strong and effective regulatory scheme;" (2) allow the LCB to perform sufficient background

15  checks on potential licensees, particularly misdemeanors; (3) allow local jurisdictions to provide

16  information about potential licensees; (4) allow for enforcement and accountability of licensees;

17  (5) "prevent big business from taking over the industry" or forming interstate business groups;

18  (6) prevent illegal transactions and overproduction; and (7) respect other states' decisions

19  regarding legalization of cannabis (collectively, the "Justifications"). Dkt. #13-1 at 4-5; Murphy

20  Decl. Ex. F ("LCB's Resp. in State Court") at 15-16, Ex. H ("Smith Decl.") ¶¶ 5–20.

21       None of the Justifications can save the Residency Requirements. The State did not

22  account for the Supreme Court's holding that residency requirements are unnecessary to

23  maintain effective oversight when the licensed business will remain in state, and the state's

24  ability to revoke licenses provides sufficiently strong incentives to comply with the law.

25  *Tennessee Wine*, 139 S. Ct. at 2475. The Justifications ultimately relate to preventing criminality,

26  but the State's existing enforcement abilities—including tracking all marijuana from seed-to-

PETITIONER'S MOTION FOR SUMMARY JUDGMENT - 9
USDC No. 3:20-cv-05661-BHS

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Ste 300
Seattle, WA 98121-1128
206.624.8300 | Fax: 206.340.9599

1    sale, requiring 24/7 security camera surveillance of marijuana facilities, and the right to access

2    and audit all business records of licensees—successfully prevent criminality from leeching into

3    the industry. WAC 314-55-083, -087, -185; Smith Decl. ¶ 14.

4        While the Justifications fail generally for these reasons, they fail individually too. First,

5    residency is unnecessary to comply with the Cole Memo. Numerous states have licensed

6    cannabis markets without residency requirements. Murphy Decl. Ex I. The Cole Memo focuses

7    on preventing diversion, and the State has not explained why owner residency is necessary when

8    diversion would originate in Washington where the businesses operate. Moreover, the Supreme

9    Court has already held that a state can maintain effective oversight of a licensed in-state business

10   if its owners live elsewhere. *Tennessee Wine*, 139 S. Ct. at 2464.

11       Second, the LCB claimed residency is necessary to investigate an applicant's

12   misdemeanor history. LCB's Resp. in State Court at 15-16. The State can require applicants to

13   provide their full criminal history, including misdemeanors in other states, and deny applications

14   if they provide inadequate information. WAC 314-55-050. If applicants lie in their application,

15   the resulting penalty is cancellation of the license. RCW 69.50.562(2)(b)(v). As a matter of law,

16   the LCB's ability to revoke licenses provides sufficient and strong incentives to comply with the

17   LCB's rules. *Tennessee Wine*, 139 S. Ct. at 2475; *see also Granholm*, 544 U.S. at 490 ("Out-of-

18   state wineries face the loss of state and federal licenses if they fail to comply with state law. This

19   provides strong incentives not to sell alcohol to minors."); *see also Toigo*, 2021 WL 5533412, at

20   *4 (rejecting the interest in getting criminal records from other states to support a residency

21   requirement in cannabis).

22       The State made the conclusory claim that financial vetting is more dynamic for owners

23   than financiers. Smith Decl. ¶ 11. But the State gave no reason why an applicant must be a

24   resident while the State reviews their financial records. Indeed, as a matter of law, the "State can

25   thoroughly investigate applicants without requiring them to reside in the State for [six months]

26   before obtaining a license." *Tennessee Wine*, 139 S. Ct. at 2475.

PETITIONER'S MOTION FOR SUMMARY JUDGMENT - 10
USDC No. 3:20-cv-05661-BHS

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Ste 300
Seattle, WA 98121-1128
206.624.8300 | Fax: 206.340.9599

1    Third, the State claimed the objections local jurisdictions can make to applications are a

2    valuable source of information about the applicant's character. Smith Decl. ¶¶ 8, 11. Residency

3    is not necessary to investigate an applicant's character. *Tennessee Wine*, 139 S. Ct. at 2475. The

4    State also misstates the purpose of local input, which focuses on existing business operations, not

5    the applicant's character. RCW 69.50.331(10). Regardless, whatever facts relate to the undefined

6    issues the Board purportedly values from local jurisdictions can be demanded from the applicant.

7    Fourth, the State claimed residency is needed for effective enforcement. Smith Decl. ¶¶ 6,

8    11. The Supreme Court disagrees. *Tennessee Wine*, 139 S. Ct. at 2475. A nonresident owner will

9    not change the location of the licensed business, which must be in Washington, and interviews or

10   responses to inquiries can be provided remotely. The State does not require that owners be

11   physically present in their facility or physically present to interact with enforcement officers.

12   Similarly, and contrary to *Tennessee Wine,* the LCB claimed the Residency Requirements

13   are necessary to hold licensees accountable in Washington courts. Smith Decl. ¶ 6; LCB's Resp.

14   in State Court at 15. The State can hold nonresidents accountable by canceling their license. *See*

15   *Tennessee Wine*, 139 S. Ct. at 2475. Further, as a matter of law, the State's objective can be

16   easily achieved "by ready alternatives, such as requiring a nonresident to designate an agent to

17   receive process or to consent to suit in the [Washington] courts." *Id*. Notably, the State provided

18   no evidence that a nonresident applicant who passes the background check and receives a license

19   is more likely to engage in criminal conduct than a resident.

20   The State lamented it cannot enforce marijuana laws in other states. Smith Decl. ¶ 7. The

21   State has no need to. All licensed marijuana activity occurs in Washington and is reflected in

22   records that must be kept in Washington and accessible to the State upon request.

23   Fifth, the LCB claimed the Residency Requirements are necessary to prevent interstate

24   tied houses, but it provided no explanation for why this risk is greater for nonresidents than

25   current licensees who are already free to invest in out-of-state cannabis businesses. Nevertheless,

26   Washington law does not prohibit interstate tied houses, but only restricts financial interests

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Ste 300
Seattle, WA 98121-1128
206.624.8300 | Fax: 206.340.9599

among businesses licensed by the State. RCW 69.50.328; RCW 69.50.101(aa), (bb), (ee). This Justification reveals the State's unlawful desire to regulate business conduct outside its borders. *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989). Similarly problematic is the State's claim that residency is necessary to enforce its limit on holding no more than five retail licenses as nonresidents may have retail stores in other states. Smith Decl. ¶ 10. Regardless, the State could require applicants to disclose their interests in out-of-state marijuana businesses.

Sixth, the LCB claimed residency prevents diversion, but it has not produced any evidence that is true. Instead, using Oregon as an example, the State claimed residency prevents overproduction and thereby prevents diversion. Smith Decl. ¶ 14. The overproduction issues in Oregon were not caused by the removal of its residency requirement, but because Oregon did not cap the number of licenses it issued and had a low cost of market entry. Murphy Decl. Ex. J. That concern does not apply to Washington, which has capped licenses and the volume of plants businesses can grow since it created the market. *See id*. Ex I; WAC 314-55-075(6).

Moreover, while preventing diversion is important, "there are multiple nondiscriminatory means of advancing that interest[.]" *Toigo*, 2021 WL 5533412, at *5. For example, the *Toigo* Court approved nondiscriminatory methods that the LCB already uses in Washington, such as tracking marijuana from seed-to-sale, requiring constant video surveillance, giving the state a broad right of access to cannabis businesses' records, and conducting criminal background checks on owners and financiers. *Id.*

"Furthermore, it is far from clear how a durational residency requirement actually hinders the diversion of [] marijuana away from its intended purpose. It is no easier for a person who has lived in [Washington] for less than [six months] to drive from [Washington to Montana] with [] marijuana in their trunk than it is for a person who has lived in [Washington] for [six months] and a day." *Id.* at *5. "[I]t is no more difficult for a long-time [Washington] resident to smuggle marijuana out of the [licensed] system and into the [unlicensed] market than it is for anyone else." *Id.*

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Ste 300
Seattle, WA 98121-1128
206.624.8300 | Fax: 206.340.9599

1    Last, the LCB argued the Residency Requirements respect the interests of Idaho, but

2    provided no evidence of any issue Idaho has taken with Oregon or Nevada, which have no

3    residency requirements for their cannabis industries. Murphy Decl., Ex I. There is no rational

4    connection between the Residency Requirements and respect for other states. There is no

5    evidence that Idaho or any other state has any legislative policy against owning a cannabis

6    business outside of its jurisdiction, nor that any state has a legislative policy of denying its

7    residents legal business opportunities in other jurisdictions. Nonetheless, employing the State's

8    reasoning, the Residency Requirements also show disrespect to those states that have legalized

9    cannabis such as Oregon, Nevada, and California.

10   The State has not disputed that facially discriminatory laws are virtually per se invalid,

11   but asserted the laws are narrowly tailored because the State previously imposed a three-month

12   residency requirement. Dkt. #13-1 at 9. But the State must justify why a residency requirement

13   of <u>any</u> duration is needed when its goals can be accomplished with less restrictive means. *Supra*

14   at 8–9. *Tennessee Wine* already resolved that residency is unnecessary to maintain enforcement

15   and oversight of in-state businesses. The State has and already employs the tools it needs to

16   regulate cannabis businesses without discriminating against nonresidents. In other words, the

17   State lacks a substantial reason for the Residency Requirements because they fail to achieve a

18   legitimate interest beyond the interest already met by the State's other non-discriminatory

19   enforcement and oversight powers—none of which Brinkmeyer challenges or seeks to modify.

20   The Residency Requirements thus violate the dormant Commerce Clause.

21          **2.      Federal courts agree that Residency Requirements violate the dormant**
                 **Commerce Clause despite the federal illegality of cannabis.**

22

23   The LCB has asserted the Residency Requirements are invulnerable to a dormant

24   Commerce Clause challenge because the federal Controlled Substances Act ("CSA") makes

25   marijuana illegal. Dkt. #13-1 at 18. None of the federal courts that have ruled on residency

26   requirements in cannabis agree. "Instead, in apparently all cases where federal courts have

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Ste 300
Seattle, WA 98121-1128
206.624.8300 | Fax: 206.340.9599

confronted dormant Commerce Clause challenges to state or local laws that favor residents in the recreational or medical marijuana context, the courts have held that such laws are likely unconstitutional" for violating the dormant Commerce Clause. *Ne. Patients Grp.*, 2021 WL 3560840, at *5 (citing *Toigo*, 2021 WL 5533412; *Lowe*, 2021 WL 2471476; *NPG*, 2020 WL 4741913)).

For example, in *NPG*, a nonresident challenged a system the City of Portland, Maine developed to issue marijuana licenses, which gave preference to applicants who lived in the city. *NPG*, 2020 WL 4741913, at *2. The court rejected the defendant's argument that the CSA enabled it to pass discriminatory laws in cannabis, ruled the City's law likely violated the dormant Commerce Clause, and preliminarily enjoined its enforcement. *Id*. at *12.

The *NPG* Court observed that "congressional action can alter the application of the dormant Commerce Clause" and "Congress may use its powers under the Commerce Clause to confer upon the States an ability to restrict the flow of interstate commerce that they would not otherwise enjoy." *Id*. at *9 (internal quotation and brackets omitted). The court described the "high" standard to find Congress consented to allow burdens on interstate commerce:

> [T]he state or local jurisdiction has the burden of demonstrating Congress's "unmistakably clear intent to allow otherwise discriminatory regulations." *United Egg Producers v. Dep't of Agric. of P.R.*, 77 F.3d 567, 570 (1st Cir. 1996); *see also Maine v. Taylor*, 477 U.S. 131, 138-39 (1986) ("[B]ecause of the important role the Commerce Clause plays in protecting the free flow of interstate trade, this Court has exempted state statutes from the implied limitations of the Clause only when the congressional direction to do so has been 'unmistakably clear."); *Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 430-32 (3d Cir. 2011).

*Id*. In rejecting the same argument the State has made, the court found the CSA did not provide "unmistakably clear intent" to burden interstate commerce. "[The CSA] nowhere says that states may enact laws that give preference to in-state economic interests. In other words, although the [CSA] criminalizes marijuana, it does not affirmatively grant states the power to burden interstate commerce in a manner which would otherwise not be permissible." *Id*. at *10 (internal quotation omitted).

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Ste 300
Seattle, WA 98121-1128
206.624.8300 | Fax: 206.340.9599

1    Ignoring this ruling, the State has relied on *Gonzales v. Raich*, 545 U.S. 1, 22 (2005),

2   where the Court held Congress acted within its Commerce Clause power when passing the CSA

3   to restrict intrastate medical marijuana. Dkt. #13-1 at 18-19. *Raich* says nothing about allowing

4   states that legalize marijuana to restrict nonresident ownership. Further, Justice Thomas has

5   questioned whether the rationale of *Raich* applies today given the federal government's tacit

6   blessing of adult-use cannabis markets, including how Congress prohibits the Department of

7   Justice from spending funds to attack medical cannabis laws. *Standing Akimbo, LLC v. U.S.*, 141

8   S. Ct. 2236, 2237 (2021) ("Whatever the merits of *Raich* when it was decided, federal policies of

9   the past 16 years have greatly undermined its reasoning."); *see also Ne. Patients Grp.*, 2021 WL

10   3560840, at *4 (observing that "Congress has barred the Department of Justice from using funds

11   'to prevent any [state] from implementing their own laws that authorize the use, distribution,

12   possession, or cultivation of medical marijuana[.]'"). "Suffice it to say, the Federal

13   Government's current approach to marijuana bears little resemblance to the watertight

14   nationwide prohibition that a closely divided Court found necessary to justify the Government's

15   blanket prohibition in *Raich*." *Standing Akimbo*, 141 S. Ct. at 2238. Thus, the State's reliance on

16   *Raich* or the formerly strict federal illegality of cannabis stands in stark contrast to recent

17   statements by the Court.

18    No federal court has found any language in the CSA that provides Congress's

19   "unmistakably clear intent" to allow states to pass economically discriminatory laws in cannabis

20   markets. One court, however, declined to reach the merits of a constitutional challenge to a

21   residency requirement in cannabis due to its federally illegal status. In *Original Investments, LLC*

22   *v. State*, CIV-20-820-F, 2021 WL 2295514 (W.D. Okla. June 4, 2021), the State of Oklahoma

23   challenged the authority of the court to issue a decision on the merits. The district court agreed

24   with one of the State's arguments and declined to exercise its jurisdiction because it would not

25   use its equitable powers to facilitate illegal conduct. *Id*. at *2.

26    Those facts are remarkably different from this case. Unlike Oklahoma, the State agrees

PETITIONER'S MOTION FOR SUMMARY JUDGMENT - 15
USDC No. 3:20-cv-05661-BHS

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Ste 300
Seattle, WA 98121-1128
206.624.8300 | Fax: 206.340.9599

"[t]his Court should reach the merits of this case[.]" Dkt. #18 at 8. Unlike the *Original Investments* Court, this Court has already ruled "it has jurisdiction to hear Brinkmeyer's claims despite the illegality of marijuana" under the CSA. Dkt. #20 at 4. And most importantly, because Brinkmeyer asks only for fair treatment when the LCB processes his application, he does not ask the Court to award any relief that is illegal under federal law. The State agrees. Dkt. #18 at 7 ("the nature of the relief asked from this Court is whether Washington's residency requirement is constitutional or not – the remedy requested does not necessitate a determination of whether [Brinkmeyer] is entitled to be an owner in a marijuana business."). Should the Court award Brinkmeyer his requested relief, the result will be that the LCB assesses nonresident applicants on their merits and character, not their address, if and when nonresidents submit applications. That relief is constitutionally mandated, not illegal.

Brinkmeyer asks this Court not to join a minority of one and instead follow the prevailing trend of federal courts by finding the CSA does not immunize the LCB from challenges to its plainly discriminatory laws.

**B.     The Residency Requirements Violate the Privileges and Immunities Clause in Article IV Because they Prevent Nonresidents from Doing Business in Washington.**

The Privileges and Immunities Clause of Article IV provides that the "Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."[3] "The primary purpose of the Privileges and Immunities Clause was to help fuse into one Nation a collection of independent, sovereign States." *Toomer v. Witsell*, 334 U.S. 385, 395 (1948). The clause was "intended to create a national economic union," *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274, 280 (1985), and was "designed to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned." *Friedman*, 487 U.S. at 64 (1988) (internal quotation omitted). The

---

[3] "While the Privileges and Immunities Clause cites the term 'Citizens,' for analytic purposes citizenship and residency are essentially interchangeable." *Supreme Court of Virginia v. Friedman,* 487 U.S. 59, 64 (1988).

PETITIONER'S MOTION FOR SUMMARY JUDGMENT - 16
USDC No. 3:20-cv-05661-BHS

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Ste 300
Seattle, WA 98121-1128
206.624.8300 | Fax: 206.340.9599

1  Privileges and Immunities Clause of Article IV bars "discrimination against citizens of other
2  States where there is no substantial reason for the discrimination beyond the mere fact that they
3  are citizens of other States." *Toomer*, 334 U.S. at 396.

4        Courts apply a two-step test to determine whether a residency requirement violates the
5  Privileges and Immunities Clause. *Barnard v. Thorstenn*, 489 U.S. 546, 552–53 (1989). First, the
6  court determines whether the alleged discrimination bears upon a fundamental right protected by
7  the Privileges and Immunities Clause. *United Bldg. & Constr. Trades Council v. Mayor of*
8  *Camden,* 465 U.S. 208, 218 (1984). Second, if the challenged law or regulation does deprive
9  nonresidents of a protected privilege or immunity, it is invalid unless "(i) there is a substantial
10  reason for the difference in treatment; and (ii) the discrimination practiced against nonresidents
11  bears a substantial relationship to the State's objective." *Barnard*, 489 U.S. at 552–53 (internal
12  quotation and citation omitted). When determining whether there is a substantial relationship, the
13  court considers whether there are less restrictive means to achieve the same state objectives.
14  *Piper*, 470 U.S. at 284 n.17 (1985) ("the State may be required to achieve its legitimate goals
15  without unnecessarily discriminating against nonresidents").

16      **1.**      **The Residency Requirements violate Brinkmeyer's right to pursue a**
17                **livelihood and his right to travel.**

18        The Residency Requirements violate two privileges and immunities protected by Article
19  IV: the right to pursue a livelihood and the right to travel. It is firmly established that the
20  Privileges and Immunities Clause protects a nonresident's right "to ply their trade, practice their
21  occupation, or pursue a common calling." *Hicklin v. Orbeck*, 437 U.S. 518, 524-25 (1978) (citing
22  *Ward v. Maryland*, 79 U.S. 418 (1871)); *see also United Bldg.*, 465 U.S. at 219 ("[T]he pursuit
23  of a common calling is one of the most fundamental of those privileges protected by the
24  Clause… Many, if not most, of our cases expounding the Privileges and Immunities Clause have
25  dealt with this basic and essential activity."). Because the Residency Requirements impose a six-
26  month waiting period before nonresidents can qualify for a marijuana license, and the LCB

PETITIONER'S MOTION FOR SUMMARY JUDGMENT - 17
USDC No. 3:20-cv-05661-BHS

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Ste 300
Seattle, WA 98121-1128
206.624.8300 | Fax: 206.340.9599

interprets these rules to require continuing residency of licensees, the Residency Requirements infringe on the right to pursue a livelihood.[4] *Toomer*, 334 U.S. at 396 ("[I]t was long ago decided that one of the privileges which the clause guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State.").

The right to travel is also a fundamental right protected, in part, by the Privileges and Immunities Clauses in Article IV. *Saenz v. Roe,* 526 U.S. 489, 500–01 (1999). The right to travel, as protected by Article IV, includes the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in a second state. *Id.* at 500. In protecting the right to travel, the Supreme Court has struck residency requirements related to obtaining employment, medical services, and licensing restrictions for commercial activity. *Id.* at 502 (citing cases). Thus, the LCB's outright ban on nonresidents obtaining a license for commercial activity in Washington implicates the right to travel under the Privileges and Immunities Clause.

The State has argued Brinkmeyer's Privileges and Immunities claim fails because there is no right to sell an illegal substance. Dkt. #13-1 at 16. Brinkmeyer does not assert that right. Instead, he relies on his fundamental rights to pursue a livelihood and travel. Those rights independently guarantee that Brinkmeyer, as a nonresident, may compete commercially in another state on the same footing as residents of that state. The Privileged and Immunities Clause has always prohibited states from creating markets and then excluding nonresidents from those markets. *See*, *e.g.*, *Toomer*, 334 U.S. at 396. The State has cited no authority that would allow it to escape that prohibition by creating a market that is, in some aspects, federally illegal.

In arguing against Brinkmeyer's right to pursue a livelihood, the State has relied on *Baldwin v. Fish & Game Comm'n of Montana*, 436 U.S. 371 (1978), which involved recreational elk hunting. Dkt. #13-1 at 16-17. The *Baldwin* Court recognized that a license for recreational hunting is different from a license for commercial activity, and the latter implicates the right to

---

[4] The Court interchangeably refers to the right to pursue a common calling and the right to pursue a livelihood. *See*, *e.g.*, *Toomer*, 334 U.S. at 403 (using "common calling"); *Baldwin*, 436 U.S. at 386 (citing *Toomer* as support for how "a nonresident's right to pursue a livelihood in a State other than his own" is protected by the Privileges and Immunities Clause.).

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Ste 300
Seattle, WA 98121-1128
206.624.8300 | Fax: 206.340.9599

pursue a livelihood. 436 U.S. at 386. The license at issue here is not for recreational activity but a commercial venture. The livelihood Brinkmeyer seeks to pursue in Washington is investment in an industry the State created and improperly reserves to its own long-term residents. *Baldwin* is more support for how the Residency Requirements violate the Privileges and Immunities Clause.

> **2.** **The State cannot show a substantial reason supporting the Residency Requirements because nonresidents are no more dangerous than residents.**

Because the Residency Requirements violate two of Brinkmeyer's rights protected by the Privileges and Immunities Clause, they are invalid unless the State can show a substantial reason for the discrimination against nonresidents that bears a substantial relationship to the State's objective. *Barnard*, 489 U.S. at 552-53; *see*, *e.g.*, *Piper*, 470 U.S. at 284. A substantial reason for discrimination does not exist "unless there is something to indicate that non-citizens constitute a peculiar source of the evil at which the statute is aimed." *Reitz v. Kipper*, 674 F.Supp.2d 1194, 1201 (D. Nev. 2009) (quoting *Toomer*, 334 U.S. at 398). Thus, the State must prove that nonresidents are somehow more "evil" than residents, its reasons for imposing the Residency Requirements mitigate that evil, and there are not alternative less restrictive means to mitigate that evil. *Piper*, 470 U.S. at 284 n.17. The State cannot, so the Residency Requirements violate the Privileges and Immunities Clause.

To be sure, there is nothing inherently problematic about nonresidents, and the First Circuit has cautioned against assuming residency disqualifies a person from receiving a commercial license. In *Silver v. Garcia*, 760 F.2d 33 (1st Cir. 1985), the First Circuit struck a residency requirement that Puerto Rico imposed on insurance professionals for violating the Privileges and Immunities Clause. Puerto Rico attempted to justify its residency requirement by claiming it was more difficult to investigate the trustworthiness and competence of nonresidents. *Id*. at 38. The First Circuit recognized that "[t]here is no evidence that nonresidents are inherently less trustworthy or less competent insurance professionals than Puerto Rican residents, nor may we assume that this is so." *Id*. at 38; *see also Piper*, 470 U.S. at 285 (refusing to assume

1   nonresident lawyers were less competent than resident lawyers). The same is true for business

2   owners in Washington, and the State has not identified why nonresidents are inherently more

3   problematic than residents when it comes to owning a share of a cannabis business.

4          The LCB has admitted that a primary purpose of the Residency Requirements is

5   economic protectionism for Washington residents. Answer ¶ 18. Economic protectionism is not a

6   legitimate aim of state policy. *Friedman*, 487 U.S. at 64 (1988). Further, the Justifications are not

7   substantial reasons under the Privileges and Immunities Clause for the same reasons they are not

8   legitimate local purposes under the dormant Commerce Clause analysis.

9          **3.     The Residency Requirements bear no substantial relationship to legitimate
10                  state objectives because less restrictive means are available and used.**

11         In addition to lacking a substantial reason for the Residency Requirements, the State

12  cannot establish its discrimination against nonresidents bears a substantial relationship to its

13  objectives. When evaluating the substantial relation element of the Privileges and Immunities

14  Clause, courts should consider whether less restrictive means of regulation are available.

15  *Barnard*, 489 U.S. at 552–53. For example, the *Barnard* Court struck a residency requirement

16  for lawyers barred in the Virgin Islands that was premised, in part, on how nonresidents would

17  be less likely to attend court proceedings on short notice compared to residents. *Id.* The Court

18  held that a less restrictive means to accomplish that objective would be requiring lawyers to

19  retain local attorneys to be available for unscheduled meetings and hearings. *Id.* at 554. As

20  addressed in the dormant Commerce Clause analysis and similar to *Tennessee Wine*, any

21  substantial reason found by the Court would be better addressed by the regulations governing all

22  cannabis licensees than through the Residency Requirements.

23         The State previously asserted the Residency Requirements bear a substantial relationship

24  to the Justifications because applicants returned to their home states when the residency

25  requirement was three months. Dkt. #13-1 at 17-18. That travel was constitutionally protected.

26  *See Saenz*, 526 U.S. at 500. Denying an application on that protected basis is an unconstitutional

penalty, not a justification to restrict fundamental rights. *See Harman v. Forssenius*, 380 U.S. 528, 540 (1965). Further, the duration of the requirement is irrelevant when there are less restrictive means to accomplish the State's objectives. *Barnard*, 489 U.S. at 552-53. As described above, less restrictive means already exist due to the State's tight regulation. Thus, the Residency Requirements violate the Privileges and Immunities Clause.

**C.      The Residency Requirements Violate the Equal Protection and Privileges or Immunities Clauses of the Fourteenth Amendment.**

The Residency Requirements violate the Equal Protection and Privileges or Immunities Clauses of the Fourteenth Amendment for similar reasons. Durational residency requirements have been challenged under both clauses, and the analysis is similar for both. *Compare Dunn v. Blumstein*, 405 U.S. 330 (1972) (equal protection) *with Saenz*, 526 U.S. 489 (privileges or immunities). Both clauses protect the right to travel, which provides "for those travelers who elect to become permanent residents, the right to be treated like citizens of their new state of residence." *Saenz*, 526 U.S. at 500. State law burdens the right to travel "when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right." *Soto–Lopez*, 476 U.S. at 903 (citations and quotation marks omitted).

The Residency Requirements are constitutionally suspect for infringing on the fundamental right to travel because they discriminate between newly arrived bona fide residents and those residing in the state for over six months; thus, they are subject to strict scrutiny review. *See Saenz*, 526 U.S. at 501-03; *see also Dunn*, 405 U.S. at 341-42 ("The right to travel is an 'unconditional personal right,' a right whose exercise may not be conditioned"); *Soto–Lopez*, 476 U.S. at 904-06; *Smith v. D.C.*, 387 F.Supp.3d 8, 28-30 (D. D.C. 2019). The Supreme Court has held that durational residency laws single out the class of bona fide residents who have recently exercised their constitutionally protected right to travel, and penalize those travelers directly. *Dunn*, 405 U.S. at 338. "Absent a compelling state interest, a State may not burden the

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Ste 300
Seattle, WA 98121-1128
206.624.8300 | Fax: 206.340.9599

1   right to travel in this way." *Id.* at 341-42. Under strict scrutiny, the LCB must prove the

2   Residency Requirements are narrowly tailored to serve a compelling governmental interest. *Id.*

3         The Residency Requirements violate the Equal Protection and Privileges or Immunities

4   Clauses for the same reasons they violate the Privileges and Immunities Clause in Article IV and

5   the dormant Commerce Clause. The Justifications are not compelling governmental interests.

6   The lone exception may be the interest in improving public safety, but as with the other non-

7   compelling interests, the Residency Requirements are not narrowly tailored to accomplish that

8   interest. As described above, the LCB's broad oversight powers—which tightly regulate licensed

9   cannabis businesses—provide less restrictive means to promote public safety without requiring

10  that equity holders be and remain Washington residents. Moreover, the LCB arbitrarily

11  distinguishes between nonresident financiers (which are permissible) and equity owners (which

12  are not) despite having no basis that allowing ownership poses some risk to public safety.

13        The State cited *Martinez v. Bynum*, 461 U.S. 321 (1983), to suggest the Residency

14  Requirements survive strict scrutiny. Dkt. #13-1 at 22. *Martinez* involved a bona fide residency

15  requirement, not a durational residency requirement. 461 U.S. at 333. Bona fide residency

16  requirements may be legitimate, but durational residency requirements are highly suspect. *Id*. at

17  325–29; *see also Walsh v. City & Cty. of Honolulu*, 423 F.Supp.2d 1094, 1102 (D. Haw. 2006).

18  The State cannot carry its burden of proving the durational Residency Requirements pass strict

19  scrutiny, so they should be stricken for violating the Equal Protection and Privileges or

20  Immunities Clauses of the Fourteenth Amendment.

21  **D.     The Residency Requirements Violate Brinkmeyer's Fourteenth Amendment Due
22            Process Rights.**

23        The Residency Requirements also violate the Fourteenth Amendment's Due Process

24  Clause, which protects the right to pursue a profession. Unlike the Article IV Privileges and

25  Immunities context, the right to pursue a profession is not considered a fundamental right under

26  the Fourteenth Amendment Due Process Clause, and is subject to rational basis review. *Amunrud*

PETITIONER'S MOTION FOR SUMMARY JUDGMENT - 22
USDC No. 3:20-cv-05661-BHS

1    *v. Bd. of Appeals*, 143 P.3d 571, 576 (Wash. 2006), *abrogated on other grounds by Yim v. City of*

2    *Seattle*, 451 P.3d 694 (Wash. 2019). Thus, the Residency Requirements survive if they are

3    rationally related to a legitimate state interest. *Amunrud,* 143 P.3d at 578.

4           Assuming the Justifications qualify as legitimate state interests, the Residency

5    Requirements are not rationally related to them. In *Gulch Gaming*, 781 F. Supp. at 631, South

6    Dakota asserted its residency requirement for gaming licenses was rationally related to its goals

7    to protect the "health, safety, morals, good order, and general welfare" of those inhabiting the

8    state. The court concluded those legitimate interests failed rational basis review because the state

9    required applicants for gaming licenses to meet various character standards, and the state would

10   not issue licenses unless the applicant's background indicated that they posed no threat to the

11   public or the state's ability to control gaming. *Id*. at 631-32. Given these existing standards, the

12   court found the additional residency requirement did not "further the goal of preventing

13   potentially illegal or dangerous activity from occurring within the gaming industry." *Id*. at 632.[5]

14          The Residency Requirements fail for similar reasons. The LCB imposes rigorous

15   qualifications that applicants must satisfy before the LCB will issue a license. Striking the

16   Residency Requirements will not modify those qualifications. And, as the *Tennessee Wine* Court

17   held, applicants need not reside in Washington for the LCB to evaluate whether they meet the

18   qualifications to receive a license. Imposing the Residency Requirements on top of the already

19   robust regulatory framework that applicants must satisfy is not rationally related to the State's

20   interests. Instead, it operates to unconstitutionally violate Brinkmeyer's due process right to

21   pursue a profession in Washington while remaining an Idaho resident.

22          The State has claimed Brinkmeyer's reliance on *Gulch Gaming* "falls flat" because that

23   case involved gambling that was federally legal. Dkt. #13-1 at 22. The State misses the point.

24   The residency requirement in *Gulch Gaming* failed rational basis review because, like the LCB,

25   the state's existing oversight of the gambling industry accomplished the state's legitimate

26

---

[5] Although *Gulch Gaming* was decided in the equal protection context, it applied the same rational basis test that
courts apply in due process challenges.

PETITIONER'S MOTION FOR SUMMARY JUDGMENT - 23
USDC No. 3:20-cv-05661-BHS

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Ste 300
Seattle, WA 98121-1128
206.624.8300 | Fax: 206.340.9599

objectives without requiring residency. 781 F. Supp. at 631-32. Federal legality was irrelevant to that analysis. *Id*. Moreover, the State has asserted the Justifications are rationally related to the Residency Requirements. Dkt. #13-1 at 22. But the underlying basis for the Residency Requirements is reducing criminality. The Residency Requirements do not prevent criminality, *supra*, but they do unconstitutionally and irrationally prevent nonresidents from pursuing a livelihood in Washington as owners of licensed cannabis businesses.

## V.      CONCLUSION

The Constitution has always prevented states from creating markets that only their residents can access, but that is the express purpose of the Residency Requirements. There is no question that if the Residency Requirements were in any other industry created by the State, they would be unconstitutional. It is the policy of Washington not to treat cannabis use like a crime, but the LCB relies exclusively on the federally illegal status of marijuana—a status it disregarded when creating the market it now denigrates as an illegal threat to the public—to deprive Brinkmeyer of his constitutional rights. Federal courts reject those self-serving arguments from states, apply *Tennessee Wine*, and enjoin the enforcement of durational residency requirements in cannabis. Brinkmeyer asks this Court to follow that trend. Only then can Brinkmeyer's application be reviewed fairly and not subject to discrimination based solely on living in a state other than Washington.

DATED this 1st day of February, 2022.

MILLER NASH, LLP

*/s/ Andy Murphy*
Andy Murphy, WSBA No. 46664
*/s/Daniel J. Oates*
Daniel J. Oates, WSBA No. 39334
Email: *Andy.Murphy@millernash.com*
          *Dan.Oates@millernash.com*
*Attorneys for Petitioner*

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Ste 300
Seattle, WA 98121-1128
206.624.8300 | Fax: 206.340.9599

1

## DECLARATION OF SERVICE

2

    I, Jennifer L. Schnarr, hereby declare under penalty of perjury under the laws of the

3

United States and the state of Washington that on this 1st day of February, 2022, a copy of the

4

foregoing document was served upon the attorneys of record in the above cause as follows:

5

Penny Allen, WSBA No. 18821          ☐  via Hand Delivery

6

Ellen Range, WSBA No. 51334         ☐  via U.S. Mail
Assistant Attorneys General           ☐  via Facsimile

7

1125 Washington St SE, PO Box 40110   ☒  via E-Service
Olympia, WA 98504-0110            ☒  via Email

8

Phone: (360) 753-2702
Email: Pennyl.Allen@atg.wa.gov;

9

       Ellen.Range@atg.wa.gov

10

*Attorneys for Respondent*

11

    Executed at Burien, Washington, this 1st day of February, 2022.

12

                  *s/Jennifer L. Schnarr*
                  Jennifer L. Schnarr, Legal Assistant

13

14

15

4870-1896-5515.4

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF SERVICE - 1
USDC No. 3:20-cv-05661-BHS