Exhibit H

1  Hearing date: July 23, 2021
   Hearing time: 9 a.m.
2  Judge/Calendar: Honorable Mary Sue Wilson

3

4

5

6

7           **IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
                **IN AND FOR THE COUNTY OF THURSTON**

8

9  TODD BRINKMEYER,                          NO. 20-2-01568-34

10                      Petitioner,           DECLARATION OF
                                              REBECCA SMITH IN SUPPORT OF
11     v.                                     BOARD'S RESPONSE TO MOTION
                                              FOR PRELIMINARY INJUNCTION
12 WASHINGTON STATE LIQUOR AND
   CANNABIS BOARD,
13
                        Defendant.
14

15         I, REBECCA SMITH, make the following Declaration of my own personal knowledge

16 under penalty of perjury under the laws of the state of Washington that the foregoing is true and

17 correct. I am over the age of 18 and competent to testify to the matters stated here:

18         1.     In 2012, I-502, an initiative for the legalization of recreational marijuana in the

19 State of Washington, was approved by a popular vote. I was initially the Marijuana Licensing

20 Manager, and then shortly thereafter, the Director of Licensing with the Washington State Liquor

21 and Cannabis Board (Board) when I-502 was being implemented. As Licensing Director, I

22 oversee and work with hundreds of Board employees, including licensing specialists,

23 enforcement officers, and their leadership all to ensure that the Washington marijuana industry

24 runs smoothly and in accord with the intent of the law. In my eight years working at the top level

25 of this new and evolving industry, I am intimately familiar with marijuana statutes and rules, and

26 the underlying policies that support those laws.

2. In voting for I-502, the people of Washington approved a residency requirement. As Washington was one of the first two states (the other being Colorado) to legalize the marijuana industry, it was of paramount importance to meet the Initiative's goal to having a "tightly-regulated" industry and to ensure that marijuana remained within Washington's borders.

3. I am aware that Todd Brinkmeyer, an Idaho resident, has challenged Washington's residency requirement. Mr. Brinkmeyer would like to receive an ownership interest from Michael "Scott" Atkison, who currently has ownership interest in five marijuana retailer licenses, four of which Mr. Brinkmeyer helped finance. It is not clear if Mr. Brinkmeyer anticipates ownership in all five businesses, just the four he helped finance or some other arrangement. Below are the current ownership details of each of the five licenses that Mr. Atkison currently has ownership in:

 a. **CANNA4LIFE**. Mr. Atkison owns 80% of Canna4Life LLC, a marijuana retailer, License Number 414211. Mr. Atkison's ownership is through his company Insagu, LLC. Insagu, LLC is owned by No. 259 and No. 259 is owned by Mr. Atkison and his spouse. Robin Cook owns the remaining 20% of Canna4Life. Mr. Brinkmeyer, through his company, ATC 2, LLC, loaned $400,000 to this business to help finance Mr. Atkison's purchase of the business. Attached as **Exhibit 1** is a true and accurate copy of a Report of Application demonstrating the ownership structure, and **Exhibit 2** is a true and accurate copy of a Source of Funds document reflecting Mr. Brinkmeyer's contribution.

 b. **317 Retail, LLC**. Mr. Atkison owns 50% of 317 Retail, LLC, a marijuana retailer, License No. 427634. Mr. Atkison's ownership is through his company Insagu, LLC. Insagu, LLC is owned by No. 259 and No. 259 is owned by Mr. Atkison and his spouse. Brian Jennings and Anthony Peschak each own 25% of 317 Retail, LLC. Anthony Peschek was recently removed from this license. Mr. Brinkmeyer loaned $800,000 to the business. Attached as **Exhibit 3** is a is a true and accurate copy of a

Declaration of Rebecca Smith   2   ATTORNEY GENERAL OF WASHINGTON
20-2-01568-34          1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

1    Report of Application demonstrating the ownership structure, and **Exhibit 4,** is a true

2    and accurate copy of a Source of Funds document reflecting Mr. Brinkmeyer's

3    contribution.

4         c.    **3213 Retail, Inc.** Mr. Atkison owns 50% of 3213 Retail, Inc., a marijuana

5    retailer, License No. 084154. Mr. Atkison's ownership is through his company

6    Insagu, LLC. Insagu, LLC is owned by No. 259 and No. 259 is owned by Mr. Atkison

7    and his spouse. Mr. Jennings and Mr. Peschek each own 25% of this business.

8    Mr. Brinkmeyer did not provide any financing to this business. Attached as **Exhibit 5**

9    is a true and accurate copy of a Report of Application demonstrating the ownership

10   structure.

11        d.    **2215 Retail, LLC**. Mr. Atkison directly owns 50% of 2215 Retail, LLC,

12   a marijuana retailer, License No. 423754. Mr. Jennings and Mr. Peschek each own 25%

13   of this business. Mr. Brinkmeyer through his company ATC2, LLC provided

14   $1,400,000 to the business. Mr. Atkison also provided a loan of $800,000 from his

15   personal accounts and from his company Insagu, LLC. Additional funds were also

16   provided from 317 retail and each of the three owners. Attached as **Exhibit 6** is a is a

17   true and accurate copy of a Report of Application demonstrating the ownership

18   structure, and **Exhibit 7** is a true and accurate copy of a Source of Funds document

19   reflecting Mr. Brinkmeyer's contribution.

20        e.    Finally, Mr. Atkison and his partners, Brian Jennings and

21   Anthony Peschek, recently acquired a fifth marijuana retail license, RD Tacoma, LLC,

22   License No. 415010 on September 10, 2020. Mr. Atkison owns 50% of

23   RD Tacoma, LLC through Insangu, LLC. Mr. Jennings and Mr. Peschek each own 25%

24   of the business. This business is in the process of changing locations and

25   Mr. Brinkmeyer is assisting in financing the change of location. Attached as **Exhibit 12**[1]

26
_____
[1] This exhibit was added after the other exhibits were numbered.

Declaration of Rebecca Smith                    3          ATTORNEY GENERAL OF WASHINGTON
20-2-01568-34                                               1125 Washington Street SE
                                                               PO Box 40100
                                                          Olympia, WA 98504-0100
                                                              (360) 664-9006

1    is a true and correct copy of a Report of Application demonstrating the ownership

2    structure and **Exhibit 13**[2] is a true and accurate copy of a Source of Funds document

3    reflecting Mr. Brinkmeyer's contribution.

4        4.      Mr. Brinkmeyer alleges that there no reason why he could not hold a Washington

5    Marijuana license because the Board has already vetted him. However, whether a person may

6    hold a Washington State Marijuana license is a decision that the Board determines after fully

7    vetting a person at the time he or she applies. It has been several years since Mr. Brinkmeyer

8    was vetted as a financier, and until he is vetted as an owner, the Board does not know whether

9    he would qualify, absent the residency requirement. For example, the Board was unaware of the

10   lawsuit between *Tricore Invesments, LLC v. Estate of Warren, John Stockton and*

11   *Todd Brinkmeyer*, 485 P.3d 92 (2021). Although the Idaho Supreme Court found that

12   Mr. Brinkmeyer and several others did not engage in conspiracy to accomplish an unlawful act,

13   the fact remains that the Board was unaware of the decision and it may have impacted

14   Mr. Brinkmeyer's suitability to hold a Washington Marijuana license. Attached as **EXHIBIT**

15   **14**[3] is a copy of *Tricore Invesments, LLC v. Estate of Warren, John Stockton and*

16   *Todd Brinkmeyer*, 485 P.3d 92 (2021).

17       5.      Washington's residency requirement is a necessary component of Washington's

18   robust legal marijuana industry. The residency requirement helps Washington meet the *Cole*

19   memorandum factors and deters federal interference in our market. The federal Controlled

20   Substances Act (CSA) makes any marijuana possession, transfer, or delivery a federal crime.

21   After I-502 passed, the federal government issued the *Cole* memorandum, which signaled to any

22   state that chose to legalize marijuana, including Washington, that if certain enforcement

23   priorities were met, the federal government would be unlikely to investigate or prosecute those

24   within the regulated marijuana market. Those priorities included preventing sales to minors,

25

26         [2] This exhibit was also added after the exhibits had been numbered.
      [3] This exhibit was also added after the exhibits had been numbered.

1   preventing marijuana from becoming associated with criminal affiliates, and preventing

2   diversion of marijuana to other states. The *Cole* memo also generally expected that states

3   enacting "laws authorizing marijuana-related conduct" to "implement strong and effective

4   regulatory and enforcement systems that will address the threat those state laws could pose to

5   public safety, public health and other law enforcement interests." It further warned, "If state

6   enforcement efforts are not sufficiently robust to protect against the harms . . . the federal

7   government may seek to challenge the regulatory structure itself." Attached as **Exhibit 8** is a

8   true and accurate copy of the *Cole* memorandum.

9       6.      While the *Cole* memo was rescinded by Former Attorney General Jeff Sessions,

10  it still serves as the hallmark guidance that states follow, and the federal government has

11  continued to implicitly follow that guidance as well. Attached as **Exhibit 9** is true and accurate

12  copy of a recent article entitled "2 Years After Sessions Rescinded Cole Memo, Prosecutors

13  Continue to Adhere to Obama-Era Enforcement Guidelines." Upon looking at Department of

14  Justice prosecutions from 2018-2020, the article concludes that the DOJ still follows the

15  *Cole* Memo despite it being rescinded. An online version of the article is located at:

16  https://www.benzinga.com/markets/marijuana/20/01/15093079/2-years-after-sessions-

17  rescinded-cole-memo-prosecutors-continue-to-adhere-to-obama-era-enforce.

18      7.      The residency requirement also helps to ensure that all potential owners are

19  properly investigated and prevents criminal elements from gaining a foothold in Washington's

20  market. All potential licensees must undergo a financial investigation, criminal and civil

21  background investigation, interviews, fingerprinting, among other requirements to successfully

22  pass the Board's vetting requirements and be eligible for licensure. In order to complete a

23  successful criminal background check, the Board needs to be able to conduct criminal

24  background checks in local Washington jurisdictions that are not available on any federal

25  database. Even a pattern of misdemeanors that may not show up on the federal database will

26  disqualify an applicant for licensure. See WAC 314-55-040. The residency requirement ensures

1   that the Board can contact local authorities and access the tools necessary to conduct these local

2   checks. If an owner were located in another state, the ability to conduct local criminal

3   background checks would be made much more difficult because the Board lacks a relationship

4   with the local or state law enforcement. Furthermore, each state has a slightly different type of

5   local criminal background system, making it more difficult for the Board to determine whom to

6   work with to obtain the necessary information. Finally, states where marijuana is illegal, such as

7   Idaho, could be understandably reluctant to assist another state where it has been legalized,

8   particularly when the states share a border.

9          8.     Under I-502, local authorities must be notified of marijuana applications and the

10  associated applicants, and can object to the location or the applicants. RCW 69.50.331(7). In

11  their objections, local authorities may provide details about an individual that the Board may not

12  be aware of, including threats to public safety that may necessitate the denial of the applicant for

13  a marijuana license. While it does not happen frequently, I am aware of several cases in which

14  information from a local authority prevented individuals from receiving a marijuana license. If

15  a marijuana licensee could live out-of-state, it is unlikely that the local authority in Washington

16  would be able to provide any additional information, and the Board would lose this meaningful

17  perspective in evaluating marijuana applicants.

18         9.     The residency requirement also ensures that owners maintain a physical presence

19  in Washington so that our criminal and marijuana laws may be prosecuted in the event the owner,

20  and/or its business, violate our laws. The Board requires that all owners of the business be

21  responsible for the conduct of their business, their employees, and even visitors on the premises.

22  WAC 314 55-110(4). Board Enforcement officers need the ability to access the physical

23  marijuana premises and to be able to interview owners in case of alleged violations. While

24  employees or another representative could perhaps help Board Enforcement Officers conduct its

25  investigation on the licensed premises, it is the owner(s) who must be able to answer for any

26  marijuana regulatory violations or criminal activity. If, for example, a marijuana retailer set up

their business so that it routinely sold marijuana to minors or diverted marijuana outside the regulated market, it is more than a regulatory issue, it would also be criminal one. It may prove difficult to attempt to hold an owner who lives outside of Washington accountable for any criminal activity.

10.     Furthermore, in part because of marijuana's federal illegality, Board Enforcement Officers cannot cross state lines to enforce Washington marijuana laws in another state. I am aware that unlike the Board's Enforcement Officers, the Washington State Gambling Commission's Enforcement Officers *can* leave Washington to enforce gambling laws, including even going outside the country if need be to conduct investigations.

11.     The residency requirement also supports Washington's tiered marijuana system. Washington's tiered system means an individual or business can only participate on one side of the industry—either, the marijuana retailer side, or the marijuana production and processing side. Washington's marijuana system was patterned on Washington's alcohol rules, which separate retail sellers from manufacturers and distributors to prevent "tied houses." Tied houses invited criminal activity and unsafe business practices by failing to limit a manufacturer's influence over a retail seller. By eliminating the residency requirement, Washington's tiered marijuana system, as set up by the people of Washington, would be undermined. This is because another state's resident could be involved with marijuana production, retail, or even both in their own state, and then apply to be a producer or retailer in Washington. As there is no federal database of those involved in the industry, the best enforcement mechanism we would have is to "ask" the individual whether they are involved with marijuana and rely on their truthfulness. As demonstrated by some of the companies set up in Mr. Atkison's ownership in his marijuana retailers, the corporate structure can become very complicated and make it difficult for the Board to track down whether the individual is in fact involved with marijuana outside of Washington.

12.     Washington allows one individual/business to own up to five marijuana retailer licenses. RCW 69.50.325(3)(b). Such a limitation ensures that big business and criminal activity

Declaration of Rebecca Smith
20-2-01568-34

7

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 664-9006

cannot dominate the market in our State—but if residency were eliminated, this safeguard to Washington's marijuana industry would be threatened because it would be difficult to know who is already involved with other retailers in other states. By keeping all ownership of marijuana businesses in Washington, we can work within our State's regulatory structure to ensure the tiered system and limitation on marijuana licenses remains intact.

13.     As tightly regulated as this industry has been, the Board has continued to listen to its constituents and loosened restrictions to the extent it can without risking public safety or Washington's marijuana structure. For example, financiers were previously required to be Washington residents, but the Board, in conversation with industry stakeholders, determined that vetting of a financier could be accomplished without residency. This makes sense because financiers, generally speaking, are limited to providing loans on a fixed interest rate to marijuana licensees. That is it—they are purely investors.

14.     While the vetting of financiers and owners is similar, it is not exactly the same. Simply because a person can pass vetting as a financier, does not mean that they would pass vetting as an owner. The investigation into an owner is more searching and thorough as compared to a financier. By way of example, Licensing Specialists and Board Enforcement Officers will spend more time reviewing the character of an owner, including local criminal background checks not available out of state. An out-of-state financier is not subject to the same local background scrutiny (because of the difficulty as described in Paragraph 7). Another difference is a financier's funds can be more easily traced because they have a one-time determinate amount of money that they are investing. The vetting process for that is straightforward. Comparatively, an owner's financial accounts receive additional vetting as they are more dynamic in nature; they can be used to deposit and withdraw revenue/profits from marijuana business, so additional tracking is required so the ebb and flow of marijuana money can be tracked.

15.     Moreover, owners are held responsible for the operation of the business, regulatory compliance, and for any criminal conduct that may occur. WAC 314-55-110(4).

1    Because of the level of accountability between financiers and owners, there is less of a need for

2    financiers to be domiciled in the State. In contrast, an owner must be located here so that they

3    oversee business operations, timely respond to investigations, be present for inspections as

4    needed, and properly respond to the Board's requests for documents or information,

5    *see* WAC 314-55-185.

6        16.    In addition, the Board determined that the six-month residency requirement is the

7    shortest amount of time to accomplish the goals discussed above. When I-502 was initially

8    passed, the residency requirement was only a three-month period. While we would have liked to

9    make that work, we had issues with individuals who came into Washington for three months for

10   the sole purpose of receiving a marijuana license and then would leave the State. This caused

11   issues on the licensure side as well as on the Enforcement side, as applications often take three

12   months or more to process, so applicants would start out qualifying for a license, but by the end,

13   would not because they were no longer a resident. To that end, Second Engrossed Second

14   Substitute House Bill 2136 in 2015 was passed that raised the residency requirement from three

15   months to six months. In my opinion, this small increase has better achieved the policies of the

16   residency requirements set forth in this Declaration.

17       17.    If marijuana becomes federally legal, it may be time for another discussion on

18   whether a residency requirement is needed. Though I would have concerns about the impact on

19   Washington's tiered-system, it is possible that we may be able to make a system more like liquor

20   or tobacco, both of which are federally legal.

21       18.    I also understand that other states have chosen not to include a residency

22   requirement in their marijuana system. While that may work for them, other states have issues

23   with overproduction and diversion of marijuana out of state. For example, Oregon does not have

24   a residency requirement and has significant overproduction. Overproduction of marijuana is a

25   common issue that leads to diversion, as marijuana licensees become desperate to make a sale

26   in an over saturated market, they end up selling their marijuana out of state to earn money to

Declaration of Rebecca Smith                           9                    ATTORNEY GENERAL OF WASHINGTON
20-2-01568-34                                                                        1125 Washington Street SE
                                                                                           PO Box 40100
                                                                                      Olympia, WA 98504-0100
                                                                                          (360) 664-9006

keep their business afloat. Even Exhibit C, an article attached to the Declaration of Andy Murphy, on page 9 reflects that the elimination of the residency requirement may have caused Oregon to be the "target of federal attention due to marijuana diversion" because of the overproducion of marijuana. For convenience, a true and accurate copy of that article is attached as **Exhibit 10.** That article on page 4 also states that "[t]he main cost of residency requirements is loss of funding." That concern is not as great in Washington anymore, because as previously discussed, we have allowed out-of-state financiers to provide money and loans to marijuana retailers. I am also proud to say that Washington's marijuana regulations have ensured that 70% of marijuana in Washington right now has come from legal sources, displacing the illegal market. While that number may seem low, it is one of the highest in the nation for legal marijuana production.

19.     Other states, including Mr. Brinkmeyer's resident state Idaho, have not even chosen to decriminalize marijuana. Attached as **Exhibit 11** is a true and accurate copy of an explanation of laws and map detailing the current legality of marijuana in each state (retrieved online at https://disa.com/map-of-marijuana-legality-by-state). Without the residency requirement, Mr. Brinkmeyer—and other residents of Idaho—could enter into the Washington marijuana industry, much, I imagine, would cause Idaho concern. The U.S. District Attorney in Idaho could exercise his discretion and determine that ownership goes one-step too far—and Idaho residents would then be subject to federal criminal prosecution.

20.     It would also be easy for an Idaho resident, who was a Washington licensee, to bring marijuana home to Idaho, in violation of Idaho state law. It is common for retail licensees to sample products so that they can determine whether to carry a product in the store. As a licensee cannot try samples on the licensed premises or in public places in Washington, they may need to bring it home to try it. See, RCW 69.50.445 prohibiting public consumption, WAC 314-55-096 allowing samples and WAC 314-55-015(12) prohibiting the consumption of marijuana on a licensed premises. The residency requirement, therefore, not only protects the

integrity of our State's legal marijuana system, it better respects other states that have chosen not to legalize marijuana and protects those citizens from criminal prosecution.

21.     In my opinion as Licensing Director for the last eight years and a dedicated advocate for the integrity of Washington's marijuana industry, it is paramount that the residency requirement be maintained.

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct to the best of my knowledge.

Signed this ⎯18⎯ day of June 2021, at Olympia, Washington.

REBECCA SMITH
Licensing Director
Washington State Liquor and Cannabis Board

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE

# Exhibit 1

```
Special Instructions to Issue Desk:
JV Number 86383 | Entity Expiration Date 10/31/2020
Email Address for Issue Letter: Licensee – SCOTTCANNA4LIFE@GMAIL.COM
```

## WASHINGTON STATE LIQUOR AND CANNABIS BOARD
## REPORT OF APPLICATION – SARAH WORLEY

LICENSE NUMBER: 414211                    UBI NO.:  6034482820010001

EO CODE:  7V

LICENSE TYPE: RETAILER/MEDICAL         APPLICATION TYPE: CHANGE IN
                                       GOVERNING PEOPLE APPLICATION

ENTITY: CANNA4LIFE LLC                 TRADE NAME: CANNA4LIFE

LICENSEES/TRUE PARTIES OF INTEREST:

| | |
|---|---|
| **INSANGU LLC** | **MGR/MBR 80%** |
| **NO 259, INC** | **MGR/100%** |
| **MICHAEL "SCOTT" ATKISON** | **MGR/100%** |
| **PAULA LORRAINE ATKISON** | **SPOUSE** |
| **ROBIN DEAN COOK** | **MBR/20%** |
| **KIA COOK** | **SPOUSE** |

FINANCIER(S):

| | |
|---|---|
| CANNA4LIFE LLC | FINANCIER |
| INSANGU LLC | MGR/MBR 80% |
| NO 259, INC | MGR/100% |
| MICHAEL "SCOTT" ATKISON | MGR/100% |
| ROBIN COOK | SPOUSE |
| KIA COOK | MBR/20% |
| | SPOUSE |

**LOCAL AUTHORITY:** N/A for this application- TPI being removed
Approved:
Conditional Approval:
Neutral:
No Response:
Disapproved:
Objections/Courtesy Information:

## Application Summary:

### Application Information:

This application is for changing the entity structure of a licensed Marijuana Retailer/Medical  located in
The City of Clarkston. This application was received on 2/26/2020.

The business has applied to remove Bethany Frost from the entity structure.

### Licensee/Applicant Information/Violation/Criminal History:

The currently licensed entity is a LLC consisting of 2 married members.

The licensee's associated administrative violation history is as follows for the last two years:

Page **1** of 3

Exhibit 1
Page 1 of 3

<u>Marijuana Retail/Medical License # 414211  (From 01/26/2018 to Current)</u>:
- There is no associated administrative violation history to report.

<u>Marijuana Retail/Medical License # 084154  (From 12/7/2018 to Current)</u>:
- There is no associated administrative violation history to report.

<u>Marijuana Retail/Medical License # 427634  (From 10/31/2018 to Current)</u>:
- There is no associated administrative violation history to report.

<u>Marijuana Retail/Medical License # 423754  (From 7/10/2019 to Current)</u>:
- There is no associated administrative violation history to report.

The business has applied to remove a true party of interest. The member being removed is Bethany Frost.

**Business Property:**

Applicant Robin Cook is purchasing Bethany Frosts 10% for $130,000.00, and will be paid within 10 days upon WSLCB's approval. Canna4life LLC will be the financier, lending the $130,000 to Robin to pay Bethany Frost. Robin Cook signed a promissory note with Canna4life LLC for the loan of $130,000. The terms of this agreements reflect that the loan of $130,000 is to be repaid by December 31, 2021.

The applicants have submitted a copy of the required business property documents to reflect and record the terms of this transaction. The business property documents verify that Bethany Frost is selling her 10% to Robin Cook for $130,000.

**Source of Funds:**

Funds of $130,000 are coming from Canna4Life LLC. The applicant has submitted 6 months of business bank statements to verify the eligibility and availability of these funds.

**Special Requests/Protests/Support:**

None received.

**Enforcement Officer Comments:**

None received and Final Inspection is not required for this application.

**Hold Terms/Manager Comments/Notes:**

### LICENSE SPECIALIST SENIOR/REVIEWER/MANAGER

| | | |
|---|---|---|
| License Specialist Sr.<br>Sarah Worley | Date<br>3/31/2020 | Approval |
| Reviewer<br>supervisor review not required for this application, self-review completed | Date | Approval |
| Manager (Threshold Only) | Date | Approval |

## THRESHOLD  DECISION:

| Name | Date | Approved | Disapproved | Discuss |
|------|------|----------|-------------|---------|

Exhibit 1
Page 3 of 3

# Exhibit 2



**Washington State**
**Liquor and Cannabis Board**

| License Number | 414211 |
|---|---|
| UBI Number | 6034482820010001 |
| Trade Name | CANNA4LIFE |

## Source of Funds

**Identify where your money is coming from.**

*Examples include but are not limited to:*

- Bank/Lending Institution
- Loan or gift from an individual or company

- Sale of property
- Inheritance
- Deferred contract
- Cash

- Promissory note
- Credit card
- Investment account
- Sweat equity/labor

**Only detail the source(s) and dollar amount you are using to fund the business** *(include the name of any financial institution, credit card lender or investment company)*

| Source (see examples above) | Account Number (if applicable) | Amount Contributing |
|---|---|---|
| Loan from Todd Brinkmeyer (ATC2, LLC) | none | 400000 |
| | | |
| | | |
| | | |
| | | |
| | **Total:** | **$  400,000.00** |

**Does the money you have gifted, loaned or invested give you a percentage of profit or part ownership in the business?**     NO [X]   YES [ ]     If yes, what percentage? _____

I certify under penalty of perjury that all answers and statements are true, correct and complete. I understand that untruthful or misleading answers are cause for rejection of my application and/or revocation of any license granted. I hereby authorize investigation of my criminal history, financial records and other sources as necessary for licensing.

PRINT NAME     Michael Scott Atkison

SIGNATURE    *Michael Scott Atkison*
DocuSigned by:
D2A0AB3CFEE6440...

DATE     9/26/2017

**Continuation Sheet Attached?**     [ ] YES     [ ] NO

# Exhibit 3

Special instructions to Issue desk:

Email Address for Issue Letters: SCOTTATKISON@MAC.COM

Ok Issue

**Washington State Liquor and Cannabis Board**
**REPORT OF APPLICATION – MICHAEL WALKER**
LICENSE NUMBER/AGENT'S CODE  427634-1R     UBI NO.  6042736840010002
LICENSE TYPE: RETAILER

APPLICATION TYPE: ENTITY STRUCTURE

ENTITY: 317 RETAIL, LLC

PEOPLE:
**INSANGU, LLC**                               **MGR/MBR/50%**
  **NO 259, INC.**                   **MBR/100%**
    **MICHAEL SCOTT ATKISON**     **PRES/100%**
     **PAULA LORRAINE ATKISON**  **(SPOUSE)SEC**
**BRIAN DAVID JENNINGS**                       **MBR/25%**
**ANTHONY ALLEN PESCHEK**                      **MBR/25%**
  **BRITTANY ANNE PESCHEK**            **SPOUSE**

TRADE NAME: ZIPS CANNABIS

| | | | |
|---|---|---|---|
| Street Address: | 317 S 72ND ST | Mailing Address: | 317 S 72nd ST |
| City: | TACOMA | City: | TACOMA |
| County: | PIERCE | State: | WA |
| Zip: | 98408-6003 | Zip: | 98408-6003 |

**LOCAL AUTHORITY/DATE SENT:** LAN Sent to the City of Tacoma on May 7, 2019.

Approved: The City of Tacoma Responded with Approval to the Applicant and Location on May 15, 2019.
Conditional Approval:
Disapproved:
Neutral:
No Response:

**WITHIN 1,000 FEET OF:** Child Care Center, Elementary School, Secondary School, Playground, Game Arcade, Library, Public Park, Public Transit Center, Recreation Center or Facility?    ☐ Yes  ☐ No  ☒ N/A
**WITHIN 1,000 FEET OF:** Tribal Land, Trust Land or Fee Land?
IF YES, date Local Authority Notice was sent:    Response:    ☐ Yes  ☐ No  ☒ N/A

## Report/Review Summary:

**Location Information:**

This application is for changing the governing people and percentages of ownership of a licensed Marijuana Retailer located in the City of Tacoma. The premises consists of a single-story building structure. There is no direct access into another business or living quarters from within this business.

**Applicant Information/Violation History:**

Page **1** of 4

Exhibit 3
Page 1 of 4

The currently licensed entity is a limited liability company consisting of two officers, who are married to each other, and one member who is unmarried. The licensed members' associated administratively violation history is as follows:

Marijuana Retailer License 414211 (January 26, 2018, to Current):
- No administrative violations assessed during this timeframe.

Marijuana Retailer License 414889 (June 27, 2018, to October 31, 2018):
- A written warning issued on September 12, 2018, for (MJ) Advertising: Violations (statements/illustrations) (WAC 314-55-155).

Marijuana Retailer License 084154 (December 7, 2018, to Current):
- No administrative violations assessed during this timeframe.

Marijuana Retailer License 427634 (October 31, 2018, to Current):
- No administrative violations have been assessed to this license.

Marijuana Retailer License 412923 (November 16, 2016, to Current):
- An administrative violation issued on December 28, 2016, for (MJ) Failure to utilize and/or maintain traceability (processor or retail licensee) (WAC 314-55-083(4)), (MJ) Failure to maintain required security alarm and surveillance systems (WAC 314-55-083(3)), and (MJ) Retail outlet selling unauthorized products (RCW 69.50.357), which was closed on May 12, 2017.
- A verbal warning issued on June 29, 2017, for (MJ) Failure to utilize and/or maintain traceability (processor or retail licensee) (WAC 314-55-083(4)).
- A verbal warning issued on October 26, 2017, for (MJ) Advertising: Violations (statements/illustrations) (WAC 314-55-155).
- A verbal warning issued on December 12, 2017, for (MJ) Advertising violations (WAC 314-55-017).
- A written warning issued on September 12, 2018, for (MJ) Advertising: Violations (statements/illustrations) (WAC 314-55-155).
- An administrative violation issued on December 6, 2018, for (MJ) Advertising: Violations (statements/illustrations) (WAC 314-55-155), which is currently pending an administrative hearing.

Marijuana Retailer License 422570 (August 4, 2017, to March 11, 2019):
- An administrative violation issued on January 12, 2018, for (MJ) Allowing a minor to frequent a restricted area (RCW 69.50.357) and (MJ) Sale or service to a minor (WAC 314-55-079), which was closed on January 16, 2019.

The new applicant member that is being added with this application is Anthony Peschek. Anthony Peschek is married to Brittany Peschek. The applicants' associated administrative violation history is as follows:

Marijuana Retailer License 084154 (December 7, 2018):
- No administrative violations assessed during this timeframe.

All parties are eligible for licensure having passed their fingerprinting and background checks.

**Real Property:**

Real property verification is not required for Entity Structure applications.

**Business Property:**

The business has applied to add a new governing member. The new member, Anthony Peschek, is a current marijuana retailer licensee (084154).

Exhibit 3
Page 2 of 4

The business has also applied to change the percentages of ownership within this entity. Currently 67% of *317 Retail LLC* is owned by *Insangu, LLC*. *Insangu, LLC* is 100% owned by *No 259, Inc.*, which is 100% owned by Michael Atkison. Brian Jennings owns 33% of *317 Retail, LLC*.

Anthony Peschek is acquiring his 25% ownership interest in *317 Retail, LLC*, through a $1,000 share purchase and due to contributions of sweat equity. An agreement has been submitted to reflect and record the terms of this transaction. The agreement shows that Anthony Peschek is receiving 25% ownership interest in this company for $1,000 and previous contributions of sweat equity. Brian Jennings will be transferring 8% of his current 33% ownership interest to Anthony Peschek and *Insangu LLC* will be transferring 17% of their current 67% ownership interest to Anthony Peschek.

After this application is processed Brian Jennings will own 25% of *317 Retail LLC*, Anthony Peschek will own 25% of *317 Retail LLC*, and *Insangu, LLC* will own 50% of *317 Retail LLC*.

**Source of Funds:**

Funds of $1,000 are coming from applicant member Anthony Peschek's personal account with Tacoma Longshore Credit Union.

**License Requirements/Operating Plan:**

Description of operation and premises – No changes are occurring to the business's operations or premises with this Entity Structure application.

MJ Examiner – Not required for Marijuana Retailers.

Fire Marshal Approval – Not Required for Marijuana Retailers.

Security – Security badges will be issued to employees. A complete surveillance system of management and monitoring will be utilized for coverage of all controlled access areas, security areas, and points of ingress/egress. The cameras will provide image acquisition, and are IP compatible, recording at a resolution of 640x470. Sounding alarms have been placed at all exterior entrances, exits, and windows. Recordings will be kept for a minimum of 45 days on a storage device, and all cameras will be continuously recording for 24 hours a day.

Traceability – The licensee has previously passed Traceability Testing.

Insurance – The licensee has previously provided proof of adequate insurance coverage.

**Local Authority Objections/Special Requests/Protests/Support:**

The Local Authority Notice was sent to the City of Tacoma on May 7, 2019. The City of Tacoma responded with approval to the applicant and location on May 15, 2019.

**Enforcement Officer Comments:**

None Received.

---

**LICENSE SPECIALIST/REVIEWER/MANAGER**

License Specialist          Date          Approval
*Michael A. Walker*         6/6/19

Reviewer                    Date          Approval
                            6.6.19

Manager                     Date          Approval

Director                    Date          Approval
Page | 3

Exhibit 3
Page 3 of 4

**Hold Terms:**

**DESIGNEE  DECISION:**

Name                          Date                    Approved              Disapproved            Discuss

MANAGER/DIRECTOR COMMENTS/NOTES:

Exhibit 3
Page 4 of 4

**Exhibit 4**



**Washington State**
**Liquor and Cannabis Board**

| | |
|---|---|
| License Number | 414889 |
| UBI Number | 6042736840010001 |
| Trade Name | HIGHWAY 7 |

## Source of Funds

**Identify where your money is coming from.**

**Detail each source(s) and dollar amount of where the money is coming from that you are using to fund the business** *(include the name of any financial institution(s), credit card lender or Investment Company)*

| Source | Account Number | Amount Contributing |
|---|---|---|
| sale of Oregon property | ███████ | 520000 |
| stock account | ███████ | 280000 |
| | | |
| | | |
| | | |
| | | |
| | **Total:** | **$** 800,000.00 |

**Does the money you have gifted, loaned or invested give you a percentage of profit or part ownership in the business?**     NO ☒   YES ☐     If yes, what percentage? 0

I certify under penalty of perjury that all answers and statements are true, correct and complete. I understand that untruthful or misleading answers are cause for rejection of my application and/or revocation of any license granted. I hereby authorize investigation of my criminal history, financial records and other sources as necessary for licensing.

PRINT NAME     Todd Brinkmeyer

SIGNATURE    *Todd Brinkmeyer*
DocuSigned by:
DC6343CEBBD44F1...

DATE     5/13/2018

**Continuation Sheet Attached?**   ☐ YES   ☐ NO

# Exhibit 5

Special instructions to Issue desk:
Include 15 day window in approval letter: ☐ Yes   X No
Email Address for Issue Letters: scottatkison@mac.com

Ok Issue

## Washington State Liquor and Cannabis Board
### REPORT OF APPLICATION - AGW

LICENSE NUMBER/AGENT'S CODE  **084154**          UBI NO.  **6043267590010001**
LICENSE TYPE: **Retailer/Medical**

APPLICATION TYPE: **ASSUMPTION** from 25 Trees, LLC

ENTITY: **3213 RETAIL, LLC**

PEOPLE:
**INSANGU, LLC**                                **MBR/50%**
  NO 259, INC                                     MBR/100%
    MICHAEL S. ATKISON                                PRES/SH/100%
    PAULA ATKISON                                     SEC
**BRIAN D. JENNINGS**                          **MBR/25%**
**ANTHONY A. PESCHEK**                         **MBR/25%**
  BRITTANY A. PESCHEK                             SPOUSE

**NO 259, INC**                                **FINANCIER**
  MICHAEL S. ATKISON                              PRES/SH/100%
  PAULA L ATKISON                                 SEC
**317 RETAIL LLC**                             **FINANCIER**
  INSANGU                                         MBR/67%
    NO 259, INC                                     MBR/100%
    MICHAEL S. ATKISON                              PRES/SH/100%
    PAULA ATKISON                                   SEC
  BRIAN JENNINGS                                  MBR/33%

TRADE NAME: **25 TREES**

| | | | |
|---|---|---|---|
| Street Address: | **3213 S 38TH STE C** | Mailing Address: | **2020 S ROCKWOOD BLVD** |
| City: | **TACOMA** | City: | **SPOKANE** |
| County: | **PIERCE** | State: | **WA** |
| Zip: | **98404-1094** | Zip: | **99203-3460** |

**LOCAL AUTHORITY/DATE SENT:** 9/28/18

Approved:        City of Tacoma
Conditional Approval:
Disapproved:
Neutral:
No Response:

**WITHIN 1,000 FEET OF:** Child Care Center, Elementary School, Secondary School, Playground, Game Arcade, Library, Public Park, Public Transit Center, Recreation Center or Facility?          ☐ Yes    X No
**WITHIN 1,000 FEET OF:** Tribal Land, Trust Land or Fee Land?          ☐ Yes    X No
IF YES, date Local Authority Notice was sent:          Response:

Page **1** of **3**

Exhibit 5
Page 1 of 4

084154 pg. 2

## Report/Review Summary:

**Location Information:**

This is an application for the assumption of a retail marijuana store located in the City of Tacoma. The premises is located in a single story strip mall. There is no direct access to another business or living quarters.

**Applicant Information/Violation History:**

The applying entity is a LLC consisting of 3 members, one of which is another LLC. The applicant has not been previously licensed by the Board. LLC member Anthony Peschek has not been previously licensed by the Board. LLC members Michael and Paula Atkison and Brian Jennings are currently licensed at 414889 (retail marijuana), since June 2018 with no violation history.

In addition LLC members Michael and Paula Atkison are currently licensed at the following:4
- 414211 (retail marijuana), since January 2018 with no violation history.

LLC member Brian Jennings is currently licensed at the following:
- 412923 (retail marijuana), since November 2016 with the following violation history:
  - 9/12/18 – Written Warning, Advertising violations, Ended
  - 12/28/16 – AVN 1R6363A, Failure to maintain required alarm/video. Ended – paid $1,500 fine 5/12/17.
  - 11/3/16 – Written Warning, allowing a minor to frequent a restricted area. Ended
- 422570 (retail marijuana), since August 2017 with the following violation history:
  - 1/12/18 – AVN 3H8012A, 1) Allowing a minor to frequent a restricted area 2) Sale or service to minor. Pending.
  - 6/7/17 – AVN 3E5178A, Sale or service to minor. Ended – paid $1,500 fine 8/21/17
  - 6/7/17 – AVN 3E5178B, Allowing a minor to frequent a restricted area. Ended – paid $600 fine 8/23/17

**Real Property:**

The applicant is leasing the real property for a term of 3 years, terminating September 30, 2021. The monthly rent is $4,000. There is a $4,000 security deposit. There are 2 options to extend for 5 years each.

**Business Property:**

On July 10, 2018 the current licensee and the Board reached a Stipulated Settlement Agreement where the licensee acknowledged that it currently owes approximately $430,629.35 in back taxes, interest and penalties. In return for payment in full balance of taxes, interest and penalties the Board has agreed to allow the licensee to attempt to sell its business and have the buyer assume and remove Chad Dagais from license number 084154. In addition the licensee acknowledges and agrees that all members to include Chad Dagais will have no further involvement, including employment, with marijuana retail license number 084154. The licensee also agrees that no member of the current licensee will be approved for a marijuana license or as a true party of interest on a marijuana license for a period of 5 years. The Licensee and the buyer will have 120 days from the date of the Stipulated Settlements Agreement (July 10, 2018) to complete the assumption and removal of Chad Dagais from the license.

The applicant is purchasing the business for $1,500,000 with $700,000 to be paid at closing. The balance of $800,000 will be paid in 13 "Earn Out Payments" to begin 1 month after the closing. The payments begin at $40,000 per month and escalate to a final payment of $170,000. In addition the applicant will be spending $154,000 on lease costs, inventory costs and operating expenses.

**Source of Funds:**

Funds of $352,000 are coming from LLC member Insagnu LLC's corporate bank account, $1,000 each from LLC members Brian Jennings' and Anthony Peschek's personal bank accounts, $250,000 from financier Canna4Life's corporate bank account and $250,000 from financier 317 Retail, LLC's corporate bank account.

Page | 2

Exhibit 5
Page 2 of 4

084154 pg. 3

**License Requirements/Operating Plan:**

<u>**Description of operation and premises**</u> – There are 2 points of ingress/egress, one is for the general public to use and another at the rear of the store with controlled access. The business consists of 5 rooms; the retail area where the display cases and POS stations are located, an office where surveillance recording equipment is located, a controlled access area, a storage room where the quarantine and product storage are located and a restroom. The applicant intends to sell usable marijuana, marijuana infused products, marijuana concentrates and marijuana related paraphernalia.

<u>**MJ Examiner**</u> – N/A

<u>**Fire Marshal Approval**</u> – N/A

<u>**Security**</u> – All employees will have identification badges. All points of ingress/egress will be alarmed. Surveillance cameras will be located in all required locations capable of 640x470 resolution and IP compatible. All recordings will be stored for a minimum of 45 days.

<u>**Traceability**</u> – The applicant will be using GreenBits software to meet traceability requirements.

<u>**Insurance**</u> – The applicant will have insurance with the state and its employees, agents, and volunteers shall be named as an additional insured at the time of final inspection.

**Local Authority Objections/Special Requests/Protests/Support:**

None received

**Enforcement Officer Comments:**

None received
11/15/18 – Passed final inspection with EO Kraig Selter

---

## LICENSE SPECIALIST/REVIEWER/MANAGER

License Specialist      Date *11/21/18*      Approval

Reviewer      Date *11/26/18*      Approval *X*

Manager      Date      Approval

Director      Date      Approval

**Hold Terms:**

## DESIGNEE DECISION:

Name      Date      Approved      Disapproved      Discuss

MANAGER/DIRECTOR COMMENTS/NOTES:

Page | 3

Exhibit 5
Page 3 of 4

Exhibit 5
Page 4 of 4

# Exhibit 6

Special instructions to Issue desk:

Email Address for Issue Letters: SCOTTATKISON@MAC.COM

Ok Issue

## Washington State Liquor and Cannabis Board
### REPORT OF APPLICATION – Lauren Ware

LICENSE NUMBER/AGENT'S CODE  423754          UBI NO.  6043975500010001
LICENSE TYPE: Retailer

APPLICATION TYPE:          Assumption from Diego Pellicer, Inc.

ENTITY: 2215 RETAIL, LLC

PEOPLE:

| | |
|---|---|
| **MICHAEL SCOTT ATKISON** | **MGR/MBR/50%** |
| **PAULA LORRAINE ATKISON** | **SPOUSE** |
| **BRIAN DAVID JENNINGS** | **MBR/25%** |
| **ANTHONY ALLAN PESCHEK** | **MBR/25%** |
| **BRITTANY PESCHEK** | **SPOUSE** |
| ATC2 LLC | FINANCIER |
| TODD BRINKMEYER | MBR/50% |
| ANGELA MAROZZO | MBR/50% |
| INSANGU, LLC | FINANCIER |
| NO 259, INC. | MBR/100% |
| MICHAEL S ATKISON | PRES/100% |
| PAULA L ATKISON | SPOUSE |
| 317 RETAIL LLC | FINANCIER |
| INSANGU, LLC | MBR/67% |
| NO 259, INC. | MBR/100% |
| MICHAEL S ATKISON | PRES/100% |
| PAULA L ATKISON | SPOUSE |
| BRIAN D JENNINGS | MBR/33% |

TRADE NAME: ZIPS CANNABIS

| | | | |
|---|---|---|---|
| Street Address: | 2215 4TH AVE S | Mailing Address: | 518 W RIVERSIDE |
| City: | SEATTLE | City: | SPOKANE |
| County: | KING | State: | WA |
| Zip: | 981341516 | Zip: | 99201 |

**LOCAL AUTHORITY/DATE SENT:** 5/2/19

Approved:
Conditional Approval:
Disapproved:
Neutral:
No Response:  City of Seattle

**WITHIN 1,000 FEET OF:**  Child Care Center, Elementary School, Secondary School, Playground, Game Arcade, Library, Public Park, Public Transit Center, Recreation Center or Facility?   ☐ Yes  ☒ No  ☐ N/A
**WITHIN 1,000 FEET OF:**  Tribal Land, Trust Land or Fee Land?
IF YES, date Local Authority Notice was sent:          Response:   ☐ Yes  ☒ No  ☐ N/A

Exhibit 6
Page 1 of 4

## Report/Review Summary:

### Location Information:

This application is for the assumption of a marijuana retailer located in the city of Seattle.  It is located in a one story building with no direct access to another business or living quarters from the interior.

### Applicant Information/Violation History:

The applicant is an LLC consisting of three members, two of which are married.  The applicant entity has never been licensed by the board. Michael Atkison, Brian Jennings, and Anthony Peschek are currently licensed at 084154 (12/18) without any violations.  Brian and Michael are currently licensed at 427634 (10/18) without any violations. Michael is licensed at 414211 (01/18) without any violations. Brian is licensed at 412923 (11/16) with one written warning and one pending AVN 1O8340A received 12/6/18 for advertising violations. **The selling entity, Diego Pellicer, Inc., has received two AVN's, one that is still pending.  The first AVN, C2N8094A, was received 8/6/18 for misrepresentation of fact and true party of interest violation.  A settlement was reached on 4/9/2019 that stipulated the selling entity must pay $50,000 and serve a three day suspension. The three day suspension has been served and the $50,000 has been broken up to monthly payment plans.  Two payments have been made, and the purchasing entity will pay the remaining balance before the sale is complete.  The second AVN was received 4/5/19 for sale or service to a minor; it was completed on 5/31/19.**

### Real Property:

The applicant is assuming the lease of the previous tenant.  The previous tenant was operating on a five year lease extension that stated the current monthly rent is $7,126.12 per month.  The rent increases on a yearly basis.  The lease will expire on September 30, 2023 with no additional options to renew.

### Business Property:

The applicant is purchasing the business for a total cost of $2,034,000. The actual purchase of the business is $1,300,000.  The applicant is paying an additional $550,000 to Diego Pellicer Worldwide, Inc. for the lease assumption, $100,000 to Alejandro Canto (seller) for a non-compete agreement, and $45,000 to Alejandro Canto for transition services.  The applicant is vetting an additional $470,000 for operating capital.  The applicant has also agreed to pay the $39,000 remaining balance for the AVN the previously licensed entity received.

### Source of Funds:

Funds in the amount of $2,034,000 are coming from multiple sources.  $1,400,000 is coming from a loan from financier, ATC 2, LLC.  The principal of ATC 2, LLC, Todd Brinkmeyer, is getting the money from a UBS personal line of credit.  Scott and Paula Atkison are going to be loaning the LLC $200,000 from their Charles Schwab account.  Insangu, LLC is going to be loaning 2215 Retail, LLC $600,000 from their business profits from their other retail licenses.  They will also be investing $2,000 from their business profits that is not part of the loan. 317 Retail, LLC is loaning 2215 Retail, LLC $300,000 from their business profits from their retail store.  Brian Jennings is investing $1,000 from his TAPCO Credit Union account, and Anthony Peschek is investing $1,000 from his Tacoma Longshoremen Credit Union account.

### License Requirements/Operating Plan:

Description of operation and premises – The business will consist of 6 rooms; the retail area, three offices, a quarantine/product storage room, and a restroom.  The security will be housed in an office.  All product will be kept in locked glass display cases.

MJ Examiner – MJ Examiner is not required for this application.

Fire Marshal Approval – Fire Marshal approval is not required for this application.

Security – Security badges have been issued to all employees. Perimeter entry points have alarms. Cameras posted in proper location for clear identification of activities. Fixed cameras cover controlled access areas,

Exhibit 6
Page 2 of 4

security areas and all points of ingress and egress. All cameras meet pixel resolution requirements, are IP compatible, have a recording system of 24/7 capacity for at least 45 days and clearly display time and date.

Insurance –  A copy of the insurance certificate is on file.

**Local Authority Objections/Special Requests/Protests/Support:**

None received.

**Enforcement Officer Comments:**

The applicant passed a final inspection on 6/26/19 which was conducted by officer Jordan Anderson.

### LICENSE SPECIALIST/REVIEWER/MANAGER

| | | |
|---|---|---|
| License Specialist<br>Lauren Ware | Date<br>6/27/19 | Approval<br>x |
| Reviewer | Date<br>6·28·19 | Approval<br>⨍ |
| Manager | Date | Approval |
| Director | Date | Approval |

**Hold Terms:**

1.  Insurance

### DESIGNEE  DECISION:

| Name | Date | Approved | Disapproved | Discuss |
|---|---|---|---|---|

MANAGER/DIRECTOR COMMENTS/NOTES:

Exhibit 6
Page 3 of 4

Exhibit 6
Page 4 of 4

# Exhibit 7



**Washington State**
**Liquor and Cannabis Board**

| | |
|---|---|
| **License Number** | 423754 |
| **UBI Number** | 6043975500010001 |
| **Trade Name** | ZIPS CANNABIS |

## Source of Funds

**Identify where your money is coming from.**

**Detail each source(s) and dollar amount of where the money is coming from that you are using to fund the business** *(include the name of any financial institution(s), credit card lender or Investment Company)*

| Source | Account Number | Amount Contributing |
|---|---|---|
| UBS personal line of credit | ███████ | 1400000 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | **Total:** | **$** 1,400,000.00 |

**Does the money you have gifted, loaned or invested give you a percentage of profit or part ownership in the business?**     NO ☒    YES ☐     If yes, what percentage? _____

I certify under penalty of perjury that all answers and statements are true, correct and complete. I understand that untruthful or misleading answers are cause for rejection of my application and/or revocation of any license granted. I hereby authorize investigation of my criminal history, financial records and other sources as necessary for licensing.

PRINT NAME     Todd Brinkmeyer

SIGNATURE     *DocuSigned by:*
*T.S.Brinkmeyer*
DC6343CEBBD44F1...     DATE     5/12/2019

**Continuation Sheet Attached?**    ☐ YES    ☒ NO

**Exhibit 8**



**U.S. Department of Justice**

Office of the Deputy Attorney General

---

The Deputy Attorney General                    *Washington, D.C. 20530*

August 29, 2013

MEMORANDUM FOR ALL UNITED STATES ATTORNEYS

FROM:        James M. Cole
             Deputy Attorney General

SUBJECT:     Guidance Regarding Marijuana Enforcement

In October 2009 and June 2011, the Department issued guidance to federal prosecutors concerning marijuana enforcement under the Controlled Substances Act (CSA). This memorandum updates that guidance in light of state ballot initiatives that legalize under state law the possession of small amounts of marijuana and provide for the regulation of marijuana production, processing, and sale. The guidance set forth herein applies to all federal enforcement activity, including civil enforcement and criminal investigations and prosecutions, concerning marijuana in all states.

As the Department noted in its previous guidance, Congress has determined that marijuana is a dangerous drug and that the illegal distribution and sale of marijuana is a serious crime that provides a significant source of revenue to large-scale criminal enterprises, gangs, and cartels. The Department of Justice is committed to enforcement of the CSA consistent with those determinations. The Department is also committed to using its limited investigative and prosecutorial resources to address the most significant threats in the most effective, consistent, and rational way. In furtherance of those objectives, as several states enacted laws relating to the use of marijuana for medical purposes, the Department in recent years has focused its efforts on certain enforcement priorities that are particularly important to the federal government:

- Preventing the distribution of marijuana to minors;
- Preventing revenue from the sale of marijuana from going to criminal enterprises, gangs, and cartels;
- Preventing the diversion of marijuana from states where it is legal under state law in some form to other states;
- Preventing state-authorized marijuana activity from being used as a cover or pretext for the trafficking of other illegal drugs or other illegal activity;

Exhibit 8
Page 1 of 4

Memorandum for All United States Attorneys                                    Page 2
Subject:  Guidance Regarding Marijuana Enforcement

- Preventing violence and the use of firearms in the cultivation and distribution of marijuana;
- Preventing drugged driving and the exacerbation of other adverse public health consequences associated with marijuana use;
- Preventing the growing of marijuana on public lands and the attendant public safety and environmental dangers posed by marijuana production on public lands; and
- Preventing marijuana possession or use on federal property.

These priorities will continue to guide the Department's enforcement of the CSA against marijuana-related conduct.  Thus, this memorandum serves as guidance to Department attorneys and law enforcement to focus their enforcement resources and efforts, including prosecution, on persons or organizations whose conduct interferes with any one or more of these priorities, regardless of state law.[1]

Outside of these enforcement priorities, the federal government has traditionally relied on states and local law enforcement agencies to address marijuana activity through enforcement of their own narcotics laws.  For example, the Department of Justice has not historically devoted resources to prosecuting individuals whose conduct is limited to possession of small amounts of marijuana for personal use on private property.  Instead, the Department has left such lower-level or localized activity to state and local authorities and has stepped in to enforce the CSA only when the use, possession, cultivation, or distribution of marijuana has threatened to cause one of the harms identified above.

The enactment of state laws that endeavor to authorize marijuana production, distribution, and possession by establishing a regulatory scheme for these purposes affects this traditional joint federal-state approach to narcotics enforcement.  The Department's guidance in this memorandum rests on its expectation that states and local governments that have enacted laws authorizing marijuana-related conduct will implement strong and effective regulatory and enforcement systems that will address the threat those state laws could pose to public safety, public health, and other law enforcement interests.  A system adequate to that task must not only contain robust controls and procedures on paper; it must also be effective in practice. Jurisdictions that have implemented systems that provide for regulation of marijuana activity

---

[1] These enforcement priorities are listed in general terms; each encompasses a variety of conduct that may merit civil or criminal enforcement of the CSA.  By way of example only, the Department's interest in preventing the distribution of marijuana to minors would call for enforcement not just when an individual or entity sells or transfers marijuana to a minor, but also when marijuana trafficking takes place near an area associated with minors; when marijuana or marijuana-infused products are marketed in a manner to appeal to minors; or when marijuana is being diverted, directly or indirectly, and purposefully or otherwise, to minors.

Exhibit 8
Page 2 of 4

Memorandum for All United States Attorneys                                                    Page 3
Subject:  Guidance Regarding Marijuana Enforcement

must provide the necessary resources and demonstrate the willingness to enforce their laws and regulations in a manner that ensures they do not undermine federal enforcement priorities.

In jurisdictions that have enacted laws legalizing marijuana in some form and that have also implemented strong and effective regulatory and enforcement systems to control the cultivation, distribution, sale, and possession of marijuana, conduct in compliance with those laws and regulations is less likely to threaten the federal priorities set forth above.  Indeed, a robust system may affirmatively address those priorities by, for example, implementing effective measures to prevent diversion of marijuana outside of the regulated system and to other states, prohibiting access to marijuana by minors, and replacing an illicit marijuana trade that funds criminal enterprises with a tightly regulated market in which revenues are tracked and accounted for.  In those circumstances, consistent with the traditional allocation of federal-state efforts in this area, enforcement of state law by state and local law enforcement and regulatory bodies should remain the primary means of addressing marijuana-related activity.  If state enforcement efforts are not sufficiently robust to protect against the harms set forth above, the federal government may seek to challenge the regulatory structure itself in addition to continuing to bring individual enforcement actions, including criminal prosecutions, focused on those harms.

The Department's previous memoranda specifically addressed the exercise of prosecutorial discretion in states with laws authorizing marijuana cultivation and distribution for medical use.  In those contexts, the Department advised that it likely was not an efficient use of federal resources to focus enforcement efforts on seriously ill individuals, or on their individual caregivers.  In doing so, the previous guidance drew a distinction between the seriously ill and their caregivers, on the one hand, and large-scale, for-profit commercial enterprises, on the other, and advised that the latter continued to be appropriate targets for federal enforcement and prosecution.  In drawing this distinction, the Department relied on the common-sense judgment that the size of a marijuana operation was a reasonable proxy for assessing whether marijuana trafficking implicates the federal enforcement priorities set forth above.

As explained above, however, both the existence of a strong and effective state regulatory system, and an operation's compliance with such a system, may allay the threat that an operation's size poses to federal enforcement interests.  Accordingly, in exercising prosecutorial discretion, prosecutors should not consider the size or commercial nature of a marijuana operation alone as a proxy for assessing whether marijuana trafficking implicates the Department's enforcement priorities listed above.  Rather, prosecutors should continue to review marijuana cases on a case-by-case basis and weigh all available information and evidence, including, but not limited to, whether the operation is demonstrably in compliance with a strong and effective state regulatory system.  A marijuana operation's large scale or for-profit nature may be a relevant consideration for assessing the extent to which it undermines a particular federal enforcement priority.  The primary question in all cases – and in all jurisdictions – should be whether the conduct at issue implicates one or more of the enforcement priorities listed above.

Exhibit 8
Page 3 of 4

Memorandum for All United States Attorneys                                                              Page 4
Subject:  Guidance Regarding Marijuana Enforcement

As with the Department's previous statements on this subject, this memorandum is
intended solely as a guide to the exercise of investigative and prosecutorial discretion.  This
memorandum does not alter in any way the Department's authority to enforce federal law,
including federal laws relating to marijuana, regardless of state law.  Neither the guidance herein
nor any state or local law provides a legal defense to a violation of federal law, including any
civil or criminal violation of the CSA.  Even in jurisdictions with strong and effective regulatory
systems, evidence that particular conduct threatens federal priorities will subject that person or
entity to federal enforcement action, based on the circumstances.  This memorandum is not
intended to, does not, and may not be relied upon to create any rights, substantive or procedural,
enforceable at law by any party in any matter civil or criminal.  It applies prospectively to the
exercise of prosecutorial discretion in future cases and does not provide defendants or subjects of
enforcement action with a basis for reconsideration of any pending civil action or criminal
prosecution.  Finally, nothing herein precludes investigation or prosecution, even in the absence
of any one of the factors listed above, in particular circumstances where investigation and
prosecution otherwise serves an important federal interest.

cc:     Mythili Raman
         Acting Assistant Attorney General, Criminal Division

         Loretta E. Lynch
         United States Attorney
         Eastern District of New York
         Chair, Attorney General's Advisory Committee

         Michele M. Leonhart
         Administrator
         Drug Enforcement Administration

         H. Marshall Jarrett
         Director
         Executive Office for United States Attorneys

         Ronald T. Hosko
         Assistant Director
         Criminal Investigative Division
         Federal Bureau of Investigation

Exhibit 8
Page 4 of 4

**Exhibit 9**

# 2 Years After Sessions Rescinded Cole Memo, Prosecutors Continue To Adhere To Obama-Era Enforcement Guidelines

*Benzinga Cannabis Contributors*

**By Tom Firestone of Baker McKenzie.**

January 4, 2020 marked the two year anniversary of the "Sessions Memorandum" in which (then) Attorney General Jeff Sessions rescinded the Cole Memorandum and other Obama era DOJ guidance which essentially stated that DOJ would not prosecute state-compliant marijuana-related activity. Many saw the statement as a declaration of a new "War on Drugs." However, a review of DOJ cases brought over the last two years reveals that the Trump Justice Department has largely adhered to the Obama Administration's enforcement priorities.

## The Cole Memorandum

The Cole Memorandum stated that federal cannabis enforcement resources would be concentrated on cases involving:

---

## THE Trading and Investing Boot Camp

Learn everything about stock trading and investing from start to finish.

You can register for free to our 3-week Boot Camp for 1:1 coaching, a 24/hour discord chat, and a paper trading competition.

## Click here to claim your Boot Camp registration

---

- Revenue from the sale of cannabis going to criminal enterprises, gangs, and cartels,
- State authorized cannabis activity being used as a cover or pretext for the trafficking of other illegal drugs or other illegal activity,
- Violence and the use of firearms in the cultivation and distribution of cannabis,
- Distribution of cannabis to minors,
- Diversion of cannabis from states where it is legal under state law in some form to other states,
- Drugged driving and the exacerbation of other adverse public health consequences associated with cannabis use,

Exhibit 9
Page 1 of 4

- Growing of cannabis on public lands and the attendant public safety and environmental dangers posed by cannabis production on public lands, and
- Cannabis possession or use on federal property.

The Cole Memorandum also stated that:

> In jurisdictions that have enacted laws legalizing marijuana in some form and that have also implemented strong and effective regulatory and enforcement systems to control the cultivation, distribution, sale, and possession of marijuana, conduct in compliance with those laws and regulations is less likely to threaten the federal priorities set forth above.... The primary question in all cases – and in all jurisdictions-should be whether the conduct at issue implicates one or more of the enforcement priorities listed above.

In other words, so long as a marijuana business complied with state law, it would not be subject to federal prosecution unless it violated one of the Cole Memorandum priorities.  At his confirmation hearing in 2018, Attorney General Barr suggested that DOJ would not prosecute state compliant marijuana activity but has left the Sessions Memorandum in place as official DOJ policy.  Nevertheless, the Sessions Memorandum appears to have done little to change Obama Administration policy.

## DOJ Cases

We reviewed DOJ press releases on approximately 50 federal prosecutions involving marijuana during the period 2018-2020 and did not find one that involved purely state compliant activity. In fact, almost all involved Cole Memorandum priorities – most commonly, organized crime, the use of firearms, and trafficking of other illegal drugs. Those prosecutions which did not involve one of the Cole Memorandum priorities took place in states where recreational marijuana has not (or had not yet) been legalized, such as Texas, Oklahoma and Georgia.

This review also revealed another federal enforcement priority not identified in the Cole Memorandum – public corruption in the marijuana industry.  For example, one reported case involved a former Maryland state delegate who allegedly took bribes in exchange for voting in favor of a bill to increase the number of medical marijuana grower and processing licenses available to an out-of-state company. Another involved a police officer who used his official position to protect a marijuana trafficking business. One case involved a Border Patrol Agent who took bribes from a suspected drug trafficker in exchange for information about Customs Border Protection surveillance. Another involved the prosecution of the Mayor of Fall River, Massachusetts for extorting more than $250,000 in bribes from cannabis businesses in return for assistance with licenses.

In such official extortion cases, legitimate marijuana businesses, far from

Exhibit 9
Page 2 of 4

being prosecuted, are actually treated as victims. We did not identify any cases involving the prosecution of financial institutions for laundering marijuana proceeds. Nor did we identify any cases involving the prosecution of ancillary legitimate businesses that supported marijuana businesses by providing them with otherwise legitimate products or services.

Finally, almost all of the DOJ press releases express appreciation to state and local law enforcement and many cited the Organized Crime Drug Enforcement Task Force (OCDETF) program, a federal multi-agency, multi-jurisdictional task force that supplies supplemental federal funding to federal and state agencies to help them disrupt and dismantle drug trafficking organizations. Such statements indicate the great extent to which federal narcotics enforcement is dependent on assistance from state and local law enforcement. As long as this remains the case, state compliant behavior is unlikely to be prosecuted, regardless of DOJ's publicly stated policy.

See Also: [MedMen CEO On Recent Layoffs: 'We're On Chapter Two, Where Execution Means Profitability'](#)

*Tom Firestone is a Partner at Baker & McKenzie LLP. He is Co-chair of the firm's North American Government Enforcement practice and is a member of the Firm's Global Compliance & Investigations Steering Committee. He represents clients in matters involving anti-corruption and the US Foreign Corrupt Practices Act (FCPA), internal investigations and transactional due diligence. Prior to joining the Firm, he spent 14 years at the US Department of Justice. He worked as an Assistant US Attorney in the Eastern District of New York where he prosecuted transnational organized crime cases. He also worked as Resident Legal Adviser and Acting Chief of the Law Enforcement Section at the US Embassy in Moscow.*

The preceding article is from one of our external contributors. It does not represent the opinion of Benzinga and has not been edited.

---

## These Options Trades Make Me Money

I'm Nic Chahine -- The guy who made a massive 300% return in two weeks with BA options this year. Then I 4X'd my investment with ETF calls in June.

So obviously, I trade options *for a living.*

Now I'm sharing my trades as I make them with [Benzinga Options](#). And I want you to join me for the ride.

**[Click here to subscribe to Benzinga Options.](#)**

---

© 2020 Benzinga.com. Benzinga does not provide investment advice. All

Exhibit 9
Page 3 of 4

*rights reserved.*

# Exhibit 10



# RESIDENCY REQUIREMENTS FOR MARIJUANA LICENSURE

by Allie Howell
January 2019



Exhibit 10
Page 1 of 16



Reason Foundation's mission is to advance a free society by developing, applying and promoting libertarian principles, including individual liberty, free markets and the rule of law. We use journalism and public policy research to influence the frameworks and actions of policymakers, journalists and opinion leaders.

Reason Foundation's nonpartisan public policy research promotes choice, competition and a dynamic market economy as the foundation for human dignity and progress. Reason produces rigorous, peer-reviewed research and directly engages the policy process, seeking strategies that emphasize cooperation, flexibility, local knowledge and results. Through practical and innovative approaches to complex problems, Reason seeks to change the way people think about issues, and promote policies that allow and encourage individuals and voluntary institutions to flourish.

Reason Foundation is a tax-exempt research and education organization as defined under IRS code 501(c)(3). Reason Foundation is supported by voluntary contributions from individuals, foundations and corporations. The views are those of the author, not necessarily those of Reason Foundation or its trustees.

Exhibit 10
Page 2 of 16

# TABLE OF CONTENTS

**RESIDENCY REQUIREMENTS FOR MARIJUANA LICENSURE** ........................................................................ **1**

    1.1 JUSTIFICATIONS FOR RESIDENCY REQUIREMENTS ................................................ 1

    1.2 COSTS OF RESIDENCY REQUIREMENTS ................................................................ 4

    1.3 SUMMARY OF RESIDENCY REQUIREMENTS ......................................................... 5

    1.4 DO RESIDENCY REQUIREMENTS ACHIEVE ECONOMIC GOALS? ................................ 8

    1.5 DO RESIDENCY REQUIREMENTS REDUCE MARIJUANA DIVERSION? ........................ 9

    1.6 RESIDENCY REQUIREMENTS AND TAXES ........................................................... 10

    1.7 CONCLUSIONS ............................................................................................ 11

**ABOUT THE AUTHOR** .................................................................................................... **12**

**PART 1**

# RESIDENCY REQUIREMENTS FOR MARIJUANA LICENSURE

Many states that have legalized recreational or medical marijuana have included requirements that marijuana license holders, employees, or even consumers be state residents. The requirement is justified as a way to ensure safety in the industry and keep out-of-state investors from reaping all the economic benefits. Yet by limiting investment and entry into the legal marijuana business, residency requirements could prevent potential entrepreneurs from getting the capital they need.

## 1.1 JUSTIFICATIONS FOR RESIDENCY REQUIREMENTS

Many marijuana regulations are justified as necessary to comply with the federal government's marijuana enforcement priorities laid out in the Cole Memo, a 2013 memo issued by then-Deputy Attorney General James Cole in response to legalization in Colorado and Washington. Related to residency requirements is the priority of "[p]reventing the

Exhibit 10
Page 4 of 16

diversion of marijuana from states where it is legal under state law in some form to other states."[1]

The Financial Crimes Enforcement Network (FinCEN) later issued guidance related to the Bank Secrecy Act for financial institutions interested in providing services to marijuana businesses. The guidance provides a long list of "red flags" that may signal a business is violating state law or implicating a Cole Memo priority. Two of these red flags directly relate to residency requirements:

1. A marijuana-related business engages in international or interstate activity, including by receiving cash deposits from locations outside the state in which the business operates, making or receiving frequent or large interstate transfers, or otherwise transacting with persons or entities located in different states or countries.

2. The owner(s) or manager(s) of a marijuana-related business reside outside the state in which the business is located.

The existence of red flags could lead to a financial institution filing a "marijuana priority" suspicious activity report, which includes "(iii) details regarding the enforcement priorities the financial institution believes have been implicated; and (iv) dates, amounts, and other relevant details of financial transactions involved in the suspicious activity"—or terminating the relationship altogether.[2] While financial institutions typically avoid working with cannabis businesses altogether due to the difficulties of complying with FinCEN regulations and the risk of losing federal bank insurance, there were 486 depository institutions serving marijuana businesses in September 2018.[3]

---

[1]   Cole, James M. "Memorandum for all United States Attorneys." *U.S. Department of Justice Office of the Attorney General.* Aug. 29, 2013.
       https://www.justice.gov/iso/opa/resources/3052013829132756857467.pdf

[2]   "BSA Expectations Regarding Marijuana-Related Businesses." *United States Department of Treasury Financial Crimes Enforcement Network.* Feb. 14, 2014.
       https://www.fincen.gov/resources/statutes-regulations/guidance/bsa-expectations-regarding-marijuana-related-businesses

[3]   Reiners, Lee and John Matthews. "Federal Law Leaves Banks Shying Away from Marijuana Businesses." *The FinReg Blog.* Dec. 5, 2016.
       https://sites.duke.edu/thefinregblog/2016/12/05/federal-law-leaves-banks-shying-away-from-marijuana-businesses/; "Marijuana Banking Update." *Financial Crimes Enforcement Network.*
       https://www.fincen.gov/sites/default/files/shared/Marijuana_Banking_Update_September_2018.pdf

Exhibit 10
Page 5 of 16

Additionally, early residency requirements, such as those in Colorado and Washington, were based on a fear that legal marijuana would be easily diverted into the black market. Residency requirements could, according to regulators, keep profits out of international drug cartels and keep the industry smaller and easier to manage.[4] When discussing residency requirements in Alaska, Assistant Attorney General Harriet Milks commented that with unchecked outside investment, "there's no way to control any of it, so it's a big problem."[5]

Residency requirements are also a form of economic protectionism for state residents. Since marijuana businesses may be illegal in neighboring states, there is fear that out-of-state businesses will swoop in and take advantage of voters' hard work in passing legalization. As summarized by a business owner in Ohio: "We're the ones who fought for this. Allowing people from outside the state is not benefiting Ohio or Ohioans or our unemployment."[6]

Requirements are further justified as simply giving state residents a head start since entrepreneurs can move into the state and eventually overcome the restriction. In newly legal states, inexperienced locals will have a chance to establish their business before experienced businesses from legal states can compete.[7]

Finally, by reducing investment in the marijuana industry, residency requirements are defended as necessary to keep the industry from being overrun by big business. In Colorado, for example, some credit the residency requirements with allowing small businesses to set up shop. As summarized by Colorado attorney Rachel Gillette: "It's

---

[4]   Wyatt, Kristen. "Legalized States Taking Fresh Look at Out-Of-State Marijuana Investing." *The Cannabist.* Jan. 20, 2016. https://www.thecannabist.co/2016/01/20/marijuana-investing-lawmakers-out-of-state-ownership/46945/

[5]   Andrews, Laurel. "Alaska Marijuana Regulators Loosen Residency Requirements for New Business Owners." *Anchorage Daily News.* Sept. 28, 2016. https://www.adn.com/cannabis-north/article/alaska-marijuana-control-board-makes-major-residency-requirement-change-last-minute/2015/11/21/

[6]   Borchardt, Jackie. "Ohio Medical Marijuana Entrepreneurs Want Residency Requirement for Business Licenses." *Cleveland.com.* Mar. 21, 2017. https://www.cleveland.com/metro/index.ssf/2017/03/ohio_medical_marijuana_entrepr.html

[7]   Overton, Penelope. "First Pot-Business Licenses Would Go to Maine Residents of at Least 4 Years." *Portland Press Herald.* https://www.pressherald.com/2018/04/03/first-pot-business-licenses-would-go-to-maine-residents-of-at-least-4-years/

[residency requirements] allowed for small businesses, mom and pops. It doesn't allow for corporate consolidation in the marketplace. You can be a small business in Colorado and compete."[8]

## 1.2  COSTS OF RESIDENCY REQUIREMENTS

Any entry restriction in the legal marijuana industry has the potential to reduce investment and prevent the industry from developing. Reductions in the size of the marijuana market may make it harder for the legal market to replace the illicit one as the main supplier of marijuana.

The main cost of residency requirements is a loss of funding. A lack of capital in the marijuana industry is important for two reasons. First, because marijuana is still illegal on the federal level, businesses have extremely limited access to traditional bank loans. Further, marijuana entrepreneurs cannot write off business expenses on their federal taxes and growers have a hard time obtaining crop insurance.[9] Second, state licenses to start a marijuana business are prohibitively expensive. Without access to banks, only state residents with access to non-bank financing or who independently have start-up cash can enter the industry. Out-of-state investors eager to join the industry could be another source of capital.

This is what happened in Oregon. The state initially required 51% of a marijuana business to be owned by two-year state residents, but repealed these requirements in 2016. Portland attorney and Executive Director of the Oregon Cannabis Association Amy Margolis pushed for the change because "[f]or every five people who came into my office, three or four of them were looking for capital, and they couldn't find it here in Oregon. It became clear that

---

[8]   Crombie, Noelle. "Out-Of-State Companies Eye Oregon Marijuana Market for Expansion." *The Oregonian*. April 25, 2016. https://www.oregonlive.com/marijuana/index.ssf/2016/04/colorado_marijuana_entrepreneu.html

[9]   Weed, Julie. "California Marijuana Start-Ups, Shut Out From Banks, Turn to Private Backing." *The New York Times*. Dec. 27, 2017. https://www.nytimes.com/2017/12/27/business/smallbusiness/california-marijuana-start-ups.html

unless people could reach outside the state for investment money, we weren't going to have a very successful market."[10]

Colorado also updated its residency requirements to allow out-of-state investors more access to the industry. Residency requirements could become problematic as other states open up markets with less restrictive rules, as summarized by head of the Colorado Cannabis Chamber of Commerce, Tyler Henson: "We can't go get a loan from the bank to grow our business to help us accelerate. We are susceptible to falling behind other states."[11]

The change allowed U.S. citizens to have ownership interest in marijuana businesses, but all businesses must still have at least one Colorado resident direct beneficial interest owner. Businesses with any non-resident owners are capped at 15 owners while resident owned businesses can have an unlimited number of owners. Officers with day-to-day operational control must have been residents for at least one year and must maintain residency while they have day-to-day control.[12] Legislation passed by the legislature but vetoed by the governor in June 2018 could have lifted the 15 owner cap and allowed publicly traded cannabis companies.[13]

## 1.3   SUMMARY OF RESIDENCY REQUIREMENTS

For recreational marijuana, state residency restrictions were included in the initial marijuana regulations for both Colorado and Washington. California, Nevada, and Oregon have no residency restrictions, with Alaska and Massachusetts following suit.

---

[10]   Schroyer, John. "Flood of Investment Money Flowing to Oregon Cannabis Firms After Residency Change." *Marijuana Business Daily*. July 28, 2016. https://mjbizdaily.com/flood-of-investment-money-flowing-to-oregon-cannabis-firms-after-residency-change/

[11]   Wyatt, Kristen. "Legalized States Taking Fresh Look at Out-Of-State Marijuana Investing."

[12]   Code of Colorado Regulations. 1 CCR 212-2. https://www.colorado.gov/pacific/sites/default/files/ColoradoRegister.pdf1%20CCR%20212%20-2%20Retail%20Effective%2002022018.pdf

[13]   "HB18-1011: Marijuana Business Allow Publicly Traded Owners." *Colorado General Assembly*. https://leg.colorado.gov/bills/hb18-1011

| TABLE 1: RESIDENCY RESTRICTIONS IN LEGAL RECREATIONAL MARIJUANA STATES | | |
| --- | --- | --- |
| **State** | **Owners** | **Employees** |
| Alaska[14] | The sole proprietor, each business partner, each member of a limited liability company, and all shareholders in a corporation must be state residents. | None |
| California[15] | None | None |
| Colorado[16] | Each marijuana establishment must have at least one direct beneficial interest owner who holds an associated key license and has been a state resident for at least one year. Businesses can have an unlimited number of direct beneficial interest owners if they have been residents for one year. U.S. citizens who are not Colorado residents may apply for an associated key license only if there has been a "finding of suitability." Businesses with non-resident owners can only have 15 owners. The associated key license application fee for non-residents is $4,925 and $725 for residents. | Key and support employees must be residents. There is a potential workforce training or development exemption to the residency requirement. |
| Massachusetts[17] | The majority of microbusiness members or executives and all craft marijuana cooperative members must have resided in the state for 12 months prior to application. Applicants for the social equity program also must be residents. | None |
| Nevada[18] | None | None |
| Oregon[19] | None | None |
| Washington[20] | The sole proprietor or all members of any other business organization structure must have resided in the state six months prior to application. Managers, spouses, and persons expecting a share of profit also must meet residency requirement. | The six-month residency requirement applies to managers or agents who manage the business. |

14   Alaska Administrative Code. 3 AAC Chapter 306. https://www.commerce.alaska.gov/web/Portals/9/pub/MCB/StatutesAndRegulations/MarijuanaRegulations.pdf; "Marijuana Handler Permit Application Instructions." *Alcohol and Marijuana Control Office*. July 3, 2018. https://www.commerce.alaska.gov/web/Portals/9/pub/MCB/MJHandlerPermit/Marijuana%20Handler%20Permit%20Application%20Instructions.pdf

15   Medicinal and Adult-Use Cannabis Regulation and Safety Act (MAUCRSA). California Law. https://leginfo.legislature.ca.gov/faces/codes_displayexpandedbranch.xhtml?tocCode=BPC&division=10.&title=&part=&chapter=&article

16   1 CCR 212-2.

17   Code of Massachusetts Regulations. 953 CMR. Cannabis Control Commission. https://www.mass.gov/files/documents/2018/03/27/935cmr500.pdf

18   Nevada Revised Statues (NRS). Chapter 453D. https://www.leg.state.nv.us/NRS/NRS-453D.html#NRS453DSec230; email correspondence with the Nevada Department of Taxation.

19   "OLCC Marijuana Program: Frequently Asked Questions (all)." *Oregon Liquor Control Commission*. https://www.oregon.gov/olcc/marijuana/Documents/MJ_FAQS.pdf

20   Washington Administrative Code. Title 314. Chapter 314-55. Marijuana Licenses, Application Process, Requirements, and Reporting. http://apps.leg.wa.gov/wac/default.aspx?cite=314-55

Most marijuana residency restrictions use a time period to determine eligibility for licensure. In Alaska, residency is determined by eligibility for the state's permanent fund dividend, which typically requires one year of state residency.[21] The residency requirement had previously been met by being eligible to vote in the state, which only requires an Alaska address. The less burdensome regulation was thrown out only a month after it was enacted.[22]

While Massachusetts does not have any specific residency requirements for marijuana business employees, the state has created an incentive system to encourage resident hiring. For example, businesses can achieve a "local employment leader" leadership rating when at least 51% of employees and executives have been state residents for 12 months prior to an application. Leadership ratings are taken into consideration when the Cannabis Control Commission levies fines or imposes disciplinary action.[23]

Some states also restrict investments from non-resident investors that do not qualify as licensed owners but wish to provide capital to a business. Colorado differentiates so that state residency requirements do not apply to indirect beneficial interest owners, qualified limited passive investors, or permitted economic interests.[24] Yet in Washington, for example, the six-month residency requirement is especially burdensome because it applies to all investors—even those with only .01% ownership and their spouses. In fact, the requirement is so extensive that it even includes royalties on branded products.[25] Washington only allows gifts and loans from out-of-staters and still requires background checks for this source of financing.[26]

---

[21]  3 AAC 306; "Permanent Fund Dividend Statutes and Regulations 2017." *State of Alaska Department of Revenue.* Jan. 1, 2017. https://pfd.alaska.gov/LinkClick.aspx?fileticket=rxyLww36su8%3d&tabid=495&portalid=6

[22]  "Alaska Tightens Residency Requirements for MJ Licenses." *Marijuana Business Daily.* Dec. 2, 2015. https://pfd.alaska.gov/LinkClick.aspx?fileticket=rxyLww36su8%3d&tabid=495&portalid=6

[23]  935 CMR.

[24]  1 CCR 212-2.

[25]  McVay, Robert. "Washington Marijuana: Residency and Ownership Revisited." *Canna Law Blog.* Dec. 20, 2017. https://www.cannalawblog.com/washington-marijuana-residency-and-ownership-revisited/

[26]  Bricken, Hillary. "Washington State Will Allow for Out of State Cannabis Financing (Sort Of)." *Canna Law Blog.* May 25, 2016. https://www.cannalawblog.com/washington-state-will-allow-for-out-of-state-cannabis-financing-sort-of/

Finally, local governments may impose their own residency requirements. In California, a state where the new marijuana market has been severely hampered by burdensome local regulations, many localities have imposed residency requirements.

For example, Hollister, California requires that 75% of applicants and managers of the cannabis facility have been state residents for the past three years.[27] Applicants also must submit in writing that they will give preference to hiring city residents.[28]

Medical marijuana programs also have residency requirements. When Hawaii updated its medical marijuana program in 2015, it included a five-year residency requirement for 51% of owners.[29]

## 1.4  DO RESIDENCY REQUIREMENTS ACHIEVE ECONOMIC GOALS?

Reducing investment in the legal marijuana industry is clearly problematic. As more states legalize marijuana and more investors become interested in the market, states with residency requirements will be at a disadvantage. Colorado already adjusted its regulation to avoid being left behind as investors looked to more-open states.

Many regulators claim that residency requirements allow small businesses a chance to compete or at least get their foot in the door. In reality, this claim is not always true. In Washington, for example, the ten largest farms harvested 16.79% of all dry weight weed from January to September 2017. The 500 smallest firms harvested only 13.12%. The edible market is especially dominated by large firms. Of the over 1,000 companies with licenses that would allow them to process edibles between September 2016 and September 2017, only 74 companies sold one. The five largest edible producers sold 51.15% of the $38.7

---

[27]   "Hollister Cannabis Facilities Permit Application and Information." *City of Hollister California.*
       http://hollister.ca.gov/business/medical-cannabis/

[28]   Hollister Municipal Code. Title 5 Business Licenses and Registrations. Chapter 5.42 Cannabis
       Facilities Regulatory Permit. 5.42.050 Regulatory Permit Required.
       https://library.municode.com/ca/hollister/codes/code_of_ordinances

[29]   House Bill 321. State of Hawaii. 2015.
       https://www.capitol.hawaii.gov/session2015/bills/HB321_CD1_.HTM

million in edibles sold in 12 months. During the same time period, the top 20 producers sold 90.48% of edibles.[30]

While Washington only has a six-month residency requirement, it is quite expansive. Yet after a few years of legal sales, consolidation took place as companies began to take advantage of economies of scale or bought expensive equipment to produce cutting edge marijuana products. Reducing license fees or opening up access to banking would be more beneficial to small business owners than residency requirements.

## 1.5 DO RESIDENCY REQUIREMENTS REDUCE MARIJUANA DIVERSION?

The effectiveness of residency requirements in preventing marijuana diversion is a difficult question to answer. Residency requirements did not prevent Colorado from being sued by border states for marijuana diversion.[31]

Further, it is almost impossible to make a comparison because most states without residency requirements are relatively new to recreational sales. Nevada began legal sales in 2017 but is yet to fully open up license applications.[32] California's rollout of legal marijuana has been rocky and an estimated 85–90% of marijuana sales still take place illegally.[33]

Oregon rolled back residency requirements in 2016. The state has recently been a target of federal attention due to marijuana diversion. At a summit in February 2018, U.S. Attorney Billy Williams said the following: "Here's what I know in terms of the landscape here in Oregon, and that is, we have an identifiable and formidable marijuana overproduction and

---

30 Black, Lester. "Legal Weed Isn't The Boon Small Businesses Thought It Would Be." *FiveThirtyEight*. Dec. 29, 2017. https://fivethirtyeight.com/features/legal-weed-isnt-the-boon-small-businesses-thought-it-would-be/

31 Wolf, Richard and Trevor Hughes. "Justices Won't Hear Nebraska, Oklahoma Marijuana Dispute With Colorado." *USA Today*. March 21, 2016. https://www.usatoday.com/story/news/2016/03/21/marijuana-lawsuit-colorado-oklahoma-nebraska-supreme-court/81984006/

32 "Getting a License." *Marijuana in Nevada*. http://marijuana.nv.gov/Businesses/GettingALicense/; email correspondence with Nevada Department of Taxation.

33 White, Martha C. "Growing Like a Weed? California Marijuana Market Off to Slow Start." *NBC News*. April 20, 2018. https://www.nbcnews.com/business/business-news/growing-weed-california-marijuana-market-slow-start-n867871

diversion problem. And make no mistake about it, we're going to do something about it." Overproduction was blamed for the diversion—the state is estimated to produce three times more than it can consume a year.[34] This should not come as a huge surprise; the industry is fairly new and it may simply take some time for the market to stabilize.

The state was also known for a thriving black market before legalization.[35] With increased federal and state attention to marijuana trafficking with legalization, diversion may be the same as before and only gaining federal attention now.

## 1.6   RESIDENCY REQUIREMENTS AND TAXES

It is useful to note that residency requirements have little impact on tax revenue from marijuana. This is especially important to consider as many states designed marijuana regulations to maximize tax revenue. California, for example, collects taxes from both residents and non-residents in the industry. If income is California-sourced, out-of-state partners, limited liability company members, or S corporation shareholders will be taxed by California on that income. These non-residents must fill out a California non-resident tax return. Further, S corporations, partnerships, and limited liability companies must withhold 7% on distributions of California-sourced income to out-of-state shareholders, partners, or owners if distributions exceed $1,500 annually. This mandatory withholding tends to encourage non-residents to file California tax returns.[36]

For traditional C corporations, income taxes are paid by the corporation, not the stockholders. Non-resident stockholders are then taxed by their resident state on all dividends and capital gain distributions annually and when the stock is sold. An exception is if the California corporation pays a salary or director fees to an investor, then that income is taxable to California.[37]

There may be slightly less compliance in non-residents than in residents. Most states do, however, have reciprocal agreements with other states and the IRS to assist in collecting

---

[34]   The Associated Press. "U.S. Prosecutor: Oregon Has a Big Pot Overproduction Problem." *NY Daily News.* Feb. 2, 2018. http://www.nydailynews.com/newswires/news/business/prosecutor-oregon-big-pot-overproduction-problem-article-1.3794431

[35]   Ibid.

[36]   Email correspondence with Michael R. Snell, Tax and Accounting Offices of Michael R. Snell.

[37]   Ibid.

taxes owed in other states. So, for example, if an Arizona resident owes taxes on California-sourced income, Arizona will help collect the taxes.[38]

In New Jersey, a state considering marijuana legalization with policymakers highly motivated by tax revenue, the rules are similar. Withholding for non-residents ranges from 6.37% to 9% depending on organization type.[39]

Tax collection is an important concern when discussing recreational marijuana rules, but it should not be used to justify residency requirements. In fact, lifting residency requirements could potentially increase tax revenue by increasing industry investment.

## 1.7 CONCLUSIONS

Residency requirements are justified as both a public safety regulation and form of economic protectionism. While the use of residency requirements to avoid federal intervention makes some sense, it is not clear that the requirements reduce marijuana diversion or trafficking. The requirements are also used by regulators to keep the industry small and manageable. Yet reductions in enforcement costs come at the expense of the legal market—keeping the legal marijuana industry small means money still must be spent prosecuting those involved in the black market.

Economic protectionism also has the effect of reducing overall market size. Advocates of protectionism claim that the marijuana industry can be made up of small businesses because of residency restrictions. In Washington, however, consolidation has taken place despite strict requirements.

In New Jersey, draft regulations for marijuana legislation contain residency requirements as seen in many other states. Policymakers would be wise to consider if the reduction in investment is worth the supposed benefits for regulators. With the requirements, the industry will likely suffer as out-of-state investment and expertise flow into other states.

---

[38]  Ibid.

[39]  Ibid.

# ABOUT THE AUTHOR

**Allie Howell** is a research intern at Reason. Previously, she was a Burton C. Gray Memorial intern at Reason and an economic policy intern at the Manhattan Institute. Allie has been published on Economics21.org, the Foundation for Economic Education, and Reason. She is a recent graduate of Hillsdale College where she majored in economics and mathematics. Allie is attending Notre Dame Law School.



Exhibit 10
Page 16 of 16

# Exhibit 11



HOME / **MAP OF MARIJUANA LEGALITY BY STATE**

OUR SERVICES    THE DISA DIFFERENCE    BLOG    CAREERS    ABOUT    CONTACT

# MAP OF MARIJUANA LEGALITY BY STATE

## WONDERING WHAT THE LAW IS IN YOUR STATE?

Marijuana laws are changing at a rapid pace across all 50 states, making things a bit confusing at times. In order to keep up with the ever-changing laws, DISA has provided this interactive map for information on legalization, medical use, recreational use, and anything in between.

**Are you wondering what the marijuana laws are in your state?**

This marijuana legalization map clearly defines the laws in each state and remains up-to-date with the latest changes on a monthly basis. It's important to understand and respect the rules that vary across the U.S. regarding marijuana use, and whether you're a visiting tourist, or a resident the following



### Start A Drug Testing Policy

Educating your employees and enforcing a consistent drug testing policy is crucial to keeping your workplace safe. Talk with a DISA representative today and get the information you need to start a drug testing policy at your company.

CONTACT US

Exhibit 11
Page 1 of 7

Map of Marijuana Legality by State

information will help you steer clear of any misunderstandings or trouble. Scroll over each state to learn more about their individual legalization laws.

**Not sure where to start with Drug Testing?**

>> Drug & Alcohol Testing Overview
>> DOT & Transportation Compliance
>> Pre-Employment Drug Testing
>> Random Drug Testing
>> Cost of Drug Testing Calculator

**Last Updated:** July 2020

**Note:** State status reflects current laws at time of update, not pending legislation or future dates upon which marijuana becomes available medicinally or recreationally.

* Enactment is pending until future date.

■ Legalized   ■ Medical and Decriminalized   ■ Medical   ■ Decriminalized
■ Fully illegal

Exhibit 11
Page 2 of 7

Map of Marijuana Legality by State

Page 3 of 7



| State | Legal Status | Medicinal | Decriminalized | State Laws |
|---|---|---|---|---|
| Alabama | Fully Illegal | No | No | View State Laws |
| Alaska | Fully Legal | Yes | Yes | View State Laws |
| Arizona | Mixed | Yes | No | View State Laws |
| Arkansas | Mixed | Yes | No | View State Laws |
| California | Fully Legal | Yes | Yes | View State Laws |
| Colorado | Fully Legal | Yes | Yes | View State Laws |
| Connecticut | Mixed | Yes | Yes | View State Laws |
| Delaware | Mixed | Yes | Yes | View State Laws |

8/21/2020

Exhibit 11
Page 3 of 7

Map of Marijuana Legality by State                                          Page 4 of 7

| State | Legal Status | Medicinal | Decriminalized | State Laws |
|---|---|---|---|---|
| District of Columbia | Fully Legal | Yes | Yes | View State Laws |
| Florida | Mixed | Yes | No | View State Laws |
| Georgia | Mixed | CBD Oil Only | No | View State Laws |
| Hawaii | Mixed | Yes | Yes | View State Laws |
| Idaho | Fully Illegal | No | No | View State Laws |
| Illinois | Fully Legal | Yes | Yes | View State Laws |
| Indiana | Mixed | CBD Oil Only | No | View State Laws |
| Iowa | Mixed | CBD Oil Only | No | View State Laws |
| Kansas | Fully Illegal | No | No | View State Laws |
| Kentucky | Mixed | CBD Oil Only | No | View State Laws |
| Louisiana | Mixed | Yes | No | View State Laws |
| Maine | Fully Legal | Yes | Yes | View State Laws |
| Maryland | Mixed | Yes | Yes | View State Laws |
| Massachusetts | Fully Legal | Yes | Yes | View State Laws |
| Michigan | Fully Legal | Yes | Yes | View State Laws |
| Minnesota | Mixed | Yes | Yes | View State Laws |
| Mississippi | Fully Illegal | No | Yes | View State Laws |
| Missouri | Mixed | Yes | Yes | View State Laws |
| Montana | Mixed | Yes | No | View State Laws |
| Nebraska | Fully Illegal | No | Yes | View State Laws |
| Nevada | Fully Legal | Yes | Yes | View State Laws |

Exhibit 11
Page 4 of 7

Map of Marijuana Legality by State                                    Page 5 of 7

| State | Legal Status | Medicinal | Decriminalized | State Laws |
|-------|-------------|-----------|----------------|------------|
| New Hampshire | Mixed | Yes | Yes | View State Laws |
| New Jersey | Mixed | Yes | No | View State Laws |
| New Mexico | Mixed | Yes | Yes | View State Laws |
| New York | Mixed | Yes | Yes | View State Laws |
| North Carolina | Fully Illegal | No | Yes | View State Laws |
| North Dakota | Mixed | Yes | Yes | View State Laws |
| Ohio | Mixed | Yes | Yes | View State Laws |
| Oklahoma | Mixed | Yes | No | View State Laws |
| Oregon | Fully Legal | Yes | Yes | View State Laws |
| Pennsylvania | Mixed | Yes | No | View State Laws |
| Rhode Island | Mixed | Yes | Yes | View State Laws |
| South Carolina | Fully Illegal | No | No | View State Laws |
| South Dakota | Fully Illegal | No | No | View State Laws |
| Tennessee | Fully Illegal | No | No | View State Laws |
| Texas | Mixed | CBD Oil Only | No | View State Laws |
| Utah | Mixed | Yes | No | View State Laws |
| Vermont | Fully Legal | Yes | Yes | View State Laws |
| Virginia | Mixed | CBD Oil Only | Yes | View State Laws |
| Washington | Fully Legal | Yes | Yes | View State Laws |
| West Virginia | Mixed | Yes | No | View State Laws |
| Wisconsin | Fully Illegal | No | No | View State Laws |

https://disa.com/map-of-marijuana-legality-by-state                     8/21/2020

Exhibit 11
Page 5 of 7

Map of Marijuana Legality by State

| State | Legal Status | Medicinal | Decriminalized | State Laws |
|-------|-------------|-----------|----------------|------------|
| Wyoming | Fully Illegal | No | No | View State Laws |



Map of Marijuana Legality by State

10900 Corporate
Centre Drive Ste.
250
Houston, TX
77041

Privacy
Policy

DOT &
Transportation
Compliance

Copyright © 2020 DISA Global Solutions. All rights reserved.

8/21/2020

Exhibit 11
Page 7 of 7

# Exhibit 12

Special instructions to Issue desk:

Email Address for Issue Letters: scottatkison@mac.com

Ok Issue

**Washington State Liquor and Cannabis Board**
**REPORT OF APPLICATION – Lauren Ware**
LICENSE NUMBER/AGENT'S CODE  415010 – 7H     UBI NO.  6033850920010001
LICENSE TYPE:

APPLICATION TYPE: CHANGE OF ENTITY STRUCTURE

ENTITY: RD TACOMA, LLC

PEOPLE:
**112 RETAIL LLC**                                 **MBR/100%**
  **INSANGU, LLC**                              **MBR/50%**
    **MICHAEL SCOTT ATKISON**          **MBR/100%**
    **PAULA ATKISON**                         **SPOUSE**
  **BRIAN DAVID JENNINGS**             **MBR/25%**
  **ANTHONY PESCHEK**                     **MBR/25%**
  **BRITTANY PESCHEK**                     **SPOUSE**


TRADE NAME: URBAN BUD

| Street Address: | 112 S 24TH ST | Mailing Address: | 317 S 72ND ST |
|---|---|---|---|
| City: | TACOMA | City: | TACOMA |
| County: | PIERCE | State: | WA |
| Zip: | 98402 | Zip: | 98408 |

**LOCAL AUTHORITY/DATE SENT:  7/7/2020**

Approved:
Conditional Approval:
Disapproved:
Neutral:
No Response:  City of Tacoma

**WITHIN 1,000 FEET OF:**  Child Care Center, Elementary School, Secondary School, Playground, Game Arcade, Library, Public Park, Public Transit Center, Recreation Center or Facility?    ☐ Yes   ☒ No   ☐ N/A
**WITHIN 1,000 FEET OF:** Tribal Land, Trust Land or Fee Land?
IF YES, date Local Authority Notice was sent:        Response:    ☐ Yes   ☒ No   ☐ N/A

## Report/Review Summary:

**Location Information:**

This application is for the change of entity structure for a marijuana retailer located in the City of Tacoma. It is a complete takeover. The business is located in a one story building with no direct access to another business or living quarters from the interior.

**Applicant Information/Violation History:**

Page **1** of **3**

Exhibit 12
Page 1 of 3

The applicant is an LLC consisting of three members. RD Tacoma has been licensed at this location since 01/15 with one written warning in the past two years. Scott Atkison, Brian Jennings, and Anthony Peschek are currently licensed at 427634 (10/18), 423754 (07/19), and 084154 (07/19) without any violations in the past two years. Scott is also licensed at 414211(01/18) with no violations in the past two years. Brian is also licensed at 412923 (11/16) with one written warning and one AVN 1O8340A received 12/6/18 for advertising violations; it was completed on 10/17/19.

**Real Property:**

Real property verification is not required for this application.

**Business Property:**

The applicant is spending $1,850,000 to purchase the business. They are vetting an additional $154,000 for inventory and other closing costs. They will be paying $1,450,000 down with the remaining $400,000 on a promissory note at 6% per annum. The promissory note stipulates that the buyer will make payments in the amount of $20,000 for three months, then payments in the amount of $40,000 until the amount is paid in full.

**Source of Funds:**

Funds in the amount of $1,904,000 are coming from various sources. Brian Jennings and Anthony Peschek will both be contributing $1,000 from their personal checking accounts, and Scott Atkison is contributing $2,000 from his personal checking account. 3213 Retail, LLC (084154) will be loaning $1,300,000. 317 Retail, LLC (423754) will be loaning $300,000. The entities are both owned by the same members as RD Tacoma, LLC will be comprised of. Both loans will bear interest rate at 3% per annum and must be paid back in full by August 20, 2025.

**License Requirements/Operating Plan:**

<u>Description of operation and premises</u> – The premises consists of 8 rooms; a retail room, an inventory/storage room, a storage room, an office/security room, an employee breakroom, two utility rooms, and a restroom. All product will be stored in display cases that prohibit customer access.

<u>MJ Examiner</u> – MJ Examiner is not required for this application.

<u>Fire Marshal Approval –</u> Fire Marshal approval is not required for this application.

<u>Security</u> – Security badges have been issued to all employees. Perimeter entry points have alarms. Cameras posted in proper location for clear identification of activities. Fixed cameras cover controlled access areas, security areas and all points of ingress and egress. All cameras meet pixel resolution requirements, are IP compatible, have a recording system of 24/7 capacity for at least 45 days and clearly display time and date.

<u>Insurance</u> – A copy of the insurance certificate is on file.

**Local Authority Objections/Special Requests/Protests/Support:**

None received.

**Enforcement Officer Comments:**

The applicant passed a final inspection on 9/8/2020 which was conducted by Officer Anthony Masias.

---

**LICENSE SPECIALIST/REVIEWER/MANAGER**

| | Date | Approval |
|---|---|---|
| License Specialist<br>Lauren Ware | | |
| Reviewer<br>Supervisor review not required for this application, self-review completed | Date | Approval |

Page | 2

Exhibit 12
Page 2 of 3

Manager                          Date                    Approval

Director                         Date                    Approval

**Hold Terms:**

**DESIGNEE  DECISION:**

Name                     Date              Approved           Disapproved          Discuss

MANAGER/DIRECTOR COMMENTS/NOTES**:**

Exhibit 12
Page 3 of 3

**Exhibit 13**

DocuSign Envelope ID: 813E1736-5F6B-438B-BFB4-17B6E135DDC5

**Washington State**
**Liquor and Cannabis Board**

| | |
|---|---|
| 415010 | |
| License Number | |
| 6033850920010002 | |
| UBI Number | |
| ZIPS CANNABIS | |
| Trade Name | |

## Source of Funds

**Identify where your money is coming from.**

**Detail each source(s) and dollar amount of where the money is coming from that you are using to fund the business** *(include the name of any financial institution(s), credit card lender or Investment Company)*

| Source | Account Number | Amount Contributing |
|---|---|---|
| sale of 52 chutes lane Sandpoint ID | n/a | 800,000 |
| loan payment from 2215 retail | | 200000 |
| | | |
| | | |
| | | |
| | | |
| **Total:** | | $   1,000,000.00 |

**Does the money you have gifted, loaned or invested give you a percentage of profit or part ownership in the business?**     NO  x    YES          If yes, what percentage?

I certify under penalty of perjury that all answers and statements are true, correct and complete. I understand that untruthful or misleading answers are cause for rejection of my application and/or revocation of any license granted. I hereby authorize investigation of my criminal history, financial records and other sources as necessary for licensing.

**PRINT NAME**   Todd Brinkmeyer

**SIGNATURE**   DocuSigned by:
T5Bihr
DC6343CEBBD44F1...          **DATE**   10/23/2020

**Continuation Sheet Attached?**     YES      NO  x

1025 Union Ave SE, PO Box 43098, Olympia WA 98504-3098, (360) 664-1600, lcb.wa.gov

# Exhibit 14

IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket Nos. 46912 & 46913

| | |
|---|---|
| TRICORE INVESTMENTS, LLC, an Idaho limited liability company, )<br><br>Plaintiff-Respondent/ )<br>Cross-Appellant, )<br><br>v. )<br><br>THE ESTATE OF FRANCES ELAINE WARREN, deceased, acting through the Court-Appointed Co-Personal Representatives, DANIEL ROBERT WARREN and CHRISTOPHER GEORGE WARREN; PLBM, LLC, an Idaho limited liability company; and JOHN STOCKTON, an individual, )<br><br>Defendants-Appellants/ )<br>Cross-Respondents, )<br><br>and )<br><br>TODD BRINKMEYER, an individual, )<br><br>Defendant-Appellant. )<br>_____ ) | Boise, January 2021 Term<br><br>Filed: April 14, 2021<br><br>Melanie Gagnepain, Clerk |

Appeal from the District Court of the First Judicial District of the State of Idaho, Bonner County. Barbara A. Buchanan, District Judge.

The district court's judgment is affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion. Costs and attorney fees on appeal are awarded to Tricore as to the Estate only.

Witherspoon Brajcich McPhee, PLLC, Spokane, Washington, attorneys for Appellants/Cross-Respondents Estate of Frances Elaine Warren and John Stockton. James McPhee argued.

Lukins & Annis, P.S., Spokane, Washington and Stoel Rives, LLP, Boise, Idaho, attorneys for Appellant/Cross-Respondent Todd Brinkmeyer. William Christopher Pooser argued.

1

Exhibit 14
Page 1 of 43

Roberts Freebourn, PLLC, Spokane, Washington and Featherston Law Firm, Sandpoint, Idaho, attorneys for Respondent/Cross-Appellant. Brent Featherston and Kevin Roberts argued.

---

BEVAN, Chief Justice

This appeal arises from a contract dispute. The Estate of Frances Elaine Warren ("Estate") entered into a purchase and sale agreement with Tricore Investments, LLC ("Tricore") involving real property near Priest Lake in Bonner County, Idaho. However, before closing, the Estate sold the property to other buyers: John Stockton and Todd Brinkmeyer. Tricore filed a complaint against the Estate for breach of contract and violation of the Idaho Consumer Protection Act ("ICPA"), among other things, and sought specific performance of the purchase and sale agreement. The complaint also alleged that Stockton and Brinkmeyer tortiously interfered with the purchase and sale agreement and that the Estate, Stockton, and Brinkmeyer (collectively, "Appellants") engaged in a civil conspiracy.

The Estate asserted a statute of frauds defense, which the district court dismissed on summary judgment. The case proceeded to a bench trial where the district court made these findings: 1) the purchase and sale agreement between the Estate and Tricore constituted a valid and enforceable contract; 2) the Estate breached the contract when it sold the property to Stockton and Brinkmeyer; 3) the Estate's actions violated the ICPA; 4) Stockton and Brinkmeyer tortiously interfered with the contract; and 5) the Appellants engaged in a civil conspiracy. The district court ordered specific performance of the contract but declined to award any additional damages. The district court awarded Tricore its fees and costs against Appellants on a joint and several basis. Additionally, the district court granted Appellants' motion to stay enforcement of the judgment pending appeal and required Appellants to post a supersedeas bond.

The Estate and Stockton jointly appealed. Brinkmeyer appealed separately. The Estate argues the purchase and sale agreement is not a valid, enforceable contract because it violates the statute of frauds and there was no meeting of the minds. In the alternative, the Estate argues it did not breach the contract because Tricore repudiated it. The Estate also argues it did not violate the ICPA. Stockton and Brinkmeyer argue they did not tortiously interfere with the purchase and sale agreement. Together, Appellants argue they did not engage in a civil conspiracy and that the district court's attorney fee award against them on a joint and several basis was erroneous.

2

Exhibit 14
Page 2 of 43

Brinkmeyer alone appeals the supersedeas bond amount. Tricore cross-appealed. Tricore argues the district court erred in failing to award damages for the Estate's violation of the ICPA and for Stockton and Brinkmeyer's tortious interference.

We consolidated the appeals of the Estate, Stockton, and Brinkmeyer for purposes of this opinion, even though the two appeals were argued and briefed separately. We affirm in part and reverse in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

For decades, the Warren family owned real property near Priest Lake in Bonner County, Idaho. The property included undeveloped lake frontage and wetlands. Around 1990, Bill and Elaine Warren sold a portion of their property to Brinkmeyer's parents. Around the same time, Bill and Elaine sold another portion of their property to Stockton. Before the Warren and Stockton sales closed, the Warrens asked Stockton if they could move the already agreed upon property line. In return, the Warrens promised Stockton they would come to him first if they were going to sell any of their property in the future, which Stockton characterized as a right of first refusal. The property line was moved, but the parties never memorialize the promise in writing. Shortly after, Bill Warren passed away. Elaine Warren passed away in 2003. The Estate was formed after Elaine's passing and her sons, Dan and Chris Warren, serve as the Estate's co-personal representatives.

In 2014, plagued by the property's back taxes, the Estate obtained a loan on the property. The Estate then decided to sell some of its property and use the proceeds to pay back the loan when it became due. On May 20, 2014, John Finney, the Estate's legal counsel, emailed Stockton about the Estate's interest in selling. Attached was a plat map of the property, which included three parcels: Parcels A, B, and C. At that time, the Estate was seeking to sell Parcel B, which included around forty-five acres and was appraised around $5,200,000. Finney explained that the Estate was "willing to sell Parcels A and C if a buyer want[ed] to take on the responsibility of platting a waterfront parcel for [Chris and Dan Warren] . . . ." Stockton made no offer on any of the Warren property at that time. About a year later, Finney again emailed Stockton. In that email, Finney explained that the Estate was listing the Warren property at "a purchase price closer to the range [Stockton] indicated [he was] comfortable with" when the two previously communicated. Again, Stockton declined to purchase any of the Warren property.

3

Exhibit 14
Page 3 of 43

On July 2, 2015, the Estate retained Teague Mullen[1] as its real estate agent to assist in the sale of Parcel B. The seller representation agreement provided Parcel B was around forty-five acres and set a listing price of $2,000,000. Clifford Mort, the owner of Tricore, seeing substantial development opportunities in the property, became interested in purchasing the listed property. On October 6, 2015, the Estate entered into a purchase and sale agreement with Tricore. Tricore's offer was contingent on its ability to perform a feasibility study. Tricore had forty-five days to conduct the feasibility study but could extend that time for additional earnest money. The agreement also required the Estate to provide Tricore with all historical information on the property within those forty-five days.

Sometime between October 6, 2015, and November 11, 2015, the parties entered into the first addendum to the purchase and sale agreement. The first addendum incorporated the terms of the original purchase and sale agreement and included more definite legal descriptions of the property being sold. The first addendum also listed the property's restrictive covenants and encumbrances, none of which disclosed any right of first refusal to Stockton. Tricore, however, did not "put up the earnest money" because the Estate failed to provide Tricore with enough information to move forward in the process.

Despite falling out of contract with the Estate, Tricore remained interested in purchasing the property. Tricore continued to work with Mullen–negotiating a purchase of all of the Warren's waterfront property from the Estate. The negotiations were fruitful, leading Tricore and the Estate to enter into the second addendum to the original purchase and sale agreement on June 24, 2016. The original purchase and sale agreement, the first addendum, and the second addendum together form the Tricore Purchase and Sale Agreement (hereinafter, "Tricore PSA"). Pursuant to the Tricore PSA, Tricore deposited $20,000 in earnest money and the earnest money became nonrefundable on July 31, 2016, after the feasibility period ended.

The Tricore PSA added Parcel A to the sale. Thus, the Estate agreed to sell Parcels A, B, and C, which comprised about sixty-five acres (hereinafter, the "Warren Property").[2] The Tricore PSA purchase price was $2,400,000. In addition, the Tricore PSA provided:

---

[1] Mullen served as a dual agent representing both the Estate and Tricore.

[2] To differentiate between the property subject to the Tricore PSA and the Warren's property as a whole, the property subject to the Tricore PSA is hereinafter referred to as "Warren Property" and the Warren's property as a whole is referred to generally as "the property."

4

Exhibit 14
Page 4 of 43

> The Sellers reserve and retain from Parcel A and Buyer shall create in compliance with Bonner County Planning and Zoning provisions and approval, a parcel(s) in size not less than 200 feet of waterfront (or two 100 foot parcels—consistent with Buyer's development) adjacent to Tax 31 between the existing access road and the lake.

The Tricore PSA's closing date was September 9, 2016, but Tricore could extend that date by paying additional earnest money.

On August 5, 2016, the Estate provided Tricore a revised plat map of the Warren Property. The revised map divided the original three parcels into five parcels, Parcels A, B, C, D, and E. The Warren Property remained unchanged. However, at that time, Mort came to understand that the Tricore PSA did not include "all of the waterfront" of the property. The revised map showed that approximately three hundred feet of waterfront located at the east end of the property was not included in the sale. Instead, the Warren Property included *most* of the waterfront, as illustrated directly below by the highlighted area containing horizontal lines identifying Parcels A, B, and C, the parcels subject to the Tricore PSA.



Recognizing that losing the additional waterfrontage changed the development process, Mort instructed his counsel, Chuck Lempesis, to negotiate with Finney on how to move the project forward. Mort, Lempesis, and Finney met on August 9, 2016, to discuss the misunderstanding regarding the 318-feet of waterfront, as well as issues related to the existing water system, sewer service, and fill materials for the wetlands. After that meeting, Mort proposed the following terms in an email to Lempesis:

    1)    $2.1 million purchase price[.]
    2)    [The Estate] to grant to [Tricore] existing water system and all water rights
          to the property.

<div align="center">5</div>

Exhibit 14
Page 5 of 43

3)   [The Estate] to grant to [Tricore] any necessary easement's needed for all utilities and access to the property[.]

4)   [The Estate] to allow [Tricore] up to 160,000 yards of sand/structural fill material ([Tricore] to haul from [Tricore's] pit property)[.]

5)   [Tricore] to deposit additional $10,000 non refundable Property closing shall be extended to 12/31/16[.]

Lempesis forwarded the email to Finney on August 17, 2016. Negotiations continued regarding the Warren Property's water system and the possibility of pricing fill material. On September 1, 2016, Lempesis texted Finney asking if the Estate's representatives would meet with Mort. In that text, Lempesis stated, "[Mort's] counter is 2.25 and a dollar a yard for dirt. This could go south. Are you available to meet[?]" Finney responded with a suggested time of 3:30 p.m. However, that meeting never occurred. In fact, no further meetings between the Estate and Tricore occurred.

After learning about Tricore's proposed development, and concerned about preserving the existing characteristics of the area, Stockton and Brinkmeyer agreed to pursue purchasing the Warren Property. On September 2, 2016, Stockton and Brinkmeyer entered into a purchase and sale agreement with the Estate for the Warren Property for $2,500,000 ("Stockton PSA"). The Estate, Stockton, and Brinkmeyer also signed an indemnification agreement in which Stockton and Brinkmeyer agreed to indemnify the Estate up to $100,000 against any claims Tricore brought against the Estate.

On September 6, 2016, the Estate, Stockton, and Brinkmeyer closed on the Stockton PSA. Stockton and Brinkmeyer simultaneously assigned the Warren Property to Stockton's limited liability company, PLBM.[3] Also on September 6, 2016, Finney emailed Mullen and Lempesis, informing them that the Estate decided to proceed in a "different direction." Lempesis, shocked by the Estate's unexpected termination, responded and explained that the Tricore PSA was a binding agreement. Lempesis tendered another $10,000 to extend the deadline for closing to October 7, 2016, as provided for in the Tricore PSA. Days later, Tricore independently discovered the Estate had sold the Warren Property to Stockton and Brinkmeyer.

Shortly after discovering these facts, Tricore filed a complaint against the Estate, PLBM and John Does 1-10. Tricore later amended its complaint naming Stockton and Brinkmeyer. Tricore alleged the Estate breached the Tricore PSA and violated the ICPA. Tricore also alleged

---

[3] Stockton and PLBM will be collectively referred to as "Stockton" for purposes of this appeal unless otherwise indicated.

6

Exhibit 14
Page 6 of 43

Stockton and Brinkmeyer tortiously interfered with the Tricore PSA and that the Estate, Stockton, and Brinkmeyer engaged in a civil conspiracy. Tricore sought specific performance of the Tricore PSA. The Estate, Stockton, and Brinkmeyer answered separately, each asserting the affirmative defense of the statute of frauds.

Both Tricore and the Estate then moved for summary judgment as to the statute of frauds, with Tricore seeking to dismiss the Estate's affirmative defense, while the Estate sought to enforce its defense. The district court, after consideration of the cross motions and a motion to reconsider, dismissed the Estate's statute of frauds defense.

The case proceeded to a six-day bench trial. The district court later issued its decision and order. The district court found the Tricore PSA was a valid and enforceable contract, Tricore did not repudiate the Tricore PSA, and the Estate breached the Tricore PSA by selling the Warren Property to Stockton and Brinkmeyer. The district court also found that Stockton and Brinkmeyer tortiously interfered with the Tricore PSA, the Estate violated the ICPA, and the Appellants engaged in a civil conspiracy. For a remedy, the district court found Tricore was entitled to specific performance but no other damages. The district court subsequently awarded Tricore attorney fees and costs against the Appellants on a joint and several basis. Appellants moved the district court to stay enforcement of the judgment. The district court granted the motion and ordered Appellants to post a supersedeas bond in the amount of $672,426.30 with an additional amount of $362,069.61 to compensate Tricore for its loss of use of the Warren Property during the appeal.

The Estate and Stockton jointly appealed. Brinkmeyer also timely appealed. Tricore timely cross-appealed. For purposes of our decision, the appeals of the Estate, Stockton, and Brinkmeyer, together with Tricore's cross-appeal, have been consolidated and this opinion will address all of their arguments, although some arguments were made solely by the Estate, Brinkmeyer, or Tricore.

## II. ISSUES ON APPEAL

1.   Whether the district court erred in granting summary judgment for Tricore on the Estate's statute of frauds defense.
2.   Whether the district court erred in finding the Tricore PSA was a valid and enforceable contract.
3.   If the Tricore PSA was a valid and enforceable contract, whether the district court erred in finding that Tricore did not repudiate the Tricore PSA.
4.   Whether the district court erred in finding the Estate violated the ICPA.
5.   Whether the district court erred in finding Stockton and Brinkmeyer tortiously interfered with the Tricore PSA.

Exhibit 14
Page 7 of 43

6.   Whether the district court erred in finding the Estate, Stockton, and Brinkmeyer engaged in a civil conspiracy.

7.   Whether the district court abused its discretion by awarding Tricore fees and costs against the Estate, Stockton, and Brinkmeyer on a joint and several basis.

8.   Whether the district court abused its discretion by requiring the Estate, Stockton, and Brinkmeyer post an additional bond amount of $362,069.61 to compensate Tricore for its loss of use of the property during this appeal.

### III. ISSUE ON CROSS-APPEAL

1.   Whether the district court erred in declining to award damages to Tricore for Stockton and Brinkmeyer's tortious interference and for the Estate's violation of the ICPA.

### IV. STANDARDS OF REVIEW

"[T]he standard of review for this Court when reviewing a district court's grant of summary judgment is well-settled: this Court uses the same standard properly employed by the district court originally ruling on the motion." *Drakos v. Sandow*, 167 Idaho 159, 162, 468 P.3d 289, 292 (2020) (internal quotations omitted).

> A moving party must support its assertion by citing particular materials in the record or by showing the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact[s]. Summary judgment is improper if reasonable persons could reach differing conclusions or draw conflicting inferences from the evidence presented. Even so, a mere scintilla of evidence or only slight doubt as to the facts is not sufficient to create a genuine issue of material fact for the purposes of summary judgment.

*Trumble v. Farm Bureau Mut. Ins. Co. of Idaho*, 166 Idaho 132, 140–41, 456 P.3d 201, 209–10 (2019) (internal citations and quotations omitted). "[W]hen reviewing the grant or denial of a motion for reconsideration following the grant of summary judgment, this Court must determine whether the evidence presented a genuine issue of material fact to defeat summary judgment." *Drakos*, 167 Idaho at 162, 468 P.3d at 292 (quoting *Ciccarello v. Davies*, 166 Idaho 153, 159, 456 P.3d 519, 525 (2019)).

"Following a bench trial, this Court's review is limited to ascertaining whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions of law." *Wilson v. Mocabee*, 167 Idaho 59, 64, 467 P.3d 423, 428 (2020) (quoting *Mortensen v. Berian*, 163 Idaho 47, 50, 408 P.3d 45, 48 (2017)). This Court will not set findings of fact aside unless the findings are clearly erroneous. *Id.* "In view of this role, the trial court's findings of fact will be liberally construed in favor of the judgment entered." *Id.* (quoting *Borah v. McCandless*, 147 Idaho 73, 77, 205 P.3d 1209, 1213 (2009)). "Findings of fact that are supported by substantial and

8

Exhibit 14
Page 8 of 43

competent evidence are not clearly erroneous—even in the face of conflicting evidence in the record." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018). "Substantial and competent evidence is relevant evidence which a reasonable mind might accept to support a conclusion." *Id*. (quoting *Kelly v. Wagner*, 161 Idaho 906, 910, 393 P.3d 566, 570 (2017)).

Idaho Appellate Rule 13(b) authorizes district courts to take certain actions during an appeal, such as issuing stays and requiring a supersedeas bond. Because the district court has the authority, but is not required, to take such actions under I.A.R. 13(b), this Court reviews these actions under an abuse of discretion standard. *See In re Idaho Workers Comp. Bd*., 167 Idaho 13, 24, 467 P.3d 377, 388 (2020) (emphasis in original) (holding that I.R.C.P. 11.3(c), which provides "the court *may* dismiss . . ." is reviewed for an abuse of discretion because "[the rule] does not mandate the court to do either one. Rather, [the rule] provides that a court *may* dismiss the claims with prejudice or *may* enter a default judgment, leaving the decision to the sound discretion of the district court."). An abuse of discretion inquiry considers whether the district court: "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg*, 163 Idaho at 863, 421 P.3d at 194. "This Court [also] reviews a district court's award of attorney fees for an abuse of discretion." *Alsco, Inc. v. Fatty's Bar, LLC*, 166 Idaho 516, 533, 461 P.3d 798, 815 (2020).

## V. ANALYSIS

The Estate, Stockton, and Brinkmeyer assert several alleged errors on appeal. The Estate argues the Tricore PSA is not a valid and enforceable contract. The Estate maintains the Tricore PSA violates the statute of frauds and that there was no meeting of the minds between the Estate and Tricore. Alternatively, the Estate argues if the Tricore PSA is valid and enforceable, the Estate did not breach the Tricore PSA because Tricore repudiated it. The Estate also argues it did not violate the ICPA.

Stockton and Brinkmeyer, relying on the Estate's position that the Tricore PSA is invalid and unenforceable, argue the claim against them for tortious interference with contract is unsubstantiated. More, Stockton and Brinkmeyer argue that if the Tricore PSA is valid and enforceable, they did not tortiously interfere with it because they pursued purchasing the Warren Property in good-faith based on Stockton's alleged right of first refusal.

9

Exhibit 14
Page 9 of 43

Together, the Estate, Stockton, and Brinkmeyer argue they did not engage in a civil conspiracy. As a result, Appellants argue the district court erred in awarding Tricore attorney fees and costs against them on a joint and several basis. Brinkmeyer alone argues the $362,069.61 required to compensate Tricore for its loss of use of the property during this appeal was erroneous

Tricore cross-appeals. Tricore argues it should have been awarded monetary damages for Stockton and Brinkmeyer's tortious interference and for the Estate's violation of the ICPA.

**A.    The Tricore PSA does not violate the statute of frauds.**

Below, Tricore moved for partial-summary judgment asking the district court to dismiss the Estate's statute of frauds defense. The Estate also moved for summary judgment asking the district court to dismiss Tricore's breach of contract claim arguing the Tricore PSA violated the statute of frauds. The district court found there were triable issues of fact on the statute of frauds defense and denied both Tricore's and the Estate's motions. The Estate moved the district court to reconsider and argued that the reservation of "not less than 200 feet of waterfront" violated the statute of frauds because it failed to describe the property reserved with exactness. On reconsideration, the district court held that the Tricore PSA did not violate the statute of frauds and dismissed the defense.

The Estate argues the district court erred in dismissing its statute of frauds defense. The Estate maintains the description of "not less than 200 feet of waterfront" violates the statute of frauds because it fails to sufficiently describe the property being reserved. According to the Estate, "not less than 200 feet of waterfront" does not sufficiently describe the reserved property because it does not provide the exact size, dimensions, or location of the reserved property.

Tricore asserts the Estate is barred from raising a statute of frauds defense because the Estate acknowledged the existence of the Tricore PSA. Analogizing to an oral contract, Tricore asserts "[a] defendant's admission of an unwritten contract during the course of litigation will prevent the defendant from relying upon the statute of frauds." *Peterson v. Shore*, 146 Idaho 476, 479, 197 P.3d 789, 792 (Ct. App. 2008). "[I]n order for an admission to operate to remove the bar of the [statute of frauds], it must in fact be an acknowledgment of the contract alleged, whether the admission is contained in a complaint, responsive pleading, deposition, other testimony, or otherwise in a judicial proceeding." *Id*. Thus, "[i]t must be clear from the defendant's judicial statement that there is an unqualified or unconditional admission of . . . facts which would constitute the formation of a valid, oral contract." *Id*. at 479–80, 197 P.3d at 792–93 (internal

10

Exhibit 14
Page 10 of 43

quotations omitted). When an admission "consists of statements merely confirming . . . that the defendant had agreed to certain terms different from those alleged by the plaintiff, it will not operate to remove the alleged contract" from the statute of frauds. *Id*. at 480, 197 P.3d at 793.

Tricore's argument is inapt because the Tricore PSA was in writing. In addition, the Estate did not admit the existence of a valid and enforceable contract in any judicial proceeding. At all stages of litigation, beginning with its initial answer, the Estate argued the Tricore PSA was invalid and unenforceable. In response to Tricore's partial motion for summary judgment, the Estate argued the Tricore PSA was invalid and unenforceable. In the motion for reconsideration, the Estate again argued the Tricore PSA was invalid and unenforceable. Even after the district court dismissed the Estate's statute of frauds defense, the Estate continued to argue the Tricore PSA was invalid and unenforceable on other grounds. In sum, arguing whether Appellants admitted the contract "exists" is not really the point. The key is that they argued that it did not exist "as a valid and enforceable contract." Merely, arguing that a contract is invalid and unenforceable is not tantamount to admitting it exists. Thus, the record does not support a finding that the Estate sufficiently admitted the existence of the Tricore PSA in a judicial proceeding to remove the bar of the statute of frauds.

As to the merits of the defense, the district court ruled that the statute of frauds is satisfied by the legal description contained in the PSA here. We agree. But before we reach that point, we voice our concern whether the statute of frauds is even available to the Estate as a defense in this case. "By its plain language, [section 9-505] governs contracts or agreements . . . . Its purpose is to prevent false or fraudulent contract claims by forbidding disputed assertions of certain types of contracts without any written memorandum of the agreement." *McKoon v. Hathaway*, 146 Idaho 106, 111, 190 P.3d 925, 930 (Ct. App. 2008). The statute of frauds "is to shield persons with interests in land from being deprived of those interests by perjury, not to arm contracting parties with a sword they may use to escape bargains they rue." *Flight Sys., Inc. v. Elec. Data Sys. Corp.*, 112 F.3d 124, 128 (3rd Cir. 1997); *see also Gibson v. Arnold*, 288 F.3d 1242, 1247 (10th Cir. 2002) ("[T]he purpose of the statute of frauds is to shield persons with interests [covered by the statute] from being deprived of those interests by perjury, not to arm contracting parties with a sword they may use to escape bargains they rue."). The interest and purpose of the statute of frauds is not served by the Estate using it as a sword against Tricore to escape its own breach of contract. It is telling that the Stockton PSA uses nearly the identical property description as contained in the

11

Exhibit 14
Page 11 of 43

PSA between the Estate and Tricore. Even so, Tricore failed to raise this question directly, and our concerns do not underpin the decision we announce today. They are noted simply as an additional impediment to the statute of frauds being used in the manner sought by the Estate.

> Idaho Code section 9-505 requires certain agreements to be in writing. Section 9-505, in relevant part, provides: In the following cases the agreement is invalid, unless the same or some note or memorandum thereof, be in writing and subscribed by the party charged, or by his agent. Evidence, therefore, of the agreement cannot be received without the writing or secondary evidence of its contents:
> . . . .
> 4. An agreement for . . . the sale[] of real property, or of an interest therein[.]

I.C. § 9-505(4). "[T]he great majority of courts have held that executory contracts and agreements for the sale of real estate must be complete and speak in definite terms of all the conditions, terms, and descriptions necessary to constitute the contract." *Lexington Heights Dev., LLC v. Crandlemire*, 140 Idaho 276, 280, 92 P.3d 526, 530 (2004) (quoting *Allen v. Kitchen*, 16 Idaho 133, 141, 100 P. 1052, 1055 (1909)). Thus, "a description of real property must adequately describe the property such that it is possible for someone to identify 'exactly' what property the seller is conveying to the buyer." *The David and Marvel Benton Tr. v. McCarty*, 161 Idaho 145, 151, 384 P.3d 392, 398 (2016) (quoting *Ray v. Frasure*, 146 Idaho 625, 629, 200 P.3d 1174, 1178 (2009)). "In order to exactly identify the property that is being conveyed, 'a description . . . [must be written such that] quantity, identity, or boundaries can be determined.' " *Id*. at 153, 384 P.3d at 400 (quoting *Garner v. Bartschi*, 139 Idaho 430, 435, 80 P.3d 1031, 1036 (2003)).

In *Ray*, this Court tempered the notion that a sufficient property description, for the statute of frauds, need only designate the land being conveyed with reasonable certainty. 146 Idaho at 629, 200 P.3d at 1178. Instead, we noted that "a property description [must] designate 'exactly' what property the seller is conveying to the buyer." *Id*. at 629–30, 200 P.3d at 1178–79 (quoting *Garner*, 139 Idaho at 435–36, 80 P.3d at 1036–37). While the word "exactly" normally means "in a manner or measure or to a degree or number that strictly conforms to a fact or condition," *Exactly*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/exactly (last updated Feb. 1, 2021), in the statute of frauds context "exactly" designates the "quantity, identity, or boundaries [that] can be determined" from the sales document itself, or by reference to extrinsic evidence to which it refers. *Id*. Thus, we held that a "physical address is not a sufficient description of the property for purposes of the statute of frauds." *Id*. at 630, 200 P.3d at 1179. Such a description

12

Exhibit 14
Page 12 of 43

alone is not sufficient because "[t]he physical address gives no indication of the quantity, identity, or boundaries of the real property." *Id*. We ultimately relied on the holding of *Lexington Heights*: "[a] description contained in a deed will be sufficient so long as quantity, identity or boundaries of property can be determined from the face of the instrument, or by reference to extrinsic evidence to which it refers." *Id*. at 629, 200 P.3d at 1178 (quoting 140 Idaho at 281–82, 92 P.3d at 531–32).

In *Lexington Heights*, this Court invalidated a contract for the sale of land that failed to sufficiently describe the boundaries of a five-acre parcel the parties intended to reserve from the sale of a larger ninety-five acre parcel. 140 Idaho at 282, 92 P.3d at 532. There, the sellers contracted to sell approximately ninety of ninety-five acres they owned to buyers and described the property as "the real property situated in Ada County, Idaho located at 1400 West Floating Feather Road, consisting of approximately ninety (90) acres . . . however excluding the residential dwelling (which will include no more than five acres) . . . ." *Id*. at 278, 92 P.3d at 528. The contract also provided that the "precise size, location, dimensions and configuration" of the excluded five-acre parcel reserved by the seller was to be mutually determined later. *Id*. Because the "precise size, location, dimensions and configuration" of the reserved five-acre parcel were left open–to be mutually determined–this Court held the precise boundaries were material and the parties had to agree upon such boundaries in writing for the contract to satisfy the statute of frauds. *Id*. at 282, 92 P.3d at 532. We also prohibited the buyer from introducing extrinsic evidence to identify the location of the reserved five-acre parcel. *Id*. at 283, 92 P.3d at 533. We noted that extrinsic evidence may be admitted "for the purpose of identifying the land described and applying the description to the property" but extrinsic evidence may not be admitted to supply and add "to a description insufficient and void on its face." *Id*. We reasoned:

> Although the [contract] provides that the parcel excluded from the sale would include the land upon which the residence, swimming pool, tennis court, and volleyball court were located, the excluded property was not limited to such land. The [contract] did not simply exclude from the sale the residence, swimming pool, tennis court, and volleyball court, and the land upon which such structures were located. Rather, it excluded "the existing residential dwelling situated on the Premises together with no more than five (5) acres immediately surrounding the proposed residential development (which five (5) acres will include the existing tennis court, volleyball court, and swimming pool)." It is clear from the face of the [contract] that the excluded property was more than the land upon which these structures were located. Thus, extrinsic evidence could certainly identify the structures described, but there was nothing in the [contract] from which [one] could identify the boundaries of the approximate five-acre parcel that would include, but

13

Exhibit 14
Page 13 of 43

not be limited to, the land upon which those structures were located. The [contract] did not reference as the boundaries of the excluded parcel any structure or landmark (e.g., the existing fence enclosing the residence, swimming pool, tennis court, and volleyball court) that could then be identified by parol evidence.

*Id.* at 283–84, 92 P.3d at 533–34.

Here, the Tricore PSA provides legal descriptions for the Warren Property, which encompasses Parcels A, B and C. The sufficiency of those legal descriptions is undisputed by the parties. The Tricore PSA also provides:

The Sellers reserve and retain from Parcel A and Buyer shall create in compliance with Bonner County Planning and Zoning provisions and approval, a parcel(s) in size not less than 200 feet of waterfront (or two 100 foot parcels—consistent with Buyer's development) adjacent to Tax 31 between the existing access road and the lake.

The district court relied on *Lexington Heights* in finding the reservation of "not less than 200 feet of waterfront" did not violate the statute of frauds. The district court found:

As set forth in *Lexington Heights*, . . . the law makes a distinction between the consideration of extrinsic evidence "for the purpose of identifying the land described and applying the description to the property" versus "that of supplying and adding to a description insufficient and void on its face." The former is allowed. The latter is not. Therefore, the crucial question is what purpose does the consideration of extrinsic evidence, to wit: Bonner County Planning and Zoning provisions and the configuration of the development, serve in the [Tricore] PSA? In *Lexington Heights*, the Idaho Supreme Court makes clear that "**the issue with respect to the statute of frauds is not whether the parties had agreed upon the precise dimensions of the property to be sold. It is whether the written memorandum contains an adequate description of the property to be sold.**" Hence, the determinative issue is not whether the [Tricore] PSA contains the precise dimensions of the parcel(s) to be carved out from Parcel A, but whether [the Tricore] PSA contains an adequate description of the real property to be sold, in this case, Parcels A, B. [sic] and C.

Upon consideration of the applicable law, and drawing the most probable inferences from the undisputed evidence properly before it, this [c]ourt finds as a matter [of] law, first, that the legal descriptions of Parcels A, B, and C in Paragraph 3 of Addendum #2 (including the parcel map depicted on Exhibit "B" to Addendum #1, which is reference in Paragraph 3) are sufficient because the "quantity, identity or boundaries of . . . [each parcel] can be determined from the face of the instrument, or by reference to extrinsic evidence to which it refers." Second, the [c]ourt finds as a matter of law that the purpose of considering extrinsic evidence (in the form of Bonner County Planning and Zoning provisions and the configuration of the development) to create a parcel for the Estate to be carved out from Parcel A is not to supply and add to a description that is insufficient and void on its face. This [c]ourt has already found the descriptions of Parcels A, B. [sic] and C are sufficient.

14

Exhibit 14
Page 14 of 43

Rather, the purpose of considering such evidence is to identify the land described and apply the description to the property. In sum, the [c]ourt finds as a matter of law that the [Tricore] PSA does not violate the statute of frauds because it contains an adequate description of the property to be sold, as well as the sales price, and thus, is "complete and speak[s] in definite terms of all the conditions, terms, and descriptions necessary to constitute the contract."

(Internal citations omitted) (Emphasis in original). We find the district court's reasoning sound and adopt it in full. The Tricore PSA speaks for itself; it contains a solid legal description for Parcels A, B, and C, and the reservation of "not less than 200 feet of waterfront" does not invalidate the Tricore PSA. The reservation references Bonner County Planning and Zoning provisions, which are admissible to sufficiently identify the property being reserved. Thus, we hold the Tricore PSA satisfies the statute of frauds and that the district court properly dismissed the statute of frauds defense on summary judgment.

**B.      The Tricore PSA is a valid and enforceable contract and the Estate breached the Tricore PSA when it sold the Warren Property to Stockton and Brinkmeyer.**

On Tricore's breach of contract claim, the district court found the Tricore PSA constituted a valid and enforceable contract. The district court found there was a meeting of the minds between the Estate and Tricore as to all material terms of the sale. The district court also held the Estate failed to prove Tricore repudiated the Tricore PSA. As a result, the district court ultimately held the Estate breached the Tricore PSA by selling the Warren Property to Stockton and Brinkmeyer.

The Estate argues the district court erred in finding it breached the Tricore PSA. The Estate maintains the Tricore PSA did not constitute a valid, enforceable contract because there was no meeting of the minds on two material terms: 1) whether the sale included 318-feet of waterfront property; and 2) whether the two hundred feet reserved for the Estate would ever transfer title during the development process. Alternatively, the Estate argues even if the Tricore PSA is enforceable, the district court erred in finding Tricore did not repudiate.

1.   The Estate and Tricore had a meeting of the minds on all material terms.

"In order for a contract to be formed there must be a meeting of the minds. A meeting of the minds is evidenced by a manifestation of intent to contract which takes the form of an offer and acceptance." *Unifund CCR, LLC v. Lowe*, 159 Idaho 750, 754, 367 P.3d 145, 149 (2016) (quoting *Barry v. Pac. W. Constr., Inc.*, 140 Idaho 827, 831, 103 P.3d 440, 444 (2004)). "The meeting of the minds must occur on all material terms to the contract." *Barry*, 140 Idaho at 831, 103 P.3d at 444 (internal quotations omitted). "The material terms which must be identified in a

15

Exhibit 14
Page 15 of 43

contract to convey land include the parties to the contract, the subject matter of the contract, the price or consideration, and a description of the property." *Bear Island Water Ass'n, Inc. v. Brown*, 125 Idaho 717, 722, 874 P.2d 528, 533 (1994). "Whether there was a meeting of the minds is an objective inquiry that does not focus on the subjective beliefs or intentions of [the parties]." *Brunobuilt, Inc. v. Strata, Inc.*, 166 Idaho 208, 217, 457 P.3d 860, 869 (2020).

"For a land sale contract . . . the contract must typically contain the minimum provisions of the parties involved, the subject matter thereof, the price or consideration, a description of the property, and all the essential terms of the agreement." *P.O. Ventures, Inc. v. Loucks Fam. Irrevocable Tr.*, 144 Idaho 233, 238, 159 P.3d 870, 875 (2007). The Tricore PSA identifies the Estate and Tricore as the parties. It identifies the property as three separate parcels, each with legal descriptions undisputed by the parties, and identifies the total acreage being sold. The purchase price is $2,400,000, with $20,000 in required earnest money. The closing date was set for September 9, 2016. Last, the Estate and Tricore signed the Tricore PSA. Despite the Estate's contentions, the Tricore PSA includes all the essential material terms of a land sale contract. *See P.O. Ventures*, 144 Idaho at 238, 159 P.3d at 875.

Even so, the Estate argues there was no meeting of the minds due to mutual mistake because Mort believed the sale included 318-feet of waterfront property at the east end of the property and the Estate knew that the Tricore PSA did not include as much. The Estate thus argues there was a mutual mistake between the parties.

"To establish mutual mistake, '[t]he mistake must be common to both parties.' " *Bolognese v. Forte*, 153 Idaho 857, 863, 292 P.3d 248, 254 (2012) (quoting *O'Connor v. Harger Constr., Inc.*, 145 Idaho 904, 909, 188 P.3d 846, 851 (2008)). "A mutual mistake occurs when both parties, at the time of contracting, share a misconception regarding a basic assumption or vital fact upon which the bargain is based." *Hughes v. Fisher*, 142 Idaho 474, 482, 129 P.3d 1223, 1231 (2005). "Under Idaho law, a mutual mistake permits a party to rescind or modify a contract as long as the mistake is so substantial and fundamental as to defeat the object of that party." *Bolognese*. 153 Idaho at 865, 292 P.3d at 256.

Here, there is no evidence of mutual mistake. Finney testified "that the Estate understood [the 318-feet] was always not in the contract, Mr. Mort always understood that [the 318-feet] was in the contract." The Estate knew the 318-feet of waterfront was not included in the Tricore PSA based on the Tricore PSA's legal description and its understanding of the property. But Mort's

16

Exhibit 14
Page 16 of 43

misunderstanding does not create a mutual mistake; there was no mutual mistake because the mistake was not common to both parties; the Estate knew exactly what it was selling to Tricore.

At most, Mort's misunderstanding constitutes a unilateral mistake. But "[a] party to a contract 'who makes a mistake unilaterally cannot rescind or modify the agreement absent' misrepresentation or knowledge of the mistake by the other party." *Cline v. Hoyle & Assocs. Ins., Inc.*, 108 Idaho 162, 164, 697 P.2d 1176, 1178 (1985) (quoting *Cohen v. Merrill*, 95 Idaho 99, 104, 503 P.2d 299, 304 (1972)). Pointedly, Tricore, the party who made the mistake, is not the party seeking to rescind or modify the Tricore PSA. Even so, Mort testified that Tricore, when it entered into the Tricore PSA, thought it was purchasing all waterfront property but later discovered the Tricore PSA excluded 318-feet of waterfront located at the east end of the property. Mort explained that Tricore "knew [it was] purchasing a legal description, but [it] thought based upon what . . . [it was] told[,] that [it was] purchasing all the waterfront." Later, after the earnest money became nonrefundable and the contract became "hard,"[4] Tricore received a revised plat map of the Warren Property and it was then that Mort discovered the Tricore PSA did not include 318-feet of waterfront at the east end of the property. Mort's testimony provides that there was no misrepresentation by the Estate and there is no evidence that the Estate knew Mort did not understand what he was contracting for when the parties entered into the Tricore PSA. Thus, even though Mort sought to rework the contract after his discovery, that fact is not sufficient to undo the contract. We hold there was substantial and competent evidence that the Estate and Tricore agreed on all material terms and that the district court did not err in finding the Tricore PSA constituted a valid and enforceable contract.

　　2.　Tricore did not repudiate the Tricore PSA.

Where a valid and enforceable contract exists imposing contractual duties on the parties to the contract, a wronged party may raise as a defense the doctrine of anticipatory repudiation. *See Trumble*, 166 Idaho at 137, 456 P.3d at 216. "The Supreme Court has stated that to repudiate a contract, a party must make 'a positive, unconditional, and unequivocal declaration of fixed purpose not to perform the contract in any event or at any time.' " *Minidoka Irr. Distr. v. Dep't of Interior of U.S.,* 154 F.3d 924, 926 (9th Cir. 1998) (quoting *Dingley v. Oler,* 117 U.S. 490, 502

---

[4] In real estate parlance, a contract "goes hard" when a due diligence period ends, meaning that the buyer will lose its earnest money deposit if it does not close.

17

Exhibit 14
Page 17 of 43

(1886)). "A repudiating party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform." *Trumble*, 166 Idaho at 137, 456 P.3d at 216 (internal quotations omitted).

At the time the Appellants closed on the Stockton PSA, the three also entered into an indemnification agreement. The indemnification agreement provided:

> WHEREAS *Sellers have entered into a contract to sell the [Warren] Property to Tricore Investments, LLC*, an Idaho limited liability company, for $2,400,000, plus additional considerations (hereinafter, the "Warren-Tricore PSA");
>
> . . . . [and]
>
> WHEREAS *Sellers have agreed to repudiate their obligations under the Warren-Tricore PSA* upon the execution of this Indemnification Agreement, which repudiation shall be in writing and delivered to the third party named in the Warren-Tricore PSA within two (2) calendar days; [and]
>
> WHEREAS *Sellers' repudiation of their obligations under the Warren-Tricore PSA* may expose Sellers to liability for a breach of the Warren-Tricore PSA[.]

(Emphasis added). The indemnification agreement alone dispenses with the Estate's argument that Tricore repudiated. This agreement provides more than substantial evidence that the Estate—not Tricore—was the party repudiating the agreement. The Appellants acknowledged the existence of the Tricore PSA and that it was the *Appellants' agreement* for the Estate to repudiate its own obligations under the valid and existing Tricore PSA that lead to the breach found by the district court.

Beyond that, Tricore's actions in attempting to renegotiate the original contract were not "sufficiently positive to be reasonably interpreted to mean that [Tricore would] not or [could not] perform." *Trumble*, 166 Idaho at 137, 456 P.3d at 216. Even so, Finney held a firm belief that Tricore repudiated on August 9, 2016, and he testified accordingly. However, Tricore's overtures about changing the deal to account for the mistaken 318-feet of waterfront property did not amount to a refusal to perform; Tricore continued to pursue development of the property well after August 9, 2016. Indeed, on August 15, 2016, Mort emailed Bonner County Commissioner, Milton Ollerton, in which Mort proposed a meeting to "discuss a project that [Tricore is] entertaining on the south end of Priest Lake." On August 16, 2016, Mort emailed Drew Dittman, the engineer Tricore had employed, about further assessments of the property, particularly the waterfront. Also on August 16, 2016, after discovering the Tricore PSA did not include the 318-feet of waterfront located at the east end of the property, Mort sent Lempesis a letter discussing options on how to

18

Exhibit 14
Page 18 of 43

"move the project forward." In that email Mort stated Tricore was "still in the process of our Wetland Biologist and Engineer doing the wetlands delineation and assessment on the property . . . ." The letter also proposed:

> 1) $2.1 million purchase price[.]
> 2) Seller to grant to buyer existing water system and all water rights to the property.
> 3) Seller to grant to buyer any necessary easement's [sic] needed for all utilities and access to the property[.]
> 4) Seller to allow buyer up to 160,000 yards of sand/structural fill material (buyer to haul from buyers pit property)[.]
> 5) Buyer to deposit additional $10,000 nonrefundable Property closing shall be extended to 12/31/16[.]

Mort testified that these terms were proposed "to negotiate based upon the waterfront not being there the way [Tricore] thought." Offering a counterproposal after an agreement has been reached does not amount to a repudiation. Indeed, such ongoing discussions are simply that–discussions– which, without more, do not come close to "a positive, unconditional, and unequivocal declaration," *Minidoka Irr. Distr.,* 154 F.3d at 926, required to amount to a repudiation of the Tricore PSA.

After proposing the above options, Mort continued to communicate with key players in developing the property, particularly Dittman, Tom Duebendorfer and Commissioner Ollerton. In fact, even after receiving Finney's letter on September 6, 2016, where the Estate informed Tricore it was proceeding in a different direction, Tricore continued to pursue purchasing the property under the Tricore PSA. These facts do not support a finding of repudiation. Rather, as the district court found, Tricore was at all times ready, willing and able to close on the Tricore PSA. Thus, we affirm the district court's finding that Tricore did not repudiate the Tricore PSA.

## C.    The Estate violated the ICPA.

The district court found the Estate's actions were misleading and deceptive in violation of the ICPA. Specifically, the court found the Estate acted in a misleading and deceptive manner when it lead Tricore to believe the parties were moving forward with the Tricore PSA without mentioning the ongoing negotiations and eventual sale of the Warren Property to Stockton and Brinkmeyer. On appeal, the Estate maintains that because the Tricore PSA is not a valid, enforceable contract, there can be no ICPA claim against it. In the alternative, the Estate argues the ICPA claim must fail because its refusal to schedule a meeting as requested by Mort does not constitute unfair or unconscionable behavior.

19

Exhibit 14
Page 19 of 43

"The purpose of the [ICPA] is to protect both consumers and businesses against unfair methods of competition and unfair or deceptive acts and practices in the conduct of trade or commerce, and to provide efficient and economical procedures to secure such protection." I.C. § 48-601. "[T]he Act must be liberally construed to effect the legislative intent." *Pierce v. McMullen*, 156 Idaho 465, 474, 328 P.3d 445, 454 (2014). Acts or practices declared unlawful by the ICPA include "[e]ngaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer." I.C. § 48-603(17). "[P]roof of intention to deceive is not required for finding that an act is unfair or deceptive." *Duspiva v. Fillmore*, 154 Idaho 27, 32, 293 P.3d 651, 656 (2013). "[T]he offending party must be a person who 'knows, or in the exercise of due care should know, that he has in the past, or is' committing an act or practice declared unlawful by Idaho Code section 48-603." *Swafford v. Huntsman Springs, Inc.*, 163 Idaho 209, 213, 409 P.3d 789, 793 (2017) (quoting I.C. § 48-603). "[C]laims brought under the ICPA must be based on a contractual relationship." *Doble v. Interstate Amusements, Inc.*, 160 Idaho 307, 309, 372 P.3d 362, 364 (2016*); see also Taylor v. McNichols*, 149 Idaho 826, 846, 243 P.3d 642, 662 (2010) ("In order to have standing under the [ICPA], the aggrieved party must have been in a contractual relationship with the party alleged to have acted unfairly or deceptively.").

A simple timeline establishes the substantial evidence supporting the district court's conclusion that the Estate engaged in misleading and deceptive behavior. On September 1, 2016, Lempesis texted Finney requesting a meeting. On September 2, 2016, the Estate entered into the Stockton PSA. In addition, on September 2, Finney emailed Lempesis letting him know he could not schedule a meeting as requested. Yet, in that email, Finney did not tell Lempesis that the Estate had entered into the Stockton PSA. Despite its many attempts, Tricore was unable to schedule any other meeting with the Estate. As Mullen testified, there was "radio silence" from the Estate. On September 6, 2016, the Estate closed on the Stockton PSA around 3:30 P.M. Then, that same day around 4:30 P.M., Finney emailed Mullen and Lempesis informing them that the Estate had decided to "proceed in a different direction." Even after the Estate closed on the Stockton PSA, Tricore was not informed that the Estate had sold the Warren Property to other buyers. In fact, it was not until Tricore, in checking with its title company to determine the status of the sale, discovered that the Estate had sold the Warren Property to Stockton and Brinkmeyer. Until that time, as the district court found, believing it was under contract to purchase the property, Tricore remained ready to close on the Tricore PSA despite its reservations about the 318-feet of waterfront

20

Exhibit 14
Page 20 of 43

property. The Estate's actions led Tricore to believe it was under contract and it would be purchasing the Warren Property. At the same time, the Estate, in actuality, was colluding with Stockton and Brinkmeyer to sell the Warren Property by repudiating the Tricore PSA. Because we have previously held that the Tricore PSA was a valid and enforceable contract, substantial and competent evidence supports the district court's conclusion that the Estate violated the ICPA by misleading Tricore to believe it was proceeding with closing of the Tricore PSA when the Estate, in fact, was not going to close.

**D.     Stockton and Brinkmeyer tortiously interfered with the Tricore PSA and their interference was unjustified.**

The district court found Stockton and Brinkmeyer tortiously interfered with the Tricore PSA.[5] The district court also found that Stockton and Brinkmeyer's interference was not justified by Stockton's purported right of first refusal. On appeal, Stockton and Brinkmeyer argue that the district court erred in finding they tortiously interfered with the Tricore PSA because the Tricore PSA is not a valid and enforceable contract. In the alternative, Stockton and Brinkmeyer argue the district court erred in finding they tortiously interfered with the Tricore PSA because their intentions were proper, and they were justified in purchasing the Warren Property.

"One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability. . . ." *Wesco Autobody Supply, Inc. v. Ernest*, 149 Idaho 881, 895, 243 P.3d 1069, 1083 (2010) (quoting RESTATEMENT (SECOND) OF TORTS § 766 (1979)). "Tortious interference with contract has four elements: "(1) the existence of a contract; (2) knowledge of the contract on the part of the defendant; (3) intentional interference causing breach of the contract; and (4) injury to the plaintiff resulting from the breach." *Id*. (quoting *Bybee v. Isaac*, 145 Idaho 251, 259, 178 P.3d 616, 624 (2008)). "A plaintiff may show the defendant's interference with another's contractual relation is intentional if the actor desires to bring it about or 'if he knows that the interference is certain or substantially certain to occur as a result of his

---

[5] Tricore asserts there is enough evidence before this Court to find Stockton and Brinkmeyer also tortiously interfered with a valid business expectancy. The district court did not make any findings on this claim. Tricore does not assign error to the district court's failure to address the business expectancy claim. Therefore, Tricore waived the claim on appeal. *See Bach v. Bagley*, 148 Idaho 784, 790, 229 P.3d 1146, 1152 (2010) ("[T]o the extent that an assignment of error is not argued and supported in compliance with the I.A.R., it is deemed to be waived.").

Exhibit 14
Page 21 of 43

action.' " *BECO Constr. Co., Inc., v. J-U-B Eng'rs, Inc.*, 145 Idaho 719, 723, 184 P.3d 844, 848 (2008) (quoting *Highland Enter., Inc., v. Barker*, 133 Idaho 330, 340, 986 P.2d 996, 1006 (1999)).

     1.  Existence of the Tricore PSA.

We affirm the district court's finding that the Tricore PSA was a valid and enforceable contract. As a result, we hold the first element of tortious interference with contract, the existence of a contract, is satisfied. *See Wesco Autobody Supply,* 149 Idaho at 895, 243 P.3d at 1083.

     2.  Stockton and Brinkmeyer's knowledge of the Tricore PSA.

To satisfy the second element of a tortious interference with contract claim, the plaintiff must show the defendant had knowledge of the contract. *Wesco Autobody Supply,* 149 Idaho at 895, 243 P.3d at 1083. Here, the indemnification agreement clearly discloses Appellants' had knowledge of the existence of the Tricore PSA. The Tricore PSA was also disclosed to Stockton and Brinkmeyer at the meeting held on September 2, 2016, between the Estate, Stockton, and Brinkmeyer and in the draft documents provided to Stockton and Brinkmeyer prior to this meeting.

The record also establishes that both Stockton and Brinkmeyer knew Tricore was purchasing the Warren Property and planning to develop it. Mort testified that he and Brinkmeyer met on August 17, 2016, where Mort told Brinkmeyer he made an offer on the Warren Property, showed Brinkmeyer an aerial map of the Warren Property, and showed Brinkmeyer a diagram of the proposed development. Stockton testified that he discovered the Estate was selling some of the property to a developer at a neighborhood meeting held on August 20, 2016. During the meeting, Cheryl Moody (with the Selkirk Conservation Alliance) gave a presentation. In a follow-up email on August 28, 2016, Moody sent Stockton a list of proposals to "get some control of the property/situation" as Moody had "promised" Stockton. In that email, Moody specifically identifies Mort as the buyer. The record establishes Stockton and Brinkmeyer knew about the Tricore PSA. The second element is thus satisfied.

     3.  Stockton and Brinkmeyer intentionally interfered and caused the Estate to breach the Tricore PSA.

To satisfy the third element of a tortious interference with contract claim, the plaintiff must show the defendant intentionally interfered. *Wesco Autobody Supply,* 149 Idaho at 895, 243 P.3d at 1083. Interference is intentional when the defendant desires to interfere or knows that the interference is certain or substantially certain to occur. *See BECO Constr. Co.,* 145 Idaho at 723, 184 P.3d at 848. "The 'intent' of the 'intentional interference' requirement can be inferred[.]"

22

Exhibit 14
Page 22 of 43

*Bybee*, 145 Idaho at 259, 178 P.3d at 624 (quoting *Highland Enter.*, 133 Idaho at 340, 986 P.2d at 1006).

"[F]or liability to arise from intentional interference with another's performance of a contract, that interference must be improper." *BECO Constr. Co.,* 145 Idaho at 723, 184 P.3d at 848. In determining whether the interference is improper, consideration is given to these factors: 1) the nature of the actor's conduct; 2) the actor's motive; 3) the interests of the other with which the actor's conduct interferes; 4) the interest sought to be advanced by the actor; 5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; 6) the proximity or remoteness of the actor's conduct to the interference; and (7) the relations between the parties. *Id*. at 723–24, 184 P.3d at 848–49 (citing RESTATEMENT (SECOND) OF TORTS § 767 (1979)).

Once again, there is substantial and competent evidence in this record that Stockton and Brinkmeyer knew that pursuing the purchase of the Warren Property was going to or substantially certain to interfere with the Tricore PSA. Indeed, it cannot be reasonably argued that the primary motivation for Stockton and Brinkmeyer purchasing the property was to prevent Tricore from owning and developing it. After discovering Tricore planned to purchase the Warren Property and develop it, Stockton and Brinkmeyer, as the district court stated, "embarked on a systematic campaign to prevent Tricore from purchasing the property." In trying to "preserve the wetland and to preserve the property," Stockton and Brinkmeyer jointly agreed to purchase the Warren Property. The two met separately with the Estate's co-personal representatives and expressed their interest in purchasing the Warren Property. On August 22, 2016, Brinkmeyer emailed Stockton, listing the legal descriptions included in the Tricore PSA. Stockton responded, "[l]et's talk in the morning about a thought for you and the potential buyer. I have an idea . . . maybe not a good one, but I have one."

On September 2, 2016, Stockton and Brinkmeyer, along with their counsel, met with the Estate. During that meeting, the parties entered into the Stockton PSA, despite knowing Tricore was under contract with the Estate for the Warren Property. Along with the Stockton PSA, the parties entered into an indemnification agreement. The indemnification agreement provided the Estate would repudiate its obligations under the Tricore PSA and sell the Warren Property to Stockton and Brinkmeyer. The parties then rushed to close on September 6, 2016, conveniently, three days before the scheduled closing of the Tricore PSA. These facts, at a minimum, support

23

Exhibit 14
Page 23 of 43

the district court's conclusion that Stockton and Brinkmeyer intentionally interfered with the Tricore PSA. Thus, the third element is satisfied.

    4. <u>Injury to Tricore resulting from the Estate's breach.</u>

    The last element of a tortious interference with a contract claim is injury to the plaintiff resulting from the breach. *Wesco Autobody Supply,* 149 Idaho at 895, 243 P.3d at 1083. First, the breach prevented Tricore from obtaining the unique property it had contracted to purchase. Second, Tricore, up until the breach, had expended significant amounts of money performing due diligence on the Warren Property. Thus, as the district court found, the Estate's breach injured Tricore and the last element is satisfied.

    5. <u>Stockton and Brinkmeyer's justification for the interference.</u>

    Once a plaintiff has established a prima facie case for tortious interference with a contract, the burden shifts to the defendant to justify its interference. *Wesco Autobody Supply*, 149 Idaho at 895, 243 P.3d at 1083. According to Stockton and Brinkmeyer, their actions were justified based on their belief that Stockton had a valid right of first refusal on the Warren Property.

    *a. The district court's exclusion of evidence regarding the alleged right of first refusal under Idaho Code section 9-202(3) and I.R.E. 601(b) was an abuse of discretion but the error was harmless and is affirmed on other grounds.*

  In ruling on the parties' numerous motions in limine, the district court granted, in part, Tricore's motion to exclude "[a]ny evidence or argument regarding Stockton's alleged right of first refusal . . . pursuant to the Deadman's Statute and Idaho rules of evidence." The court further explained:

> As a matter of law, to wit: the Deadman's Statute, I.C. § 9-202(3) and I.R.E. 601(b), there is no legally enforceable right of first refusal. The Court will not allow any hearsay statements allegedly made by Bill Warren, deceased, or by Mr. Brinkmeyer's mother. *However, this testimony is potentially relevant (and may be allowed) on the issue of Stockton's and Brinkmeyer's intent as it relates to the plaintiff's claims for tortious interference.*

(Emphasis added).

    "Trial courts have broad discretion when ruling on a motion in limine." *Wilson*, 167 Idaho at 64, 467 P.3d at 428 (quoting *Gunter v. Murphy's Lounge, LLC*, 141 Idaho 16, 25, 105 P.3d 676, 685 (2005)). In reviewing an alleged abuse of discretion, this Court asks whether the district court: "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices

<center>24</center>

Exhibit 14
Page 24 of 43

available to it; and (4) reached its decision by the exercise of reason." *Lunneborg*, 163 Idaho at 863, 421 P.3d at 194.

Idaho Code section 9-202 prohibits certain persons from testifying as witnesses. *See also Slavens v. Slavens*, 161 Idaho 198, 203, 384 P.3d 962, 967 (2016) (referring to section 9-202(3) as the "Deadman's Statute"). Section 9-202, in relevant part, provides that the following persons cannot be witnesses:

> Parties or assignors of parties to an action or proceeding, or persons in whose behalf an action or proceeding is prosecuted against an executor or administrator, upon a claim or demand against the estate of a deceased person, as to any communication or agreement, not in writing, occurring before the death of such deceased person.

I.C. § 9-202(3). "I.R.E. 601(b) is virtually identical to I.C. § 9-202(3)." *April Beguesse, Inc. v. Rammell*, 156 Idaho 500, 515, 328 P.3d 480, 495 (2014) (footnote omitted). Thus, "this Court applies the same analysis to the evidentiary rule and the [Deadman's] statute." *Id*. Critically, these rules do not apply when testimony is being offered to defend against a claim. *Lunders v. Estate of Snyder*, 131 Idaho 689, 699, 963 P.2d 372, 382 (1998) (citing *Lowry v. Ireland Bank*, 116 Idaho 708, 711 n.1, 779 P.2d 22, 25 n.1 (Ct. App. 1989)).

First, Stockton and Brinkmeyer claim the Deadman's Statute and I.R.E. 601(b) do not apply here. They are correct. Stockton sought to introduce evidence of Bill Warren's oral communications about granting Stockton a right of first refusal–communications that occurred before Bill Warren's death. That evidence was not offered *against* the Estate. Rather, the evidence was offered as a defense to Tricore's tortious interference claim since Stockton and Brinkmeyer were alleging their interference was justified based on the alleged right of first refusal. Because the evidence was being offered to defend against a claim, the district court abused its discretion in misapplying the appropriate legal standard. The district court prohibited Appellants from offering such evidence under section 9-202(3) and I.R.E. 601(b), respectively. Despite making that ruling in limine, however, the district court recognized that the evidence could be admissible for another purpose. Thus, the error was harmless because testimony about the right of first refusal *was admitted* at trial to establish whether Stockton and Brinkmeyer intended to interfere with the Tricore PSA.

Still, Stockton and Brinkmeyer maintain the district court's ruling that the Deadman's Statute and I.R.E. 601(b) rendered the right of first refusal legally unenforceable was an error that infected the entire tortious interference claim. "When the trial court reaches the correct result by

25

Exhibit 14
Page 25 of 43

an erroneous theory, we will affirm the result on the correct theory." *Nicholson v. Coeur D'Alene Placer Mining Corp.*, 161 Idaho 877, 881, 392 P.3d 1218, 1222 (2017). The district court's ruling that the Deadman's Statute rendered the right of first refusal unenforceable was erroneous. *See Slavens*, 161 Idaho at 203, 384 P.3d at 967. Even so, Stockton and Brinkmeyer's claims that this ruling contaminated the entire trial on this question is not supported in this record. We will affirm the district court's ruling that the alleged right of first refusal was unenforceable on other grounds.

First, we must address Tricore's argument that Stockton waived any alleged right of first refusal. "A right of first refusal is '[a] potential buyer's contractual right to meet the terms of a third party's offer if the seller intends to accept that offer.' " *Nicholson*, 161 Idaho at 881, 392 P.3d at 1222 (quoting BLACK'S LAW DICTIONARY (7th ed. 1999)). "Before accepting a bona fide offer of a third person, the owner must give the [holder of the right of first refusal] an opportunity to buy at the price so offered." *Meridian Bowling Lanes, Inc. v. Meridian Athletic Ass'n, Inc.*, 105 Idaho 509, 512, 670 P.2d 1294, 1297 (1983). "[T]he holder of such a right of first refusal cannot be called upon to exercise or lose that right unless the *entire* offer is communicated to him in such a form as to enable him to evaluate it and make a decision." *Gyurkey v. Babler*, 103 Idaho 663, 666, 651 P.2d 928, 831 (1982) (emphasis in original). Applied in most transactions, a seller receives a written offer that sets forth the terms and conditions of the offer. *Id.* "The preemptor, under a right of first refusal requiring acceptance on the same terms and conditions, is entitled to no lesser means of receiving the offer than is provided to the seller by the third party offeror." *Id.*

Even if the right of first refusal is enforceable, the Estate, before it accepted the Tricore PSA that set forth the final terms, had to offer Stockton the same terms. *See id.* The Estate's prior offers to Stockton did not meet these requirements. On May 20, 2014, Finney emailed Stockton informing Stockton that the Estate was interested in selling a portion of its property. There, Finney explained the Estate was interested in selling Parcel B for approximately $5,200,000. Years before the Tricore PSA, on May 29, 2015, Finney again emailed Stockton asking if he would be interested in purchasing any of the property. Finney explained the Estate would list the property at "a purchase price closer to the range you indicated you were comfortable with last year for Elaine's house parcel." Stockton declined both offers. After listing the property, the Estate eventually entered into the Tricore PSA. The Tricore PSA lists a purchase price of $2,400,000, an amount much different from what Finney originally suggested to Stockton. More, the Tricore PSA added acreage to the transaction, as the Warren Property included Parcels A, B, and C, totaling about

26

Exhibit 14
Page 26 of 43

sixty-five acres. Before entering into the Tricore PSA, the Estate never offered these terms to Stockton. As a result, Stockton did not waive any alleged right of first refusal by declining earlier, but different offers from the Estate.

Even so, we hold no valid right of first refusal exists. Idaho Code section 9-505 requires certain agreements to be in writing and signed by the parties. "An agreement that by its terms is not to be performed within a year from the making thereof" falls under the statute of frauds. I.C. § 9-505(1). Agreements for an interest in real property clearly fall under the statute of frauds. *Id*. at 9-505(4). "Like any contract for the sale of land, an oral agreement must be complete, definite, and certain in all its terms, or contain provisions which are capable in themselves of being reduced to certainty[.]" *Nicholson*, 161 Idaho at 882, 392 P.3d at 1223 (internal quotations omitted). "The description of the real property must adequately describe the property so that it is possible for someone to identify exactly what property the seller is conveying to the buyer." *Id*. (internal quotations omitted). "The statute of frauds does not prevent the creation of an oral contract but precludes the contract's enforcement." *Treasure Valley Gastroenterology Specialists, P.A. v. Woods*, 135 Idaho 485, 489 n.1, 20 P.3d 21, 25 n.1 (Ct. App. 2001).

Here, Stockton purchased a piece of Bill Warren's property in 1990. Before the sale closed, Bill Warren asked Stockton to move the property-line to accommodate another sale. In return, Stockton allegedly received "[a] right of first refusal on *future* sales" of "*any* Warren family property." (Emphasis added). Because the alleged agreement was for the sale of land and lasted indefinitely, it had to be in writing pursuant to Idaho Code sections 9-505(1) and (4). Stockton testified the agreement was not in writing but was like "a handshake deal." A handshake deal concerning an interest in real property does not satisfy the statute of frauds. More, the agreement required a description of the property that was subject to the right of first refusal. *Nicholson*, 161 Idaho at 882, 392 P.3d at 1223. Stockton first testified that the right of first refusal was for *any* Warren property. Later, Brinkmeyer testified that the right of first refusal was for "*every waterfront property* [the Warrens] had to sell." (Emphasis added). This confusion, even between these co-defendants, supports why such an agreement must be in writing. A description of the real property subject to the right of first refusal did not exist. Therefore, the district court did not err in ruling that the alleged right of first refusal was unenforceable.

   *b. A valid and enforceable right of first refusal did not exist and, thus, Stockton and Brinkmeyer's interference with the Tricore PSA was unjustified.*

Exhibit 14
Page 27 of 43

Stockton and Brinkmeyer maintain that their view of the right of first refusal justified their interference with the Tricore PSA and that the district court erred in finding otherwise. The district court concluded Stockton and Brinkmeyer failed to establish the defense of justification. The district court explained:

> The argument that either Stockton or Brinkmeyer reasonably believed that Stockton possessed any legitimate right of first refusal to purchase the 65 acres is ludicrous. Bill Warren died in 1992. Elaine Warren died in 2003. There is nothing in writing giving Stockton any right to any portion of the property. Stockton and Brinkmeyer are sophisticated, experienced businessmen. Both testified to routinely buying and selling property worth millions of dollars. Both have been advised and represented by competent legal counsel since the day they partnered to acquire the 65 acres. Any competent attorney would have immediately informed them that Stockton's so-called right of first refusal was invalid.

The district court's sentiments about the right of first refusal may be harsh, but its findings are supported by substantial and competent evidence.

Stockton's alleged right of first refusal was not in writing but was "like a handshake deal." Stockton, supported by Brinkmeyer and Chris and Dan Warren, testified that the families all acknowledged the existence of the right of first refusal. Thus, Stockton and Brinkmeyer argue the right of first refusal existed since all parties performed as promised.

In asserting as much, Stockton and Brinkmeyer argue Tricore lacks standing to challenge the validity of the right of first refusal and cite *Frantz v. Parke*, 111 Idaho 1005, 729 P.2d 1068 (Ct. App. 1986), *Mikesell v. Newworld Dev. Corp.*, 122 Idaho 868, 840 P.2d 1090 (Ct. App. 1992), and *Nicholson*, 161 Idaho 877, 392 P.3d 1218, in support. None of these cases are directly on point. *See Nicholson,* 161 Idaho at 882, 392 P.3d at 1223 (holding an oral right of first refusal was too vague to be enforced); *see Mikesell*, 122 Idaho at 874, 840 P.2d at 1096 (imputing the doctrine of part performance to a seller's successor in title); s*ee Franz*, 111 Idaho at 1006, 729 P.2d at 1069 (analyzing the enforceability of an oral non-compete agreement between an employer and former employee by applying the doctrine of part performance). These cases do not support the claim that Tricore has no basis to argue against Stockton and Brinkmeyer's claims of justification.

Beyond that, the record does not support a finding that a right of first refusal existed. In the email Finney sent to Stockton on May 20, 2014, in which Finney informed Stockton of the Estate's intent to sell the property, Finney did not mention any right of first refusal. There, Finney explained that the two had spoken previously and "[a]s [Finney] indicated on the phone, the Estate w[anted] to determine [Stockton's] interest in purchasing based upon past conversations and [wanted] to

28

Exhibit 14
Page 28 of 43

work with [Stockton] prior to putting any of the property officially on the market." In an email Finney sent to Mullen on September 2, 2014, Finney explained "[t]he Warrens have given a neighbor a *first look* at the property" but did not mention any right of first refusal. (Emphasis added). On May 29, 2014, Finney again emailed Stockton about selling the property but again never mentioned any right of first refusal. Instead, Finney stated: "*[a]s a courtesy*, I wanted to let you know that Chris and Dan Warren as Personal Representatives of the [Estate] are in the process of listing the real property . . . ." (Emphasis added).

More, the Estate never disclosed any historical information about the alleged right of first refusal even though such disclosures are standard practice. The title report issued pursuant to the first purchase and sale agreement between the Estate and Tricore contained no reference to any right of first refusal. In fact, Finney testified he was confident there was never any written right of first refusal. Finney further testified that if there had been a right of first refusal, he would have included that information in the Tricore PSA. The Estate also did not disclose a right of first refusal to Tricore before the parties entered into the Tricore PSA.

Stockton and Brinkmeyer argue that the district court's findings of fact acknowledge the existence of the alleged right of first refusal and that those findings are binding here because Tricore assigned no error to the district court's factual findings. The district court's factual findings provided:

> In 1989, Stockton was negotiating to purchase lakefront from the Warrens, adjacent to the Brinkmeyers' property. During the negotiations, Stockton agreed to move his property line to the east to allow the Warrens to sell additional lakefront property to the Brinkmeyers. In exchange for this concession, *Bill and Elaine Warren promised to give Stockton the first right to purchase any additional Priest Lake Property they offered for sale.*
>
> The *first right to purchase* was never reduced to writing. *There is nothing of record indicating that any of the Estate's real property is subject to a right of first refusal.* . . . Both Dan and Chris were aware of their *parents' promise to Stockton.*

(Emphasis added).

"The rule of law is well-settled in this state that a trial court's findings of fact to which the appellant has not specified as an issue, i.e., assigned as error, will not be considered on appeal." *Cox v. Mtn. Vistas, Inc.*, 102 Idaho 714, 719 n.4, 639 P.2d 12, 17 n.4 (1981); *see also Lockridge v. Amalgamated Ass'n of St., Elec. Ry. And Motor Coach Emp. of America*, 93 Idaho 294, 304, 460 P.2d 719, 729 (1969) ("After the trial on the merits, the trial court made certain findings of fact to

29

Exhibit 14
Page 29 of 43

which appellant has made no assignments of error on appeal and therefore such findings are necessarily binding on this [C]ourt."). Contrary to Stockton and Brinkmeyer's assertions, however, the district court did not find a valid and enforceable right of first refusal. Instead, the district court acknowledged a promise by the late Warrens to Stockton for purchasing Warren property in the future. A mere promise to sell land in the future to a specific buyer falls far short of creating a valid and enforceable right of first refusal. *See Gyurkey*, 103 Idaho at 666, 651 P.2d at 931 (applying the same basic principles of contract law to rights of first refusals). More, we "liberally construe the trial court's findings of fact in favor of the judgment entered." *Alsco*, 166 Idaho at 523, 461 P.3d at 805. The district court ultimately held that a valid right of first refusal did not exist. Thus, we construe the district court's findings about the Estate's promise to sell land to Stockton as just that, a mere promise, not a valid and enforceable right of first refusal.

In summary, there is substantial and competent evidence supporting the district court's finding that a valid and enforceable right of first refusal did not exist. Thus, an alleged "handshake deal" is insufficient to show that the district court erred in failing to find justification for the tortious interference. To be enforceable, and to form the basis for justification for Stockton and Brinkmeyer's actions, the underlying right of first refusal had to be valid, in writing, and it had to include precise descriptions of what the right entailed. We affirm the district court's finding that Stockton and Brinkmeyer were not justified in their interference with the Tricore PSA.

**E.    The Estate, Stockton, and Brinkmeyer did not engage in a civil conspiracy.**

The district court found a conspiracy existed involving the Estate, Stockton, and Brinkmeyer. In its initial order on the civil conspiracy claim, the district court found: "there was an agreement between the defendants to accomplish an unlawful objective, i.e., interference with the [Tricore PSA], resulting in the breach of the [Tricore PSA], and damage, i.e., loss of the property by Tricore." The district court later clarified its ruling on the unlawful objective giving rise to the conspiracy claim, stating its original decision was "inartful" and did not "accurately reflect that all of the defendants were found to have engaged in the conspiracy." The district court clarified, "there was an agreement between all of the defendants to accomplish an unlawful objective, i.e., for the Estate to breach the [Tricore PSA] to facilitate the purchase of the property by Stockton [and] Brinkmeyer[.]"

The Estate, Stockton, and Brinkmeyer argue the district court erred in finding they engaged in a civil conspiracy. Again, Appellants argue the Tricore PSA is not a valid, enforceable contract.

30

Exhibit 14
Page 30 of 43

Relying on that position, Appellants argue there can be no claim for civil conspiracy because there is no underlying wrong. Inasmuch as we have already found this argument unsupportable, it is inadequate to reinforce the Appellants' argument as to the civil conspiracy.

In the alternative, Appellants argue the district court erred in finding they engaged in a civil conspiracy because the Estate cannot tortiously interfere with its own contract and Stockton and Brinkmeyer cannot breach a contract they are not a party to. The Appellants have a point on these grounds.

As an initial matter, Tricore argues this Court should dismiss the Appellants' argument on whether a party can tortiously interfere with its own contract because the Appellants did not argue as much below. We have held that "so long as a substantive issue is properly preserved, a party's appellate argument may evolve on appeal." *State v. Hoskins*, 165 Idaho 217, 224, 443 P.3d 231, 238 (2019). Metaphorically, a party riding a horse into the appellate process that has been groomed and reshod for the appeal is not only permitted but expected. *State v. Gonzalez*, 165 Idaho 95, 99, 439 P.3d 1267, 1271 (2019). An argument is only precluded when the party rides in on an entirely different horse. *Id*. Here, whether Appellants engaged in a civil conspiracy was an issue raised and ruled on below. The Appellants have continually argued they did not engage in a civil conspiracy. Thus, the Appellants have simply groomed, reshod, and readied their horse up for this Court. Thus, we will address the merits of the Appellants' arguments as they relate to the civil conspiracy finding.

"A civil conspiracy that gives rise to legal remedies exists only if there is an agreement between two or more to accomplish an unlawful objective or to accomplish a lawful objective in an unlawful manner." *McPheters v. Maile*, 138 Idaho 391, 395, 64 P.3d 317, 321 (2003). A civil conspiracy is not, on its own, a claim for relief. *Id*. Rather, a civil conspiracy "is the civil wrong committed as the objective of the conspiracy, not the conspiracy itself." *Id*. Conspiracy is only material for the purpose of "making all of the defendants liable for each individual act of the other defendants, if the conspiracy is established." *Dahlquist v. Mattson*, 40 Idaho 378, 393, 233 P. 883, 887 (1925).

Although this Court is not bound by the holdings of other jurisdictions, the benchmark governing civil conspiracy explained in *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454 (Cal. 1994), is instructive. There, the California Supreme Court explained that civil conspiracy is "a legal doctrine that imposes liability on persons who, although not actually

31

Exhibit 14
Page 31 of 43

committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Applied Equipment*, 869 P.2d at 510–11. "By its nature, tort liability arising from conspiracy presupposes that the coconspirator is legally capable of committing the tort, i.e., that he or she owes a duty to plaintiff recognized by law and is potentially subject to liability for breach of that duty." *Id.* at 511. As a result, if the underlying wrong is tortious interference, and the Estate owes no duty to itself, it cannot commit that tort; accordingly, it is also unable to engage in a conspiracy with Stockton and Brinkmeyer to commit that same tort. *See Ostrander v. Farm Bureau Mut. Ins. Co. of Idaho, Inc.*, 123 Idaho 650, 654, 851 P.2d 946, 950 (1993) ("The general rule is that a party cannot tortiously interfere with its own contract.").

Alternatively, if the underlying wrong is the Estate's breach of contract, Stockton and Brinkmeyer cannot breach a contract to which they are not a party. *See Vickers v. Hanover Const. Co., Inc.*, 125 Idaho 832, 834, 875 P.2d 929, 931 (1994) ("There is no dispute that the parties to the contract were Hanover and Huntington. Although Claimants maintain this contract created a duty to Vickers, it is undisputed that Vickers was not a party to the agreement."); *see also Fuchs v. Lloyd*, 80 Idaho 114, 122–23, 326 P.2d 381, 386 (1958) ("There is no basis upon which the formation of a contract with respondent could be had in this agreement because the agreement is between [two other parties]."). As a result, the tortious interference claim covers their misdeeds, and they cannot be held responsible for also engaging in a conspiracy to breach a contract with the Estate based on those same misdeeds. Therefore, we reverse the district court's finding that Appellants engaged in a civil conspiracy.

**F.    The district court abused its discretion by awarding Tricore attorney fees against Appellants on a joint and several basis.**

In its decision and order on the bench trial, the district court found: 1) the Estate breached the Tricore PSA; 2) the Estate violated the ICPA; 3) Stockton and Brinkmeyer tortiously interfered with the Tricore PSA: and 4) the Estate, Stockton, and Brinkmeyer engaged in a civil conspiracy. Based on the conspiracy finding, the district court found Tricore was entitled to fees on a joint and several basis. The district court then awarded Tricore fees for $494,431.11, pursuant to the Tricore PSA, Idaho Code section 12-120(3), and the ICPA.

Appellants argue the district court abused its discretion in awarding Tricore attorney fees against them on a joint and several basis. According to Stockton and Brinkmeyer, Tricore is not entitled to fees against them because fees cannot be awarded for tortious interference with contract.

32

Exhibit 14
Page 32 of 43

Moreover, Stockton and Brinkmeyer argue they are not parties to the Tricore PSA, and they did not engage in a civil conspiracy that would make them liable for the Estate's breach of the Tricore PSA. Thus, Appellants argue the award was error because Tricore failed to apportion fees incurred against Stockton and Brinkmeyer from fees incurred against the Estate. We agree.

"In any civil action the court may award reasonable attorney fees . . . to the prevailing party or parties . . . when provided for by any statute or contract." I.R.C.P. 54(e)(1). "A party claiming attorney's fees must assert the specific statute, rule, or case authority for its claim." *Alsco*, 166 Idaho at 533, 461 P.3d at 815 (quoting *Eighteen Mile Ranch, LLC v. Nord Excavating & Paving, Inc.*, 141 Idaho 716, 720, 117 P.3d 130, 134 (2005)). The prevailing party is determined "from an overall view, not a claim-by-claim analysis." *Syringa Networks, LLC v. Idaho Dep't of Admin.*, 159 Idaho 813, 831, 367 P.3d 208, 226 (2016).

The district court, in awarding fees, stated: "[h]aving found a civil conspiracy amongst all the defendants, the judgment against the defendants for said costs and attorney's fees shall be joint and several." As noted above, we now hold the district court erred in finding the Appellants engaged in a civil conspiracy. Thus, the district court's award against Stockton and Brinkmeyer is unsupported because Stockton and Brinkmeyer were solely liable on the tortious interference claim. Attorney fees are not recoverable under section 12-120(3) for tortious interference with a contract. *Bybee*, 145 Idaho at 260–61, 178 P.3d at 625–26 ("Tortious interference with contract . . . . are torts and not actions to recover on a contract."); *see also NW Bec-Corp. v. Home Living Serv.*, 136 Idaho 835, 842, 41 P.3d 263, 270 (2002) (holding a party has no right to attorney fees under section 12-120(3) for tortious interference with contract). Thus, we vacate the district court's attorney fee award against Stockton and Brinkmeyer.

As for the Estate, the district court's basis for awarding fees was the Tricore PSA, Idaho Code section 12-120(3), and the ICPA. First, "[w]here there is a valid contract between parties which contains a provision for an award of attorney fees and costs, the terms of that contractual provision establish a right to an award of attorney fees and costs." *Humphries v. Becker*, 159 Idaho 728, 739, 366 P.3d 1088, 1099 (2016) (quoting *Farm Credit of Spokane v. W.W. Farms, Inc.*, 122 Idaho 565, 569, 836 P.2d 511, 515 (1992)). "[A]ttorney's fees . . . can be awarded to a prevailing party pursuant to a purchase and sale agreement." *Id.* The Tricore PSA provides "the prevailing party shall be entitled to recover from the non-prevailing party reasonable costs and attorney's

33

Exhibit 14
Page 33 of 43

fees, including such fees and costs on appeal." Thus, the district court's award against the Estate under the Tricore PSA was not an abuse of discretion.

Second, section 12-120(3), in relevant part, provides:

In any civil action to recover on a . . . contract relating to the purchase or sale of goods . . . or services and in any commercial transaction unless otherwise provided by law, the prevailing party shall be allowed a reasonable attorney's fee to be set by the court, to be taxed and collected as costs.

The term "commercial transaction" is defined to mean all transactions except transactions for personal or household purposes. . . .

I.C. § 12-120(3). Here, the breach of contract claim against the Estate for which fees were awarded constitutes a commercial transaction. Thus, the district court did not abuse its discretion in awarding fees against the Estate under section 12-120(3).

Last, section 48-608, in relevant part, permits "reasonable attorney's fees to the plaintiff if he prevails." I.C. § 48-608(5). The district court found the Estate violated the ICPA. Thus, the district court did not abuse its discretion in awarding fees against the Estate pursuant to section 48-608(5).

Even so, "[w]here fees were not apportioned between a claim that qualifies . . . and one that does not, no fees are to be awarded." *See Rockefeller v. Grabow*, 136 Idaho 637, 645, 39 P.3d 577, 585 (2001). Because the district court's fee award against Stockton and Brinkmeyer was error, we remand to the district court for Tricore to apportion the fees incurred against the Estate from the fees incurred against Stockton and Brinkmeyer. *See Dickinson Frozen Foods, Inc. v. J.R. Simplot Co.*, 164 Idaho 669, 687, 434 P.3d 1275, 1293 (2019) (remanding a fee award to the district court after finding the district court's award was inappropriate because it did not apportion fees).

**G.    The district court abused its discretion by adding $362,069.61 to the supersedeas bond to compensate Tricore for the loss of use of the property during this appeal.**

After entering judgment for Tricore, the district court granted the Appellants' motion to stay enforcement of the judgment pending appeal. The district court, among other things, ordered Appellants post an additional bond in the amount of $362,069.61 to compensate Tricore for its anticipated loss of use of the Warren Property during the appeal process. Brinkmeyer alone argues the district court erred in adding $362,069.61 to the supersedeas bond to compensate Tricore for the loss of use of the property during the appeal process. Brinkmeyer argues the additional bond

34

Exhibit 14
Page 34 of 43

amount does not align with rules governing stay of judgments, nor did it align with the district court's damages findings.

Idaho Appellate Rule 13 authorizes the district court to stay a judgment during an appeal. In relevant part, I.A.R. 13(b) provides:

> **Stay Upon Appeal—Powers of District Court—Civil Actions**. In civil actions, unless prohibited by order of the Supreme Court, the district court shall have the power and authority to rule upon the following motions and to take the following actions during the pendency on an appeal:
>
> . . . .
>
> (14) Stay execution or enforcement of any judgment, order or decree appealed from, other than a money judgment, upon the posting of such security and upon such conditions as the district court shall determine.

I.A.R. 13(b)(14). These actions may be taken to preserve the status quo throughout the appeal. *See Coeur D'Alene Turf Club, Inc. v. Cogswell*, 93 Idaho 324, 330, 461 P.2d 107, 113 (1969).

Although Rule 13(b)(14) grants the district court broad authority to impose certain conditions when a nonmonetary judgment is stayed, the district court's discretion is not unfettered. Here, the district court ordered an additional bond be posted in the amount of $362,069.61 to "compensate Tricore for the lost opportunity to develop the property while the matter is being appealed . . . that is equivalent to 136% of the total interest on the purchase price of $2.4 million for 18 months at the legal rate of 7.375%." The district court did not explain why it imposed an additional bond other than "[t]o compensate Tricore for the lost opportunity to develop the property while the matter is being appealed." The district court's arrival at the additional amount of $362,069.61 stems from the legal rate of interest and an estimated appeal window of eighteen months. There is no explanation as to why these criteria were used in the district court's calculation, particularly where the district court awarded no damages for the tortious interference claim at trial. Thus, we hold that because the district court did not act consistently with the legal standards applicable to the specific choices available to it, the court abused its discretion by requiring Appellants to post the additional bond of $362,069.61. Consequently, the district court's finding the necessity of posting an additional bond of $362,069.61 is reversed.

**H.     Tricore was entitled to damages for the Estate's violation of the ICPA but not for Stockton and Brinkmeyer's tortious interference.**

The district court, after finding that the Estate breached the Tricore PSA, found Tricore was entitled to an award of specific performance. The court explained that specific performance

35

Exhibit 14
Page 35 of 43

was the only appropriate remedy because of the uniqueness of the Warren Property and the conflicting testimony on the Warren Property's value at the time of the breach. As a result, the court declined to award any additional monetary damages to Tricore.

On cross-appeal, Tricore argues the district court erred by not awarding monetary damages to Tricore on the tortious interference claim and for the Estate's violation of the ICPA. According to Tricore, the court overlooked the evidence presented supporting an award of damages. Tricore argues it presented competent evidence of damages relating to preparing to use the Warren Property, the loss of the use of the Warren Property, and the increase in costs over the two years Tricore was deprived of the Warren Property because of this litigation. Tricore also argues it should have been awarded at least $1,000.00 in damages under the ICPA.

"A district court's award of damages will be upheld on appeal where there is sufficient evidence supporting the award." *Griffith v. Clear Lakes Trout Co., Inc.*, 143 Idaho 733, 740, 152 P.3d 604, 611 (2007). Damages must be proven with reasonable certainty. *Id*. "Reasonable certainty requires neither absolute assurance nor mathematical exactitude; rather, the evidence need only be sufficient to remove the existence of damages from the realm of speculation." *Id*.

In a case of tortious interference with contract, tort damages are a better measure of damages than contract damages. *Barlow v. Int'l Harvester Co.*, 95 Idaho 881, 896, 522 P.2d 1102, 1117 (1974) *abrogated by Siercke v. Siercke*, 476 P.3d 376 (2020). "Thus, in a proper case, general damages, damages for unforeseen expenses, and even punitive damages may be recovered. Recovery for interference is not limited to those damages within the contemplation of the parties to the contract . . . ." *Id*.

Appellants allege Tricore is not entitled to damages because monetary damages and specific performance are mutually exclusive remedies. The appellants cite *Campbell v. Parkway Surgery Center, LLC*, 158 Idaho 957, 354 P.3d 1172 (2015), where this Court, to avoid double recovery, declined to consider specific performance when it ordered monetary damages. 158 Idaho at 969, 354 P.3d at 1184. But Tricore is not appealing the district court's award for the Estate's breach of contract claim, in which the court ordered specific performance. Instead, Tricore is appealing the district court's denial of monetary damages for Stockton and Brinkmeyer's tortious interference and for the Estate's violation of the ICPA. Thus, the fact that the district court ordered specific performance is not dispositive to Tricore's cross-appeal.

36

Exhibit 14
Page 36 of 43

As for the tortious interference claim, it is undisputed that Tricore suffered damages. The district court explained that Tricore "lost both the property it had contracted to purchase and all of the time and money it had expended over the preceding year on feasibility studies, site analysis, engineering, and development plans." We recognize that in the proper circumstance damages may be awarded *in addition to specific performance. See, e.g., Deeds v. Stephens*, 8 Idaho 514, 518–19, 69 P. 534, 538–39 (1902) (recognizing that if damages were adequately proven, on top of specific performance, "it would have been incumbent upon the court to ascertain the amount, if any, the appellant had sustained. . . ."); *Pern v. Stocks*, 93 Idaho 866, 871, 477 P.2d 108, 113 (1970) (damages, though awardable in specific performance action, were not proven with reasonable certainty, and were thus not awardable). That said, the district court found Tricore was entitled to no additional damages because such an award would amount to a double recovery. Tricore is the beneficiary of the court's equitable award of specific performance of the Tricore PSA. The district court found that any damages related to approximately $170,000 spent by Tricore "on various tasks, including the feasibility studies, the wetland delineation, engineering, and site analysis" were subsumed by the order of specific performance, since those charges did not accrue independently of Tricore's planned subdivision development. This conclusion is supported by substantial and competent evidence.

The district court also denied Tricore $2,500,000 in damages for the "loss of use of the property" because it found the amount was "pulled out of thin air." The number came from the estimated increase in costs of construction and development from 2016 to 2018. Mort testified, "I think it would take more money marketing th[e Warren Property] today than it would have a few years ago. So I think, you know, all of that said, I think between costs and all of those numbers, you know, if we can buy the property back we would be requesting an additional two and a half million." Robert Gordon, an expert called by the defense, testified to the increase in costs of construction and development in the two years. Gordon agreed with Mort that the cost of construction and development had increased. Yet Gordon could not provide an amount as to how much the costs had increased, nor would he provide a speculative percentage without more information. Thus, the district court weighed these facts and concluded that the amount asserted by Tricore for loss of use of the property was not proven to a reasonably certainty. *See Griffith*, 143 Idaho at 740, 152 P.3d at 611; *Pern*, 93 Idaho at 871, 477 P.2d at 113. Although tort damages differ from contract damages and do not require proof by mathematical exactitude, *see Cramer v.*

37

Exhibit 14
Page 37 of 43

*Slater,* 146 Idaho 868, 879, 204 P.3d 508, 519 (2009), the district court, as the trier of fact, still found the proof lacking to award tort damages for the delay occasioned by Stockton and Brinkmeyer's tort. *See id.* (Where "injuries are subjective and measurable with only an approximation of certainty, their award is primarily a question for the [trier of fact] and an appellate court should interfere with such a verdict only in the most exceptional circumstances.") Thus, while there is some evidence in the record to support Tricore's claimed damages due to the delay occasioned by Stockton and Brinkmeyer's tort, we decline to interfere with the court's finding that is supported by substantial and competent evidence.

As for the ICPA, "[a]ny person who purchases . . . goods . . . and thereby suffers any ascertainable loss . . . as a result . . . of a method, act or practice declared unlawful by this act . . . may bring an action to recover actual damages or one thousand dollars ($1,000), whichever is greater[.]" I.C. § 48-608(1). Thus, at a minimum, a victim of an ICPA violation is entitled to at least one thousand dollars in damages. *White v. Mock,* 140 Idaho 882, 890, 104 P.3d 356, 364 (2004) ("Having determined that the Mocks had engaged in an act or practice which was misleading, false, or deceptive to White, in violation of the [ICPA], the jury was required to make an award of at least one thousand dollars to White."). The district court found the Estate violated the ICPA, which we affirm. Under section 48-608(1), a victim of an ICPA violation is entitled to at least one thousand dollars in damages. *White,* 140 Idaho at 890, 104 P.3d at 364. The district court erred in finding Tricore was not entitled to at least one thousand dollars in damages because of the Estate's violation of the ICPA. We hold that Tricore is entitled to $1,000 in damages against the Estate for its ICPA violation, as a matter of law.

In conclusion, the district court ordered specific performance of the Tricore PSA. It did so by requiring Stockton and Brinkmeyer, through PLBM, to reconvey the Warren Property to Tricore and for Tricore to compensate Stockton and Brinkmeyer the purchase price, $2,400,000. We affirm and clarify that the $2,400,000 is to be paid to Stockton and Brinkmeyer without interest.

## I. Attorney fees on appeal.

The Estate requests fees on appeal pursuant to Idaho Code section 12-120(3) and costs under Idaho Code section 12-107 and Idaho Appellate Rule 40. The Estate argues a prevailing party may be awarded fees under section 12-120(3) although it argues a contract or commercial transaction never existed. Tricore requests fees on appeal under Idaho Code section 12-121 arguing

38

Exhibit 14
Page 38 of 43

the Estate, Stockton, and Brinkmeyer are simply asking this Court to second-guess the district court's decisions. Tricore also argues this Court can award fees on appeal pursuant to the Tricore PSA and section 12-120(3).

"Attorney fees under Idaho Code section 12-120(3) are appropriately awarded to the prevailing party '[i]n any civil action . . . in any commercial transaction[.]' " *Alsco*, 166 Idaho at 535, 461 P.3d at 817 (quoting I.C. § 12-120(3)). Commercial transaction is "defined to mean all transactions except transactions for personal or household purposes." I.C. § 12-120(3). "The test for determining whether this provision authorizes an award of attorney fees is whether the commercial transaction comprises the gravamen of the lawsuit." *Alsco*, 166 Idaho at 535, 461 P.3d at 817 (quoting *Erickson v. Flynn*, 138 Idaho 430, 436, 64 P.3d 959, 965 (Ct. App. 2002)) (internal quotations omitted).

The Tricore PSA provides "[i]f either party initiates or defends any arbitration or legal action or proceedings which are in any way connected with this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party reasonable costs and attorney's fees, including such costs and fees on appeal."

Idaho Code section 12-121 provides, in part, "[i]n any civil action, the judge may award reasonable attorney's fees to the prevailing party or parties when the judge finds that the case was brought, pursued or defended frivolous, unreasonably or without foundation." "Those circumstances exist when appellants simply ask the 'appellate court to second-guess the trial court by reweighing the evidence or ha[ve] failed to show that the district court incorrectly applied well-established law.' " *Lola L. Cazier Revocable Tr. v. Cazier*, 167 Idaho 109, 228–29, 468 P.3d 239, 252–53 (2020) (quoting *Clark v. Jones Gledhill Fuhrman Gourley, P.A.*, 163 Idaho 215, 230, 409 P.3d 795, 810 (2017)). This Court will not award fees when good-faith arguments are raised on appeal. *Id*. at 229, 468 P.3d at 253.

"[T]he prevailing party determination is based on the action as a whole." *City of Middleton v. Coleman Homes, LLC*, 163 Idaho 716, 732, 418 P.3d 1225, 1232 (2018). "The question is not to be examined claim-by-claim. *Id*. "The determination should be based on what party prevailed on the 'primary issues of [the] litigation.' " *Id*. at 726, 418 P.3d at 1235 (quoting *Idaho Mil. Hist. Soc'y, Inc. v. Maslen*, 156 Idaho 624, 630, 329 P.3d 1072, 1078 (2014)).

Tricore prevailed on the primary issues of the litigation as against the Estate: the breach of contract and ICPA claims. Thus, Tricore is the prevailing party as against the Estate. Tricore is

Exhibit 14
Page 39 of 43

entitled to attorney fees under the Tricore PSA and section 12-120(3) against the Estate on the breach of contract claim. It is also entitled to attorney fees against the Estate on the independent ground of Idaho Code section 48-608(5). Because we reverse the district court's finding that the Estate, Stockton, and Brinkmeyer engaged in a civil conspiracy, attorney fees on appeal are not awardable against Stockton or Brinkmeyer under section 12-120(3) or the Tricore PSA.

Tricore also seeks fees pursuant to section 12-121. However, Appellants' arguments were made in good faith and they did not ask this Court to simply second-guess what was decided below. In fact, the Estate, Stockton, and Brinkmeyer succeeded in their efforts to reverse the district court's findings as to the civil conspiracy claim, the attorney fee award on a joint and several basis, the additional bond and, in part, the district court's denial of damages to Tricore. Thus, Tricore is not entitled to fees on appeal against any Appellant under section 12-121.

## VI. CONCLUSION

We affirm the district court's grant of summary judgment for Tricore on the Estate's statute of frauds defense. We also affirm these findings of the district court: 1) the Estate breached the Tricore PSA; 2) the Estate violated the ICPA; and 3) Stockton and Brinkmeyer tortiously interfered with the Tricore PSA.

We reverse the district court's finding that the Appellants engaged in a civil conspiracy. As a result, we affirm the district court's attorney fee award only as it applies to the Estate and remand to the district court to apportion fees against the Estate from fees against Stockton and Brinkmeyer. We also reverse the district court's requirement that Appellants post an additional supersedeas bond in the amount of $362,069.61 and order that amount of the bond to be returned to the party or parties posting the same.

On cross-appeal, we affirm the district court's decision that Tricore is not entitled to monetary damages on the tortious interference claim. However, we reverse the district court's finding on damages awarded under the ICPA and we hold that Tricore is entitled to $1,000 in damages under Idaho Code 48-608(1).

Tricore is the prevailing party on appeal and is entitled to its costs and attorney fees pursuant to the Tricore PSA and section 12-120(3) against the Estate only. Stockton and Brinkmeyer are not entitled to costs since they prevailed only in part.

JUSTICES BURDICK, STEGNER and MOELLER, CONCUR.

40

Exhibit 14
Page 40 of 43

BRODY, Justice, dissenting.

I respectfully dissent. From my vantage point, this case centers on whether the purchase and sale agreement between Tricore and the Estate is invalid because it violates the statute of frauds. I conclude that the agreement is invalid because the reservation of a parcel or parcels "in size not less than 200 feet of waterfront" fails to sufficiently describe the portion of Parcel A that is to be retained. Consequently, the agreement also fails to sufficiently describe the portion of the property that is to be sold. Therefore, I would reverse the district court's ruling concerning the Estate's statute of frauds defense, vacate the judgment, and remand the case to the district court.

This Court has long-held that an agreement concerning the sale of real property must contain a sufficient description of the property to be sold to satisfy the requirements set forth in Idaho Code section 9-505(4). *Lexington Heights Dev., LLC v. Crandlemire ("Lexington Heights")*, 140 Idaho 276, 280, 92 P.3d 526, 530 (2004). A description of the property to be sold "will be sufficient so long as [the] quantity, identity or boundaries of [the] property can be determined from the face of the instrument, or by reference to extrinsic evidence to which it refers." *Id.* at 281, 92 P.3d at 531 (quoting *City of Kellogg v. Mission Mountain Interests, Co.*, 135 Idaho 239, 244, 16 P.3d 915, 920 (2000)). Reasonable certainty is not enough. *Ray v. Frasure*, 146 Idaho 625, 629–30, 200 P.3d 1174, 1178–79 (2009). "[A] property description [must] designate 'exactly' what property the seller is conveying to the buyer." *Id.* (quoting *Garner v. Bartschi*, 139 Idaho 430, 435–30, 80 P.3d 1031, 1036–37 (2003)).

Here, the Estate contends it is not possible to ascertain the boundaries of the property that is to be reserved and retained because the parcel or parcels could be configured in several different ways. Tricore disagrees, arguing instead that three out of the four boundaries are ascertainable because they can be established by reference to the shoreline of the lake, the location of the existing road, and the location of the "Tax 31" parcel. As Tricore conceded during oral argument, however, at least one boundary cannot be ascertained because Tricore has not yet determined how the plat for the proposed development will be configured. For our purposes, it is irrelevant which party is correct. The important point is that it is *undisputed* that the agreement does not fully describe the boundaries of the property that is to be reserved and retained. Additionally, the agreement does not address the "quantity" or the "identity" of the property to be retained.

In *Lexington Heights*, this Court addressed a similar issue. 140 Idaho at 278–80, 92 P.3d at 528–30. Roger and Elizabeth Crandlemire owned 95 acres. *Id.* at 278, 92 P.3d at 528. They

41

Exhibit 14
Page 41 of 43

entered into an agreement to sell approximately 90 acres of their property to Lexington Heights Development, LLC. *Id.* The agreement stated that the sale excluded "the residential dwelling (which will include no more than five acres) . . . ." *Id.* Additionally, the agreement indicated that "the precise size, location, dimensions and configuration" of the property to be excluded from the sale would be determined later. *Id.* After a dispute arose between the parties, the Crandlemires refused to consummate the sale to Lexington Heights and sold 40 acres of their property to a third party. *Id.* at 279, 92 P.3d at 529. Lexington Heights filed suit, seeking specific performance and damages. *Id.* The district court held that the agreement was invalid because it did not contain a sufficient description of the property to be sold. *Id.* at 278, 92 P.3d at 528. This Court reached the same conclusion on review. *Id.* at 282, 92 P.3d at 532. "The legal description in the Agreement does not contain a sufficient description of the property to be sold because it does not contain any description sufficient to identify the approximate five-acre parcel that is to be excluded from the sale." *Id.* Therefore, this Court held that the agreement was invalid. *Id.* at 285, 92 P.3d at 535.

Similar to the parties in *Lexington Heights*, who agreed to reserve "no more than five acres" from the sale of the larger 95-acre property, the parties here agreed to reserve "not less than 200 feet of waterfront" from the sale of the larger 65-acre property. Like the agreement in *Lexington Heights*, which did not include a sufficient description of the property that was to be excluded from the sale, the agreement here does not include a sufficient description of the property to be excluded from the sale, either. Thus, like the agreement in *Lexington Heights*, which was invalid because it lacked a sufficient description of the property to be sold, the agreement here is invalid for the same reason. In short, the agreement here, like the agreement in *Lexington Heights*, violates the statute of frauds.

The district court concluded the agreement does not violate the statute of frauds because it includes a sufficient description of the larger 65-acre property, which consists of parcels A, B, and C. That conclusion ignores the fact, however, that the agreement does not contemplate the sale of Parcel A in its entirety. Rather, the agreement contemplates the sale of a *portion* of Parcel A. Section 3 of the second addendum to the agreement contains a legal description for Parcel A, but notes that Parcel A is subject to conditions. Section 5 of the second addendum to the agreement then states:

> The Sellers reserve and retain from Parcel A and Buyer shall create in compliance with Bonner County Planning and Zoning provisions and approval, a parcel(s) in size not less than 200 feet of waterfront (or two 100 foot parcels –

42

Exhibit 14
Page 42 of 43

> consistent with Buyer's development) adjacent to Tax 31 between the existing
> access road and the lake.

Stated differently, the agreement contemplates that the Estate will retain a portion of Parcel A and sell the remainder of the property to Tricore. As explained previously, however, the reservation of "not less than 200 feet of waterfront" fails to sufficiently describe the property to be reserved and retained by the Estate. Because there is not a sufficient description of the property that is to be reserved and retained, there is not a sufficient description of the portion of the property that is to be sold, either. It is irrelevant whether there is a sufficient description of the larger 65-acre property (i.e., a sufficient description of Parcels A, B, and C); there must be a sufficient description of the portion of the property that is to be sold in order to satisfy the statute of frauds. There is no such description in the agreement.

For the foregoing reasons, I conclude that the agreement between Tricore and the Estate is invalid because it violates the statute of frauds. Moreover, the invalidity of the agreement directly impacts other issues decided by the district court. Thus, I would reverse the district court's ruling dismissing the Estate's statute of frauds defense, vacate the judgment, and remand the case to the district court with instructions to render a new decision consistent with our holding in *Lexington Heights*.

Exhibit 14
Page 43 of 43