# EXHIBIT A

## UNITED STATES COURT OF APPEALS
### FOR THE FIRST CIRCUIT

**No. 21-1719**
NORTHEAST PATIENTS GROUP, d/b/a Wellness Connection of Maine; HIGH
STREET CAPITAL PARTNERS, LLC,
Plaintiffs – Appellees,

v.

UNITED CANNABIS PATIENTS AND CAREGIVERS OF MAINE,
Defendants – Appellant,

MAINE DEPARTMENT OF ADMINISTRATIVE AND FINANCIAL
SERVICES; KIRSTEN FIGUEROA, in her official capacity as Commissioner of
Maine Department of Administrative and Financial Services,
Defendants.

_____

**No. 21-1759**
NORTHEAST PATIENTS GROUP, d/b/a Wellness Connection of Maine; HIGH
STREET CAPITAL PARTNERS, LLC,
Plaintiffs – Appellees,

v.

KIRSTEN FIGUEROA, in her official capacity as Commissioner of Maine
Department of Administrative Services,
Defendant – Appellant,

MAINE DEPARTMENT OF ADMINISTRATIVE AND FINANCIAL
SERVICES; UNITED CANNABIS PATIENTS AND CAREGIVERS OF
MAINE,
Defendants.

_____

On appeal from the United States District Court for the District of Maine
(District of Maine Case No. 1:20-cv-00468-NT)

_____

**BRIEF OF DEFENDANT-APPELLANT KIRSTEN FIGUEROA**

_____

AARON M. FREY
Attorney General

THOMAS A. KNOWLTON
Deputy Attorney General

CHRISTOPHER C. TAUB
Chief Deputy Attorney General

PAUL E. SUITTER
Assistant Attorney General

Office of the Maine Attorney General
6 State House Station
Augusta, Maine 04333-0006
(207)-626-8800
Attorneys for Defendant-Appellant Kirsten Figueroa

# **TABLE OF CONTENTS**

Table of Authorities ........................................................ iii

Introduction ................................................................... 1

Jurisdictional Statement ................................................ 1

Statement of the Issues Presented for Review ................ 2

Statement of the Case .................................................... 2

Summary of the Argument ............................................ 6

Standard of Review ....................................................... 7

Argument ...................................................................... 7

I.    The Dormant Commerce Clause Does Not Apply to Maine's Medical Marijuana Market Because Congress Has Explicitly Eliminated Any Possible Interstate Market ........................................ 7

    A. The History and Purpose of the Dormant Commerce Clause ......... 7

    B. Congress Can Act to Neutralize the Dormant Commerce Clause .. 8

    C. The Dormant Commerce Clause Does Not Apply Here ............... 11

    D. Marijuana Is Different from Alcohol and Other Legal Markets ... 13

    E. Congress Has Eliminated All Legal Interstate Markets for Marijuana ........................................................ 16

    F. Federal Enforcement Policies Do Not Alter the Commerce Clause Analysis ......................................... 18

    G. Striking Down Maine's Residency Requirement Will Not
       Expand Legal Interstate Commerce ............................................... 21

Conclusion ...................................................................................... 23

Certificate of Service ..................................................................... 24

Addendum .......................................................................... Add. – i

# <u>TABLE OF AUTHORITIES</u>

Page(s)

<u>Cases</u>

*Bowman v. Chicago & N.W. Ry. Co.*,
   125 U.S. 465 (1888) ........................................................................ 16

*C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*,
   511 U.S. 383 (1994) ..................................................................... 8, 17

*Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*,
   520 U.S. 564 (1997) ................................................................... 10, 20

*Champion v. Ames*,
   188 U.S. 321 (1903) ................................................................... 10, 17

*City of Philadelphia v. New Jersey*,
   437 U.S. 617 (1978) .......................................................................... 9

*Exxon Corp. v. Governor of Md.*,
   437 U.S. 117 (1978) ..................................................................... 8, 17

*Gen. Motors Corp. v. Tracy*,
   519 U.S. 278 (1997) ................................................................... Passim

*Gibbons v. Ogden*,
   22 U.S 1 (1824). ...................................................................... 18, 19

*Gonzales v. Raich*,
   545 U.S. 1 (2005). .................................................................... 18, 19

*H.P. Hood & Sons, Inc. v. Du Mond*,
   336 U.S. 525 (1949) .......................................................................... 9

*Houlton Citizens' Coalition v. Town of Houlton*,
   175 F.3d 178 (1st Cir. 1999) .............................................................. 9

*Hughes v. Alexandria Scrap Corp.*,
   426 U.S. 794 (1976) .......................................................................... 8

*Hunt v. Wash. State Apple Adver. Comm'n,*
    432 U.S. 333 (1977) ........................................................................ 8, 17

*Lewis v. BT Inv. Managers, Inc.,*
    447 U.S. 27 (1980) ............................................................................. 10

*March v. Mills,*
    867 F.3d 46 (1st Cir. 2017) .................................................................. 7

*McBurney v. Young,*
    569 U.S. 221 (2013) ........................................................................ 8, 18

*Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys.,*
    472 U.S. 159 (1985) ............................................................................ 13

*New England Power Co. v. New Hampshire,*
    455 U.S. 331 (1982) ............................................................................ 10

*Or. Waste Sys., Inc. v. Dep't of Envtl. Quality,*
    511 U.S. 93 (1994) ............................................................................. 15

*Perez v. United States,*
    402 U.S. 146 (1971) ............................................................................ 10

*Pharm. Research & Mfrs. of Am. v. Concannon,*
    249 F.3d 66 (1st Cir. 2001) .................................................................. 7

*Pike v. Bruce Church, Inc.,*
    397 U.S. 137 (1970) ............................................................................ 17

*Predka v. Iowa,*
    186 F.3d 1082 (8th Cir. 1999) ............................................................. 17

*Safe Streets Alliance v. Hickenlooper,*
    859 F.3d 865 (10th Cir. 2017) ............................................................. 22

*South Dakota v. Wayfair, Inc.,*
    138 S. Ct. 2080 (2018) ........................................................................ 10

iv

*Susan B. Anthony List v. Driehaus*,
779 F.3d 628 (6th Cir. 2015) ................................................................... 20

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
139 S. Ct. 2449 (2019) ........................................................ 9, 14, 15, 18

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
550 U.S. 330 (2007) ........................................................................ 7, 20

*Wilkinson v. Austin*,
545 U.S. 209 (2005) .............................................................................. 21

Federal Statutes and Constitutional Provisions

18 U.S.C. § 2252 ....................................................................................... 11

21 U.S.C. § 812 ......................................................................................... 11

21 U.S.C. §§ 801-904 ........................................................................ 16, 22

28 U.S.C. § 1291 ......................................................................................... 2

28 U.S.C. § 1331 ......................................................................................... 2

Pub. L. 116-260 § 531, 134 Stat 1182, 1282-83 (2020) ......................... 19

United States Constitution art. I, § 8, cl. 3 ...................................... 1, 2, 7

State Statutes

22 M.R.S.A. § 2422 ..................................................................................... 4

22 M.R.S.A. § 2428 ..................................................................................... 4

22 M.R.S.A. §§ 2421-2430-H ................................................................. 3, 4

<u>Other Authorities</u>

Charlie Eichacker, *Feds Charge 13 in Alleged Maine Marijuana Conspiracy, Including Cops, Prosecutor, and Selectman*, Maine Public, (Oct. 28, 2021, 6:26 PM) ........................................................................................................................ 20

*Policy, Preemption, and Pot: Extraterritorial Citizen Jurisdiction*, 58 B.C. L. Rev. 929 (2017) .................................................................................. 17

# INTRODUCTION

The question facing the Court is purely legal. Does the Commerce Clause of the United States Constitution (art. I, § 8, cl. 3) permit states to enact residency requirements in intrastate marijuana markets when Congress has foreclosed all interstate commerce in markets for marijuana under the Controlled Substances Act of 1970? The answer is yes.

The Commerce Clause of the United States Constitution bars discriminatory treatment of out-of-state interests in areas related to interstate commerce, unless Congress has granted states permission to do so. Congress has done so regarding marijuana. Because Congress has effectively eliminated all legal interstate commerce markets in marijuana pursuant to the Controlled Substances Act of 1970, it has granted states authority to regulate residency restrictions in intrastate marijuana markets however the states see fit.

Accordingly, the Court should reverse the district court's judgment and remand for entry of judgment in favor of Commissioner Figueroa.

# JURISDICTIONAL STATEMENT

Plaintiff-Appellees Northeast Patients Group, LLC and High Street Capital Partners, LLC (collectively "NPG"), filed suit against Maine's Department of Administrative and Financial Services (the "Department") and its Commissioner,

Kirsten Figueroa (the "Commissioner"). App. 8. The district court had jurisdiction

pursuant to 28 U.S.C. § 1331.

On March 23, 2021, the district court permitted the trade association United

Cannabis Patients and Caregivers of Maine ("United Cannabis") to participate in the

litigation as an Intervenor-Defendant. *Id.* at 4. On August 13, 2021, the district court

entered an order issuing final judgment in favor of NPG. *Id.* at 23. On September

10, 2021, United Cannabis filed a timely notice of appeal, which was followed by a

timely notice of appeal by the Commissioner on September 22, 2021. *Id.* at 5-6. This

Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE PRESENTED FOR REVIEW

I.    Whether the Commerce Clause of the United States Constitution (art. I, § 8,

cl. 3) permits Maine to enact residency restrictions in its intrastate medical

marijuana market when Congress has foreclosed all interstate commerce in

markets for marijuana under the Controlled Substances Act of 1970.

## STATEMENT OF THE CASE

The Supreme Court's dormant Commerce Clause jurisprudence stands for the

principle that states may not enact legislation that unduly restricts the interstate flow

of goods and services. While it is true that the dormant Commerce Clause often

functions to guard against individual states protecting their own citizens over

citizens of other states, courts must first answer a threshold question as to whether

the dormant Commerce Clause applies, at all, in a given case. The ultimate test of whether state laws violate the dormant Commerce Clause asks whether a state has done something to restrict interstate commerce more severely than where Congress has left the market.[1] Here, the dormant Commerce Clause does not apply to Maine's intrastate market for medical marijuana. Nor do the residency requirements in the Maine Medical Use of Marijuana Act burden interstate commerce more severely than Congress, because Congress has already eliminated that market. Because striking down Maine's residency requirements at issue in this case would do nothing to expand legal interstate commerce in the United States, they should stand.

### The Maine Medical Use of Marijuana Act

Maine has permitted the cultivation and use of marijuana for medical purposes for years. *See* "An Act to Permit the Medical Use of Marijuana in Maine," I.B. 2, 1999, c. 1. In 2009, the law, which did not provide for the sale of medical marijuana, and only provided a defense to violation of the criminal laws, was amended to establish a more comprehensive system, including authorizing the sale of medical marijuana. *See* "An Act to Establish the Maine Medical Marijuana Act." I.B. 2, 2009, c. 1. The current iteration of these laws is the Maine Medical Use of Marijuana Act,

---

[1] If the answer is yes, courts further ask whether the restriction is necessary to uphold a legitimate local purpose such as certain health or safety measures.

22 M.R.S.A. §§ 2421-2430-H (Westlaw through 2021 1st Spec. Sess.)[2] (the "Act"). In summary, the Act authorizes qualified patients who have a certification from a medical provider for the medical use of marijuana to possess, use, and purchase medical marijuana. The Act also authorizes caregivers and dispensaries—among other things—to possess, cultivate, and sell marijuana to qualified patients consistent with the statute. *See id.* §§ 2423-A(2) (caregivers) & 2428 (dispensaries).

While qualified patients can cultivate their own marijuana, medical marijuana is generally cultivated, processed, manufactured, and sold by registered dispensaries or by registered caregivers. The Act contains various requirements that govern the operation of registered dispensaries, including a provision that "all officers or directors of a dispensary must be residents of this State." 22 M.R.S.A. § 2428(6)(H).[3] That restriction is at the heart of NPG's challenge.

---

[2] Unless otherwise indicated, all citations to the Maine Revised Statutes Annotated have been obtained from Westlaw and are current through the 2021 First Special Session of the 130th Maine Legislature. For readability, this portion of the M.R.S.A. citation will be omitted *infra*.

[3] "Officer or director" is defined by the Act as "a director, manager, shareholder, board member, partner or other person holding a management position or ownership interest in the organization," *see* 22 M.R.S.A. § 2422(6-B), while the Act defines "resident of the state" as "a person who is domiciled in the State," 22 M.R.S.A. § 2422(13-B).

### Procedural History

On December 17, 2020, NPG filed suit against the Commissioner and the Department, challenging the constitutionality of Maine's residency requirements in its intrastate medical marijuana market. App. at 8. The parties filed a stipulated record on March 11, 2021. *Id.* at 18. On March 23, the district court granted a motion to intervene by United Cannabis. *Id.* at 4. United Cannabis filed no objections or motions to alter the stipulated record.

All parties moved for judgment on the stipulated record. *Id.* at 4-5. The district court concluded that the Department was entitled to sovereign immunity and dismissed it from the suit, but otherwise granted NPG's Motion for Judgment against the Commissioner, entering final judgment on August 13, 2021. Add. at 19-14. Both the Commissioner and United Cannabis filed timely notices of appeal. App. at 5-6. NPG has not appealed from the district court's ruling that the Department was entitled to sovereign immunity.

On September 13, 2021, United Cannabis moved to stay the district court's decision through the duration of the appeal, which the Commissioner also requested on October 4, 2021. *Id.* at 6. The district court granted a stay of its decision on October 27, 2021, and the residency requirement at issue remains in effect. *Id.* at 7.

## SUMMARY OF THE ARGUMENT

The Constitution's Commerce Clause has long been read to include a negative implication that stands for the proposition that individual states may not enact economic regulation that inhibits interstate commerce. This protection applies to the interstate flow of commerce, generally, and not to individual participants within a given interstate market. But Congress also has the power to alter or exempt certain markets from the dormant Commerce Clause's sweep. When Congress has spoken regarding a particular market, courts should first examine what Congress has said about the market at issue.

Here, Congress has eliminated all interstate markets for marijuana, through the passage of the Controlled Substances Act of 1970. When Congress eliminates a market from interstate commerce in its entirety, there is no state regulation of that market—be it a residency requirement or otherwise—that could possibly hinder interstate commerce. Because Maine's residency requirement does not impede legal interstate commerce and because striking down Maine's residency requirement would do nothing to increase the legal flow of marijuana in interstate commerce, it should be allowed to stand.

Since Maine's residency requirements in its medical marijuana market does not violate the Commerce Clause, the Court should reverse the district court's judgment and remand for entry of judgment in favor of the Commissioner.

## STANDARD OF REVIEW

The dispute in this appeal is purely legal—the parties agreed to stipulate to all relevant facts in this case before the district court. This Court reviews the district court's legal analysis of the constitutionality of a state statute de novo. *March v. Mills*, 867 F.3d 46, 53 (1st Cir. 2017); *Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 72 (1st Cir. 2001), *aff'd*, 538 U.S. 644 (2003).

## ARGUMENT

I.   **The Dormant Commerce Clause Does Not Apply to Maine's Medical Marijuana Market Because Congress Has Explicitly Eliminated Any Possible Interstate Market in Marijuana.**

### A. The History and Purpose of Dormant Commerce Clause

The Constitution's Commerce Clause provides that "Congress shall have power" "[t]o regulate commerce with foreign nations, and among the several states, and with the Indian tribes." U.S. CONST., art. I, § 8, cl. 3. No part of the Commerce Clause's text, as written, prohibits states from engaging in economic regulation.

However, the Supreme Court has long read a negative implication into its text, known as the "dormant" (or sometimes "negative") Commerce Clause, which prohibits states from enacting laws that improperly burden or discriminate against interstate commerce "even in the absence of a conflicting federal statute." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007). "[T]he dormant Commerce Clause's fundamental objective [is] preserving a

7

national market for competition." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299-300 (1997); *see also Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 350 (1977) (referring to "the Commerce Clause's overriding requirement of a national 'common market'").

To that end, the dormant Commerce Clause "prohibits state … regulation that … impedes free private trade in the national marketplace." *Tracy*, 519 U.S. at 287 (cleaned up). It does not confer civil rights upon individuals. Rather, it "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Exxon Corp. v. Governor of Md*., 437 U.S. 117, 127-28 (1978) (emphasis added). At its core, "[t]he Commerce Clause presumes a national market." *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 393 (1994).

### B. Congress Can Act to Neutralize the Dormant Commerce Clause

A state does not commit a dormant Commerce Clause violation if it "neither prohibits access to an interstate market nor imposes burdensome regulation on that market." *McBurney v. Young*, 569 U.S. 221, 235 (2013). Moreover, the Supreme Court has recognized that "[t]he 'common thread' among those cases in which the Court has found a dormant Commerce Clause violation is that 'the State interfered with the natural functioning of the interstate market either through prohibition or through burdensome regulation.'" *Id.* at 235 (quoting *Hughes v. Alexandria Scrap Corp*., 426 U.S. 794, 806 (1976)).

The dormant Commerce Clause does not apply when Congress has foreclosed any interstate market. For the dormant Commerce Clause to apply, Congress must allow the interstate market at issue to both exist and lie at least somewhat dormant. According to the Supreme Court, "[d]ormant Commerce Clause restrictions apply only when Congress has not exercised its Commerce Clause power to regulate the matter at issue." *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2465 (2019) (emphasis added).

If Congress instead chooses to regulate the interstate market at issue, then courts should look first to what Congress has actually said about the market. Indeed, as this Court has explained, "[t]he dormant Commerce Clause does not affect state or local regulations directly authorized by Congress, but, rather, acts as a brake on the states' authority to regulate in areas in which Congress has not affirmatively acted." *Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178, 184 (1st Cir. 1999) (citations omitted); *see also H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 534-35 (1949) (describing the negative Commerce Clause as filling in one of the "great silences of the Constitution").

Hence, while "[a]ll objects of interstate trade merit Commerce Clause protection … at the outset," *City of Philadelphia v. New Jersey,* 437 U.S. 617, 622 (1978), "Congress unquestionably has the power to repudiate or substantially modify" the presumption of the dormant Commerce Clause through legislation.

9

*Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 572 (1997). "It is indeed well settled that Congress may use its powers under the Commerce Clause to 'confer upon the States an ability to restrict the flow of interstate commerce that they would not otherwise enjoy.'" *New England Power Co. v. New Hampshire*, 455 U.S. 331, 339-40 (1982) (quoting *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 44 (1980)). Congress may also directly regulate the "channels of interstate . . . commerce," "the instrumentalities of interstate commerce," and "those activities affecting commerce." *Perez v. United States*, 402 U.S. 146, 150 (1971). The dormant Commerce Clause doctrine is based on the notion that "in general Congress has left it to the courts to formulate the rules to preserve the free flow of interstate commerce," but "when Congress exercises its power to regulate commerce by enacting legislation, the legislation controls." *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2089 (2018).

One way that Congress can exercise its power is to outright ban a certain product or market from interstate commerce. The Supreme Court has long recognized "the principle that the power of Congress to regulate interstate commerce may . . . be exerted with the effect of excluding particular articles from such commerce." *Champion v. Ames*, 188 U.S. 321, 362 (1903). For example, Congress has in the past used its Commerce Clause power to exclude from the market many articles of interstate commerce, from diseased cattle to heroin to child pornography.

*See* Act of May 29th, 1884, ch. 60, 23 Stat. 32, § 6 (diseased cattle); 21 U.S.C.

§ 812(b)(10) (heroin); 18 U.S.C. § 2252 (child pornography). For such items, the

dormant Commerce Clause doctrine can no longer presume protection of the "free

private trade in the national marketplace." *Cf. Tracy*, 519 U.S. at 287, 299-303.

Nor is there any possible state legislation that could restrict such markets

beyond the extent to which Congress has already restricted them. Simply put, there

is no Supreme Court dormant Commerce Clause precedent directly addressing a

situation like this: a challenge to a state law regulating an *intra*state market entirely

consistent with congressional regulations that have banned any *inter*state market.[4]

## C. The Dormant Commerce Clause Does Not Apply Here

In this appeal, the Court should first address whether the dormant Commerce

Clause doctrine is applicable to the challenged Maine statute at all. The Supreme

Court's decision in *General Motors v. Tracy*, 519 U.S. 278 (1997) provides a

roadmap for such an approach and confirms that the dormant Commerce Clause

---

[4] Entities affiliated with NPG challenged a residency restriction in Maine's recreational marijuana law and the Office of the Attorney General previously advised the Commissioner in that matter that the restriction was not likely to withstand a constitutional challenge, prompting the Commissioner to decline to defend the requirement in that context. *NPG, LLC v. Dep't of Adm. & Fin. Servs.*, No. 1:20-cv-00107-NT (D. Me. May 11, 2020) (ECF No. 9). Nevertheless, the Office of the Attorney General acknowledges that the courts are the ultimate arbiter of a statute's constitutionality and is therefore defending the constitutionality of the residency requirement at issue here so that this Court can conclusively decide whether the dormant Commerce Clause applies to a state market where Congress has prohibited interstate commerce.

should not be applied to a state market without considering the doctrine's inherent purpose. In *Tracy*, the Supreme Court held that Ohio's differential tax treatment of natural gas sales by domestic public utilities and out-of-state independent marketers did not violate the dormant Commerce Clause. 519 U.S. at 282. The Court considered "the threshold question whether the conditions entailing application of the dormant Commerce Clause are present" by comparing the "central assumption[s]" of the dormant Commerce Clause to the natural gas market along with related acts of Congress. *Id.* at 299, 307.

After a thorough analysis of the natural gas market and its regulatory history, the Court held that the plaintiff failed to prevail on this threshold question. *Id.* at 298-99. It reasoned that "any notion of discrimination assumes a comparison of substantially similar entities" in a particular market. *Id.* at 298. Most of the time, "this central assumption had . . . itself remained dormant in th[e] Court's opinions" because the two entities' similarity within the market is a given. *Id.* at 299. But in *Tracy*, the Court had to address the issue. There, the Court concluded that the different gas suppliers were not similarly situated because they served different markets. *Id.* at 300. As such, there was no "actual or prospective competition between the supposedly favored and disfavored entities in a single market." *Id.* And thus, "there can be no local preference . . . to which the dormant Commerce Clause may apply." *Id.*

The holding in *Tracy* is logical, as the dormant Commerce Clause's "fundamental objective [is] preserving a <u>national</u> market for competition." *Id.* at 299 (emphasis added). When there is no singular national market to guard from state regulatory interference, there is nothing left for the dormant Commerce Clause to protect.

The broad reasoning and specific approach of *Tracy* both apply here. Specifically, the Court should start its examination of the market at issue by examining what Congress has said about that market. NPG's dormant Commerce Clause arguments should fail because it cannot satisfy the threshold question: Does the dormant Commerce Clause protect the commerce at issue? The answer is no.

Congress has exercised its Commerce Clause power to ban interstate commerce of marijuana. When Congress has eliminated an interstate market, there is nothing left for the dormant Commerce Clause to protect. Stated another way, "[h]ere the commerce power of Congress is not dormant…." *Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys*., 472 U.S. 159, 174 (1985). The district court erred in ruling to the contrary.

### D. Marijuana Is Different from Alcohol and Other Legal Markets

Below, NPG asserted that "the dormant Commerce Clause applies to state cannabis regulations just the same as it applies to any other type of state law." NPG Mot. for J. ("NPG Mot."), *Northeast Patients Group v. Me. Dep't of Admin. & Fin.*

*Servs.* 1:20-cv-00468-NT (D. Me.) (ECF No. 14) at 9. That assertion places the cart before the horse. Congress has not chosen to merely regulate an interstate market alongside the states' regulation of that market—a circumstance that could leave room for the dormant Commerce Clause's application. Rather, Congress has affirmatively eliminated the interstate market for marijuana by criminalizing any activity that would support such a market.

Banning a market entirely leaves no room for the Commerce Clause's dormant sweep. In the most "active" way imaginable, Congress has flexed its Commerce Clause powers and placed marijuana proprietors on notice that they enjoy no federal protections in the interstate market—because there is no such market.

Below, NPG insisted that this case's outcome is dictated by *Tennessee Wine*, 139 S. Ct. 2449. NPG Mot. at 5-8. The district court likewise erroneously relied on *Tennessee Wine*. Add. at 5. Reliance on that decision is misplaced for several reasons. First and foremost, unlike with marijuana, Congress has not exercised its authority to exclude alcohol from interstate commerce. Moreover, the Twenty-First Amendment specifically governs the federal-state distribution of regulatory authority over alcohol. Specifically, according to the Supreme Court, Section 2 of the Twenty-First Amendment should be interpreted as "constitutionaliz[ing] the basic structure of federal-state alcohol regulatory authority that prevailed" before Prohibition. *Tenn. Wine*, 139 S. Ct. at 2463. Two pre-Prohibition acts of Congress—

the Wilson Act and the Webb-Kenyon Act—outlined this basic regulatory structure, which did not include a "ban [on] all interstate shipment of alcohol." *Id.* at 2466-67. These acts "gave each State a measure of regulatory authority over the importation of alcohol" but also mandated that "States treat[] in-state and out-of-state liquor on the same terms." *Id.*

Hence, even when it comes to the unique regulatory environment of alcohol under the Twenty-First Amendment, the Supreme Court started its analysis by looking to what Congress had affirmatively said about the interstate market. This Court should do the same.

Below, NPG assumed that the dormant Commerce Clause <u>must</u> apply to Maine's marijuana market, but it failed to demonstrate that the Act is "subject to judicial scrutiny under the negative Commerce Clause." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994). Under the Supreme Court precedent described above, in order for the dormant Commerce Clause to apply, the market that is the subject of the challenged state regulation must be an interstate market with respect to which Congress's power under the Commerce Clause remains at least partially dormant, such that one can presume Congress intended to permit the free flow of interstate trade in that market.

## E. Congress Has Eliminated All Legal Interstate Markets for Marijuana

Congress's commerce power with respect to marijuana is not dormant. Instead, it has been exercised to its full extent by criminalizing any interstate market or any activity supporting such a market. Congress has done so though the Controlled Substances Act. In *Gonzales v. Raich*, the Supreme Court held that the authority to criminalize marijuana, even locally, was "squarely within Congress' commerce power." 545 U.S. 1, 19 (2005). Congress exercised that power precisely to "eliminat[e] commercial transactions in the interstate [marijuana] market in their entirety." *Id.*; *see also* 21 U.S.C. §§ 812(b)-(c), 841(a)(1). The Controlled Substances Act is a "closed regulatory system" under which "the manufacture, distribution, or possession of marijuana became a criminal offense." *Id.* at 13-14.

By deeming marijuana a Schedule I drug, Congress expressly and unambiguously declared that marijuana is not among the "legitimate subjects of trade and commerce" for any purpose. *Cf. Bowman v. Chicago & N.W. Ry. Co.*, 125 U.S. 465, 489 (1888); *see also Raich*, 545 U.S. at 27 ("The [Controlled Substances Act] designates marijuana as contraband for <u>any</u> purpose.") (emphasis in original). There is no congressional silence from which courts may infer that Congress intended to preserve any aspect of a free interstate market. Instead, there is Congressional action under the Commerce Clause to eliminate the market entirely. As the Eighth Circuit has noted, "marijuana is contraband and thus not an object of

interstate trade protected by the Commerce Clause." *Predka v. Iowa*, 186 F.3d 1082, 1085 (8th Cir. 1999); *see also* Gabriel J. Chin, *Policy, Preemption, and Pot: Extraterritorial Citizen Jurisdiction*, 58 B.C. L. Rev. 929, 941-42 (2017) ("From the federal perspective, marijuana production and sales are not legitimate commerce even if licensed by a state. Therefore, the dormant Commerce Clause would not restrict a state from regulating its citizens' extraterritorial possession and use of marijuana.").

Because Congress has used its Commerce Clause power to shut down the entire interstate marijuana market, there are no negative or "dormant" inferences to be drawn from Commerce Clause doctrine when it comes to state medical marijuana markets. While "[t]he Commerce Clause presumes a national market," *C & A Carbone*, 511 U.S. at 393, commerce that is "prohibited by positive law" is no longer legitimate, *Champion*, 188 U.S. at 347. Because the dormant Commerce Clause "protects the interstate market, not particular interstate firms," *Exxon Corp.*, 437 U.S. at 127, a market deemed illicit by Congress cannot enjoy the Commerce Clause's protections.

NPG's theory below ignored "the Commerce Clause's overriding requirement of a national 'common market.'" *Hunt*, 432 U.S. at 350 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 14 (1970). Without a legal national market, it makes no sense to pursue the dormant Commerce Clause's "fundamental objective" of

"preserving a national market for competition." *Tracy*, 519 U.S. at 299-300; *see also Tenn. Wine*, 139 S. Ct. at 2459 (function of dormant Commerce Clause is to "preserve[] a national market for goods and services"). Maine's residency requirement in no way "impedes free private trade in the national marketplace" or "interfere[s] with the natural functioning of the interstate market" or "prohibit[s] access to an interstate market" when there is no national marketplace allowed by Congress. *Cf. Tracy*, 519 U.S. at 287; *McBurney*, 569 U.S. at 235.

While NPG quoted below the seminal Commerce Clause case, *Gibbons v. Ogden*, for the proposition that "[i]f there was any one object riding over every other in the adoption of the constitution, it was to keep the commercial intercourse among the States free from all invidious and partial restraints," NPG Mot. at 6, NPG failed to recognize that under federal law, Congress has determined that marijuana should be <u>prohibited</u> from the "commercial intercourse among the States." NPG even conceded as much elsewhere. *See* NPG Mot. at 2-3 & n. 3; *see also Gibbons v. Ogden*, 22 U.S. 1, 194 (1824) ("Comprehensive as the word 'among' is, it may very properly be restricted to that commerce which concerns more States than one.").

## F. Federal Enforcement Policies Do Not Alter the Commerce Clause Analysis

The federal executive branch's discretionary enforcement policies do not alter the fact that Congress has shuttered the interstate market for marijuana. Even assuming true NPG's assertion below that "[t]he federal government has not stood

in the way of legalization at the state level," NPG Mot. at 2-3, sporadic federal

prosecutorial enforcement of marijuana crimes does not invalidate a congressional

enactment such as the Controlled Substances Act.[5] For decades, federal officials

prosecuted marijuana criminal laws uniformly, regardless of the product's legal

status under state law. Even today, only the discretion of the United States Attorney

General prevents federal prosecutors from charging individuals for criminal

violations of the Controlled Substances Act.[6] By relying on federal executive branch

---

[5] Nor has the federal government's attitude been as straightforward as NPG implied below. Even though the Cole Memorandum cited by NPG deprioritized prosecutions for marijuana-related activity permitted under state law, the Memorandum also states that 1) this policy shift "does not in any way alter the Department's authority to enforce federal law . . . . regardless of state law;" 2) "Congress has determined that marijuana is a dangerous drug and that the illegal distribution and sale of marijuana is a serious crime;" and 3) the "Department of Justice is committed to enforcement" of the nation's marijuana laws. Memorandum for all U.S. Attorneys: Guidance Regarding Federal Marijuana Enforcement, Office of the Deputy Attorney General (Aug. 29, 2013). The Memorandum goes on to say that "[i]f state enforcement efforts are not sufficiently robust … the federal government may seek to challenge the [marijuana] regulatory structure itself in addition to continuing to bring individual enforcement actions, including criminal prosecutions." Such evaluations, the Memorandum emphasizes, must be made on a "case-by-case basis." *Id.* In short, the Cole Memorandum does not offer blanket and irrevocable protection to marijuana sales, even if they occur intrastate.

[6] In addition to the Cole Memorandum, since 2014 Congress has consistently authorized an appropriation rider known as the "Rohrabacher-Farr Amendment." This amendment states that the Department of Justice may not use any of its appropriated funds "to prevent [any state] from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana." *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260 § 531, 134 Stat 1182, 1282-83 (2020). However, this appropriation rider does nothing to change the legal status of the interstate medical marijuana market. Nor does it guarantee that

enforcement policies, instead of the text of statutes enacted by Congress, NPG attempts to wave away the ongoing congressional mandates restricting marijuana—principally that it is forbidden from interstate commerce.[7]

In any event, the Cole Memorandum is an executive branch policy statement regarding prosecutorial discretion. Exercising such discretion does nothing to alter the legal authority of the Controlled Substances Act. *See*, *e.g.*, *Susan B. Anthony List v. Driehaus*, 779 F.3d 628, 630 (6th Cir. 2015) ("The parties … acknowledge that executive orders do not amend statutes."). The Commerce Clause does not grant power to the executive branch, or even to the federal government more broadly, but instead to Congress. It is therefore the actions of Congress—and Congress alone—that matter. It is Congress, not the executive branch, that "unquestionably has the power to repudiate or substantially modify" the presumptions inferred by dormant Commerce Clause doctrine. *Camps Newfound/Owatonna,*, 520 U.S. at 572. Thus, "the balancing of various values is left to Congress—which is precisely what the Commerce Clause … envisions." *United Haulers*, 550 U.S. at 349 (Scalia, J.,

---

individual users or purveyors of medical marijuana are exempt from prosecution under the Controlled Substances Act.

[7] Nor has the Cole Memorandum halted federal prosecutions in Maine for individuals attempting to participate in an interstate marijuana market. *See, e.g.* Charlie Eichacker, *Feds Charge 13 in Alleged Maine Marijuana Conspiracy, Including Cops, Prosecutor, and Selectman*, Maine Public, (Oct. 28, 2021, 6:26 PM), https://www.mainepublic.org/news/2021-10-28/feds-charge-13-in-alleged-maine-marijuana-conspiracy-including-cops-prosecutor-and-selectman.

concurring). Regardless of whether the federal executive branch chooses to "stand in the way" of entities participating in Maine's intrastate marijuana market, Congress has eliminated any notion of an interstate marijuana market to protect. Maine's residency requirements do nothing to further restrict the flow of legal interstate commerce.

## G. Striking Down Maine's Residency Requirement Will Not Expand Legal Interstate Commerce

Alternatively, NPG suggested below that the federal ban on interstate marijuana commerce alters no aspect of the dormant Commerce Clause analysis because "the dormant Commerce Clause applies to state cannabis regulations just the same as it applies to any other state law." NPG Mot. at 9. But that assertion is not supported by case law.

The starting point in any dormant Commerce Clause case—as it must be—is to examine whether the Constitution and federal statutes envision a robust (or even partial) interstate market. Only if the answer is "yes" can a state law be examined to determine whether the state has violated such a federal vision.[8] While it is true that

---

[8] For example, just like "those who seek to invoke [the Due Process Clause's] procedural protection must [first] establish that [a protectable due process] interest[] is at stake," *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005), those who seek to invoke the market protections of the dormant Commerce Clause must first establish that Congress intended to protect competition in that market. Only then can a particular state law be subject to dormant Commerce Clause scrutiny. In other words, courts need not look at the substantive applications of the dormant Commerce Clause when that doctrine does not apply—much like courts need not look at whether a party was

the Commerce Clause sets as a default presumption that all markets are presumed to be open and free among the states, Congress neutralized such a presumption for marijuana. There is nothing that the Maine Legislature could do to further restrict the legal interstate medical marijuana market. *Cf. Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 876 (10th Cir. 2017) ("[W]hat [Colorado law] did not and could not do was amend the United States Constitution or the Controlled Substances Act (CSA), 21 U.S.C. §§ 801-904, under which manufacturing, distributing, selling, and possessing with intent to distribute marijuana remains illegal.").

Federal executive policy notwithstanding, Congress has exercised its Commerce Clause power to shutter the interstate market for marijuana. If there is no interstate market, then there is nothing for the dormant Commerce Clause to protect. This Court should conclude that the dormant Commerce Clause doctrine does not apply to the residency requirements in Maine's medical marijuana law. If the dormant Commerce Clause does not apply, then Maine cannot violate it.

---

given adequate notice or the opportunity to be heard when no interest protected by the Due Process Clause is at stake.

22

## <u>CONCLUSION</u>

For the reasons discussed above, the Commissioner respectfully requests that the Court vacate the district court's judgment and remand for entry of judgment in her favor.

Dated: January 6, 2022
Augusta, Maine

Respectfully submitted,

AARON M. FREY
Attorney General


 /s/ Paul E. Suitter
Christopher C. Taub
Chief Deputy Attorney General
Thomas A. Knowlton
Deputy Attorney General
Paul E. Suitter
Assistant Attorney General
Six State House Station
Augusta, ME 04333-0006
(207) 626-8800
Attorneys for Appellant
Kirsten Figueroa

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this, the 6th day of January, 2022, I electronically filed the above document with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Matthew S. Warner
mwarner@preti.com

James G. Monteleone
jmonteleone@bernsteinshur.com

Alexandra Harriman
aharriman@preti.com

Patrick I. Marass
pmarass@bernsteinshur.com

Jonathan George Mermin
jmermin@preti.com

Dated: January 6, 2022
Augusta, Maine

Respectfully submitted,

AARON M. FREY
Attorney General

 /s/ Paul E. Suitter
Christopher C. Taub
Chief Deputy Attorney General
Thomas A. Knowlton
Deputy Attorney General
Paul E. Suitter
Assistant Attorney General
Six State House Station
Augusta, ME 04333-0006
(207) 626-8800
Attorneys for Appellant
Kirsten Figueroa

**ADDENDUM**

**ADDENDUM**

## Table of Contents

Order on Cross Motions for Judgment .................................................. Add. 1

Judgment ............................................................................. Add. 14

# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| NORTHEAST PATIENTS GROUP, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Docket No. 1:20-cv-00468-NT |
| MAINE DEPARTMENT OF ADMINISTRATIVE AND FINANCIAL SERVICES, et al., | ) ) ) ) | |
| Defendants. | ) ) | |

## ORDER ON CROSS-MOTIONS FOR JUDGMENT

Plaintiffs High Street Capital Partners, LLC ("**High Street**") and Northeast Patients Group d/b/a Wellness Connection of Maine ("**Wellness Connection**") allege that Maine's medical marijuana licensing program violates the dormant Commerce Clause by restricting licenses to residents and resident-owned entities. The Plaintiffs have sued the Maine Department of Administrative and Financial Services ("**the Department**" or "**DAFS**") and the Department's Commissioner, Kirsten Figueroa.[1] Both parties have moved for judgment on a stipulated record (ECF Nos. 14 and 17). I held oral argument via videoconference on July 16, 2021 (ECF No. 25). For the reasons set forth below, the Plaintiffs' motion is **DENIED** as to the Department and **GRANTED** as to Commissioner Figueroa, and the Defendants' motion is **DENIED**.

---

[1] The Complaint mistakenly captioned the Commissioner's first name as "Kristine." *See* Defs.' Opp'n to Pls.' Mot. for J. on the Record and Cross-Mot for J. on the Record ("**Defs.' Mot.**") 1 n.1 (ECF No. 17).

## BACKGROUND

In 2009, the Maine Legislature amended the State's existing medical marijuana law to establish a comprehensive system authorizing the sale of medical marijuana. Defs.' Opp'n to Pls.' Mot. for J. on the Record and Cross-Mot. for J. on the Record ("**Defs.' Mot.**") 2 (ECF No. 17). The current iteration of the law—the Maine Medical Use of Marijuana Act (the "**Act**")—authorizes qualified patients who have a certification from a medical provider for the medical use of marijuana to possess, use, and purchase medical marijuana. Defs.' Mot. 3; 22 M.R.S.A. § 2423-A. The Act also authorizes two types of entities—registered dispensaries and caregivers—to possess, cultivate, and sell marijuana to qualified patients. Defs.' Mot. 3; 22 M.R.S.A. §§ 2423-A(2), 2428. While dispensaries and caregivers can engage in similar activities, dispensaries—by statutory design—engage in operations that are much larger than caregivers. For example, caregivers are limited in the number of plants that they can grow and sell, *see* 22 M.R.S.A. § 2423-A(2), whereas dispensaries can grow an unlimited amount, *see* 22 M.R.S.A. § 2428(1-A). As of February 2021, there were approximately 3,000 caregivers in the State, and seven dispensaries. Pls.' Br. in Supp. of J. on the Record ("**Pls.' Mot.**") 3–4 (ECF No. 14). Caregivers accounted for 76 percent of retail sales as of February 2020, with dispensaries accounting for the remaining 24 percent. Pls.' Mot. 3–4. Together, the medical marijuana industry generated over $110 million in sales in 2019. Compl. ¶ 1.

Although dispensaries can grow more marijuana plants, they are restricted in other ways, including the restriction that is at the center of this case. The Act provides

that "[a]ll officers or directors of a dispensary[2] must be residents of this State," (the "**Dispensary Residency Requirement**"). 22 M.R.S.A. § 2428(6)(H). "Officer or director" is defined as "a director, manager, shareholder, board member, partner or other person holding a management position or ownership interest in the organization." 22 M.R.S.A. § 2422(6-B). "Resident of the State" is defined as "a person who is domiciled in the State." 22 M.R.S.A. § 2422(13-B).

Plaintiff High Street is a Delaware limited liability company entirely owned by residents of states other than Maine. Joint Stipulation of the Record ("**Record**") ¶ 1 (ECF No. 13-1). Plaintiff Wellness Connection owns and operates three of the seven registered dispensaries in Maine's medical marijuana program. Record ¶ 2. From June of 2010 until March of 2020, Wellness Connection operated as a mutual benefit nonprofit corporation without any equity ownership, but when Maine changed its law in 2020 to allow dispensaries to become for-profit companies, Wellness Connection converted to a for-profit corporation and is currently wholly owned by three Maine residents. Record ¶¶ 3–5. High Street states that it would purchase all of the equity in Wellness Connection if the Dispensary Residency Requirement did not prohibit it from doing so.

The Plaintiffs sued the Department—which is responsible for implementing, administrating, and enforcing the Act—and Kirsten Figueroa, who is the

---

[2]    A "dispensary" is defined as "an entity registered under section 2425-A that acquires, possesses, cultivates, manufactures, delivers, transfers, transports, sells, supplies or dispenses marijuana plants or harvested marijuana or related supplies and educational materials to qualifying patients and the caregivers of those patients." 22 M.R.S.A. § 2422(6).

Commissioner of DAFS. *See* Record ¶¶ 7–8. The Plaintiffs allege that the Dispensary Residency Requirement violates the dormant Commerce Clause because it explicitly discriminates against residents of other states and Maine cannot show a legitimate local purpose for the requirement.

United Cannabis Patients and Caregivers of Maine ("**United Cannabis**") intervened in this case. (ECF Nos. 11, 16.) United Cannabis opposes the Plaintiffs' motion for judgment and partially opposes the Defendants' motion. *See* ECF Nos. 20, 22.

## LEGAL STANDARD

The Commerce Clause empowers Congress "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3; *see also Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337 (2008). Although the Commerce Clause only contains an affirmative grant of power, "[o]ver time, courts have found a negative aspect embedded in this language—an aspect that prevents state and local governments from impeding the free flow of goods from one state to another." *Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178, 184 (1st Cir. 1999). This "dormant Commerce Clause" prohibits "protectionist state regulation designed to benefit in-state economic interests by burdening out-of-state competitors." *Wine & Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 10 (1st Cir. 2007) (internal quotations omitted); *see also Davis*, 553 U.S. at 337–38. The dormant Commerce Clause is intended "to effectuate the Framers' purpose to prevent a State from retreating into the economic isolation . . . that had plagued relations among the Colonies and later

among the States under the Articles of Confederation." *Davis*, 553 U.S. at 337–38 (internal quotations and citations omitted and alterations adopted).

To this end, a state or local law that "discriminates on its face against interstate commerce, whether in purpose or effect, demands heightened scrutiny." *Wine & Spirits Retailers*, 481 F.3d at 10. I must invalidate such a law "unless it furthers a legitimate local objective that cannot be served by reasonable non-discriminatory means."[3] *Id.* at 10–11; *see also Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2461 (2019) ("[A] state law [that] discriminates against out-of-state goods or nonresident economic actors . . . can be sustained only on a showing that it is narrowly tailored to advance a legitimate local purpose.") (internal quotations omitted and alterations adopted). The plaintiff bears the initial burden of showing discrimination, but the state or local government bears the burden of identifying legitimate local purposes and establishing a lack of non-discriminatory alternatives. *Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 9 (1st Cir. 2010).

Importantly, congressional action can alter the application of the dormant Commerce Clause. As the Supreme Court recently stated, "[d]ormant Commerce Clause restrictions apply only when Congress has not exercised its Commerce Clause power to regulate the matter at issue." *Tenn. Wine & Spirits Retailers Ass'n*, 139 S. Ct. at 2465. Thus, Congress "may use its powers under the Commerce Clause to

---

[3]     Statutes that "regulate[ ] evenhandedly and ha[ve] only incidental effects on interstate commerce engender[ ] a lower level of scrutiny." *Wine & Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 11 (1st Cir. 2007) (internal quotations omitted). Such statutes "will stand 'unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.' " *Id.* (alteration in original) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

'[confer] upon the States an ability to restrict the flow of interstate commerce that they would not otherwise enjoy.' " *New England Power Co. v. New Hampshire*, 455 U.S. 331, 340 (1982) (alteration in original) (quoting *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 44 (1980)). The standard for finding such congressional consent is "high," and the state has the burden of demonstrating Congress's "unmistakably clear intent to allow otherwise discriminatory regulations." *United Egg Producers v. Dep't of Agric. of P.R.*, 77 F.3d 567, 570 (1st Cir. 1996); *see also Maine v. Taylor*, 477 U.S. 131, 138–39 (1986) ("[B]ecause of the important role the Commerce Clause plays in protecting the free flow of interstate trade, this Court has exempted state statutes from the implied limitations of the Clause only when the congressional direction to do so has been 'unmistakably clear.' "); *Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 430–32 (3d Cir. 2011).

## DISCUSSION

### I.      Claims Against the Department

As a threshold issue, the Defendants assert that the Department is immune from suit under the Eleventh Amendment because it is an "arm of the state." Defs.' Mot. 2, 15–17. The Plaintiffs did not respond to this argument in their opposition brief.[4]

---

[4]      The Intervenor opposed the Defendants' motion for judgment, but their opposition focuses solely on whether the claims against *Commissioner Figueroa* are barred by the Eleventh Amendment. *See* Intervenor's Opp'n to Defs.' Cross-Mot. for J. on the Record 1–2 (ECF No. 22). The Defendants' motion, however, only argues that the *Department* is immune from suit.

I agree that the Department is shielded from suit in federal court. "Long interpreted as an affirmation of state sovereign immunity," the Eleventh Amendment bars individuals—regardless of their citizenship—from bringing a federal court action against a state, "including instrumentalities of the state, such as state agencies." *Town of Barnstable v. O'Connor*, 786 F.3d 130, 138 (1st Cir. 2015) (quotations and citations omitted); *see also PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244, 2258 (2021). By statute, the Department "is established as the principal fiscal department of State Government." 5 M.R.S.A. § 281. It is responsible for "coordinat[ing] financial planning and programming activities of departments and agencies of the State Government for review and action." *Id.* Like other Maine agencies, the Department is not "independent and separate," but rather is an arm of the State shielded by the Eleventh Amendment from suit in federal court. *See Abdisamad v. City of Lewiston*, No. 2:19-CV-00175-LEW, 2019 WL 2552194, at *2 (D. Me. June 20, 2019) (quoting *Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & the Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 63 (1st Cir. 2003)) (holding that the Maine Department of Agriculture, Conservation and Forestry is an arm of the State); *United Cannabis Patients & Caregivers of Me. v. Me. Dep't of Admin. & Fin. Servs.*, No. 1:20-cv-00388-NT, 2021 WL 1581767, at *5 (D. Me. Apr. 22, 2021). No party argues that the State has consented to suit against the Department in this context or that the State's sovereign immunity has otherwise been abrogated. I conclude that the Plaintiffs' claims against the Department must fail.

In addition to claims against the Department, the Plaintiffs seek injunctive relief against the Commissioner. The State does not contend that these claims are barred by sovereign immunity, *see Ex parte Young*, 209 U.S. 123, 159–60 (1908); *O'Connor*, 786 F.3d at 138–39, so I go on to address the merits of the Plaintiffs' claims against the Commissioner.

## II.    Claims Against the Commissioner

This case raises a novel question, and it involves a unique scenario in the Commerce Clause realm. The Controlled Substances Act ("**CSA**") makes it unlawful under federal law "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841. Marijuana is classified as a Schedule I drug under the CSA. 21 U.S.C. § 812(c)(Schedule I)(c)(10). Although Congress has barred the Department of Justice from using funds "to prevent any [state] from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana," *see* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260 § 531, 134 Stat. 1182, 128283 (2020) ("**Rohrabacher-Farr Amendment**"), Congress has not amended the CSA to legalize marijuana for either medical or recreational use. And the Supreme Court has held that the CSA is a valid exercise of Congress's Commerce Clause power, even where it criminalizes the cultivation and possession of marijuana for personal use. *Gonzales v. Raich*, 545 U.S. 1, 22 (2005). What this means, then, is that the federal government could prosecute various actors in Maine's medical marijuana industry at any time.

Against this backdrop, the Plaintiffs recite traditional arguments about the dormant Commerce Clause. They assert that the Dispensary Residency Requirement violates the dormant Commerce Clause because it plainly favors Maine residents over residents of other states. Noting that Maine's medical marijuana industry is booming, Pl.'s Mot. 3, the Plaintiffs argue that the requirement "reserves . . . enormous economic opportunities . . . for long-term residents," excluding non-residents from participating in "the largest and most lucrative type of medical marijuana business[ ] in Maine," Pls.' Mot. 7–8. And the Plaintiffs emphasize that the requirement "facially discriminates against non-residents" and thus is "virtually per se invalid." Pl.'s Mot. 8 (quoting *Camps Newfound/Owatonna v. Town of Harrison*, 520 U.S. 564, 575 (1997)).

The Defendants and Intervenor emphasize the unique context of *this* dormant Commerce Clause challenge. At oral argument, the Defendants pointed out that, at its core, the dormant Commerce Clause is not about protecting individual rights but rather about preserving a national market and prohibiting state laws that interfere with that national market. The Defendants do not argue that there is any justification for the Dispensary Residency Requirement that could overcome a constitutional challenge. Rather, they argue that Congress has eliminated the national market for marijuana and thus there is no national market with which Maine can interfere.[5]

---

[5]    The Defendants contend that the Supreme Court's decision in *General Motors Corp. v. Tracy* "provides a roadmap . . . and confirms that the dormant Commerce Clause should not be applied to a state market without considering the doctrine's inherent purpose." Defs.' Mot. 8 (citing 519 U.S. 278 (1997). More specifically, the Defendants argue that, because the dormant Commerce Clause's "fundamental objective is preserving a national market for competition," Defs.' Mot. 9 (quoting *Tracy*, 519 U.S. at 299), there can be "nothing left for the dormant Commerce Clause to protect" where "Congress has eliminated [that] market," *id.*

Defs.' Mot. 4, 6–7. In other words, the Defendants argue that, "[i]n the most 'active' way imaginable, Congress has flexed its Commerce Clause powers and placed marijuana proprietors on notice that they enjoy no federal protections in the interstate market—because there is no such market."[6] Defs.' Mot. 9–10. And thus, the Defendants contend, the Dispensary Residency Requirement does not violate the dormant Commerce Clause.[7]

The Defendants' argument is not without logic, but I see several issues with it. First, the notion that the medical marijuana industry in Maine is wholly intrastate does not square with reality. Maine does not prevent qualified nonresidents from purchasing marijuana for medical use at Maine facilities, *see* 22 M.R.S.A. § 2423-D.

I agree that the dormant Commerce Clause's purpose is important, but I find *Tracy* to be distinguishable. In that case, the Supreme Court upheld a state law that taxed out-of-state natural gas marketers differently from state-regulated natural gas utilities. 519 U.S. at 293, 299. After a detailed review of the development of the natural gas retail market, the Court held that these two entities were not comparable for dormant Commerce Clause purposes because the requirements placed on local suppliers meant that they were essentially providing a different, bundled product. *Id.* at 297–98. With different products, the Court explained, "there is a threshold question whether the companies are indeed similarly situated for constitutional purposes" because a "difference in products may mean that the different entities serve different markets, and would continue to do so even if the supposedly discriminatory burden were removed." *Id.* at 299. In other words, eliminating the "regulatory differential [may] not serve the dormant Commerce Clause's fundamental objective." *Id.* Here, the Plaintiffs are trying to break into Maine's existing medical marijuana market and compete directly with resident-owned entities. There is no indication that they would be providing a fundamentally different product. Given the reality that an interstate market for medical marijuana does seem to exist despite the Controlled Substances Act ("**CSA**"), eliminating the Dispensary Residency Requirement *would* serve the dormant Commerce Clause's fundamental objective by "preserving a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *Id.*

[6] At oral argument, the Defendants added that, from a practical stand point, it would not make sense for Congress to criminalize the interstate market while also offering parameters that would permit it—such as by making it expressly clear that states can treat resident and nonresident actors differently.

[7] The Intervenor took a slightly different approach. It contends that there is nothing "dormant" about Congress's Commerce Clause power in this context where Congress "has exercised its affirmative Commerce Clause powers to exclude marijuana from any national market of interstate commerce." Intervenor's Opp'n to Pls.' Mot. for J. on the Record 6 (ECF No. 20).

Nor does Maine seem to prohibit nonresidents who purchase marijuana here from taking it home with them. And Maine appears to allow nonresidents to participate in some aspects of the medical marijuana market.[8] *See, e.g.,* 22 M.R.S.A. § 2423-F (law governing marijuana extraction facilities not limited to residents).

Second, the Defendants have the burden of showing Congress's "unmistakably clear intent to allow otherwise discriminatory regulations." *United Egg Producers*, 77 F.3d at 570. The CSA says nothing about eliminating a national market, but merely criminalizes various acts of possession, manufacture, and distribution of controlled substances.[9] The Rohrabacher-Farr Amendment further muddies the question of congressional intent.

Finally, the Defendants cite no authority for their position. Instead, in apparently all cases where federal courts have confronted dormant Commerce Clause challenges to state or local laws that favor residents in the recreational or medical marijuana context, the courts have held that such laws are likely unconstitutional.[10]

---

[8]     In addition, because the Defendants have declined to enforce the residency requirement for adult-use marijuana licenses after a legal challenge, *see* Stipulation of Dismissal, *NPG, LLC, et al. v. Dep't of Admin. and Fin. Servs., et al.*, No. 1:20-cv-00107-NT (May 11, 2020) (ECF No. 9), nonresidents are currently able to participate in that market too.

[9]     The Defendants argue that the CSA made marijuana contraband. But, as with their argument regarding Congress's "eliminat[ion]" of the marijuana market, they cite no authority holding that a product that is contraband under federal law but a valuable commodity under state law is outside the scope of the dormant Commerce Clause.

[10]     One court recently reached a different resolution. In *Original Investments, LLC v. Oklahoma*, the district court dismissed the plaintiff's dormant Commerce Clause challenge to an Oklahoma statute that prohibits nonresidents from obtaining medical marijuana business licenses and from owning more than 25 percent of any such licensed entity. Case No. CIV-20-820-F, 2021 WL 2295514 (W.D. Okla. June 4, 2021). Sidestepping the dormant Commerce Clause issue, the court held that it should not use its equitable power to facilitate conduct—namely enabling nonresidents to obtain licenses to sell medical marijuana—that is illegal under federal law. *See id.* at *3.

*See Toigo v. Dept. of Health and Senior Servs.*, No. 2:20-cv-04243-NKL (W.D. Mo. June 21, 2021) (ECF No. 25) (granting preliminary injunction enjoining state agency from restricting medical marijuana licenses to businesses that are majority-owned by persons who have been residents for more than one year because such a requirement was discriminatory on its face); *Lowe v. City of Detroit*, No. 21-CV-10709, 2021 WL 2471476 (E.D. Mich. June 17, 2021) (granting motion for preliminary injunction and holding that city ordinance that granted preferential treatment to long-time residents in awarding licenses was a form of economic protectionism that violated the dormant Commerce Clause); *NPG, LLC v. City of Portland*, No. 2:20-cv-00208-NT, 2020 WL 4741913 (D. Me. Aug. 14, 2020).

These courts recognized that the law or ordinance at issue was "the sort of economic protectionism that the Supreme Court has long prohibited." *See Lowe*, 2021 WL 2471476, at *9 (citing *Davis*, 553 U.S. at 337–38). In those cases, as here, the defendants had not shown "unmistakably clear" intent from Congress to authorize states to discriminate in this way.[11] *See United Egg Producers*, 77 F.3d at 570; *see also South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87–88, 91–92 (1984) (explaining that the "requirement that Congress affirmatively contemplate otherwise invalid state legislation is mandated by the policies underlying dormant Commerce Clause doctrine"). I have no authority to invent such an affirmative grant where

---

[11]     Although the CSA criminalizes marijuana, it does not affirmatively grant states the power to "burden interstate commerce 'in a manner which would otherwise not be permissible.' " *New England Power Co. v. New Hampshire*, 455 U.S. 331, 341 (1982) (quoting *S. Pac. Co. v. Arizona*, 325 U.S. 761, 769 (1945)).

Congress has not provided it. *See New England Power Co.*, 455 U.S. at 343 ("[W]hen Congress has not expressly stated its intent and policy to sustain state legislation from attack under the Commerce Clause, . . . [courts] have no authority to rewrite its legislation based on mere speculation as to what Congress probably had in mind." (internal quotations and citations omitted)).

I recognize that none of the courts that have confronted this specific constitutional issue have rendered final judgments, and it also seems that no circuit court has addressed it. But given the Supreme Court's and First Circuit's unmistakable antagonism towards state laws that explicitly discriminate against nonresident economic actors, I conclude that the Dispensary Residency Requirement violates the dormant Commerce Clause.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Plaintiffs' motion for judgment on the stipulated record as to Defendant Figueroa, **DISMISSES** the claims against Defendant DAFS, and **DENIES** the Defendants' motion for judgment on the stipulated record. The Commissioner shall be enjoined from enforcing the Dispensary Residency Requirement.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 11th day of August, 2021.

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE


NORTHEAST PATIENTS GROUP, et al.,    )
       Plaintiffs              )
                                    )
v.                               )     CIVIL NO. 1:20-cv-00468-NT
                                    )
MAINE DEPARTMENT OF           )
ADMINISTRATIVE AND FINANCIAL    )
SERVICES, et al.,               )
       Defendants           )

JUDGMENT

In accordance with the Order on Cross-Motions to Dismiss, issued on August 11, 2021 by U.S. District Judge Nancy Torresen,

Judgment is hereby entered for the Plaintiffs, Northeast Patients Group and High Street Capital Partners LLC, against Defendant Kirsten Figueroa, enjoining the Commissioner from enforcing the Dispensary Residency Requirement.

JUDGMENT OF DISMISSAL is hereby entered as to Defendant Maine Department of Administrative and Financial Services.

                              Christa K. Berry
                              Clerk of Court


                  By:    /s/ Melody Dalphonse
                           Melody Dalphonse
                           Deputy Clerk

Dated: August 13, 2021