# EXHIBIT C

# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

No. 21-1719

NORTHEAST PATIENTS GROUP, d/b/a Wellness Connection of Maine; HIGH STREET CAPITAL PARTNERS, LLC

Plaintiffs – Appellees,

v.

UNITED CANNABIS PATIENTS AND CAREGIVERS OF MAINE,

Defendant – Appellant,

MAINE DEPARTMENT OF ADMINISTRATIVE AND FINANCIAL SERVICES; KIRSTEN FIGUEROA, in her official capacity as Commissioner of the Maine Department of Administrative and Financial Services,

Defendants,

————————————————

No. 21-1759

NORTHEAST PATIENTS GROUP, d/b/a Wellness Connection of Maine; HIGH STREET CAPITAL PARTNERS, LLC

Plaintiffs – Appellees,

v.

KIRSTEN FIGUEROA, in her official capacity as Commissioner of Maine Department of Administrative and Financial Services,

Defendant – Appellant,

MAINE DEPARTMENT OF ADMINISTRATIVE AND FINANCIAL SERVICES; UNITED CANNABIS PATIENTS AND CAREGIVERS OF MAINE,

Defendants.

————————————————

On Appeal from the United States District Court for the District of Maine

————————————————

## CORRECTED BRIEF OF DEFENDANT-APPELLANT
## UNITED CANNABIS PATIENTS AND CAREGIVERS OF MAINE

December 30, 2021

James G. Monteleone, Bar No. 1180204

Attorney for United Cannabis Patients and Caregivers of Maine

BERNSTEIN SHUR
100 Middle Street/P.O. Box 9729
Portland, ME  04104-5029
(207) 774-1200

## DISCLOSURE STATEMENT

United Cannabis Patients and Caregivers of Maine is a not-for-profit entity in which no person, association of persons, firm, partnership, limited liability company, joint venture, corporation or other entity owns any stock or share.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................. iii

JURISDICTIONAL STATEMENT………………………………………………1

STATEMENT OF THE ISSUE PRESENTED.........................................................2

STATEMENT OF THE CASE………………………………………………2

      A.    Summary of the Facts………………………………………………….2

      B.    Procedural History………………………………………………4

SUMMARY OF THE ARGUMENT…………………………………………..6

STANDARD OF REVIEW ....................................................................................8

ARGUMENT..........................................................................................................9

I.     Discussion of Law Regarding the Interstate Commerce Clause……….9

      A.    Congress Alone Holds the Commerce Clause Power…..……….10

      B.    The Dormant Commerce Clause is Available Where Congress
           Has Not Regulated the Subject Commerce………………………....12

II.    Maine Law Prohibiting Non-Resident Ownership of Maine
     Marijuana Dispensaries Does Not Offend the Dormant
     Commerce Clause………………..…...…………………...…………..14

      A.    The Dormant Commerce Clause Cannot Apply Because
           Congress Regulates Marijuana Commerce Via the CSA….....…14

      B.    Executive Branch Nonenforcement of the CSA Does Not
           Repeal Congress's Exercise of Its Commerce Clause Power…...19

      C.    The Dormant Commerce Clause Cannot Apply Because No
           National Common Market Exists for Marijuana Products……..21

III.   No Constitutional Right to Marijuana Trade Exists, Shielding
      Other States From Obligation to Accept and Sell Maine Marijuana...24

CONCLUSION...................................................................................... 28

CERTIFICATE OF SERVICE ............................................................................29

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Champion v. Ames,* 188 U.S. 321 (1903) ...........................................................10, 11

*City of Philadelphia v. New Jersey,* 437 U.S. 617 (1978) ..........................10, 13, 27

*Crimson Galeria Ltd. P'ship v. Healthy Pharms, Inc.,*
    337 F.Supp.3d 20 (D. Mass 2018) ...................................................................19

*Dean Milk Co. v. City of Madison, Wis.,* 340 U.S. 349 (1951)…………………. 24

*Dee v. United States,* 241 F. Supp. 2d 50 (D. Me. 2003)…………………………25

*Department of Revenue of KY v. Davis,* 553 & U.S. 328 (2008) .........................13

*Evans v. Cty. of Trinity,* No. 218-CV-00083-TLN-JDP,
    2021 WL 516796 (E.D. Cal. Feb. 11, 2021)…………………………………...26

*Feinberg v. C.I.R.,* 808 F.3d 813 (10th Cir. 2015)………..……………...…… 20

*Franchise Tax Bd. of California v. Hyatt,* 136 S. Ct. 1277, 1281 (2016) ........27, 28

*Giles v. United States,* No. 309-CR-203-RJCD-CK1,
    2017 WL 3971282 (W.D.N.C. Sept. 8, 2017)…………………………...……25

*Gen. Motors Corp. v. Tracy,* 519 U.S. 278(1997) ................................7, 13, 22, 23

*Gonzales v. Raich,* 545 U.S. 1 (2005) ....................................................6, 15, 16, 18

*Grandpa Bud, LLC v. Chelan Cty. Wash.,* No. 2:19-CV-51-RMP,
    2020 WL 2736984 (E.D. Wash. May 26, 2020)………………………………26

*Hoke v. United States,* 227 U.S. 308 (1913) ..........................................................10

*Hunt v. Wash. State Apple Advertising Comm'n,* 432 U.S. 333 (1997) ........13, 21

*Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27, 44 (1980) ........................12

*Little v. Gore,* 148 F. Supp. 3d 936 (S.D. Cal. 2015)…………...……………...25

*Manchester Sch. Dist. v. Crisman,* 306 F.3d 1 (1st Cir. 2002)………………..8

*Maine v. Taylor*, 477 U.S. 131 (1986) ..................................................................12

*Ne. Bancorp, Inv. v. Bd of Governors of Fed. Rsrv. Sys.*,
    472 U.S. 159 (1985)..........................................................................................17

*New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982) ......................11

*Perez v. United States*, 402 U.S. 146 (1970) ....................................................10, 26

*Pic-A-State PA, Inc., v. Com. Of PA*, 42 F.3d 175 (3rd Cir. 1994) .......................11

*Predka v. Iowa*, 186 F.3d 1082 (8th Cir. 1999) ................................................11, 18

*Reeves, Inc. v. Stake*, 447 U.S. 429 (1980)..........................................................22

*Sawtelle v. United States*, No. 1:17-CR-00125-JDL-2,
    2019 WL 6879733 (D. Me. Dec. 17, 2019)…………………………………….18

*South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080spirits (2018) ..................10, 12, 17

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas*,
    139 S. Ct. 2449 (2019) ........................................................7, 12, 13, 15

*United States v. Costigan*, 18 Fed. Appx. 2 (1st Cir. 2001)………………………..8

*United States v. Fogarty*, 692 F.2d 542, 547 (8th Cir. 1982) ……………………25

*United States v. Fry*, 787 F.2d 903 (4th Cir. 1986)…………………………....8, 25

*United States v. Marenghi*, 109 F.3d 28 (1st Cir. 1997)…………………………..8

## Federal Statutes

21 U.S.C. § 801-904 …………………………………………………………...*Passim*

21 U.S.C. § 846…………………………………………………………………………17

21 U.S.C. § 854..............................................................................................................17

28 U.S.C. § 1331………………………………………………………………………1

28 U.S.C. § 1291………………………………………………………………………1

## State Statutes

22 M.R.S. § 2421 …………………………………………………………..2

22 M.R.S. § 2422-A…………………………………………………………..2

22 M.R.S. § 2428 ............................................................................*Passim*

S.C. Code Ann. § 44-53-190...................................................................27

S.C. Code Ann. § 44-53-370...................................................................27

## Other Authorities

Memorandum for all United States Attorneys: Guidance Regarding
  Federal Marijuana Enforcement, Office of the Deputy Attorney
  General (Aug. 29, 2013) (the "Cole Memo")..………………………19, 21, 23

## JURISDICTIONAL STATEMENT

Plaintiffs High Street Capital Partners, LLC, and Northeast Patients Group (collectively "NPG") petitioned the United States District Court for the District of Maine for a judgment determining whether a Maine state statute offends the Commerce Clause of the United States Constitution. App. 13-14.  NPG's requested relief, which is the subject of this appeal, invoked the Court's federal question jurisdiction pursuant to 28 U.S.C. § 1331.

The District Court entered final judgment for Plaintiffs on August 13, 2021.  App. 23.  This Court has appellate jurisdiction to review the District Court's final decision pursuant to 28 U.S.C. § 1291.

Appellant United Cannabis Patients and Caregivers of Maine timely filed its Notice of Appeal of the District Court's final judgment on September 10, 2021 pursuant to Fed. R. App. P. 4(a)(1)(A)'s requirement for appeal within 30 days after entry of judgment.

## STATEMENT OF THE ISSUE PRESENTED

Under the interstate Commerce Clause, is the Maine statute restricting Maine marijuana dispensary ownership to Maine residents a lawful economic protectionism where Congress has eliminated marijuana from the nation's interstate commerce through the Controlled Substances Act?

## STATEMENT OF THE CASE

### A.    Summary of the Facts

The State of Maine in 2009 enacted laws establishing an exclusively intrastate market for the medical use of marijuana by allowing for the "acquisition, possession, cultivation, manufacture, use, deliver, transfer or transportation of marijuana …" as a prescribed medical treatment for certain medical conditions. *See* 22 M.R.S. § 2421, *et seq.* (2009) (the "Medical Marijuana Act" or the "Act"). The Medical Marijuana Act allows for marijuana to be cultivated in Maine by qualifying patients, caregivers or dispensaries.  22 M.R.S. §§ 2423-A(1)(B), (2)(B); 22 M.R.S. § 2428 (1-A)(B). Additionally, the Act allows for Maine-cultivated marijuana to be sold to qualifying patients exclusively by a Maine-licensed medical marijuana

caregiver or one of seven large-scale state dispensaries.  22 M.R.S. § 2423-A(2)(A-1); § 2428(1-A)(A).

The Medical Marijuana Act allows caregivers to cultivate and sell medical marijuana for profit, but it imposes strict caps on the amount of marijuana that caregivers may lawfully cultivate.  The larger-scale dispensaries are limited by different rules.  The Act exempts the dispensaries from the strict caps applicable to caregivers, but originally limited the larger-scale dispensaries through a requirement that all dispensaries operate as non-profit entities.  *See* 22 M.R.S. § 2428(6)(A) (Dispensary "must be operated on a not-for-profit basis for the mutual benefit of its members and patrons.")  The Act's prohibition against for-profit dispensary operations was eliminated in 2018, but Maine continued to impose restrictions on the scale of dispensary operations by imposing residency requirements for dispensaries.  Specifically, the Act allows dispensaries to become for-profit businesses by merging with or into a Maine-incorporated business, *see* 22 M.R.S. § 2428(13)(A)(1)-(2), but the Act also requires that all officers or directors of such dispensary business to be Maine residents.  22 M.R.S. § 2428(6)(H) (the "Residency Requirement").

Appellee Northeast Patients Group owns and operates three of Maine's seven licensed dispensaries as a for-profit corporation wholly owned by three Maine residents. App. 20-21. Appellee High Street Capital Partners, LLC, a Delaware corporation owned exclusively by non-Maine residents, now seeks to acquire Northeast Patients Group's Maine marijuana dispensary business, but it is barred from doing so by Maine's Residency Requirement for dispensaries selling marijuana within Maine's medical marijuana marketplace. App. 21.

### B.    Procedural History

Appellees Northeast Patients Group and High Street Capital Partners, LLC (collectively "NPG") filed this action in the United States District Court for the District of Maine in December 2020. *See* App. 03. NPG asserts that Maine's Residency Requirement violates the dormant Commerce Clause. App. 13-16. Appellant-Defendant United Cannabis Patients and Caregivers of Maine ("United Cannabis") petitioned to intervene in the action and was granted permissive intervenor status by the Court pursuant to Fed. R. Civ. P. 24(a)(2). App. 4. United Cannabis's intervenor status is not challenged on cross-appeal.

The District Court considered the merits of NPG's dormant Commerce

Clause claim through Plaintiffs' Motion for Judgment on the Stipulated Record.  App. 4.   On August 11, 2021, the court entered an Order granting Plaintiffs' motion for judgment. *See* Addendum to the Brief ("Add.") at 1. The District Court, reviewing what it characterized as a novel question of law, held that Maine's Residency Requirement for Maine dispensary owners and businesses violated the inferred protections of the dormant Commerce Clause despite Congress's express prohibition of marijuana commerce. Add. 8. The District Court reasoned that Congress's exercise of Commerce Clause power to criminalize marijuana through the Controlled Substances Act "merely criminalizes various acts of possession, manufacture, and distribution" but "says nothing about eliminating a national market." Add. 11.  The District Court enjoined Maine Department of Administrative and Financial Services Commissioner Kirsten Figueroa from enforcing the Residency Requirement.   Add. 14.

United Cannabis timely appealed the Order and Judgment, and moved for the District Court to stay its injunction.  On October 27, 2021, the District Court stayed the judgment and injunction pending appeal, finding that the appeal presents a novel question of law and that a denial of the stay would have disproportionately harmed Appellees.

## SUMMARY OF THE ARGUMENT

The dormant Commerce Clause does not apply where Congress has exercised its affirmative Commerce Clause power to regulate or otherwise prohibit an article of commerce.

Here, Congress has unmistakably exercised its Commerce Clause power to prohibit any form of interstate marijuana commerce through adoption of the Controlled Substances Act, 21 U.S.C. §§ 801-904 (the "CSA"). The CSA comprehensively criminalizes the cultivation, sale and/or possession of marijuana as the means to eradicate marijuana from interstate commerce. *See Gonzales v. Raich*, 545 U.S. 1, 12 (2005). Congress's comprehensive prohibition of all interstate marijuana commerce is not diminished or impliedly repealed by Maine's adoption of conflicting laws that allow for certain marijuana cultivation, sale and possession within the state of Maine. *Id.* Rather, Maine laws regulating marijuana within the state persist in active violation of the CSA.

Amid a regime of executive branch non-enforcement of the CSA that has allowed state marijuana laws to remain in effect, NPG seek to establish a constitutional right to engage in the cultivation, sale and possession of Maine marijuana. NPG contend that their federal constitutional right to

partake in Maine's ongoing violations of the CSA is guaranteed by the dormant Commerce Clause. But, the dormant Commerce Clause applies only where Congress has not affirmatively regulated the article of commerce at issue. *See Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2465 (2019). Here, Congress has acted to regulate marijuana commerce through its comprehensive prohibition of all marijuana cultivation, sale or possession through the CSA. Consequently, the dormant Commerce Clause's inferences provide a vehicle to circumvent Congress's exercise of its Commerce Clause power to eliminate any right whatsoever to engage in federally prohibited interstate marijuana commerce.

Maine's law providing economic protectionism for Maine residents within Maine's marijuana market further avoids dormant Commerce Clause scrutiny because the challenged Maine law governs a purely local market, which is not subject to dormant Commerce Clause protections that apply only to national common markets. *See Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997).

Rejection of Appellees' claim of constitutional rights to engage in Maine's marijuana markets is wholly consistent with federal caselaw that has consistently refused to recognize any federal constitutional right

whatsoever relating to marijuana or marijuana business activities. *See, e.g.*, *United States v. Fry*, 787 F.2d 903, 905 (4th Cir. 1986) ("There is no fundamental right to produce or distribute marijuana commercially."). Affirming this long-standing denial of constitutional marijuana protections in the present case will ensure that no state can be compelled to accept the import and sale of Maine marijuana in their state, as a finding of constitutional commerce clause rights would otherwise compel.

This Court should conclude that Maine's Residency Requirement for marijuana dispensary owners does not offend the dormant Commerce Clause and reverse the District Court's judgment.

## STANDARD OF REVIEW

The interpretation of state statutes presents a question of law. *Manchester Sch. Dist. v. Crisman*, 306 F.3d 1, 9 (1st Cir. 2002). This Court reviews the District Court's determinations of questions of law *de novo*, including Constitutional questions. *United States v. Marenghi*, 109 F.3d 28, 31 (1st Cir. 1997). Most relevant, a statutory challenge based on the Commerce Clause is reviewed *de novo*. *United States v. Costigan*, 18 Fed. Appx. 2, 6 (1st Cir. 2001).

# ARGUMENT

Maine's exclusion of non-Maine residents from ownership of Maine marijuana dispensaries does not offend the Constitution's Commerce Clause because Congress has expressly (i) excluded marijuana commerce from any constitutional protections and (ii) eliminated any form of national common marijuana marketplace otherwise protected by the dormant Commerce Clause in the absence of Congress's regulation of the subject commerce.

Moreover, rejection of NPG's claim of constitutional rights to engage in Maine marijuana business is wholly consistent to federal caselaw widely rejecting any constitutional rights derived from marijuana. Affirming this long-standing denial of constitutional marijuana protections here ensures that no state can be compelled to accept the import and sale of marijuana in their state, as a constitutional interstate commerce right would otherwise compel.

## I.   DISCUSSION OF LAW REGARDING THE INTERSTATE COMMERCE CLAUSE.

The Commerce Clause of the United States Constitution, Art. I, § 8, cl. 3, grants Congress the power to regulate commerce amongst the several states. The provision, however, is effectuated in two distinct contexts: either

through Congress's affirmative exercise of the Commerce Clause power to enact legislation regulating interstate commerce, or through the dormant Commerce Clause's judicially-adopted inference that Congress intended to preserve free market protections in the absence of express federal economic regulation. *See e.g.*, *City of Philadelphia v. New Jersey*, 437 U.S. 617, 623 (1978). Each distinct application under the Commerce Clause is addressed in turn.

### A. Congress Alone Holds the Commerce Clause Power.

The Commerce Clause reserves for Congress alone the power to legislate and directly regulate all matter of Commerce among the several states, including the "channels of interstate … commerce," "the instrumentalities of interstate commerce," and "those activities affecting commerce." *Perez v. United States*, 402 U.S. 146, 150 (1970). "When Congress exercises its power to regulate commerce by enacting legislation, the legislation controls." *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2089 (2018).

Congress's affirmative Commerce Clause power includes the ability to entirely eliminate certain products or activities from the markets of interstate commerce. *See Champion v. Ames*, 188 U.S. 321, 358 (1903) (concluding that Congressional "regulation may sometimes appropriately assume the form of prohibition" pursuant to its Commerce Clause power); *Hoke v. United*

*States*, 227 U.S. 308, 322 (1913) ("Congress may prohibit [an article's] transportation between the states, and by that means defeat the motive and evils of its manufacture.").

Congress's prohibition of certain articles of interstate commerce reflects its "determin[ation] that the commerce is not in the national interest," *Pic-A-State PA, Inc. v. Com. of Pa.*, 42 F.3d 175, 179 (3d Cir. 1994). "Where such a determination has been made by Congress, it does not offend the purpose of the Commerce Clause for states to discriminate or burden that commerce." *Id.* Accordingly, when Congress prohibits a type of commercial activity, that activity no longer enjoys any of the constitutional protections that the Commerce Clause may have otherwise provided. *See Champion*, 188 U.S. at 347 ("[A]ll commerce [is] legitimate in a state of peace, until prohibited by positive law."); *Predka v. Iowa*, 186 F.3d 1082, 1085 (8th Cir. 1999) ("[M]arijuana is contraband and thus not an object of interstate trade protected by the Commerce Clause.").

Alternatively, where Congress acts to regulate but not prohibit an article of commerce, "Congress may use its powers under the Commerce Clause to confer upon the States an ability to restrict the flow of interstate commerce that they would not otherwise enjoy." *New England Power Co. v.*

*New Hampshire*, 455 U.S. 331, 339–40 (1982) (quoting *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 44 (1980) (internal quotations and alterations omitted). In these circumstances, a "clear expression of approval by Congress" is required to apply the affirmative Commerce Clause power "to authorize otherwise invalid state legislation," *Maine v. Taylor*, 477 U.S. 131, 139 (1986).

### B. The Dormant Commerce Clause is Available Where Congress Has Not Regulated the Subject Commerce.

Where Congress has yet to regulate the relevant market or activity of interstate commerce, the dormant Commerce Clause presumes that "Congress had left it to the courts to formulate the rules to preserve the free flow of interstate commerce." *Wayfair, Inc.*, 138 S. Ct. at 2089-90. As the Supreme Court recently articulated, these "[d]ormant Commerce Clause restrictions apply *only* when Congress has not exercised its Commerce Clause power to regulate the matter at issue." *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. at 2465 (emphasis added).

The dormant Commerce Clause, when applicable, presumes that any "state law discriminat[ing] against out-of-state goods or nonresident economic actors," impedes the national markets of interstate commerce

unless the challenged law "is narrowly tailored to advance a legitimate local purpose," *Tennessee Wine*, 139 S. Ct. at 2461 (quoting *Department of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008)) (internal quotations and alterations omitted). The purpose of this presumption is to "preserve[] a national market for goods and services" intended by the Commerce Clause, *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988) because "many subjects of potential federal regulation under that power inevitably escape congressional attention because of their local character and their number and diversity," *City of Philadelphia v. New Jersey*, 437 U.S. 617, 623 (1978) (internal quotations omitted). Accordingly, the dormant Commerce Clause's only purpose is to protect "the Commerce Clause's overriding requirement of a national common market." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 350, (1977) (internal quotations omitted).

There can be no presumption of congressional intent to preserve certain national markets, however, where: (i) Congress has affirmatively addressed the subject commerce with federal regulation, *Tennessee Wine*, 139 S. Ct. at 2465; or (ii) there is no actual national market for competition with respect to the commerce at issue, *Gen. Motors Corp. v. Tracy*, 519 U.S. at 298.

## II.  MAINE LAW PROHIBITING NON-RESIDENT OWNERSHIP OF MAINE MARIJUANA DISPENSARIES DOES NOT OFFEND THE DORMANT COMMERCE CLAUSE.

Maine's exclusion of non-Maine residents from ownership of Maine marijuana dispensaries does not violate the Commerce Clause because Congress has affirmatively eliminated all forms of marijuana business or economic opportunity through the CSA's comprehensive criminalization. The Executive Branch's discretionary policy against enforcement of the CSA in no way repeals or otherwise modifies Congress's standing exercise of its Commerce Clause power.

The result of Congress's comprehensive marijuana prohibition is that no national, common market for marijuana trade exists.  The total absence of a national common market—the very forum that the dormant Commerce Clause is designed to protect—further demonstrates that the dormant Commerce Clause cannot apply to Maine's laws restricting dispensary ownership to Maine residents.

### A.  The Dormant Commerce Clause Cannot Apply Because Congress Regulates Marijuana Commerce Via the CSA.

Dormant Commerce Clause restrictions apply *only* when Congress has not exercised its Commerce Clause power to regulate the matter at issue.

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. at 2465. Consequently, the threshold question to trigger application of the dormant Commerce Clause here is whether Congress's Commerce Clause power to regulate marijuana has been "dormant."

Here, Congress has not left dormant its Commerce Clause power to regulate marijuana commerce.  Rather, Congress's adoption of the CSA through exercise of its Commerce Clause powers demonstrated Congress's "specific decisions" to adopt a federal economic policy that "excluded Schedule I drugs [such as marijuana] entirely from the market." *Gonzales v. Raich*, 545 U.S. 1, 26 (2005).  In *Gonzales*, the Supreme Court recognized that Congress's adoption of the CSA as a valid, enforceable and complete exercise of Congress's affirmative Commerce Clause power to eradicate marijuana and other Schedule I drugs from the nation's markets of interstate commerce. The Court observed:

> The CSA is a statute that regulates the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market. Prohibiting the intrastate possession or manufacture of an article of commerce is a rational (and commonly utilized) means of regulating commerce in that product.

*Gonzales*, 545 U.S. at 26.  Consequently, *Gonzales* established that Congress's exercise of its Commerce Clause power to prohibit marijuana activities is not limited by any state's contrary marijuana laws.  The Supreme Court handily rejected the *Gonzales* defendants' arguments that enforcement of the CSA for activities in compliance with state law violated the defendants' Commerce Clause rights. *See Gonzales*, 545 U.S. at 29 ("[M]arijuana possession and cultivation in accordance with state law cannot serve to place respondents' activities beyond congressional reach. … [S]tate action cannot circumscribe Congress' plenary commerce power.")

Congress's full exercise of its Commerce Clause power to regulate marijuana is underscored by the comprehensive breadth of the CSA's prohibition.  In fact, the CSA delivered "a *comprehensive* regime to combat the … interstate traffic in illicit drugs" by "devis[ing] a closed regulatory system making it unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA." *Gonzales*, 545 U.S. at 12 (emphasis added).  Significantly, the CSA's prohibitions specifically foreclose the very economic activities that NPG claims a constitutional right to undertake. For example, the CSA expressly criminalizes any attempted or conspired commercial venture involving the

manufacture or distribution of marijuana, 21 U.S.C. § 846, *or* any investment of proceeds derived from marijuana sales, 21 U.S.C. § 854(a).

This comprehensive federal economic regulation leaves no room for states to legalize any aspect of marijuana cultivation, sale, possession or usage without triggering a violation of the CSA's complete federal prohibition.  Consequently, there is no Congressional inaction from which this Court can infer that Congress intended to preserve and protect any form interstate marijuana market.  *See Wayfair, Inc.*, 138 S. Ct. at 2089-90.  Congress has done just the opposite: invoked its Commerce Clause power to eliminate any interstate market for marijuana.  *See Raich*, 545 U.S. at 15.  In doing so, Congress removed any potential Commerce Clause protections that economic activities associated with marijuana may have otherwise enjoyed.

Where Congress unmistakably exercised its Commerce Clause power to "directly regulate[] economic, commercial activity" by "excluding [marijuana] entirely from the market," *Raich*, 545 U.S. at 26, "the legislation controls" the Commerce Clause analysis, *South Dakota v. Wayfair, Inc.*, 138 S. Ct. at 2089.  Consequently, the dormant Commerce Clause offers nothing to the analysis.  *See also Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 472 U.S. 159, 174 (1985) (concluding the dormant Commerce Clause did not

apply to state banking regulations because "the commerce power of Congress is not  dormant").

Other courts have similarly recognized that Congress has spoken on the question of marijuana commerce.  For example, the United States Court of Appeals for the Eighth Circuit, in *Predka v. Iowa*, 186 F.3d 1082 (8th Cir. 1999) rejected any claim of interstate commerce rights in marijuana trade, finding that "marijuana is contraband and thus not an object of interstate trade protected by the Commerce Clause." *Id.* at 1085.  *See also Sawtelle v. United States*, No. 1:17-CR-00125-JDL-2, 2019 WL 6879733, at *3 (D. Me. Dec. 17, 2019), *report and recommendation adopted*, No. 1:17-CR-00125-JDL-2, 2020 WL 591307 (D. Me. Feb. 6, 2020) ("The Controlled Substances Act has been deemed a valid exercise of congressional authority under the Commerce Clause, and any claimed fundamental right to use, possess, or distribute marijuana is unavailing.").

The case at bar compels a similar finding.  Congress has fully spoken on the question of marijuana commerce:  Marijuana is "excluded … entirely from the market." *Gonzales*, 545 U.S. at 26.

**B. The Executive Branch's Nonenforcement of the CSA Does Not Repeal Congress's Exercise of the Commerce Clause Power.**

Executive branch decisions made by recent United States Attorneys regarding the Department of Justice's discretionary, internal priorities for CSA enforcement neither repeal the CSA nor disturb Congress's well settled exercise of its exclusive Commerce Clause power to prohibition of marijuana from all forms of interstate commerce. *See, e.g.*, *Memorandum for all United States Attorneys: Guidance Regarding Federal Marijuana Enforcement*, Office of the Deputy Attorney General (Aug. 29, 2013) (the "Cole Memo") (Add. 15).

The Cole Memo itself even recognizes its limited effect, observing that the executive branch opinion merely "a guide to the exercise of investigative and prosecutorial discretion" that "does not alter in any way the Department's authority to enforce federal law, including federal laws relating to marijuana, regardless of state law." Add. 15. The DOJ is merely acting within the discretionary role that Congress assigned in the CSA. *See, e.g.*, *Crimson Galeria Ltd. P'ship v. Healthy Pharms, Inc.*, 337 F. Supp. 3d 20, 33 (D. Mass. 2018) ("The CSA provisions that criminalize the possession and distribution of marijuana … may be enforced criminally, civilly, or administratively, but the authority to enforce these provisions rests only

with the United States Attorney General and the Department of Justice."
(internal citations and quotations omitted)). Consequently, the Supreme
Court's holding in *Gonzalez v. Raich* that the CSA was a valid and complete
exercise of Congress's Commerce Clause power to prohibit marijuana from
the marketplace stands unaltered, and no inference from the dormant
Commerce Clause can be drawn.

The CSA's continuing prohibition of both interstate and intrastate
marijuana sales means that Maine's marijuana market remains subject to
complete shut down by the federal government if or when enforcement of
the CSA's comprehensive prohibition of marijuana commerce resumes.
Vesting Maine's marijuana market with inferred dormant Commerce Clause
protections, however, would otherwise deprive the United States Attorney
General and the Department of Justice of their prosecutorial discretion when
and if the current policy of nonenforcement is revised by a future
administration.

Other federal courts have agreed that the executive branch's
discretionary nonenforcement of the CSA stops far short of rewriting
Congress's exercise of its Commerce Clause powers to comprehensively
prohibit marijuana from the streams of interstate commerce.  *See Feinberg v.*

*C.I.R.*, 808 F.3d 813, 816 (10th Cir. 2015) ("[I]n our constitutional order it's Congress that passes the laws, Congress that saw fit to enact [the CSA], and Congress that … made the distribution of marijuana a federal crime."); *Original Investments, LLC v. Oklahoma*, No. CIV-20-820-F, 2021 WL 2295514 (W.D. Okla. June 4, 2021) ("It is a complete answer to this argument to observe that Mr. Cole did not pen his memorandum … on the authority of Article I of the Constitution.").

### C.    The Dormant Commerce Clause Cannot Apply Because No National Common Market Exists for Marijuana Products.

Maine's Residency Requirement additionally survives NPG's dormant Commerce Clause attack, because the CSA's criminalization of marijuana leaves no national common marketplace for marijuana commerce.  Where local regulation does not impede commerce on the national market among the several states, the dormant Commerce Clause provides no economic protections.

The framers drafted the Commerce Clause into the Constitution to avoid economic isolationism and created an "overriding requirement of a national common market."  *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. at 350.  Indeed, the Supreme Court has explained that the "dormant

Commerce Clause's fundamental objective [is to] preserve[] a national market for competition." *Gen. Motors Corp. v. Tracy*, 519 U.S. at 298. The doctrine responds to threats "impeding free private trade in the national marketplace." *Reeves, Inc. v. Stake*, 447 U.S. 429, 437 (1980).

Because the dormant Commerce Clause's overarching purpose is to protect free trade within a national marketplace, the doctrine is only applicable when there is—or could be—a national marketplace for the regulated commercial activity. No such national, common marketplace for medical marijuana exists, nor can it, unless and until Congress amends the CSA to removes marijuana from its comprehensive regulatory regime.

The Supreme Court has refused to apply the dormant Commerce Clause to state statutes that do not implicate its fundamental purpose of protecting interstate commerce in a national marketplace. For instance, in *Tracy*, the Court recognized that a law regarding the taxation of natural gas companies that, in practice, only affected companies operating exclusively within a state market, did not violate the dormant Commerce Clause. 519 U.S. at 302-03. The Court observed, in that instance, that "[s]o far as this market is concerned, competition would not be served by eliminating any tax differential as between sellers, and the dormant Commerce Clause has

no job to do." *Tracy*, 519 U.S. at 303. *Tracy* recognized that when there is no interstate competition "in a single market there can be no local preference . . . to which the dormant Commerce Clause may apply." *Id.* at 300. The same concerns arise here, where there is no single, national market for medical marijuana. Nor can there be such a market unless and until Congress changes marijuana's designation in the CSA.

The absence of a national, common market for marijuana commerce means that states establishing local intrastate marijuana markets are isolated within their own state borders, as each state seeks to avoid violations of the CSA's prohibition against interstate marijuana trafficking and sales. Such violations of the CSA remain actively enforced. Cole Memo; Add. 15. (Ongoing federal CSA enforcement continues to prioritize "[p]reventing the diversion of marijuana from states where it is legal under state law in some form to other states.")

The result is that Maine's marijuana market is a purely intrastate market because Maine marijuana sellers are barred from importing any marijuana products from other states, and Maine marijuana cultivators are barred from exporting their Maine-grown marijuana products to other states' potentially lucrative markets. Where a national, common marketplace

exists, such prohibition of the import/export of out-of-state goods is strictly prohibited. *See, e.g.*, *Dean Milk Co. v. City of Madison, Wis.*, 340 U.S. 349, 354 (1951) (striking down economic barriers protecting Wisconsin's local producers against competition from Illinois imports). But absent the common national marketplace for marijuana, Maine's intrastate marijuana market operates in a silo, independent and apart from every other state marijuana market, and outside the interstate Commerce Clause's jurisdictional reach.

Because no national common market for marijuana commerce lawfully exists, Maine's Residency Requirement cannot and does not run afoul of the dormant Commerce Clause, even if the dormant Commerce Clause could be read in harmony with the affirmative Commerce Clause.

## III. NO CONSTITUTIONAL RIGHT TO MARIJUANA TRADE EXISTS, SHIELDING OTHER STATES FROM OBLIGATION TO ACCEPT AND SELL MAINE MARIJUANA.

Federal courts have long rejected any claim of constitutional rights arising from marijuana activities. Moreover, vesting marijuana cultivators and sellers like NPG with a first-of-its-kind constitutional right arising from the Commerce Clause would prevent other states that still criminalize

marijuana from rejecting the import and sale of Maine-grown marijuana in their own states.

Federal courts have consistently refuted claims that economic or property rights arising from marijuana trade operations are protected by the United States Constitution.  The consistent conclusion is that there simply is no federal constitutional right to use, sell, or distribute marijuana because marijuana is a federally *prohibited* substance.  *See, e.g.*, *United States v. Fry*, 787 F.2d 903, 905 (4th Cir. 1986) ("There is no fundamental right to produce or distribute marijuana commercially."); *United States v. Fogarty*, 692 F.2d 542, 547 (8th Cir. 1982) ("[T]here is no fundamental constitutional right to import, sell, or possess marijuana . . . ."); *Dee v. United States*, 241 F. Supp. 2d 50, 51 (D. Me. 2003) ("It has long been established that use of marijuana is *not* a fundamental right protected by the Constitution."); *Little v. Gore*, 148 F. Supp. 3d 936, 955 (S.D. Cal. 2015) ("Thus, under federal law, marijuana is contraband per se, which means no person can have a cognizable legal interest in it."); *Giles v. United States*, No. 309-CR-203-RJCD-CK1, 2017 WL 3971282, at *18 (W.D.N.C. Sept. 8, 2017) ("It has been repeatedly held that there is no fundamental right to use or possess or distribute marijuana.").

The Executive Branch's discretionary choices regarding state marijuana laws and the number of states that legalize medical or recreational marijuana do not change the fact that there is no federal property right in marijuana. Notwithstanding these developments, "there is no cognizable federal property interest in marijuana," *Evans v. Cty. of Trinity*, No. 218-CV-00083-TLN-JDP, 2021 WL 516796, at *4 (E.D. Cal. Feb. 11, 2021); *see also Grandpa Bud, LLC v. Chelan Cty. Washington*, No. 2:19-CV-51-RMP, 2020 WL 2736984, at *4 (E.D. Wash. May 26, 2020) ("Even when cannabis production is a legitimate use of one's property at the state level, such use is not recognized as a protectable property interest under the U.S. Constitution.").

Adoption of constitutional Commerce Clause protections here would establish an interstate marijuana market entitling cultivators, sellers and buyers to have free access to (i) all channels of interstate commerce; (ii) all instrumentalities of interstate commerce; and (ii) all persons or things in commerce. *See Perez v. United States*, 402 U.S. at 150. Such broad access to interstate marijuana markets would compel states now prohibiting marijuana to accept the Maine-grown marijuana products and sales.

Such policy risks running afoul of the Full Faith and Credit clause, which bars any state from adopting "any policy of hostility to the public Acts

of that other State." *Franchise Tax Bd. of California v. Hyatt*, 136 S. Ct. 1277, 1281 (2016). At bottom, the Full Faith and Credit Clause shields states from being required "to substitute for its own statute, applicable to persons and events within it, the statute of another State reflecting a conflicting or opposed policy." *Id.*

States that have not yet legalized medical marijuana, such as South Carolina, for example, would be effectively forced to accept Maine's medical marijuana as an article of national commerce if constitutional Commerce Clause protections exist. South Carolina businesses and residents, in turn, would be free to invest in Maine's medical marijuana market while remaining within South Carolina's borders. After all, "[t]he clearest example" of a law that the dormant Commerce Clause deems invalid "is a law that overtly blocks the flow of interstate commerce at a State's borders." *City of Philadelphia v. New Jersey*, 437 U.S. at 624.

This result would directly conflict with South Carolina's own policy to prohibit marijuana business ventures in that state, and would essentially invite violations of South Carolina laws that make it unlawful to "aid, abet, attempt, or conspire to manufacture, distribute, dispense, [or] deliver" marijuana. S.C. Code Ann. § 44-53-370; *see* S.C. Code Ann. § 44-53-190(D)(11)

(defining "Marijuana" as a "Schedule I" drug).  If Maine law could force South Carolina to allow its businesses to invest and bring home profits associated with Maine's medical marijuana, the dormant Commerce Clause would effectively trump South Carolina's own decision to prevent its residents and businesses from engaging in marijuana commerce. This illogical result amounts to a prohibited "policy of hostility to the public Acts of" South Carolina, in violation of the Full Faith and Credit Clause. *Franchise Tax Bd.*, 136 S. Ct. at 1281.

## CONCLUSION

WHEREFORE, for the above-stated reasons, United Cannabis Patients and Caregivers of Maine, respectfully requests that the Court find on *de novo* review that the dormant Commerce Clause does not apply to Maine's Residency Requirement, reverse the District Court's judgment and remand for entry of judgment for Defendants.

December 30, 2021

*/s/ James G. Monteleone*
James G. Monteleone, Bar No. 1180204

Attorney for Appellant United Cannabis
Patients and Caregivers of Maine

BERNSTEIN SHUR
100 Middle Street/P.O. Box 9729
Portland, Maine  04014
207-774-1200

**CERTIFICATE OF SERVICE**

I hereby certify that on December 30, 2021, I electronically filed this document with the Clerk of the Court using the CM/ECF system that will send notification of such filing to all attorneys of record.

*/s/ James G. Monteleone*

James G. Monteleone

# ADDENDUM
## <u>TABLE OF CONTENTS</u>

District Court Order on Cross-Motions for Judgment …………Addendum 1

District Court Judgment……………………………………… Addendum 14

The "Cole Memo" (Memorandum for all United States Attorneys:
   Guidance Regarding Federal Marijuana Enforcement,
   Office of the Deputy Attorney General, Aug. 29, 2013)...…..Addendum 15

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| NORTHEAST PATIENTS GROUP, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | )   Docket No. 1:20-cv-00468-NT |
| | ) |
| MAINE DEPARTMENT OF ADMINISTRATIVE AND FINANCIAL SERVICES, et al., | ) ) ) ) |
| Defendants. | ) |

**ORDER ON CROSS-MOTIONS FOR JUDGMENT**

Plaintiffs High Street Capital Partners, LLC ("**High Street**") and Northeast Patients Group d/b/a Wellness Connection of Maine ("**Wellness Connection**") allege that Maine's medical marijuana licensing program violates the dormant Commerce Clause by restricting licenses to residents and resident-owned entities. The Plaintiffs have sued the Maine Department of Administrative and Financial Services ("**the Department**" or "**DAFS**") and the Department's Commissioner, Kirsten Figueroa.[1] Both parties have moved for judgment on a stipulated record (ECF Nos. 14 and 17). I held oral argument via videoconference on July 16, 2021 (ECF No. 25). For the reasons set forth below, the Plaintiffs' motion is **DENIED** as to the Department and **GRANTED** as to Commissioner Figueroa, and the Defendants' motion is **DENIED**.

---

[1]     The Complaint mistakenly captioned the Commissioner's first name as "Kristine." *See* Defs.' Opp'n to Pls.' Mot. for J. on the Record and Cross-Mot for J. on the Record ("**Defs.' Mot.**") 1 n.1 (ECF No. 17).

# BACKGROUND

In 2009, the Maine Legislature amended the State's existing medical marijuana law to establish a comprehensive system authorizing the sale of medical marijuana. Defs.' Opp'n to Pls.' Mot. for J. on the Record and Cross-Mot. for J. on the Record ("**Defs.' Mot.**") 2 (ECF No. 17). The current iteration of the law—the Maine Medical Use of Marijuana Act (the "**Act**")—authorizes qualified patients who have a certification from a medical provider for the medical use of marijuana to possess, use, and purchase medical marijuana. Defs.' Mot. 3; 22 M.R.S.A. § 2423-A. The Act also authorizes two types of entities—registered dispensaries and caregivers—to possess, cultivate, and sell marijuana to qualified patients. Defs.' Mot. 3; 22 M.R.S.A. §§ 2423-A(2), 2428. While dispensaries and caregivers can engage in similar activities, dispensaries—by statutory design—engage in operations that are much larger than caregivers. For example, caregivers are limited in the number of plants that they can grow and sell, *see* 22 M.R.S.A. § 2423-A(2), whereas dispensaries can grow an unlimited amount, *see* 22 M.R.S.A. § 2428(1-A). As of February 2021, there were approximately 3,000 caregivers in the State, and seven dispensaries. Pls.' Br. in Supp. of J. on the Record ("**Pls.' Mot.**") 3–4 (ECF No. 14). Caregivers accounted for 76 percent of retail sales as of February 2020, with dispensaries accounting for the remaining 24 percent. Pls.' Mot. 3–4. Together, the medical marijuana industry generated over $110 million in sales in 2019. Compl. ¶ 1.

Although dispensaries can grow more marijuana plants, they are restricted in other ways, including the restriction that is at the center of this case. The Act provides

ADDENDUM 002

that "[a]ll officers or directors of a dispensary[2] must be residents of this State," (the "**Dispensary Residency Requirement**"). 22 M.R.S.A. § 2428(6)(H). "Officer or director" is defined as "a director, manager, shareholder, board member, partner or other person holding a management position or ownership interest in the organization." 22 M.R.S.A. § 2422(6-B). "Resident of the State" is defined as "a person who is domiciled in the State." 22 M.R.S.A. § 2422(13-B).

Plaintiff High Street is a Delaware limited liability company entirely owned by residents of states other than Maine. Joint Stipulation of the Record ("**Record**") ¶ 1 (ECF No. 13-1). Plaintiff Wellness Connection owns and operates three of the seven registered dispensaries in Maine's medical marijuana program. Record ¶ 2. From June of 2010 until March of 2020, Wellness Connection operated as a mutual benefit nonprofit corporation without any equity ownership, but when Maine changed its law in 2020 to allow dispensaries to become for-profit companies, Wellness Connection converted to a for-profit corporation and is currently wholly owned by three Maine residents. Record ¶¶ 3–5. High Street states that it would purchase all of the equity in Wellness Connection if the Dispensary Residency Requirement did not prohibit it from doing so.

The Plaintiffs sued the Department—which is responsible for implementing, administrating, and enforcing the Act—and Kirsten Figueroa, who is the

---

[2]       A "dispensary" is defined as "an entity registered under section 2425-A that acquires, possesses, cultivates, manufactures, delivers, transfers, transports, sells, supplies or dispenses marijuana plants or harvested marijuana or related supplies and educational materials to qualifying patients and the caregivers of those patients." 22 M.R.S.A. § 2422(6).

3

Commissioner of DAFS. *See* Record ¶¶ 7–8. The Plaintiffs allege that the Dispensary Residency Requirement violates the dormant Commerce Clause because it explicitly discriminates against residents of other states and Maine cannot show a legitimate local purpose for the requirement.

United Cannabis Patients and Caregivers of Maine ("**United Cannabis**") intervened in this case. (ECF Nos. 11, 16.) United Cannabis opposes the Plaintiffs' motion for judgment and partially opposes the Defendants' motion. *See* ECF Nos. 20, 22.

## LEGAL STANDARD

The Commerce Clause empowers Congress "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3; *see also Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337 (2008). Although the Commerce Clause only contains an affirmative grant of power, "[o]ver time, courts have found a negative aspect embedded in this language—an aspect that prevents state and local governments from impeding the free flow of goods from one state to another." *Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178, 184 (1st Cir. 1999). This "dormant Commerce Clause" prohibits "protectionist state regulation designed to benefit in-state economic interests by burdening out-of-state competitors." *Wine & Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 10 (1st Cir. 2007) (internal quotations omitted); *see also Davis*, 553 U.S. at 337–38. The dormant Commerce Clause is intended "to effectuate the Framers' purpose to prevent a State from retreating into the economic isolation . . . that had plagued relations among the Colonies and later

4

among the States under the Articles of Confederation." *Davis*, 553 U.S. at 337–38 (internal quotations and citations omitted and alterations adopted).

To this end, a state or local law that "discriminates on its face against interstate commerce, whether in purpose or effect, demands heightened scrutiny." *Wine & Spirits Retailers*, 481 F.3d at 10. I must invalidate such a law "unless it furthers a legitimate local objective that cannot be served by reasonable non-discriminatory means."[3] *Id.* at 10–11; *see also Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2461 (2019) ("[A] state law [that] discriminates against out-of-state goods or nonresident economic actors . . . can be sustained only on a showing that it is narrowly tailored to advance a legitimate local purpose.") (internal quotations omitted and alterations adopted). The plaintiff bears the initial burden of showing discrimination, but the state or local government bears the burden of identifying legitimate local purposes and establishing a lack of non-discriminatory alternatives. *Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 9 (1st Cir. 2010).

Importantly, congressional action can alter the application of the dormant Commerce Clause. As the Supreme Court recently stated, "[d]ormant Commerce Clause restrictions apply only when Congress has not exercised its Commerce Clause power to regulate the matter at issue." *Tenn. Wine & Spirits Retailers Ass'n*, 139 S. Ct. at 2465. Thus, Congress "may use its powers under the Commerce Clause to

---

[3]     Statutes that "regulate[ ] evenhandedly and ha[ve] only incidental effects on interstate commerce engender[ ] a lower level of scrutiny." *Wine & Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 11 (1st Cir. 2007) (internal quotations omitted). Such statutes "will stand 'unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.' " *Id.* (alteration in original) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

'[confer] upon the States an ability to restrict the flow of interstate commerce that they would not otherwise enjoy.' " *New England Power Co. v. New Hampshire*, 455 U.S. 331, 340 (1982) (alteration in original) (quoting *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 44 (1980)). The standard for finding such congressional consent is "high," and the state has the burden of demonstrating Congress's "unmistakably clear intent to allow otherwise discriminatory regulations." *United Egg Producers v. Dep't of Agric. of P.R.*, 77 F.3d 567, 570 (1st Cir. 1996); *see also Maine v. Taylor*, 477 U.S. 131, 138–39 (1986) ("[B]ecause of the important role the Commerce Clause plays in protecting the free flow of interstate trade, this Court has exempted state statutes from the implied limitations of the Clause only when the congressional direction to do so has been 'unmistakably clear.' "); *Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 430–32 (3d Cir. 2011).

## DISCUSSION

### I.  Claims Against the Department

As a threshold issue, the Defendants assert that the Department is immune from suit under the Eleventh Amendment because it is an "arm of the state." Defs.' Mot. 2, 15–17. The Plaintiffs did not respond to this argument in their opposition brief.[4]

---

[4]     The Intervenor opposed the Defendants' motion for judgment, but their opposition focuses solely on whether the claims against *Commissioner Figueroa* are barred by the Eleventh Amendment. *See* Intervenor's Opp'n to Defs.' Cross-Mot. for J. on the Record 1–2 (ECF No. 22). The Defendants' motion, however, only argues that the *Department* is immune from suit.

I agree that the Department is shielded from suit in federal court. "Long interpreted as an affirmation of state sovereign immunity," the Eleventh Amendment bars individuals—regardless of their citizenship—from bringing a federal court action against a state, "including instrumentalities of the state, such as state agencies." *Town of Barnstable v. O'Connor*, 786 F.3d 130, 138 (1st Cir. 2015) (quotations and citations omitted); *see also PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244, 2258 (2021). By statute, the Department "is established as the principal fiscal department of State Government." 5 M.R.S.A. § 281. It is responsible for "coordinat[ing] financial planning and programming activities of departments and agencies of the State Government for review and action." *Id.* Like other Maine agencies, the Department is not "independent and separate," but rather is an arm of the State shielded by the Eleventh Amendment from suit in federal court. *See Abdisamad v. City of Lewiston*, No. 2:19-CV-00175-LEW, 2019 WL 2552194, at *2 (D. Me. June 20, 2019) (quoting *Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & the Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 63 (1st Cir. 2003)) (holding that the Maine Department of Agriculture, Conservation and Forestry is an arm of the State); *United Cannabis Patients & Caregivers of Me. v. Me. Dep't of Admin. & Fin. Servs.*, No. 1:20-cv-00388-NT, 2021 WL 1581767, at *5 (D. Me. Apr. 22, 2021). No party argues that the State has consented to suit against the Department in this context or that the State's sovereign immunity has otherwise been abrogated. I conclude that the Plaintiffs' claims against the Department must fail.

In addition to claims against the Department, the Plaintiffs seek injunctive relief against the Commissioner. The State does not contend that these claims are barred by sovereign immunity, *see Ex parte Young*, 209 U.S. 123, 159–60 (1908); *O'Connor*, 786 F.3d at 138–39, so I go on to address the merits of the Plaintiffs' claims against the Commissioner.

## II.    Claims Against the Commissioner

This case raises a novel question, and it involves a unique scenario in the Commerce Clause realm. The Controlled Substances Act ("**CSA**") makes it unlawful under federal law "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841. Marijuana is classified as a Schedule I drug under the CSA. 21 U.S.C. § 812(c)(Schedule I)(c)(10). Although Congress has barred the Department of Justice from using funds "to prevent any [state] from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana," *see* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260 § 531, 134 Stat. 1182, 128283 (2020) ("**Rohrabacher-Farr Amendment**"), Congress has not amended the CSA to legalize marijuana for either medical or recreational use. And the Supreme Court has held that the CSA is a valid exercise of Congress's Commerce Clause power, even where it criminalizes the cultivation and possession of marijuana for personal use. *Gonzales v. Raich*, 545 U.S. 1, 22 (2005). What this means, then, is that the federal government could prosecute various actors in Maine's medical marijuana industry at any time.

Against this backdrop, the Plaintiffs recite traditional arguments about the dormant Commerce Clause. They assert that the Dispensary Residency Requirement violates the dormant Commerce Clause because it plainly favors Maine residents over residents of other states. Noting that Maine's medical marijuana industry is booming, Pl.'s Mot. 3, the Plaintiffs argue that the requirement "reserves . . . enormous economic opportunities . . . for long-term residents," excluding non-residents from participating in "the largest and most lucrative type of medical marijuana business[ ] in Maine," Pls.' Mot. 7–8. And the Plaintiffs emphasize that the requirement "facially discriminates against non-residents" and thus is "virtually per se invalid." Pl.'s Mot. 8 (quoting *Camps Newfound/Owatonna v. Town of Harrison*, 520 U.S. 564, 575 (1997)).

The Defendants and Intervenor emphasize the unique context of *this* dormant Commerce Clause challenge. At oral argument, the Defendants pointed out that, at its core, the dormant Commerce Clause is not about protecting individual rights but rather about preserving a national market and prohibiting state laws that interfere with that national market. The Defendants do not argue that there is any justification for the Dispensary Residency Requirement that could overcome a constitutional challenge. Rather, they argue that Congress has eliminated the national market for marijuana and thus there is no national market with which Maine can interfere.[5]

---

[5]     The Defendants contend that the Supreme Court's decision in *General Motors Corp. v. Tracy* "provides a roadmap . . . and confirms that the dormant Commerce Clause should not be applied to a state market without considering the doctrine's inherent purpose." Defs.' Mot. 8 (citing 519 U.S. 278 (1997)). More specifically, the Defendants argue that, because the dormant Commerce Clause's "fundamental objective is preserving a national market for competition," Defs.' Mot. 9 (quoting *Tracy*, 519 U.S. at 299), there can be "nothing left for the dormant Commerce Clause to protect" where "Congress has eliminated [that] market," *id.*

Defs.' Mot. 4, 6–7. In other words, the Defendants argue that, "[i]n the most 'active' way imaginable, Congress has flexed its Commerce Clause powers and placed marijuana proprietors on notice that they enjoy no federal protections in the interstate market—because there is no such market."[6] Defs.' Mot. 9–10. And thus, the Defendants contend, the Dispensary Residency Requirement does not violate the dormant Commerce Clause.[7]

The Defendants' argument is not without logic, but I see several issues with it. First, the notion that the medical marijuana industry in Maine is wholly intrastate does not square with reality. Maine does not prevent qualified nonresidents from purchasing marijuana for medical use at Maine facilities, *see* 22 M.R.S.A. § 2423-D.

---

I agree that the dormant Commerce Clause's purpose is important, but I find *Tracy* to be distinguishable. In that case, the Supreme Court upheld a state law that taxed out-of-state natural gas marketers differently from state-regulated natural gas utilities. 519 U.S. at 293, 299. After a detailed review of the development of the natural gas retail market, the Court held that these two entities were not comparable for dormant Commerce Clause purposes because the requirements placed on local suppliers meant that they were essentially providing a different, bundled product. *Id.* at 297–98. With different products, the Court explained, "there is a threshold question whether the companies are indeed similarly situated for constitutional purposes" because a "difference in products may mean that the different entities serve different markets, and would continue to do so even if the supposedly discriminatory burden were removed." *Id.* at 299. In other words, eliminating the "regulatory differential [may] not serve the dormant Commerce Clause's fundamental objective." *Id.* Here, the Plaintiffs are trying to break into Maine's existing medical marijuana market and compete directly with resident-owned entities. There is no indication that they would be providing a fundamentally different product. Given the reality that an interstate market for medical marijuana does seem to exist despite the Controlled Substances Act ("**CSA**"), eliminating the Dispensary Residency Requirement *would* serve the dormant Commerce Clause's fundamental objective by "preserving a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *Id.*

[6]  At oral argument, the Defendants added that, from a practical stand point, it would not make sense for Congress to criminalize the interstate market while also offering parameters that would permit it—such as by making it expressly clear that states can treat resident and nonresident actors differently.

[7]  The Intervenor took a slightly different approach. It contends that there is nothing "dormant" about Congress's Commerce Clause power in this context where Congress "has exercised its affirmative Commerce Clause powers to exclude marijuana from any national market of interstate commerce." Intervenor's Opp'n to Pls.' Mot. for J. on the Record 6 (ECF No. 20).

10

Nor does Maine seem to prohibit nonresidents who purchase marijuana here from taking it home with them. And Maine appears to allow nonresidents to participate in some aspects of the medical marijuana market.[8] *See, e.g.,* 22 M.R.S.A. § 2423-F (law governing marijuana extraction facilities not limited to residents).

Second, the Defendants have the burden of showing Congress's "unmistakably clear intent to allow otherwise discriminatory regulations." *United Egg Producers*, 77 F.3d at 570. The CSA says nothing about eliminating a national market, but merely criminalizes various acts of possession, manufacture, and distribution of controlled substances.[9] The Rohrabacher-Farr Amendment further muddies the question of congressional intent.

Finally, the Defendants cite no authority for their position. Instead, in apparently all cases where federal courts have confronted dormant Commerce Clause challenges to state or local laws that favor residents in the recreational or medical marijuana context, the courts have held that such laws are likely unconstitutional.[10]

---

[8]   In addition, because the Defendants have declined to enforce the residency requirement for adult-use marijuana licenses after a legal challenge, *see* Stipulation of Dismissal, *NPG, LLC, et al. v. Dep't of Admin. and Fin. Servs., et al.*, No. 1:20-cv-00107-NT (May 11, 2020) (ECF No. 9), nonresidents are currently able to participate in that market too.

[9]   The Defendants argue that the CSA made marijuana contraband. But, as with their argument regarding Congress's "eliminat[ion]" of the marijuana market, they cite no authority holding that a product that is contraband under federal law but a valuable commodity under state law is outside the scope of the dormant Commerce Clause.

[10]   One court recently reached a different resolution. In *Original Investments, LLC v. Oklahoma*, the district court dismissed the plaintiff's dormant Commerce Clause challenge to an Oklahoma statute that prohibits nonresidents from obtaining medical marijuana business licenses and from owning more than 25 percent of any such licensed entity. Case No. CIV-20-820-F, 2021 WL 2295514 (W.D. Okla. June 4, 2021). Sidestepping the dormant Commerce Clause issue, the court held that it should not use its equitable power to facilitate conduct—namely enabling nonresidents to obtain licenses to sell medical marijuana—that is illegal under federal law. *See id.* at *3.

11

ADDENDUM 011

*See Toigo v. Dept. of Health and Senior Servs.*, No. 2:20-cv-04243-NKL (W.D. Mo. June 21, 2021) (ECF No. 25) (granting preliminary injunction enjoining state agency from restricting medical marijuana licenses to businesses that are majority-owned by persons who have been residents for more than one year because such a requirement was discriminatory on its face); *Lowe v. City of Detroit*, No. 21-CV-10709, 2021 WL 2471476 (E.D. Mich. June 17, 2021) (granting motion for preliminary injunction and holding that city ordinance that granted preferential treatment to long-time residents in awarding licenses was a form of economic protectionism that violated the dormant Commerce Clause); *NPG, LLC v. City of Portland*, No. 2:20-cv-00208-NT, 2020 WL 4741913 (D. Me. Aug. 14, 2020).

These courts recognized that the law or ordinance at issue was "the sort of economic protectionism that the Supreme Court has long prohibited." *See Lowe*, 2021 WL 2471476, at *9 (citing *Davis*, 553 U.S. at 337–38). In those cases, as here, the defendants had not shown "unmistakably clear" intent from Congress to authorize states to discriminate in this way.[11] *See United Egg Producers*, 77 F.3d at 570; *see also South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87–88, 91–92 (1984) (explaining that the "requirement that Congress affirmatively contemplate otherwise invalid state legislation is mandated by the policies underlying dormant Commerce Clause doctrine"). I have no authority to invent such an affirmative grant where

---

[11]     Although the CSA criminalizes marijuana, it does not affirmatively grant states the power to "burden interstate commerce 'in a manner which would otherwise not be permissible.'" *New England Power Co. v. New Hampshire*, 455 U.S. 331, 341 (1982) (quoting *S. Pac. Co. v. Arizona*, 325 U.S. 761, 769 (1945)).

Congress has not provided it. *See New England Power Co.*, 455 U.S. at 343 ("[W]hen Congress has not expressly stated its intent and policy to sustain state legislation from attack under the Commerce Clause, . . . [courts] have no authority to rewrite its legislation based on mere speculation as to what Congress probably had in mind." (internal quotations and citations omitted)).

I recognize that none of the courts that have confronted this specific constitutional issue have rendered final judgments, and it also seems that no circuit court has addressed it. But given the Supreme Court's and First Circuit's unmistakable antagonism towards state laws that explicitly discriminate against nonresident economic actors, I conclude that the Dispensary Residency Requirement violates the dormant Commerce Clause.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Plaintiffs' motion for judgment on the stipulated record as to Defendant Figueroa, **DISMISSES** the claims against Defendant DAFS, and **DENIES** the Defendants' motion for judgment on the stipulated record. The Commissioner shall be enjoined from enforcing the Dispensary Residency Requirement.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 11th day of August, 2021.

13

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| NORTHEAST PATIENTS GROUP, et al., | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | CIVIL NO. 1:20-cv-00468-NT |
| | ) | |
| MAINE DEPARTMENT OF | ) | |
| ADMINISTRATIVE AND FINANCIAL | ) | |
| SERVICES, et al., | ) | |
| Defendants | ) | |

JUDGMENT

In accordance with the Order on Cross-Motions to Dismiss, issued on August 11, 2021 by U.S. District Judge Nancy Torresen,

Judgment is hereby entered for the Plaintiffs, Northeast Patients Group and High Street Capital Partners LLC, against Defendant Kirsten Figueroa, enjoining the Commissioner from enforcing the Dispensary Residency Requirement.

JUDGMENT OF DISMISSAL is hereby entered as to Defendant Maine Department of Administrative and Financial Services.

Christa K. Berry
Clerk of Court


By:   /s/ Melody Dalphonse
Melody Dalphonse
Deputy Clerk

Dated: August 13, 2021



**U.S. Department of Justice**

Office of the Deputy Attorney General

_____

The Deputy Attorney General                    *Washington, D.C. 20530*

August 29, 2013


MEMORANDUM FOR ALL UNITED STATES ATTORNEYS

FROM:       James M. Cole
            Deputy Attorney General

SUBJECT:    Guidance Regarding Marijuana Enforcement


In October 2009 and June 2011, the Department issued guidance to federal prosecutors concerning marijuana enforcement under the Controlled Substances Act (CSA). This memorandum updates that guidance in light of state ballot initiatives that legalize under state law the possession of small amounts of marijuana and provide for the regulation of marijuana production, processing, and sale. The guidance set forth herein applies to all federal enforcement activity, including civil enforcement and criminal investigations and prosecutions, concerning marijuana in all states.

As the Department noted in its previous guidance, Congress has determined that marijuana is a dangerous drug and that the illegal distribution and sale of marijuana is a serious crime that provides a significant source of revenue to large-scale criminal enterprises, gangs, and cartels. The Department of Justice is committed to enforcement of the CSA consistent with those determinations. The Department is also committed to using its limited investigative and prosecutorial resources to address the most significant threats in the most effective, consistent, and rational way. In furtherance of those objectives, as several states enacted laws relating to the use of marijuana for medical purposes, the Department in recent years has focused its efforts on certain enforcement priorities that are particularly important to the federal government:

- Preventing the distribution of marijuana to minors;
- Preventing revenue from the sale of marijuana from going to criminal enterprises, gangs, and cartels;
- Preventing the diversion of marijuana from states where it is legal under state law in some form to other states;
- Preventing state-authorized marijuana activity from being used as a cover or pretext for the trafficking of other illegal drugs or other illegal activity;

Memorandum for All United States Attorneys                                    Page 2
Subject:  Guidance Regarding Marijuana Enforcement

- Preventing violence and the use of firearms in the cultivation and distribution of
  marijuana;
- Preventing drugged driving and the exacerbation of other adverse public health
  consequences associated with marijuana use;
- Preventing the growing of marijuana on public lands and the attendant public safety and
  environmental dangers posed by marijuana production on public lands; and
- Preventing marijuana possession or use on federal property.

These priorities will continue to guide the Department's enforcement of the CSA against
marijuana-related conduct.  Thus, this memorandum serves as guidance to Department attorneys
and law enforcement to focus their enforcement resources and efforts, including prosecution, on
persons or organizations whose conduct interferes with any one or more of these priorities,
regardless of state law.[1]

Outside of these enforcement priorities, the federal government has traditionally relied on
states and local law enforcement agencies to address marijuana activity through enforcement of
their own narcotics laws.  For example, the Department of Justice has not historically devoted
resources to prosecuting individuals whose conduct is limited to possession of small amounts of
marijuana for personal use on private property.  Instead, the Department has left such lower-level
or localized activity to state and local authorities and has stepped in to enforce the CSA only
when the use, possession, cultivation, or distribution of marijuana has threatened to cause one of
the harms identified above.

The enactment of state laws that endeavor to authorize marijuana production,
distribution, and possession by establishing a regulatory scheme for these purposes affects this
traditional joint federal-state approach to narcotics enforcement.  The Department's guidance in
this memorandum rests on its expectation that states and local governments that have enacted
laws authorizing marijuana-related conduct will implement strong and effective regulatory and
enforcement systems that will address the threat those state laws could pose to public safety,
public health, and other law enforcement interests.  A system adequate to that task must not only
contain robust controls and procedures on paper; it must also be effective in practice.
Jurisdictions that have implemented systems that provide for regulation of marijuana activity

---

[1] These enforcement priorities are listed in general terms; each encompasses a variety of conduct
that may merit civil or criminal enforcement of the CSA.  By way of example only, the
Department's interest in preventing the distribution of marijuana to minors would call for
enforcement not just when an individual or entity sells or transfers marijuana to a minor, but also
when marijuana trafficking takes place near an area associated with minors; when marijuana or
marijuana-infused products are marketed in a manner to appeal to minors; or when marijuana is
being diverted, directly or indirectly, and purposefully or otherwise, to minors.

must provide the necessary resources and demonstrate the willingness to enforce their laws and regulations in a manner that ensures they do not undermine federal enforcement priorities.

In jurisdictions that have enacted laws legalizing marijuana in some form and that have also implemented strong and effective regulatory and enforcement systems to control the cultivation, distribution, sale, and possession of marijuana, conduct in compliance with those laws and regulations is less likely to threaten the federal priorities set forth above.  Indeed, a robust system may affirmatively address those priorities by, for example, implementing effective measures to prevent diversion of marijuana outside of the regulated system and to other states, prohibiting access to marijuana by minors, and replacing an illicit marijuana trade that funds criminal enterprises with a tightly regulated market in which revenues are tracked and accounted for.  In those circumstances, consistent with the traditional allocation of federal-state efforts in this area, enforcement of state law by state and local law enforcement and regulatory bodies should remain the primary means of addressing marijuana-related activity.  If state enforcement efforts are not sufficiently robust to protect against the harms set forth above, the federal government may seek to challenge the regulatory structure itself in addition to continuing to bring individual enforcement actions, including criminal prosecutions, focused on those harms.

The Department's previous memoranda specifically addressed the exercise of prosecutorial discretion in states with laws authorizing marijuana cultivation and distribution for medical use.  In those contexts, the Department advised that it likely was not an efficient use of federal resources to focus enforcement efforts on seriously ill individuals, or on their individual caregivers.  In doing so, the previous guidance drew a distinction between the seriously ill and their caregivers, on the one hand, and large-scale, for-profit commercial enterprises, on the other, and advised that the latter continued to be appropriate targets for federal enforcement and prosecution.  In drawing this distinction, the Department relied on the common-sense judgment that the size of a marijuana operation was a reasonable proxy for assessing whether marijuana trafficking implicates the federal enforcement priorities set forth above.

As explained above, however, both the existence of a strong and effective state regulatory system, and an operation's compliance with such a system, may allay the threat that an operation's size poses to federal enforcement interests.  Accordingly, in exercising prosecutorial discretion, prosecutors should not consider the size or commercial nature of a marijuana operation alone as a proxy for assessing whether marijuana trafficking implicates the Department's enforcement priorities listed above.  Rather, prosecutors should continue to review marijuana cases on a case-by-case basis and weigh all available information and evidence, including, but not limited to, whether the operation is demonstrably in compliance with a strong and effective state regulatory system.  A marijuana operation's large scale or for-profit nature may be a relevant consideration for assessing the extent to which it undermines a particular federal enforcement priority.  The primary question in all cases – and in all jurisdictions – should be whether the conduct at issue implicates one or more of the enforcement priorities listed above.

Memorandum for All United States Attorneys                                Page 4
Subject: Guidance Regarding Marijuana Enforcement

       As with the Department's previous statements on this subject, this memorandum is intended solely as a guide to the exercise of investigative and prosecutorial discretion. This memorandum does not alter in any way the Department's authority to enforce federal law, including federal laws relating to marijuana, regardless of state law. Neither the guidance herein nor any state or local law provides a legal defense to a violation of federal law, including any civil or criminal violation of the CSA. Even in jurisdictions with strong and effective regulatory systems, evidence that particular conduct threatens federal priorities will subject that person or entity to federal enforcement action, based on the circumstances. This memorandum is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. It applies prospectively to the exercise of prosecutorial discretion in future cases and does not provide defendants or subjects of enforcement action with a basis for reconsideration of any pending civil action or criminal prosecution. Finally, nothing herein precludes investigation or prosecution, even in the absence of any one of the factors listed above, in particular circumstances where investigation and prosecution otherwise serves an important federal interest.

cc:   Mythili Raman
      Acting Assistant Attorney General, Criminal Division

      Loretta E. Lynch
      United States Attorney
      Eastern District of New York
      Chair, Attorney General's Advisory Committee

      Michele M. Leonhart
      Administrator
      Drug Enforcement Administration

      H. Marshall Jarrett
      Director
      Executive Office for United States Attorneys

      Ronald T. Hosko
      Assistant Director
      Criminal Investigative Division
      Federal Bureau of Investigation