1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

TODD BRINKMEYER,

                Petitioner,

    v.

WASHINGTON STATE LIQUOR AND
CANNABIS BOARD,

                Respondents.

CASE NO. C20-5661 BHS

ORDER GRANTING
DEFENDANT'S CROSS MOTION
FOR SUMMARY JUDGMENT

This matter comes before the Court on Petitioner Todd Brinkmeyer and

Respondent Washington State Liquor and Cannabis Board's ("LCB") cross Motions for

Summary Judgment, Dkts. 34 (Petitioner), 39 (Respondent). Brinkmeyer seeks a

declaratory judgment that Washington's residency requirements for obtaining a

commercial cannabis[1] license are facially unconstitutional. LCB argues that Brinkmeyer

---

[1] For clarity and consistency, the Court generally refers to the substance at issue as
"cannabis" rather than "marijuana" except when marijuana is the more accurate term.
Washington's residency requirements apply to "cannabis." As the Court understands it, cannabis
is the broader term, encompassing products that contain both high and low amounts of
tetrahydrocannabinol ("THC"). Both marijuana and THC, aside from THC in hemp, are illegal
under federal law. *See* 21 U.S.C. § 812, Schedule I. Nevertheless, the terms are often used
interchangeably, and to the extent quoted or referenced sources use the term marijuana, the Court
considers them to be interchangeable for the purposes of this order.

lacks standing and that his claims fail on the merits, primarily because cannabis remains

federally illegal. The Court has considered the briefing filed in support of and in

opposition to the motions and the remainder of the file and grants LCB's motion for the

reasons stated below.

## I.   FACTUAL BACKGROUND

The citizens of Washington State enacted Initiative Measure 502 in 2012,

legalizing the possession and sale of cannabis in the state for those twenty-one years of

age and older. Dkt. 34 at 7. Washington and Colorado were the first states to pass such

initiatives. Nineteen more states, two territories, and Washington, D.C., have since

legalized recreational cannabis;[2] sixteen other states and two additional territories have

comprehensive medicinal cannabis programs;[3] and ten states have cannabidiol ("CBD")

or low THC programs.[4] Cannabis remains fully illegal in only three states and one

territory.[5] Nevertheless, cannabis continues to be federally illegal under the Controlled

Substances Act ("CSA"). *See* 21 U.S.C. § 812, Schedule I.

---

[2] The states and territories that allow adult non-medical cannabis use are Alaska, Arizona, California, Colorado, Connecticut, District of Columbia, Guam, Illinois, Maine, Maryland, Massachusetts, Michigan, Missouri, Montana, Nevada, New Jersey, New Mexico, New York, Northern Mariana Islands, Oregon, Rhode Island, Vermont, Virginia, and Washington. National Conference of State Legislatures, *State Medical Cannabis Laws*, https://www.ncsl.org/research/health/state-medical-marijuana-laws.aspx (last updated Nov. 9, 2022).

[3] Those states and territories are Alabama, Arkansas, Delaware, Florida, Hawaii, Louisiana, Minnesota, Mississippi, New Hampshire, North Dakota, Ohio, Oklahoma, Pennsylvania, Puerto Rico, South Dakota, U.S. Virgin Islands, Utah, and West Virginia. *Id.*

[4] Those states are Georgia, Indiana, Iowa, Kentucky, North Carolina, South Carolina, Tennessee, Texas, Wisconsin, and Wyoming. *Id.*

[5] Those states and territories are American Samoa, Idaho, Kansas, and Nebraska. *Id.*

Despite marijuana's federal status, the federal government has maintained a policy of non-enforcement in states that have legalized marijuana for nearly a decade. In August 2013, Deputy Attorney General James M. Cole issued a memorandum to all United States Attorneys (the "Cole Memo") encouraging them to exercise prosecutorial discretion in enforcing federal marijuana laws in states where it had been legalized. Attorney General Jeff Sessions rescinded the Cole Memo in 2018. Nevertheless, in each fiscal year since fiscal year 2015, Congress has prohibited the Department of Justice ("DOJ") from using its appropriated funds to take legal action against states that have implemented laws legalizing medicinal marijuana. *See* Consolidated Appropriations Act of 2022, Pub. L. No. 117-103, 136 Stat. 49, § 530 (2022) ("Rohrabacher-Farr Amendment"). That spending rider has also been interpreted to prohibit the DOJ from prosecuting individuals or organizations that produce, distribute, or possess marijuana in compliance with their state's medical marijuana laws.

Washington, like other states that have legalized cannabis, has a comprehensive regulatory scheme that governs the market. Washington's cannabis market is regulated by LCB. Before an individual or organization can operate a legal cannabis business, they must obtain a license from LCB. Under Washington law,

> No license of any kind may be issued to:
> (i) A person under the age of twenty-one years;
> (ii) A person doing business as a sole proprietor *who has not lawfully resided in the state for at least six months prior to applying to receive a license*;
> (iii) A partnership, employee cooperative, association, nonprofit corporation, or corporation unless formed under the laws of this state, and unless all of the members thereof are qualified to obtain a license as provided in this section; or

1        (iv) A person whose place of business is conducted by a manager or agent,
     unless the manager or agent possesses the same qualifications required of
2    the licensee.

3    RCW 69.50.331(1)(b) (emphasis added). This "residency requirement" applies to all

4    cannabis license applicants, not just sole proprietors, including all "true parties of

5    interest." *See* WAC 314-55-020(11), 314-55-035.

6        Petitioner Todd Brinkmeyer is an Idaho resident who wishes to invest in and own

7    cannabis retail stores in Washington. Dkt. 34 at 6. His friend, Scott Atkison, owns

8    cannabis retail stores in the state. *Id.* Brinkmeyer has provided debt financing for

9    Atkison's stores, but he is unable to directly invest in or hold ownership interest in the

10   stores because of Washington's residency requirements. *Id.* Atkison would also like

11   Brinkmeyer to invest in and own part of his business. *Id.*; *see also* Dkt. 35, ¶ 5. Atkison is

12   a Stage IV cancer survivor and claims he would like to make arrangements for his

13   business in case his health declines. Dkt. 34 at 6; Dkt. 35, ¶ 5. He claims, that "if the

14   State is enjoined from enforcing the Residency Requirements . . . and if the LCB

15   approves Todd's application related to the transaction, [he would] immediately transfer a

16   portion of [his] interest in the [business] to Todd." Dkt. 35, ¶ 6. Atkison asserts that

17   "[t]he only thing stopping Todd and [him] from moving forward with the

18   transactions . . . is that the LCB has confirmed it will rely on the Residency Requirements

19   to deny Todd's application to hold equity in the [business.]" *Id.*

20       Brinkmeyer has never applied for a cannabis license, but LCB has approved him

21   as a debt financier three times, which Brinkmeyer asserts involves "the same vetting and

22   approval process that [LCB] performs on licensees." Dkt. 34 at 10. Debt financiers,

however, are not subject to the State's residency requirements. *Id.* Brinkmeyer's counsel inquired with LCB whether it would approve Brinkmeyer as an owner of Atkison's stores and LCB made clear that Brinkmeyer could not inherit Atkison's businesses until he complied with the residency requirements. Dkt. 37 at 5.

## II.    PROCEDURAL HISTORY

Brinkmeyer sued LCB in Thurston County Superior Court in June 2020 seeking a declaratory judgment that Washington's residency requirements violate the dormant Commerce Clause, Article IV's Privileges and Immunities Clause, the Fourteenth Amendment's Privileges or Immunities Clause, the Fourteenth Amendment's Due Process Clause, and the Fourteenth Amendment's Equal Protection Clause of the United States Constitution. Dkt. 1-2, ¶¶ 30–57. He also sought a declaratory judgment that Washington's residency requirements violate the Privileges or Immunities Clause of the Washington State Constitution and that the regulations exceed statutory authority in violation of RCW 34.05.570(2)(c). *Id.* ¶¶ 58–65. He further sought a permanent injunction, preventing LCB from enforcing Washington's residency requirements along with fees and costs. *Id.* at 10. LCB removed the case to this Court in July 2020. Dkt. 1.

Brinkmeyer moved for a preliminary injunction. Dkt. 6. Rather than ruling on the motion, this Court ordered the parties to show cause why the Court has jurisdiction over Brinkmeyer's claims. Dkt. 17. The Court "question[ed] its authority to declare [the] state law unconstitutional," which it reasoned would allow Brinkmeyer "to participate in violations of the CSA." *Id.* at 2. The parties agreed that the Court has subject matter

jurisdiction and that granting relief in this case would not require the Court to order a violation of the CSA. Dkts. 18, 19.

Satisfied that it had jurisdiction, the Court invoked *Pullman* abstention, reasoning that the case touched on a sensitive area of public policy, that federal constitutional questions could be avoided with a definitive ruling on the state issues, and that state laws on the issue were unclear. Dkt. 20. It therefore severed Brinkmeyer's state law claims, remanded those claims case to Thurston County Superior Court, and administratively closed the case pending resolution of the state law claims. *Id.*

Thurston County Superior Court concluded that Brinkmeyer is not a Washington citizen and therefore Article I, Section 12, of the Washington Constitution—the Privileges and Immunities Clause—did not apply to him. Dkt. 24-6 at 3. It dismissed Brinkmeyer's state law claims with prejudice and Brinkmeyer did not appeal. Dkt. 23 at 1.

This Court reinstated the case and the parties filed cross-motions for summary judgment. Dkts. 34, 39. The parties agree that there are no disputed issues of material fact and that therefore the case should be decided on summary judgment.

Brinkmeyer argues, generally, that the state's residency requirements are unconstitutional because they discriminate, without justification, against out-of-state citizens. Dkt. 34 at 6–7. LCB argues that Brinkmeyer's claims are not justiciable because he has not suffered an injury-in-fact and his claims are not ripe. Dkt. 39 at 8. It further argues that at least parts of the United States Constitution do not apply to the state's cannabis market because no federally legal market exists and that, even if the

Constitution does apply, the state is justified in restricting the market to in-state citizens given the fact that cannabis remains federally illegal. *Id.* The parties' arguments are discussed in further detail below.

The Court also permitted Amici Craft Cannabis Coalition and Washington CannaBusiness Association to file briefing. Amici urge the Court to adopt and apply a four-part test to determine whether a federal right may be enforced in the context of illegal activity. Dkt. 49 at 11–16. Specifically, they argue that the Court should consider (1) "the extent of the illegality of the activity," (2) "the purposes of the federal right to be enforced," (3) "whether the court can award a remedy that does not compel or authorize illegal activity," and (4) "the public interests at stake." *Id.* at 11. According to Amici, these factors support Brinkmeyer's claim that the residency requirements are unconstitutional. *Id.*

### III.  THE LEGAL LANDSCAPE

This case presents several unique questions that arise only because cannabis remains federally illegal under the CSA but legal in the State of Washington. It is further complicated by the fact that the federal legislature has limited DOJ's ability to enforce federal cannabis law. While it is an issue of first impression in this district, several federal courts across the country have confronted these novel questions and it is helpful to start with an explanation of those decisions.

The Supreme Court's most recent dormant Commerce Clause case, *Tennessee Wine & Spirits Retailers Association v. Thomas*, 139 S. Ct. 2449, 2461 (2019), mirrors this case in many ways. There, the Court considered Tennessee's residency requirements

1  for individuals or companies seeking to operate retail liquor stores. *Id.* at 2546. Tennessee

2  required license applicants to have resided in the state for at least the prior two years,

3  among other requirements. *Id.* at 2457. The Court held that the residency requirements

4  violated the dormant Commerce Clause. *Id.* at 2476. The residency requirements at issue

5  in *Tennessee Wine* are similar to those at issue in this case. The main difference is that

6  cannabis, unlike alcohol, remains illegal under federal law.

7          Following *Tennessee Wine*, many federal courts have considered states' cannabis

8  licensing residency requirements. The majority of federal district courts to consider the

9  issue have held that the dormant Commerce Clause applies and that their states'

10 respective residency requirements violate it or likely violate it. *See, e.g.*, *NPG, LLC v.*

11 *City of Portland, Me.*, No. 2:20-cv-00208-NT, 2020 WL 4741913, at *8–12 (D. Me. Aug.

12 14, 2020) (granting plaintiff's motion for preliminary injunction after concluding that

13 plaintiff was likely to succeed on its argument that Maine's cannabis licensing residency

14 requirements violated the dormant Commerce Clause); *Variscite NY One, Inc. v. New*

15 *York*, No. 1:22-cv-1013 (GLS/DJS), 2022 WL 17257900, at *5–9 (N.D.N.Y. Nov. 10,

16 2022) (same as to New York's cannabis licensing residency requirements); *Toigo v.*

17 *Dep't of Health and Senior Servs.*, 549 F. Supp. 3d 985, 990–96 (W.D. Mo. 2021) (same

18 as to Missouri's cannabis licensing residency requirements); *Lowe v. City of Detroit*, 544

19 F. Supp. 3d 804, 812–16 (E.D. Mich. 2021) (same as to Detroit's cannabis licensing

20 residency requirements); *Finch v. Treto*, No. 22 C 1508, 2022 WL 2073572, at *12–20

21 (N.D. Ill. June 9, 2022) (concluding plaintiff was likely to succeed on the merits of its

22 claim that Illinois' cannabis licensing residency requirements violated the dormant

Commerce Clause, but denying preliminary injunctive relief because the balance of

hardships favored defendant); *Attitude Wellness, LLC v. Vill. of Pinckney*, No. 21-cv-

12021, 2022 WL 1050305, at *2–4, *7–8 (E.D. Mich. Apr. 7, 2022) (same as *Finch* as to

the Village of Pinckney's cannabis licensing residency requirements[6]).

Similarly, the only circuit court to consider the issue held that Maine's cannabis

residency requirements violated the dormant Commerce Clause. *See Ne. Patients Grp. v.

United Cannabis Patients & Caregivers of Me.*, 45 F.4th 542 (1st Cir. 2022); *see also*

Dkt. 54. There, the First Circuit affirmed the district court's ruling that Maine's residency

requirements, which are similar to Washington's, violated the dormant Commerce Clause

of the United States Constitution. *See Ne. Patients Grp.*, 45 F.4th at 544. Notably,

Maine's residency requirements applied to only medical cannabis dispensaries.

Two federal district courts have taken different paths. In *Peridot Tree, Inc. v. City

of Sacramento*, No. 22-cv-00289-KJM-DB, 2022 WL 10629241, at *11 (E.D. Cal. Oct.

18, 2022), the district court refused to rule on the issue, invoking general abstention[7] to

allow the plaintiff to pursue its claims in state court or in an "administrative venue." It

reasoned that deciding the case would risk "disrupting California's efforts to 'establish a

coherent policy with respect to a matter of substantial public concern.' And the

---

[6] The district court in *Attitude Wellness* also dismissed the plaintiff's case because it determined that the plaintiff would objectively not qualify for a license, even absent the state's residency requirements. 2022 WL 1050305, at *10.

[7] The court acknowledged that because there was no state case pending, none of the traditional abstention doctrines applied. *Peridot Tree*, 2022 WL 10629241, at *4. The court concluded, however, that abstention is broader than the doctrines traditionally used and that it was appropriate in a case such as this. *Id.* at *4–11.

constitutional question, how to apply the Dormant Commerce Clause, is difficult. It is better to allow state courts to answer that question, as they are well-equipped to do." *Id.* (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 814–16 (1976)). *Peridot Tree* is on appeal before the Ninth Circuit. *See Peridot Tree, Inc. v. City of Sacramento*, No. 22-16783 (9th Cir. Nov. 17, 2022).

In *Original Investments, LLC v. State of Oklahoma*, 542 F. Supp. 3d 1230, 1235 (W.D. Okla. 2021), the district court dismissed the case, concluding that holding otherwise would require it to grant relief in violation of federal law. The court did seem to acknowledge, however, that if cannabis was legal, the residency requirements would likely violate the dormant Commerce Clause under *Action Wholesale Liquors v. Oklahoma Alcoholic Beverage Laws Enforcement Commission*, 463 F. Supp. 2d 1294 (W.D. Okla. 2006). *Original Invs.*, 542 F. Supp. 3d at 1237. In *Action Wholesale*, the district court struck down an Oklahoma law that allowed in-state wineries, but not out-of-state wineries, to ship wine directly to retail stores and restaurants in Oklahoma.

The parties in this case also cite various authority dealing with the interplay between cannabis law and the United States Constitution outside of the dormant Commerce Clause context. LCB submitted one of those cases as supplemental authority: *Fried v. Garland*, No. 4:22-cv-164-AW-MAF, 2022 WL 16731233 (N.D. Fla. Nov. 4, 2022). In *Fried*, plaintiffs challenged 18 U.S.C. § 922(g), a federal law that prohibits certain individuals from possessing firearms, including anyone "who is an unlawful user of or addicted to any controlled substance." *Fried*, 2022 WL 16731233, at *1. The parties in that case agreed that, under § 922(g), medical cannabis users complying with Florida

1  state law would still be considered unlawful users such that it would be a federal crime

2  for them to possess firearms. *Id.* The plaintiffs argued that such a result violated the

3  Second Amendment of the United States Constitution and the Rohrabacher-Farr

4  Amendment. *Id.* at *2. The court concluded that § 922(g) did not violate either. *Id.* at *9.

5      *Fried*'s applicability to this case is somewhat unclear, though the Court presumes

6  that LCB submitted it to combat Brinkmeyer's submission of *Northeast Patients Group*,

7  where the First Circuit relied heavily on the Rohrabacher-Farr Amendment. Indeed, the

8  *Fried* court pointed out that, regardless of the amendment, "possession of marijuana

9  remains a federal crime" and that the amendment "does not make marijuana users law-

10  abiding citizens." *Fried*, 2022 WL 16731233, at *6. In other words, the district court in

11  *Fried* concluded that the Rohrabacher-Farr Amendment did not upend the CSA and did

12  not legalize marijuana, medical or otherwise.

13      While a court in this district has never addressed this issue directly, it is worth

14  noting that this Court recently decided a case dealing with LCB and Washington's

15  cannabis licensing requirements. In *Shelton v. Liquor and Cannabis Board of the State of*

16  *Washington*, the plaintiffs alleged that LCB and the City of Seattle had deprived them of

17  their ability to participate in Washington's cannabis market. No. 21-5135, 2022 WL

18  2651617, at *2. The plaintiffs were participants in Washington's medical cannabis

19  market before it was consolidated with the recreational market. *Id.* They did not seek

20  licenses to participate in the consolidated market and were therefore unable to continue

21  operating their dispensaries. *Id.*

22

The Court dismissed the plaintiffs' claims for several reasons. But relevant to this case, the Court refused to grant the plaintiffs declaratory relief, concluding that it could not "order activity that remains federally illegal." *Id.* at *5. The remedy requested in *Shelton*, however, was somewhat different from that which Brinkmeyer seeks. In *Shelton*, the plaintiffs asked the Court to declare that LCB wrongfully revoked their licenses. *Id.* Declaring as much would have effectively ordered LCB to issue the plaintiffs licenses to sell cannabis. That is clearly a type of relief this Court cannot issue under federal law. Brinkmeyer, however, asks the Court to enjoin the state from discriminating against him, and other out-of-state residents, in its licensing application process. The parties have agreed that such relief would not require the Court to order conduct that violates federal law. *See* Dkts. 18, 19. Nonetheless, the Court acknowledges that ruling in Brinkmeyer's favor would appear to be a concession that Washington's cannabis market is a "legal" one.

## IV.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where

1   there is sufficient evidence for a reasonable factfinder to find for the nonmoving party.

2   *Anderson*, 477 U.S. at 248.

3       On cross-motions, the defendant bears the burden of showing that there is no

4   evidence which supports an element essential to the plaintiff's claim. *Celotex Corp. v.*

5   *Catrett*, 477 U.S. 317, 322 (1986). Conversely, the plaintiff "must prove each essential

6   element by undisputed facts." *McNertney v. Marshall*, No. C-91-2605-DLJ, 1994 WL

7   118276, at *2 (N.D. Cal. Mar. 4, 1994) (citing *Fontenot v. Upjohn Co.*, 780 F.2d 1190,

8   1194 (5th Cir. 1986)). Either party may defeat summary judgment by showing there is a

9   genuine issue of material fact for trial. *Id.*; *Anderson*, 477 U.S. at 250. Although the

10  parties may assert that there are no contested factual issues, this is ultimately the court's

11  responsibility to determine. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*,

12  249 F.3d 1132, 1136 (9th Cir. 2001).

13      The Court agrees there are no disputed issues of fact and that this matter can be

14  decided on the briefing.

15  **B.    Dormant Commerce Clause**

16      **1.    Brinkmeyer's Dormant Commerce Clause Claim is Justiciable.**

17      A plaintiff has standing to sue only if he presents a legitimate "case or

18  controversy," meaning the issues are "definite and concrete, not hypothetical or abstract."

19  *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000). To

20  establish Article III standing, he must show that he (1) suffered an injury in fact that is (2)

21  fairly traceable to the alleged conduct of the defendants, and that is (3) likely to be

22  redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61

1    (1992). A plaintiff who faces a threat of future injury "has standing to sue if the

2    threatened injury is certainly impending, or there is a substantial risk" that the injury will

3    occur. *In re Zappos.com, Inc.*, 888 F.3d 1020, 1024 (9th Cir. 2018) (citing *Susan B.*

4    *Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

5          "A plaintiff must demonstrate standing for each claim he or she seeks to press and

6    for each form of relief sought." *Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1139 (9th

7    Cir. 2013) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 555, 561 (1992)). At

8    summary judgment, the plaintiff "must set forth by affidavit or other evidence specific

9    facts, which for purposes of the summary judgment motion will be taken to be true."

10   *Lujan*, 504 U.S. at 561 (internal quotations omitted).

11        LCB disputes only whether Brinkmeyer has suffered an injury. It argues that

12   Brinkmeyer has not suffered an injury because he has not applied for and been denied a

13   license, nor has Atkison attempted to sell or bequeath his business to Brinkmeyer. Dkt.

14   39 at 15–17. Brinkmeyer argues that LCB has made it clear he would not qualify for a

15   license, that the only reason Atkison has not assigned the business to him is LCB's

16   residency requirements, and that he need not take a futile action to have suffered an

17   injury. Dkt. 43 at 8–14.

18        An injury in fact is "an invasion of a legally protected interest which is (a)

19   concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."

20   *Lujan*, 504 U.S. at 560 (internal quotations and citations omitted). "A concrete injury is

21   one that actually exists, meaning that it is real, and not abstract." *Safer Chems., Healthy*

22   *Fams. v. U.S. Env't Prot. Agency*, 943 F.3d 397, 411 (9th Cir. 2019) (cleaned up). This

can include both a "risk of real harm" and "intangible harms." *Id.* An injury is

particularized if it "affect[s] the plaintiff in a personal and individual way." *Spokeo, Inc.*

*v. Robins*, 578 U.S. 330, 340 (2016) (citations omitted).

"[S]tanding does not require exercises in futility." *Taniguchi v. Schultz*, 303 F.3d

950, 957 (9th Cir. 2002). Other district courts that have considered this issue have

concluded that an individual who failed to apply for a cannabis license nevertheless has

standing to challenge the state's residency requirements if that individual is "able and

ready to apply" if the requirements are removed. *Finch*, 2022 WL 2073572, at *9; *see*

*also NPG*, 2020 WL 4741913, at *5–6.

LCB asserts three main arguments why Brinkmeyer lacks standing to assert his

dormant Commerce Clause claim. First, LCB argues that Brinkmeyer failed to establish

standing in his petition and that "[s]tanding must exist at the time the complaint is filed

and through all stages of the litigation." Dkt. 39 at 15 (citing *DaimlerChrysler*, 547 U.S.

at 352). Brinkmeyer argues that, while it is true he had to have standing at the time he

filed his petition, he is permitted to supplement his pleadings with affidavits to prove

standing in response to a summary judgment motion. Dkt. 43 at 9–10.

Brinkmeyer is correct. Although a motion to dismiss tests the sufficiency of a

plaintiff's allegations, a motion for summary judgment tests the sufficiency of his

evidence. *Compare* Fed. R. Civ. P. 12(b) *with* Fed. R. Civ. P. 56. When moving for

summary judgment on standing, the defendant bears the initial burden to show there is no

evidence that supports standing. *See Anderson*, 477 U.S. at 248–50. The plaintiff must

then "set forth by affidavit or other evidence specific facts" to show that his claim is

1   justiciable. *See Lujan*, 504 U.S. at 561 (internal quotations omitted). LCB moved for

2   summary judgment and, while it may allege that Brinkmeyer lacks standing, Brinkmeyer

3   is entitled to show that his claims are justiciable through additional evidence provided in

4   response to LCB's motion.

5       LCB next argues that Brinkmeyer failed to show his injuries are "actual or

6   imminent." Dkt. 39 at 15–16. It argues that his injuries are not "certainly impending," as

7   required by the Supreme Court, because "[h]is claims rely on a 'some day' future transfer

8   of ownership upon Atkison's death." *Id.* Similarly, LCB argues that Brinkmeyer failed to

9   allege a concrete injury because his ownership interest in Atkison's cannabis business is

10  "purely speculative" and based on him outliving Atkison and Atkison keeping

11  Brinkmeyer in his will. *Id.* at 16–17. Brinkmeyer argues that the state is actively blocking

12  Atkison's transfer of ownership to Brinkmeyer by enacting and enforcing the residency

13  requirements, which Brinkmeyer claims is an injury in and of itself. Dkt. 43 at 9–11.

14  Brinkmeyer also cites to the fact that LCB already confirmed it would deny his cannabis

15  license application if he submitted one, and that Atkison intends to both immediately sell

16  and bequeath his business interests to Brinkmeyer and the transfer is thus not wholly

17  dependent on Atkison's death. *Id.* at 11–12.

18      Brinkmeyer has sufficiently alleged an injury in fact to assert his dormant

19  Commerce Clause claim. The statutes and regulations are unambiguous—as an Idaho

20  resident, Brinkmeyer does not qualify for a cannabis license in Washington. He has

21  submitted declarations and affidavits asserting that the only reason Atkison has yet to

22  sign over his business to Brinkmeyer is because of the residency requirements. He also

1    submitted an email from LCB confirming that an out-of-state resident would not be

2    eligible for a license transfer until he meets the residency requirements, even where he

3    would be taking over for a terminally ill or deceased licensee. *See* Dkt. 37. All of these

4    facts were true when Brinkmeyer first sued LCB. Requiring Brinkmeyer to apply for a

5    license would be futile—it is sufficiently clear that he does not qualify because he does

6    not reside in Washington.

7        For similar reasons, Brinkmeyer's claims are ripe. The ripeness doctrine is

8    "designed to 'prevent the courts, through avoidance of premature adjudication, from

9    entangling themselves in abstract disagreements.'" *Thomas*, 220 F.3d at 1138 (quoting

10   *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by*

11   *Califano v. Sanders*, 430 U.S. 99, 105 (1977)). The doctrine "is drawn both from Article

12   III limitations on judicial power and from prudential reasons for refusing to exercise

13   jurisdiction." *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993). It therefore

14   "contains both a constitutional and prudential component." *Thomas*, 220 F.3d at 1138

15   (internal quotation marks omitted).

16       The constitutional component of ripeness overlaps almost completely with the

17   injury-in-fact question in standing analysis. *See id.*; *see also Susan B. Anthony List*, 573

18   U.S. at 157 n.5 (explaining that Article III standing and ripeness issues can "boil down to

19   the same question"). In this case, the questions overlap. Brinkmeyer's claims are ripe for

20   precisely the same reasons that he sufficiently alleges an injury in fact—LCB is currently

21   preventing him from obtaining a license which would allow him to participate in the

22

1   state's cannabis market. He cannot take any further, non-futile action that would make his

2   injury more concrete or ripe.

3          The prudential component of ripeness involves two considerations: (1) "the fitness

4   of the issues for judicial decision" and (2) "the hardship to the parties of withholding

5   court consideration." *Thomas*, 220 F.3d at 1141 (quoting *Abbott Lab'ys*, 387 U.S. at 149).

6   Courts have ruled cases were not fit for judicial decision, for example, when a case is

7   "devoid of any factual context" or where a case involves "many unknown facts" and

8   contains a "sketchy record." *Id.* at 1142 (quoting *San Diego Cnty. Gun Rights Committee*

9   *v. Reno*, 98 F.3d 1121, 1132 (9th Cir. 1996); *American-Arab Anti-Discrimination Comm.*

10  *v. Thornburgh*, 970 F.2d 501, 510–11 (9th Cir. 1991)).

11         Brinkmeyer's case is fit for judicial decision. The factual record is clear, and while

12  Brinkmeyer has not applied for a license to sell cannabis in Washington, it is beyond

13  dispute that he would not qualify. Atkison has sworn via affidavit his desire to transfer

14  ownership of his company to Brinkmeyer and that the only thing preventing him from

15  doing so are Washington's residency requirements. *See* Dkt. 35, ¶¶ 5–6.

16         Further, Brinkmeyer would certainly suffer hardship if the Court withheld

17  consideration in this case. If Atkison were to die before the legality of the residency

18  requirements was adjudicated, Brinkmeyer could be precluded from buying or inheriting

19  Atkison's business. Moreover, he is already suffering hardship in that he is unable to

20  purchase any share of Atkison's business. LCB, on the other hand, has not argued that it

21  would suffer any hardship in having this case decided.

22

LCB also argues that Brinkmeyer lacks standing because "he does not claim injury to a legally cognizable interest" because cannabis remains federally illegal. Dkt. 39 at 17. The Court views this as a substantive argument, and LCB advances it in its dormant Commerce Clause analysis. Indeed, LCB does not cite to any law to support the idea that such a question should factor into the Court's standing analysis.

Thus, Brinkmeyer's dormant Commerce Clause claim is justiciable.

**2.      The Dormant Commerce Clause Does Not Apply to Washington's Federally Illegal Cannabis Market.**

The Commerce Clause provides that "[t]he Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Art. I, § 8, cl. 3. The Supreme Court has long held that the Commerce Clause "also prohibits state laws that unduly restrict interstate commerce." *Tenn. Wine*, 139 S. Ct. at 2459. This "negative" aspect of the Commerce Clause is known as the "dormant Commerce Clause." *Id.* Under the dormant Commerce Clause, "state statutes that clearly discriminate against interstate commerce are routinely struck down, unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 274 (1988). As recently as 2019, the Supreme Court has recognized the importance of the dormant Commerce Clause "as the primary safeguard against state protectionism." *Tenn. Wine*, 139 S. Ct. at 2461.

The Supreme Court has adopted a "two-tiered approach" to determining whether a state statute violates the dormant Commerce Clause:

> (1) When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, [the Court has] generally struck down the statute without further inquiry. (2) When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, [the Court has] examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 578–79 (1986); *see also Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 948 (9th Cir. 2013) (applying the Supreme Court's test in *Brown-Forman*). Plainly discriminatory laws fall under category one and are subject to an almost per se rule of invalidity. *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008). They may survive only if they advance "a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Id.* (internal quotation marks omitted).

Nevertheless, even with an explicitly discriminatory law, an exception applies where the law is expressly authorized by Congress. *Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 472 U.S. 159, 174 (1985) ("When Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack under the Commerce Clause."). For this exception to apply, Congress's intent must be "unmistakably clear." *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91 (1984).

Brinkmeyer argues that the residency requirements violate the dormant Commerce Clause because they facially discriminate against out-of-state residents, are in place for economic protectionist reasons, and none of LCB's given state interests provide a legitimate basis to uphold them. Dkt. 34 at 12–18; Dkt. 43 at 14–22. LCB, however, argues that Brinkmeyer skips a step in his analysis by ignoring a threshold question:

1    whether the dormant Commerce Clause even applies. Dkt. 39 at 18–20; Dkt. 42 at 10–12.

2    It argues that the dormant Commerce Clause does not apply to a federally illegal market.

3    Dkt. 39 at 19–20; Dkt. 42 at 10–12. It further argues that, even if the dormant Commerce

4    Clause applies, Congress has granted states permission to create intrastate cannabis

5    markets and that its justifications provide sufficient basis to uphold the residency

6    requirements. Dkt. 39 at 18–19, 21–23; Dkt. 42 at 12–20.

7            The Court agrees with LCB that it must first address the question of whether the

8    dormant Commerce Clause applies.

9            **a.      The dormant Commerce Clause does not apply to federally illegal**
     **markets.**

10

11          LCB argues that for the dormant Commerce Clause to apply, a national market

12   must exist, and that it cannot apply when there is no *legal* interstate market. Dkt. 39 at

13   19–20. In support of its argument, LCB cites two cases where courts held the dormant

14   Commerce Clause was inapplicable to goods that were illegal to sell. *Id.* at 20 (citing

15   *Predka v. Iowa*, 186 F.3d 1082, 1085 (8th Cir. 1999); *Terk v. Ruch*, 655 F. Supp. 205,

16   215 (D. Colo. 1987)). Brinkmeyer points to other federal courts that have ruled their

17   respective states' residency requirements violate the dormant Commerce Clause, despite

18   cannabis's federally illegal status. Dkt. 34 at 18–21.

19          Congress's Commerce Clause power has been read to apply broadly to "regulate

20   purely local activities that are part of an economic 'class of activities' that have a

21   substantial effect on interstate commerce." *Gonzalez v. Raich*, 545 U.S. 1, 17 (2005).

22   That power includes the ability to deem certain substances federally illegal. *See, e.g.*, *id.*

at 19 (concluding that the prohibition of marijuana under the CSA was "squarely within Congress' commerce power because production of the commodity meant for home consumption . . . has a substantial effect on supply and demand in the national market for that commodity"). Under the Constitution's Supremacy Clause and preemption doctrine, once Congress has deemed a substance federally illegal, states do not then have the power to "legalize" the same substance. *See* U.S. Const. art. VI, cl. 2 (declaring that federal law is the "supreme Law of the Land"); *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) ("[S]tate laws that conflict with federal law are without effect." (internal quotation marks omitted)). States may enact laws that are consistent with congressional intent, but not contrary to it. *Chae v. SLM Corp.*, 593 F.3d 936, 941 (9th Cir. 2010) (explaining federal preemption applies when "state law actually conflicts with federal law").

Despite Congress prohibiting the sale and use of cannabis under the CSA and despite preemption doctrine, Washington, and most other states, have purported to legalize cannabis under state law. Brinkmeyer does not challenge the legality of Washington's cannabis market. Indeed, he wants the market to exist, and he wants to participate in it.

The problem, however, is that cannabis remains federally illegal. Conceptually, the dormant Commerce Clause exists to "preserve[] a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *Gen. Motors v. Tracy*, 519 U.S. 278, 299 (1997). In other words, it is designed to protect interstate commerce. No party in this case suggests that citizens have a federal statutory or constitutional property right to cannabis while it remains federally

1    illegal and, in fact, they do not. *See Shulman v. Kaplan*, -- F.4th --, 2023 WL 225625, at

2    *5 (9th Cir. Jan. 18, 2023) (quoting the CSA in saying that "substances which have been

3    manufactured, distributed, dispensed, or acquired in violation of [the CSA], shall be

4    subject to forfeiture to the United States and *no property right shall exist in them*."

5    (emphasis in original) (internal quotation marks omitted); *see also, e.g.*, *Grandpa Bud,*

6    *LLC v. Chelan Cnty. Wash.*, No. 19-cv-51 RMP, 2020 WL 2736984, at *4 (E.D. Wash.

7    May 26, 2020) ("Even when cannabis production is a legitimate use of one's property at

8    the state level, such use is not recognized as a protectable property interest under the U.S.

9    Constitution.").

10         Similarly, citizens do not have a legal interest in participating in a federally illegal

11   market. *Cf. Ne. Patients Grp.*, 45 F.4th at 559 (Gelpí, J., dissenting) ("The Commerce

12   Clause does not recognize an interest in promoting a competitive market in illegal goods

13   or services or forestalling hypothetical interstate rivalries in the same."). It is not clear to

14   this Court how the dormant Commerce Clause can be read to protect *illegal* interstate

15   commerce. The Supremacy Clause, preemption, general principles of federalism, and

16   common sense suggest it does not.

17         The dormant Commerce Clause is a judicially created doctrine read into the

18   Constitution's Commerce Clause. *See Davis*, 553 U.S. at 337. The doctrine undoubtedly

19   serves an important purpose—limiting economic protectionism by states. But "it makes

20   little sense to retain the presumption that [the public interest is best served by maintaining

21   an unencumbered national market for competition] when Congress has explicitly acted to

22   make the market in question illegal." *Ne. Patients Grp.*, 45 F.4th at 559 (Gelpí, J.

dissenting). The dormant Commerce Clause does not apply to federally illegal markets, including Washington's cannabis market and, thus, it does not apply to Washington's residency requirements.

### b.   Restricting interstate commerce is in line with Congress's intent.

While the Court's analysis could certainly end there with respect to the dormant Commerce Clause, LCB asserted a second argument as to why the dormant Commerce Clause does not apply: congressional intent. The Court views the congressional approval exception as just that, an exception to the dormant Commerce Clause, and not a reason why it would not apply. Nevertheless, the Court agrees with LCB that Congress's intent is relevant given the unique situation at hand. It also chooses to analyze this issue to further explain why it refuses to follow the only circuit court to have examined this issue.

LCB argues that the congressional approval exception to the dormant Commerce Clause applies because, in deeming cannabis a Schedule I drug in the CSA, Congress "expressly and unambiguously declared that marijuana is not among the legitimate subjects of trade and commerce for any purpose." Dkt. 39 at 18–19 (internal quotation marks omitted). It argues that the dormant Commerce Clause applies only "when Congress has not exercised its Commerce Clause power to regulate the matter at issue," and that here Congress exercised such power in enacting the CSA. *Id.* at 18 (internal quotation marks omitted) (quoting *Tenn. Wine*, 139 S. Ct. at 2459). It emphasizes that "Congress enacted the CSA to establish 'a comprehensive regime to combat the . . . interstate traffic in illicit drugs.'" *Id.* (quoting *Raich*, 545 U.S. at 13).

1    Brinkmeyer responds that neither the CSA, nor any other law, grants states the

2    authority to discriminate against out-of-state residents in their cannabis markets. Dkt. 43

3    at 15–16. He also asserts that the Court should consider Justice Thomas's recent

4    criticisms of *Raich*: "the Federal Government's current approach to marijuana bears little

5    resemblance to the watertight nationwide prohibition that a closely divided Court found

6    necessary to justify the Government's blanket prohibition in *Raich*." *Id.* at 16 (quoting

7    *Standing Akimbo, LLC v. United States*, 141 S. Ct. 2236, 2238 (2021)).

8    "When Congress so chooses, state actions which it plainly authorizes are

9    invulnerable to constitutional attack under the Commerce Clause." *Ne. Bancorp.*, 472

10   U.S. at 174. "An unambiguous indication of congressional intent is required before a

11   federal statute will be read to authorize otherwise invalid state legislation." *Maine v.*

12   *Taylor*, 477 U.S. 131, 139 (1986). The court is not permitted to read congressional intent

13   into a statute where it does not exist. *South-Central Timber*, 467 U.S. at 92–93 ("The fact

14   that the state policy in this case appears to be consistent with federal policy—or even that

15   state policy furthers the goals we might believe that Congress had in mind—is an

16   insufficient indicium of congressional intent.").

17   Courts across the country considering this issue have consistently held that

18   Congress did not expressly permit state discrimination in passing the CSA. *See, e.g.*,

19   *Finch*, 2022 WL 2073572, at *13 ("[F]or this exception to apply, Congress's direction

20   must be unmistakably clear. It is not enough to simply regulate on the matter, without

21   clearly authorizing the states' ability to restrict interstate commerce." (internal quotation

22   marks and citations omitted)); *NPG*, 2020 WL 4741913, at *10 ("[A]lthough the

1   Controlled Substances Act criminalizes marijuana, it does not affirmatively grant states

2   the power to burden interstate commerce in a manner which would otherwise not be

3   permissible. And I have no authority to invent such an affirmative grant where Congress

4   has not provided it." (internal quotation marks and citations omitted)); *Lowe*, 544 F.

5   Supp. 3d at 815 (quoting *NPG*, above)).

6          There is no dispute that Congress exercised its Commerce Clause power in

7   enacting the CSA and criminalizing cannabis. Moreover, it is true that Congress

8   continues to classify cannabis as an illegal substance, regardless of the DOJ's inability to

9   bring charges. It is also true that the CSA does not affirmatively grant states any power to

10  regulate cannabis, to create wholly intrastate markets in cannabis, or to discriminate

11  against out-of-state citizens in relation to any such state markets. Rather, the CSA flatly

12  forbids the sale and use of cannabis.

13         While courts usually look to whether Congress has explicitly granted states the

14  right to discriminate against out-of-state citizens, the traditional dormant Commerce

15  Clause analysis does not apply in this case. Courts are to interpret statutes in line with

16  congressional intent. Here, there is no doubt that Congress intended to restrict all

17  commerce in cannabis by adding it to Schedule I of the CSA. Although Washington's

18  "legalization" of cannabis certainly does not align with Congress's intent, the residency

19  requirements do. The residency requirements attempt to prevent any interstate commerce

20  in cannabis and to prevent cannabis from Washington from moving into states where it

21  remains illegal, like Idaho.

22

1        The Court does not agree with Brinkmeyer, Amici, or the First Circuit that

2   Congress has "substantially legalized" cannabis. There is no such thing. First,

3   prosecutorial discretion is not equivalent to legalization. DOJ and other prosecutorial

4   agencies frequently must make decisions about how to allocate resources. Those

5   decisions do not amount to binding law. *See Larson v. Saul*, 967 F.3d 914, 925 (9th Cir.

6   2020) ("[P]olicy statements, agency manuals, and enforcement guidelines do not carry

7   the force of law and are not entitled to *Chevron* deference."). Thus, the Cole Memo did

8   not repeal and could not have repealed the CSA. Moreover, the Cole Memo has been

9   rescinded.

10       Second, the Rohrabacher-Farr Amendment applies only to medical cannabis

11   markets. It is unclear what its application would or should be in Washington, where the

12   recreational and medical markets are consolidated.

13       Third, the Rohrabacher-Farr Amendment did not repeal the CSA. "When a later-

14   enacted statute does not repeal existing federal law, we ask whether the later-enacted

15   statute implicitly repeals earlier law." *Swinomish Indian Tribal Cmty. v. BNSF Railway

16   Co.*, 951 F.3d 1142, 1156 (9th Cir. 2020). "[R]epeals by implication are not favored."

17   *Posados v. Nat'l City Bank*, 296 U.S. 497, 503 (1936). "The intention of the legislature to

18   repeal must be clear and manifest." *United States v. Borden Co.*, 308 U.S. 188, 198

19   (1938). "An implied repeal will only be found where provisions in the two statutes are in

20   irreconcilable conflict, or where the latter Act covers the whole subject of the earlier one

21   and is clearly intended as a substitute." *Branch v. Smith*, 538 U.S. 254, 273 (2003). The

22   Rohrabacher-Farr Amendment cannot be interpreted as Congress's attempt to repeal the

1   CSA. It does not do so expressly, and it is limited to medical cannabis markets in states

2   that have legalized the substance under state law.

3       Finally, the Court finds unpersuasive the First Circuit's reliance on the

4   Rohrabacher-Farr Amendment in determining Congress's intent. As mentioned, the

5   Rohrabacher-Farr Amendment did not repeal the CSA. Moreover, it is not an exercise of

6   Congress's Commerce Clause authority and thus can have no application in the Court's

7   analysis of the dormant Commerce Clause. It does not indicate Congress's intent in

8   exercising its Commerce Clause authority. *See Ne. Bancorp.*, 472 U.S. at 174.

9       The dormant Commerce Clause does not apply to federally illegal markets such as

10  this one and Congress has clearly stated its intent for no interstate cannabis market to

11  exist.[8] The Court therefore need not review LCB's justifications for the residency

12  requirements and LCB's motion for summary judgment is GRANTED as to

13  Brinkmeyer's dormant Commerce Clause claim.

14  **C.    Privileges and Immunities Clause – Article IV**

15      Like with Brinkmeyer's dormant Commerce Clause claim, LCB first challenges

16  whether Brinkmeyer's Privileges and Immunities Clause claim is justiciable. *See* Dkt. 39

17  at 15–17. The parties' standing and ripeness arguments on this claim are the same

18  arguments that they assert regarding Brinkmeyer's dormant Commerce Clause claim.

19

20

---

21      [8] The Court acknowledges that this outcome is contrary to the majority of courts that
    have considered this issue. However, most of those courts failed to fully consider whether the
22  dormant Commerce Clause can apply to a federally illegal market.

1    Thus, the Court need not say more than that Brinkmeyer has standing to assert his Article

2    IV Privileges and Immunities Clause claim.

3         Brinkmeyer argues that Washington's residency requirements violate two

4    fundamental rights protected by the Privileges and Immunities Clause: the right to pursue

5    a livelihood and the right to travel.[9] Dkt. 34 at 22. He argues that the clause "has always

6    prohibited states from creating markets and then excluding nonresidents from those

7    markets." *Id.* at 23 (citing *Toomer v. Witsell*, 334 U.S. 385, 396 (1948)). He also argues

8    that LCB cannot show a substantial reason to support the residency requirements and

9    that, even if it could, the requirements do not bear a substantial relationship to legitimate

10   state objectives because less restrictive means are available. *Id.* at 24–26.

11        LCB argues that Brinkmeyer is misclassifying the right at issue as that of right to

12   travel or right to pursue a livelihood rather than the right to engage in interstate marijuana

13   commerce—which, of course, is not a fundamental right. Dkt. 42 at 20–21. It also argues

14   that there is no right to travel to pursue a federally *illegal* livelihood. *Id.* at 22–23.

15   Further, LCB argues that because Brinkmeyer is not asserting deprivation of a

16   fundamental right, the Court should review any potential Privileges and Immunities

17   violation under rational basis review and that Washington's residency requirements are

18   clearly rationally related to legitimate state interests. *Id.* at 25.

19        Under Article IV's Privileges and Immunities Clause, "The Citizens of each State

20   shall be entitled to all Privileges and Immunities of Citizens in the several States." In

21   _____

22        [9] The right to pursue a livelihood is classified as part of the right to travel. *See Saenz v. Roe*, 526 U.S. 489, 500–502 (1999). Therefore, the Court reviews the two rights together.

1    other words, "by virtue of a person's state citizenship, a citizen of one State who travels

2    in other States, intending to return home at the end of his journey, is entitled to enjoy the

3    'Privileges and Immunities of Citizens in the several States.'" *Saenz v. Roe*, 526 U.S.

4    489, 501 (1999). The clause was "designed to place the citizens of each State upon the

5    same footing with citizens of other States, so far as the advantages resulting from

6    citizenship in those States are concerned." *Supreme Court of Virginia v. Friedman*, 487

7    U.S. 59, 64 (1988).

8          Courts apply a two-step inquiry in determining whether a "particular instance of

9    discrimination" violates Article IV's Privileges and Immunities Clause. *United Bldg. &*

10   *Constr. Trades Council of Camden Cnty. and Vicinity v. Mayor & Council of the City of*

11   *Camden*, 465 U.S. 208, 218 (1984). First, the court determines "whether the [law]

12   burdens one of those privileges and immunities protected by the Clause." *Id.* The

13   Privileges and Immunities Clause applies only to rights and activities considered

14   "fundamental";[10] i.e., "those 'privileges' and 'immunities' bearing upon the vitality of the

15   Nation as a single entity." *Baldwin v. Fish & Game Comm'n of Montana*, 436 U.S. 371,

16   383, 388 (1978). If the burdened privilege is protected by the Clause, "the court must

17   then determine whether there are substantial reasons for the difference in treatment and if

18   _____

19        [10] LCB asserts that the Court must determine whether the right is "fundamental," and, if it
     is not, to apply rational basis review. *See* Dkt. 39 at 24. This is not true in relation to the
20   Privileges and Immunities Clause; if the implicated right is not "fundamental," the Clause simply
     does not apply, and the inquiry ends there. *See, e.g.*, *Baldwin*, 436 U.S. at 388 (ending the
21   inquiry after determining the right at issue was not fundamental); *United Bldg.*, 465 U.S. at 219
     (explaining the threshold step is to determine whether a right is "sufficiently fundamental to the
22   promotion of interstate harmony so as to fall within the purview of the Privileges and Immunities
     Clause" (internal quotation marks omitted)).

1  such reasons exist, whether the 'degree of discrimination bears a close relation to them.'"

2  *United Bldg.*, 960 F. Supp. at 829 (quoting *Toomer*, 334 U.S. at 396).

3  The Privileges and Immunities Clause "plainly and unmistakably secures and

4  protects the right of a citizen of one State to pass into any other State of the Union for the

5  purpose of engaging in *lawful* commerce, trade, or business without molestation." *Hicklin*

6  *v. Orbeck*, 437 U.S. 518, 525 (1978) (quoting *Ward v. State*, 79 U.S. 418, 430 (1870))

7  (emphasis added); *see also United Bldg.*, 465 U.S. at 219 ("[T]he pursuit of a common

8  calling is one of the most fundamental of those privileges protected by the Clause.")).

9  Nevertheless, it has never been established that there is any right, under the Privileges

10 and Immunities Clause or any other part of the Constitution, to engage in illegal

11 commerce. Such a "right" does not "bear on the vitality of the Nation as a single entity."

12 *see Baldwin*, 436 U.S. at 388.

13 Washington has established a comprehensive market governing the sale of

14 cannabis in the state, including granting to its own residents (of more than six months)

15 the privilege of selling cannabis with a license without fear of prosecution under state

16 law. It has simultaneously denied that right to nonresidents. The Privileges and

17 Immunities Clause does not apply, however, because the right asserted here, to engage in

18 commerce that remains federally illegal, is not a fundamental one.

19 The Privileges and Immunities Clause of Article IV does not apply to

20 Washington's residency requirements because they do not burden a fundamental right.

21 LCB's motion for summary judgment is therefore GRANTED as to that claim.

22

1

**D.      Equal Protection Clause**

2          Brinkmeyer seems to assert both that Washington's residency requirements violate

3   the Equal Protection Clause because they discriminate against new citizens by making

4   them wait six months before being eligible for a license and because they discriminate

5   against out-of-state citizens by disqualifying them from the market altogether.

6          LCB argues that Brinkmeyer does not have standing to assert the first part of his

7   Equal Protection Clause claim because the claim is based on the constitutionality of

8   treating new state residents different than existing state residents. Dkt. 39 at 16. To the

9   extent Brinkmeyer intends to challenge Washington's residency requirements under the

10  argument that new residents must be treated like existing residents, he lacks standing to

11  assert such a challenge. *See* Dkt. 34 at 26. Brinkmeyer has made clear he is not a

12  Washington resident and does not intend on becoming one. Thus, he has not asserted an

13  injury in fact for such a claim.

14         LCB also argues that Brinkmeyer does not have standing to assert the second part

15  of his Equal Protection Clause claim because the clause does not protect the rights of out-

16  of-state citizens in relation to in-state citizens. Dkt. 39 at 16 (citing *Saenz*, 526 U.S. at

17  502–03; *Zobel v. Williams*, 457 U.S. 55, 59–60 (1982)). This is not always true. In

18  *Metropolitan Life Insurance Co. v. Ward*, for example, the Supreme Court explained that

19  the Equal Protection Clause is a viable "means of challenging a statute that seeks to

20  benefit domestic industry within the State only by grossly discriminating against foreign

21  competitors." 470 U.S. 869, 879 (1985).

22

1        Under the Equal Protection Clause of the Fourteenth Amendment, no state shall

2    "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const.,

3    Amdt. 14, § 1. In essence, the clause "mandates that similarly situated persons be treated

4    alike." *Nw. Grocery Ass'n v. City of Seattle*, 526 F. Supp. 3d 884, 893 (W.D. Wash.

5    2021) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). "[I]f a law neither burdens a

6    fundamental right nor targets a suspect class, [the court] will uphold the legislative

7    classification so long as it bears a rational relation to some legitimate end." *Romer v.*

8    *Evans*, 517 U.S. 620, 631 (1996).

9        Brinkmeyer does not argue that a suspect class is at issue here, but rather that

10   Washington's residency requirements are based on a classification that implicates a

11   fundamental right: the right to travel. Dkt. 34 at 26. Yet again, while the right to travel to

12   engage in lawful commerce is an established fundamental right, the same is not true for

13   the right to travel to another state to engage in federally illegal activity. The residency

14   requirements are thus not based on a classification that implicates a fundamental right.

15   Therefore, the requirements are analyzed under rational basis review.

16       A law survives rational basis review if it "bears a rational relation to some

17   legitimate end." *Romer*, 517 U.S. at 631; *see also Pena v. Lindley*, 898 F.3d 969, 986 (9th

18   Cir. 2018). A law reviewed under the rational basis standard bears "a strong presumption

19   of validity" and the attacking party has the burden "to negative every conceivable basis

20   which might support it." *F.C.C. v. Beach Commc'ns*, 508 U.S. 307, 314–15 (1993).

21   Whether the given reason actually motivated the legislature is irrelevant to the

22   constitutional analysis. *Id.* at 315.

1    LCB asserts that Washington's residency requirements assist the state in

2  "regulating a product that attracts organized crime." Dkt. 42 at 25. It argues that

3  attempting to keep cannabis away from organized criminal activity is a legitimate state

4  interest and that the residency requirements are related to that interest. *Id.* (citing *Chance*

5  *Mgmt., Inc. v. State of South Dakota*, 97 F.3d 1107, 1114–15 (8th Cir. 1996) (upholding a

6  residency requirement for gambling licenses in part because "gambling is generally

7  understood to have a greater tendency to attract criminal infiltration than most other types

8  of business enterprises")).

9    Brinkmeyer argues that Washington's existing regulatory regime, absent the

10  residency requirements, "fully accounts for any legitimate interests the State may have."

11  Dkt. 43 at 27. For example, Brinkmeyer argues that the residency requirements are not

12  necessary to investigate applicants' backgrounds because LCB already conducts a

13  thorough investigation of all applicants under other existing regulations. *Id.*

14    Many of LCB's goals for Washington's residency requirements are legitimate and

15  the residency requirements are rationally related to those goals. Most persuasive to the

16  Court is LCB's assertion that the residency requirements serve to advance the state's goal

17  of preventing Washington's legal cannabis from being associated with criminal activity

18  or diverted to black markets in states where the substance remains illegal under state law.

19  *See* Dkt. 32, ¶ 8; Dkt. 33, ¶ 2. This is especially concerning in a market such as cannabis

20  where an illegal market continues to exist alongside the state's legal market.

21    Brinkmeyer's argument in response, that Washington's existing regulations are

22  sufficient to address the state's interest, fails. Unlike under strict scrutiny, the state's

1    means need not be narrowly tailored or necessary to achieve its goals. He cites to *Gulch*

2    *Gaming, Inc. v. State of South Dakota*, 781 F. Supp. 621, 632–32 (D.S.D. Dec. 20, 1991)

3    to support his argument that residency requirements are not rationally related to the goals

4    of preventing illegal or dangerous activity or conducting thorough investigations.

5          There are two main differences in this case, however. Cannabis remains federally

6    illegal and can be diverted into illegal markets in ways that gambling cannot.[11] Further, in

7    *Gulch Gaming*, non-residents were allowed to obtain a gaming license, they just could

8    not hold a majority ownership interest. 781 F. Supp. at 632. In Washington, nonresidents

9    cannot hold any interest in cannabis licenses.[12]

10         Washington's residency requirements do not violate the Fourteenth Amendment's

11   Equal Protection Clause. LCB's summary judgment motion on that claim is therefore

12   GRANTED.

13   **E.      Privileges or Immunities Clause – Fourteenth Amendment**

14         Brinkmeyer argues that Washington's residency requirements violate the

15   Fourteenth Amendment's Privileges or Immunities Clause because they burden the right

16   to travel. Dkt. 34 at 26. Brinkmeyer's primary assertion seems to be that the residency

17

---

18         [11] Courts have recognized that gambling has a close relationship with organized crime.
     *See, e.g.*, *Chance Mgmt.*, 97 F.3d at 1115. Cannabis, however, can be illegally transported and
19   sold across state lines, including in states where it remains illegal, making residency
     requirements much more relevant to cannabis regulation than the regulation of South Dakota's
20   gambling market.

           [12] Nonresidents can provide financial support for cannabis businesses, as Brinkmeyer has.
21   LCB argues that that distinction makes sense because owners, generally not financiers, are
     responsible for any criminal conduct that may occur. *See* Dkt. 32 at 9 (citing Wash. Admin. Code
22   314-55-10(4) (2016)).

1   requirements burden the right to travel "because they discriminate between newly arrived

2   bona fide residents and those residing in the state for over six months." *Id.*

3        LCB argues that Brinkmeyer does not have standing to assert his Privileges or

4   Immunities Clause claim because it protects the rights of citizens new to a state in

5   relation to established state citizens. Dkt. 39 at 16 (citing *Saenz*, 526 U.S. at 502–03;

6   *Zobel*, 457 U.S. at 59–60).

7        The Privileges or Immunities Clause of the Fourteenth Amendment protects "the

8   right of the newly arrived citizen to the same privileges and immunities enjoyed by other

9   citizens of the same State." *Saenz*, 526 U.S. at 502. As LCB points out, Brinkmeyer is not

10  a Washington citizen and does not intend to become one. In fact, he wishes to remain in

11  Idaho, which is why he is challenging Washington's residency requirements.

12       To the extent Brinkmeyer is asserting that Washington's residency requirements

13  violate the Privileges or Immunities Clause because they discriminate against new

14  Washington citizens in relation to established Washington citizens, he lacks standing. To

15  the extent he is instead attempting to challenge the requirements because they

16  discriminate against out-of-state citizens in relation to in-state citizens, the Privileges or

17  Immunities Clause does not authorize a cause of action for such a challenge. LCB's

18  motion for summary judgment is therefore GRANTED as to the Fourteenth

19  Amendment's Privileges or Immunities Clause.

20  **F.     Due Process Clause**

21       Brinkmeyer concedes his Due Process Clause claim is subject to rational basis

22  review. Dkt. 43 at 27. As explained above, Washington's residency requirements survive

1   rational basis review. Brinkmeyer's Due Process Clause claim therefore fails, and LCB's

2   motion for summary judgment is GRANTED as to that claim.

3                                        **V.   ORDER**

4          Therefore, it is hereby **ORDERED** that Petitioner Todd Brinkmeyer's Motion for

5   Summary Judgment, Dkt. 34, is **DENIED**, and Respondent Washington State Liquor and

6   Cannabis Board's Motion for Summary Judgment, Dkt. 39, is **GRANTED**.

7          The Clerk shall enter a **JUDGMENT** and close the case.

8          Dated this 7th day of February, 2023.

9

10                                        _____

11                                        BENJAMIN H. SETTLE
                                          United States District Judge

12

13

14

15

16

17

18

19

20

21

22